UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BRIAN HAWKS,

                    Plaintiff,          New York, N.Y.

            v.                    09 Civ. 9923 (RMB)

C. GUNSETT, D. MAZELLA, E.
CRUZ, C. GRAVELINE,

                    Defendants.

------------------------------x

                                      July 22, 2013
                                      10:55 a.m.

Before:

                    HON. RICHARD M. BERMAN,

                                          District Judge

                          APPEARANCES

LITTLER MENDELSON
      Attorneys for Plaintiff
BY:  IVAN R. NOVICH
      LAUREN J. MARCUS

ERIC T. SCHNEIDERMAN
      Attorney General of the State of New York
BY:  MARY KIM
      JASON CLARK
      Assistant Attorneys General

1          (In open court)

2          THE COURT:  So welcome, Mr. Hawks.

3          Before we call in the jury and start jury selection, I

4     have a few housekeeping matters.

5          The first is that one of my law clerks has handed out

6     some documents which we will label prospectively as court

7     exhibits.  One is a copy of the limiting instruction that we

8     discussed for quite some time that I propose to give at

9     appropriate points in testimony and I would like counsel to

10    have the responsibility of reminding me when you want that

11    limiting instruction given during the trial.  It will also be

12    included in the final jury instructions.

13         Second is we have got a copy of the draft jury

14    instructions.  In your spare time you could start looking over

15    them.  We won't have a charge conference for a day or two.  But

16    you will have them.  There is a draft verdict sheet in there or

17    verdict sheet, and then there is also materials in the event

18    that we get to punitive damages.  So there are instructions and

19    a verdict sheet about that as well.  As I say, we will mark

20    that Court Exhibits A, B, C, D and E.  I think there are five

21    documents.

22         Then two preliminary matters I just wanted to go over.

23    So with respect to some of the motions in limine and some of

24    the prior rulings -- in particular, I'm referring to

25    conferences on July 9 and July 15 -- one point I want to make

1  clear is that with respect to controverted testimony that I

2  agreed to allow, I just wanted you to be comfortable that I

3  have done the appropriate balancing test for 403 and in

4  determining that some of that information can come in, I have

5  determined that the probative value outweighs any prejudice.

6  Some citations for you are Federal Rule of Evidence 403; also a

7  case called *Huddleston v. United States*, 485 U.S. 681, and also

8  a Second Circuit case *U.S. v. Gilan*, 967 F.2d 776 (1992).

9  Another citation you could look at is *United States v.*

10 *Ozsusamlar*, 428 F.Supp.2d, a Southern District case from 2006.

11 Also, *United States v. Livoti,* 8 F.Supp.2d 250, a Southern

12 District case from 1998; and *Eng v. Scully,* 146 F.R.D. 74, a

13 Southern District case from 1993.  It is in connection with

14 those cases and those issues that I will give an appropriate

15 limiting instruction.

16      Also there was some discussion about documents, which

17 I don't think we completed, documents that should be barred --

18 this was a plaintiff's motion -- because they were not timely

19 produced during discovery.  In particular, I think you were

20 talking about the report and recommendation and the

21 superintendent hearing disposition, a Mr. Haber report, and you

22 recall that I have already found that those documents are

23 excluded in any event but some testimony related or the subject

24 of those documents is allowed.  The citation *Ebewo v. Martinez*,

25 309 F.Supp.2d 600.

D7MHHAW1

1    The rationale for part of that ruling is that the

2  defendants had timely produced to plaintiff a printout of his

3  disciplinary history in their responses to plaintiff's

4  interrogatories and that was consistent with Rule 26.  The cite

5  is *Gary Price Studios v. Randolph Rose Collection*.  The Civ.

6  number is No. 3 Civ. 969, a case from 2006.

7    And second, I will point out that I don't believe

8  there would be any prejudice because the production of

9  plaintiff's disciplinary history printout did put plaintiff on

10  notice that that history might be at issue in the case and

11  introduced allowed sufficient time in my opinion to prepare and

12  respond; and second, I believe that plaintiff had the documents

13  in his possession already.

14    The cites are *Bonanno v. Verizon New York*, 06 Civ.

15  667, a case from the Southern District in 2011, and also *Gary*

16  *Price Studios*.  The cite is 2000 WL 2381817 as well.

17    (Continued on next page)

18

19

20

21

22

23

24

25

D7m6haw2

1          THE COURT:  With that we're awaiting the jury.  I

2     think they will be here if they are not here already.  When we

3     call them in and when they go in and out, typically we all

4     stand as the jury comes and goes.

5          Yes, sir.

6          MR. NOVICH:  Good morning, your Honor.  Your Honor, I

7     didn't get a chance to speak to Mr. Hawks this morning.  Is it

8     okay if I take the time now?

9          THE COURT:  Sure.

10          MR. NOVICH:  Is it okay if I approach him?

11          THE COURT:  Absolutely.  Absolutely.

12          Ms. Marcus, you are also welcome during the trial to

13     slide over closer to Mr. Hawks.

14          MS. MARCUS:  Thank you.

15          (Recess)

16          THE COURT:  Please be seated everybody.

17          To the members of the panel of prospective jurors,

18     good morning and welcome to the United States District Court

19     for the Southern District of New York.  We're going to wait a

20     minute.  There are apparently some more jurors in the rest

21     room.

22          (Pause)

23          THE COURT:  Good morning, everybody.  My name is Judge

24     Richard Berman.  I am assisted in this trial today by my law

25     clerks, Jackie Siegel to my left, your right, and also we have

1    helping us David Imamura and Alex Reid in the back.

2            First of all, let me thank you all for being here.

3    Your presence reflects your commitment to your civic

4    responsibilities and despite some inconvenience that I know

5    jury service may cause some of you.  Jury service, however, is

6    one of the most important duties of being a citizen and our

7    system of justice depends on you.  I, like my fellow judges

8    here in the Southern District and the parties in this case, are

9    very grateful for your sacrifice.

10           So the pending case that we're going to talk about in

11   a little more detail in just a minute or two is what we call a

12   civil case as opposed to a criminal action.  I anticipate that

13   this trial will last approximately four days.  I anticipate

14   that the jury that ultimately gets selected here this morning

15   will be charged or given, that is to say, the final jury

16   charges on or before Thursday of this week and perhaps

17   Wednesday.  We'll see.  You should be aware that unexpected

18   events can always occur in a trial and there is the possibility

19   that the presentation of evidence and jury deliberations can

20   spillover a day or more.

21           In terms of the actual trial schedule, I anticipate

22   conducting trial each day from promptly 9:30 a.m. to 12:45 p.m.

23   and then we have a lunch break and pick up usually at 2:15 p.m.

24   and then we conclude each day at 4:45 p.m.  Normally also there

25   is a break or two in the midmorning if the jurors need it and

D7m6haw2

1    perhaps at the afternoon, no more than five minutes in each

2    instance probably.

3        After the case is presented to you in court, I will

4    instruct the jury on the law that applies in this case and the

5    jury will then retire to deliberate to the jury room, which

6    happens to be in the back of the courtroom behind that door

7    under the clock.  Those deliberations can take as much time or

8    as little time as the jurors feel is appropriate.  Your duty

9    for those who are selected as jurors will be to act as the

10   determiners of the facts of this case.  As I just indicated, I

11   as the presiding judge am the determiner of the law and will

12   instruct the jury on the law through jury charges at the end of

13   the case.

14       So you are here this morning to start these

15   proceedings by helping me select the jury.  The vital function

16   of jurors in our system of justice is to afford the parties in

17   a litigation, any litigation, a fair trial.  To do so jurors

18   must be free from any preconceived notions or any sympathies to

19   one side or the other or prejudices that might prevent them

20   from returning a fair and just verdict based solely on the

21   evidence that is presented here in court.  In order to give the

22   parties in this action comfort that you do not have anything in

23   your backgrounds that might improperly affect you as a juror in

24   this case, I am going to be asking certain questions of you in

25   just a minute or so.  That is known as the voir dire process.

1          Although some of my questions may appear personal, the

2    purpose of the questioning is certainly not to embarrass you

3    but simply to develop enough information to determine whether

4    you will sit as a juror in this particular case.  If your

5    response to any of my questions is personal in nature, you may

6    ask to approach the bench to respond privately.  That we will

7    do in this area to in front of the bench.  My left, your right.

8    After I ask my questions, the initial series of questions, some

9    of you may be excused "for cause" we call it.  That means that

10   for a reason determined by me to be sufficient legal grounds,

11   you are not going to sit as a juror in this case as a matter of

12   law.  An example might be that you are related to or are

13   friends with one of the witnesses or one of the parties or one

14   of the attorneys.  That would be a for cause reason to excuse a

15   juror.

16         Others of you may later be excused for "peremptorily"

17   we call it.  That means that one of the attorneys will request,

18   as is their right under our system, to have certain other

19   jurors excused without giving a reason.  As you can well

20   imagine responses to the relatively few questions that we ask

21   cannot give a thorough picture of you as a person and being

22   excused either for cause or peremptorily is certainly not the

23   reflection of you as a citizen or as a person.

24         So before we get started, I am going to ask all the

25   jurors to stand and I will ask Christine Murray to administer

1    the oath that you will answer my questions during voir dire

2    truthfully.

3            THE DEPUTY CLERK:  If you could all rise your right

4    hands, please.

5            (Jury panel sworn)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         THE COURT:  The next step is we are going to ask the

2    jurors to please stand for a minute while Christine administers

3    your oath as jurors.

4         (A jury of eight was selected and sworn)

5         THE COURT:  As I said before, and it is still true, we

6    are moving along quite nicely.  What is going to happen now is

7    I am going to give you what are called preliminary

8    instructions.  Not the final legal instructions, just some

9    preliminary instructions about being a juror.  Then we are

10   going to have opening statements by the plaintiff's counsel and

11   defense counsel and then we will have our first witness on the

12   witness stand.

13        So here are the preliminary instructions to the jury.

14        So now that you have been sworn, I am going to tell

15   you something about your duties as jurors.  At the end of the

16   trial, as I have said a couple of times, I will give you more

17   detailed instructions and those instructions will control your

18   deliberations.  So at the end of the presentation of evidence

19   and my final charges to you, it will then be your duty to

20   decide from the evidence in this case what the facts are.

21        You, and you alone -- you, the jurors -- are the

22   judges of the facts.  You will hear the evidence, decide what

23   the facts are, and then apply those facts to the law which I

24   will give to you.  That is how you reach your verdict.  In

25   doing so, you must follow the law whether or not you agree with

1    it.

2          Preliminarily, I should say, you should not take

3    anything I may say during the trial as indicating what your

4    verdict should be.  For example, don't be influenced by my

5    taking notes.  What I write down may have nothing to do with

6    the trial or what you need to be concerned with during the

7    trial.

8          With respect to notes, I have no problem with jurors

9    taking notes.  In fact, Christine will give you legal pads and

10   pens if you want to take notes.  I will tell you in advance,

11   and then I will tell you again at the end, your own notes are

12   not evidence in this case.  They are just your own particular

13   personal aids, but you are welcome to take notes.

14         So you will ultimately decide what the facts are from

15   the evidence that is presented here in court.  That evidence

16   may consist of the testimony of witnesses, it may consist of

17   documents or other things received into evidence as exhibits,

18   and it may consist of any facts which the lawyers may agree to

19   or stipulate or that I may instruct you to find.

20         So generally speaking, there are two kinds of

21   evidence.  One is called direct evidence and one is called

22   circumstantial evidence.

23         Direct evidence is testimony by a witness, for

24   example, about what that witness personally saw or heard or did

25   or felt or touched.

1    Circumstantial evidence is indirect evidence.  That

2  is, it is proof of one or more facts from which you can find

3  another fact.

4    You may consider both direct and circumstantial

5  evidence in deciding this case.  The law permits you to give

6  equal weight or no weight to the kind of evidence.  It is up to

7  you to decide how much weight to give any evidence that is

8  presented to you.

9    As the sole determiners of the facts, you, the jurors,

10  must determine which of the witnesses you believe, what portion

11  of their testimony you accept, and what weight you attach to

12  it.

13    At times during the trial I may sustain objections to

14  a question asked when the objection comes from the lawyer.

15  When that happens, if I sustain an objection, I will not permit

16  the witness to answer the question or if, as sometimes happens,

17  the witness has already answered, I shall instruct that the

18  answer be stricken from the record and that you, the jurors,

19  disregard it and dismiss it from your minds.

20    In reaching your decision, you may not draw any

21  inference from an unanswered question where an objection has

22  been sustained.  Nor may you consider testimony that I may have

23  ordered stricken from the record.

24    The law requires that your decision be made solely

25  based on the evidence before you, and so the items that I may

1    exclude from your consideration will be excluded because they

2    are not legally admissible as evidence.  The law does not,

3    however, require you to accept all the evidence that I admit in

4    or allow to be admitted into the trial.  In determining what

5    evidence you will accept, you must make your own evaluations of

6    the testimony given by each of the witnesses and of the

7    documents presented to you and you determine the weight you

8    choose to give each witness's testimony or to a particular

9    exhibit.

10            There is no magic formula by which you evaluate

11   testimony or exhibits.  I will, however, give you some

12   guidelines for determining credibility of witnesses at the end

13   of the case.

14            At this time, suffice it to say, you bring with you to

15   this courtroom all of the experience and background of your

16   lives.  You do not leave your common sense outside the

17   courtroom.  So the same types of assessments that you use in

18   your everyday dealings are the assessments that you apply in

19   your deliberations.

20            (Continued on next page)

21

22

23

24

25

1    THE COURT:  Let me say a word or two about what is not

2    evidence.  The questions and objections that the attorneys are

3    not evidence and neither is testimony that I may instruct you

4    to disregard.  The statements and arguments of the attorneys

5    during any part of the trial are also not evidence.  That

6    includes openings and closings.  That is not evidence.

7    Further, anything that you may see or hear when the

8    court is not in session, even if what you see and hear were to

9    have something to do with the case or be said by one of the

10   parties or one of the witnesses, that would not be evidence.

11   Only what is admitted into evidence here in court when the

12   court is in session and all of the parties and all of the

13   jurors are present may be considered as evidence.  There is

14   other things about the conduct of the jury, which I'll leave

15   out for now and tell you before you go home today.  We always

16   end at 4:45 by the way.

17   I do want to say one thing about burden of proof.

18   Remember, this is a civil case and those of you who may be

19   familiar with criminal cases undoubtedly know that there the

20   requirement is proof beyond a reasonable doubt.  That

21   requirement does not apply to a civil case such as this one.

22   That you should put it out of your mind.  In civil cases such

23   as this one, the burden is different and it is called proof by

24   a preponderance of the evidence I will in my final charges

25   instruct you more fully on the meaning of this burden of proof

1    by a preponderance of the evidence.

2         So as for the outline of the trial, and you probably

3    know this already, but first each side through counsel may make

4    an opening statement.  An opening statement is not evidence.

5    It is an outline of what that party intends to prove at trial

6    and it is offered to help you follow the evidence.  Next, the

7    plaintiff will present a witness or witnesses and the defendant

8    may cross-examine the plaintiff's witnesses.  Then the

9    defendants will present witnesses or a witness and plaintiff's

10   counsel may cross-examine them.  After that the attorneys will

11   make their closings arguments to summarize and give you their

12   interpretation of what the evidence in this case has proven.

13   Just like opening statements, the closing arguments are not

14   evidence themselves.

15        After the closing arguments or summations, then I will

16   give you the instructions on the law and then you will retire

17   to deliberate on your verdict.  Just as a heads up it is my

18   practice that when that time comes and when you go into the

19   jury room, I will actually give each of you a copy of the final

20   jury instructions.  So it will save you a little wear and tear

21   of trying to take notes on those subjects.  Please don't make

22   up your mind about what the verdict should be in this case

23   until after I have instructed you on the law at the end of the

24   case and you have gone into the jury room and you and your

25   fellow jurors have discussed the evidence.  Keep an open mind

1   until then.  Both parties deserve and the law requires that you

2   give them a full opportunity to be heard.

3          Now we'll start with plaintiff's counsel's opening

4   statement.

5          MR. NOVICH:  Thank you, your Honor.

6          "I told you we would get you."  That is what one of

7   the defendants said to Brian Hawks after they brutally and

8   savagely beat him.  Abuse of power, misuse of authority, people

9   in power taking things too far because they feel they can get

10  away with it.  This is a case about prison guards, the

11  defendants, who abused their power, who misused their

12  authority, who took things too far because they thought they

13  could get away with it and who engaged in excessive force by

14  savagely, brutally and maliciously beating Brian Hawks.

15         Now, let me take you back.  The pivotal date in this

16  case is November 1st, 2007.  I want you to imagine now that you

17  are a fly on the wall in Green Haven Correctional Facility,

18  Brian Hawks is an inmate and you can see him there.  You can

19  see the fiberglass cast that is on his right arm.  It stretches

20  to his wrist to just shy of his elbow.  Mr. Hawks has a

21  fractured left wrist.  He has got a swollen arm.  He has got

22  limited mobility with his fingers and he cannot make a closed

23  fist.  On November 1st, 2007 Brian Hawks is being transported

24  from Green Haven to the Regional Medical Center Unit at Fish

25  Kill Correctional Facility.  It is also known as the RMU,

1    regional medical unit.  He is going there in order to receive

2    medical treatment, physical therapy for his fractured wrist.

3    He received that fractured wrist just two months prior when

4    other prison guards at Green Haven savagely beat him so bad

5    that they put him in the hospital.

6         Now, prior to November 1st, 2007 Brian Hawks has gone

7    to the Fish Kill RMU to receive physical therapy.  He has gone

8    there multiple times.  Each time without any incident, without

9    any altercation, without any problem.  But on November 1st,

10   2007, unbeknownst to Brian Hawks all of that is going to change

11   because on that day the Defendant Clifford Gunsett was

12   transporting Mr. Hawks from Green Haven to the Fish Kill RMU.

13   Defendant Gunsett who is a prison guard at Green Haven, he is

14   not a transportation officer.  He has received no training on

15   transporting inmates to medical facilities.  He doesn't even

16   know who is in charge that day and he has never been to the

17   Fish Kill RMU before.

18        Now, prior to November 1st, 2007 the Defendant Gunsett

19   does not know Brian Hawks.  He has never met him.  He has never

20   spoken to him.  According to Defendant Gunsett he supposedly

21   has never heard of him either.  So when he transports him to

22   the Fish Kill RMU to receive physical therapy, Mr. Harkins is

23   assembled in a room with other inmates who are also receiving

24   medical treatment that day.  He is unshackled and he is

25   instructed, ordered to put his hands in his pockets for

1  security reasons.  Mr. Hawks does that, but he does it with

2  some difficulty because he has the craft because he has the

3  fractured wrist.  He does it but there is some pain and

4  discomfort.

5       Now, Defendant Gunsett claims that he never even saw

6  the cast that day and he doesn't ask Mr. Hawks, Is something

7  wrong?  What is medically wrong with you?  Are you having some

8  difficulty?  He doesn't ask him any questions.  Instead,

9  Defendant Gunsett who has never met this man, who has never

10  spoken to him, Defendant Gunsett profiles him and he profiles

11  him by incorrectly assuming that the difficulty that Mr. Hawks

12  is having putting his hands in his pockets is battling him, is

13  resisting.  He also profiles Mr. Hawks by incorrectly assuming

14  that he is being disrespectful to a officer, which is not the

15  case at all.

16       Now, the next scene that you can see is Mr. Hawks who

17  is unshackled with the other inmates, he is going upstairs to

18  receive physical therapy.  He does.  They cut his cast down to

19  his wrist.  He still has the cast on.  He still has the

20  fractured wrist, he still has the limited mobility with his

21  hand, and he still cannot make a closed fist.  Just like the

22  prior times when he has been to Fish Kill RMU, there are no

23  issues, he has no conflicts, he has no altercation with medical

24  staff or providers there.

25       When he is done with his physical therapy, Mr. Hawks

1   comes back down to a room where the other inmates who received

2   medical treatment that day were going to be transported back to

3   Green Haven.  It is called the bullpen.  They are all these

4   benches.  All of these inmates are assembled together.  They

5   are waiting to be shackled and then to be transported back to

6   Green Haven.  That day something different happens.  Defendant

7   Gunsett isolates Mr. Hawks from the rest of the inmates.  He

8   separates him and you can see Mr. Hawks is now in a room by

9   himself on a bench with his hand in his pockets even though it

10  is difficult and he is waiting for Defendant Gunsett to give

11  him the next set of instructions or commands, but those

12  instructions never come.

13          Instead, the defendant punches Mr. Hawks multiple

14  times in the head, in the face, on the right side, on the eye

15  and be Mr. Hawks falls to the ground on his back.  Defendant

16  David Mazzella who is also another prison guard at Green Haven

17  he is in that room, too.  After Defendant Gunsett jumps on

18  Mr. Hawks, Defendant Mazzella jumps on top of him as well.  The

19  other two defendants, Cruz and Graveline, they are in adjoining

20  rooms.  They hear the commotion that is going on.  They rush

21  into the room where Mr. Hawks has been isolated and separated

22  from the other inmates.  They join in the fray as well and you

23  can see a pile of bodies on top of Mr. Hawks.  It is as if he

24  is on the bottom of a football pile and the guards are using

25  him as a human punching bag.  They are pummeling him.  They are

1   raining down strikes and blows.  You can smell the stench of

2   terror and fear emanating from Mr. Hawks' pours.  He is

3   terrified for his life.

4           He uses his one good arm and the only other thing that

5   he has to defend himself, his teeth, to get the guards off of

6   him.  He can't.  There are too many of them.  They are too

7   strong.  They are too big.  The guards role him over on his

8   stomach, they put his arms behind his back, they handcuff him,

9   pick him up, and they smash him against the hard, cold concrete

10  wall.  Now you can see Mr. Hawks' face.  It is covered in

11  blood.  It is tattooed with abrasions and lacerations on his

12  face, on his eye, on his head.  He has got redness on his upper

13  chest, back, on his elbow, on his knee.  The right side of his

14  face is puffy.  It is sticking out.

15          That is when he is pushed up against that wall.

16  Mr. Hawks tries to look back to try and avoid those oncoming

17  blows coming in, trying to avoid them.  Defendant Gunsett

18  smacks him against the face to turn around.  That is when

19  Defendant Mazzella says to Mr. Hawks, "See, I told you we would

20  get you."  That statement refers to an incident that happened

21  two months before when one of their fellow prison guards and

22  David Mazzella's friend savagely beat Mr. Hawks so bad he put

23  him in the hospital and he gave him that fractured wrist.

24          Now, I don't have any videotape of this assault to

25  show you.  I wish I did.  The defendants say no such videotape

1    exists.  Even though this is a highly traffic area, even though

2    inmates and guards come into contact in this area where the

3    assault took place on Mr. Hawks all the time.  No video exists.

4          You are going to hear from Mr. Harkins.  He is going

5    to tell you what happened that day.  You are also going to hear

6    from each of the defendants, the prison guards.  You are going

7    to hear a chorus -- chorus -- that Mr. Hawks was resisting,

8    Mr. Hawks started the assault, but what they will have to

9    admit, what they will have to tell you is that only two of the

10   defendants were actually there when the assault on Mr. Hawks

11   started, and that is Gunsett and Mazzella and their stories are

12   inconsistent and their stories defy common sense.

13         Now, as the judge told you, this is a civil case.  It

14   is not a criminal case.  In a civil case the plaintiff, that

15   is, Mr. Hawks, he has the burden of proof by what is called

16   preponderance of the evidence.  The criminal case the state has

17   the burden of proof by beyond a reasonable doubt.

18   Preponderance of the evidence is much lower than beyond a

19   reasonable doubt.  Preponderance of the evidence, which is the

20   burden that Mr. Hawks has in this case, the burden of proof,

21   simply stated means more likely than not or 51 percent.  I am

22   going to prove to you that the defendants engaged in excessive

23   force and assaulted Mr. Hawks by a preponderance of the

24   evidence or by 51 percent.

25         Let me tell you how I am going to do it.  I am going

 1    to do it with the photographic evidence and I am going to do it

 2    with the medical evidence.  After the assault on Mr. Hawks on

 3    November 1st, 2007 he was seen by the prison medical personnel.

 4    The blood I told you about was cleaned up.  There were photos

 5    taken of him.  There were also photos taken of the defendants.

 6    You are going to see those photos and when you see those

 7    photos, you need to ask yourself:  Who does it look like was

 8    attacked?  Who does it look like was assaulted?  From the

 9    photos that you are going to see, you have to ask yourself who

10    looks like they got a beating.

11            You are also going to see the medical evidence.  I

12    told you Mr. Hawks was seen by the medical personnel that day.

13    They catalog all his different injuries that I told you about.

14    You will see that.  The defendants, some of them, saw medical

15    personnel.  When you see the medical records in this case, you

16    are going to ask yourself this person says they were attacked

17    or assaulted.  Are the injuries that are described in the

18    medical records consistent with someone who says they were

19    attacked or assaulted?  Do they have the injuries that would

20    show a surprise attack.  You have to ask yourself those

21    questions.

22            Now, I am going to sit down in a moment.  I am almost

23    done.  When I do, the lawyer for the defendants is going to get

24    up here and one of the things I expect the lawyer is going to

25    tell you is that Mr. Hawks is a bad man who likes to fight

1    especially with guards.  What you need to keep in mind, and you

2    will hear it directly from Mr. Hawks himself is that he is a

3    man trapped in a justice system that is broken, a justice

4    system that does not work.  You are going to hear that

5    Mr. Hawks is not was assaulted repeatedly by the guards but

6    then to add insult to injury they pressed charges against him

7    and Mr. Hawks with his fifth grade education with no lawyer,

8    because he cannot afford one to represent him, goes up in front

9    of a hearing officer and determines what discipline is he going

10   to receive.  No jury.  No lawyer.  He is found guilty.  Of

11   course he is found guilty in this case after the assault.  For

12   the beating they put down on him he got five years what they

13   call the Special Housing Unit, SHU.  Mr. Hawks is going to tell

14   you the inmates call it the box.  Do you know why they call it

15   the box?  Because you are confined to a small cell for 23 hours

16   in the day.  Five years, 23 hours a day in the same cell.

17        Mr. Hawks and I want to thank you for your service in

18   this case.  It is not easy to be a juror.  To sit here you have

19   to listen to the evidence.  I know, we know that you have

20   commitments, professional, family, other commitments that will

21   require your time.  I am going to try and keep this as short as

22   possible for you, but at the same time properly representing

23   Mr. Hawks.  In return, I ask that you do justice in this case

24   and justice in this case is to make them pay for beating this

25   man and engaging in excessive force.

1          Thank you.

2          THE COURT:  Counsel.

3          MR. CLARK:  Well, good morning.  My name is Jason

4     Clark.  I am an assistant Attorney General at the New York

5     State Attorney's General Office.  I, along with my colleagues,

6     Ms. Mary Kim, we represent the defendants -- Officers Clifford

7     Gunsett, David Mazzella, Alonso Cruz, and Cory Graveline.  Now,

8     Ms. Kim and I are going to be taking turns asking questions of

9     different witnesses, but just to be clear both of us represent

10    all four of the defendants.

11         Now, this case boils down to three things:  A punch, a

12    bite and a severe aggression with authority.  During this

13    trial, you will be presented with documents and testimony from

14    both parties regarding what happened on November 1st, 2007, but

15    in the end what that evidence will show is that these four

16    officers directly used force against Mr. Hawks after he punched

17    Officer Gunsett, after he bit Officer Mazzella, and after he

18    violently fought with all four officers as they tried to

19    restrain him and regain control of a dangerous situation.

20         Now, according to Mr. Hawks he is the victim.  As you

21    heard he alleges that these four officers were the aggressors

22    and they used excessive force against him; but as you will see,

23    it is just not supported by the evidence.  Let's take a moment

24    to discuss the defendants.  Officers Gunsett, Mazzella, Cruz

25    and Graveline are all New York State employees at the

1   Department of Corrections and Community Supervision.  It is a

2   mouth full so we like to call it DOCs for short.

3               Officer Gunsett, Mazzella and Cruz all worked at Green

4   Haven Correctional Facility.  In fact, they still work at Green

5   Haven.  It is a maximum security correctional facility.  It

6   houses inmates, male inmates 21 years and older.  It is

7   actually not too far from here, too.  It is about 65 miles

8   north of Manhattan just right off Interstate 84.  Officer

9   Graveline worked at Fish Kill Correctional Facility.  Fish Kill

10  is a medium security correctional facility about 15 minutes

11  away from Green Haven.  As you heard a couple moments ago, it

12  is also where the regional medical unit is.  Yes, Fish Kill is

13  the location where this use of force incident took place, but

14  it is also important to recognize that is where the regional

15  medical unit is.  The RMU is just for a little bit of

16  background, and as you will hear from the defendants, it is

17  essentially a huge medical hub.  So while all inmates have

18  access to 24-hour medical care at their respective prison

19  facilities, for example, if they need some type of special

20  care, such as going to a neurologist or physical therapist,

21  they are transported over from their prison facility to Fish

22  Kill's RMU so they can get the care that they need.

23               Now, November 1st, 2007 Officers Gunsett, Mazzella and

24  Cruz were transporting a number of inmates from over at Green

25  Haven to Fish Kill's RMU.  Once they arrived at Fish Kill, they

1   are put in a room where they have the restraints removed so

2   that they can have their medical examinations without the

3   restraints being in their way.  Then all the inmates were taken

4   over to another room.  In this other room, known as a bullpen

5   as mentioned earlier, that is where they wait in order to have

6   their medical examinations.

7           Now, on this particular day Mr. Hawks was complaining.

8   He was complaining about the fact that he had to have these

9   prison restraints.  He was complaining after the restraint were

10  removed about the fact that he had to keep his hands in his

11  pockets.  Keeping your hands in the pockets is a safety

12  precaution and a number of officers use because once an inmate

13  is no longer restrained, it is a way of protecting themselves

14  against any unwanted attacks, for example.  That is what you

15  will hear from the defendants during their testimony.

16          So what we have is Mr. Hawks is complaining about a

17  standing and waiting and he complaining about having to put his

18  hands in his pocket.  Eventually he complies.  He is able to go

19  see his medical examiner and at least at this part there are no

20  major issues.  After he has this medical appointment and he is

21  brought back down to this original room where he is going to

22  have his restraints reapplied, that is when the issues start.

23          Now, you will hear a lot more about this from the

24  defendants when they are on the stand.  They will probably

25  explain this a lot clearer and much more thorough way than I

1   can.  At this moment all you need to know is when an inmate is

2   being reshackled and the restraints are putting back on him,

3   they direct the inmate to stand up and then the inmate is told

4   to take one hand out.  One of the officers, in this case there

5   are two officers, will give the shackles to the second officer

6   and then make sure the restraints are on that hand in a way

7   that is secure.  Then the officer will direct the inmate to

8   take the second hand out so that hand can be secured in a

9   proper way.  There are other things that go on with waist

10  chains and leg irons, which you don't have to know at this

11  point.  The fact is that, yes, this is a regimented methodical

12  way to do things, but it is done for a reason.

13       These are inmates as you will hear who are being

14  transported from a maximum correctional facility to another

15  facility.  We have to make sure that the inmate is secure, that

16  the inmate, the civilian employee as well as the correctional

17  officers are all as safe as possible.  That is what we have in

18  this situation.  So back to what we have at in situation.

19  After the medical appointment he is brought back down into this

20  room to have his restraints reapplied.  There is a bench in

21  this room.  Mr. Hawks is sitting on the bench.  Officers

22  Gunsett and Mazzella are in the room.  Mazzella and Gunsett are

23  preparing the shackles and then eventually Officer Gunsett then

24  directs Mr. Hawks to stand up, which he does.

25       Mr. Hawks stands up but instead of keeping his hands

1  in his pocket, he takes them out.  He was told earlier by

2  Officer Gunsett to keep his hands in his pocket, but for

3  whatever reason as the evidence will show he decided that he

4  was not going to do that.  So the circumstance again Officer

5  Gunsett tells him to put his hands in his pockets until he is

6  directed to take them out.  Instead of complying, instead of

7  listening to a direct order, what he does is what the closed

8  right fist he punches Officer Gunsett.  Gunsett then responds

9  by striking him back, causing him to eventually fall over the

10  small bench in the area.

11         Now Mr. Hawks is on his back.  He is swinging his

12  arms.  He is fighting with now Officer Mazzella, who is

13  together with the two officers in this room, and trying to

14  restrain him and regain control of the situation.  In fact,

15  what they are trying to do is they are trying to turn Mr. Hawks

16  over onto his stomach so that way they can gain control of his

17  arms so they can handcuff his hand.  Unfortunately for Officer

18  Mazzella, as he is trying to turn Mr. Hawks over, Mr. Hawks

19  bites him on his arm.  Now, by this point Officer Cruz who was

20  supervising in the inmates in the bullpen area, which was

21  nearby but not in the same room, he is hearing the commotion

22  and you will hear he could not see what was going on.  He hears

23  the commotion and he rushes over.  What he does is he takes his

24  hands out and he tries to wrap them around Mr. Hawks' leg so

25  they can try to subdue him.  Then officer Graveline, who wasn't

1   in the situation until this point and is a Fish Kill officer,

2   has nothing to do with Green Haven though it appeared to be

3   hearing this is some type of retaliatory event, he comes over

4   and rushes and he is able to help by putting these handcuffs on

5   Mr. Hawks.  Between the power of them they are able to subdue

6   Mr. Hawks and essentially that is the incident in the nutshell.

7          So once it is over Mr. Hawks is then taken over to a

8   nurse, the nurse examines him.  Similarly Officers Gunsett and

9   Mazzella in particularly need to be seen by a nurse and they

10  are examined.  Again, that is essentially in a nutshell what

11  happend with the force incident.

12         Now, while the injuries that Officer Gunsett and

13  Officer Mazzella had to incur during this incident, while they

14  are not that serious, he was still assaulted by Mr. Hawks.  He

15  bit Officer Mazzella and he punched Officer Gunsett.  That is

16  assault.  That is battery.  As a result of that, sure.

17  Officers Mazzella and Gunsett, sure, are countersuing for

18  assault and battery.

19         Now, as you listen to the testimony of the plaintiff

20  and the defendants, I want you to ask yourselves two questions:

21  The first is whose story sounds more credible as to who the

22  aggressor was?  As you will see, Mr. Hawks didn't have any

23  broken bones.  He didn't have anything dislocated.  What you

24  will hear is he had abrasions, readiness and swelling.  Do

25  those injuries, are they compatible with what the plaintiff is

1    alleging, that these four officers had him on the floor and

2    were punching and kicking and slapping him around, or are these

3    injuries more indicative that, yes, there was a violent

4    struggle caused by Mr. Hawks in which they needed to use force

5    to reapprehend him on regain control of the serious situation?

6            The second question:  Is Mr. Hawks a credible witness?

7    Is he telling the truth?  Ladies and gentlemen, you will hear

8    how he had different versions of events occurred that day.  How

9    originally he admitted that he bit Officer Mazzella then during

10   his discovery we thought that he never bit Mazzella.  Now

11   apparently he did bite Mazzella.  Is he a credible witness?

12   You will have to figure that out for yourselves.

13           Now, as you review the testimony and all the evidence

14   in this matter, I am confident that you will find that the

15   force used by the defendants was not excessive by my means, the

16   plaintiff has failed to demonstrate and meet its burden of

17   proof.  In fact, as I will expect you will find, is that

18   Mr. Hawks was the aggressor and that he assaulted Officers

19   Mazzella and Gunsett.

20           The punch, the bite and the aggression is all

21   initiated by Mr. Hawks.  For those reasons at the end of this

22   trial, we'll ask that you render a verdict in favor the

23   defendants.

24           Thank you.

25           THE COURT:  Do you want to have a break before we take

1   the first witness?

2           Let's call your first witness.

3           MR. NOVICH:  Your Honor, the first witness is

4   Mr. Hawks.  My understanding is the break is required.

5           THE COURT:  It's up to you.

6           MR. NOVICH:  Yes, your Honor.

7           THE COURT:  We'll excuse the jury for two minutes.  Go

8   into the jury room and we'll call you right back.

9           (Jury excused)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. NOVICH:  I apologize, Judge.

2          THE COURT:  No.  You are right.  Out of the presence

3  of jury, we'll ask Mr. Hawks to take the witness stand.

4          (Continued on next page)

1              (In open court; jury present)

2              THE DEPUTY CLERK:  Sir, raise your right hand.

3    BRIAN HAWKS,

4         called as a witness by the Plaintiff,

5         having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. NOVICH:

8    Q.  Mr. Hawks, can you please introduce yourself to the jury.

9    A.  Yes.  My name is Brian Hawks, and I thank you all for

10   coming out and entertaining this trial.

11   Q.  Mr. Hawks, how do you spell your last name?

12   A.  Last name is spelled H-a-w-k-s.

13   Q.  To your knowledge has anyone misspelled your last name?

14   A.  Yes.  I do recall a district attorney dealing with my

15   convictions had my name -- had misprinted my name back in 2002

16   when I was arrested.

17   Q.  Do you have a middle name, Mr. Hawks?

18   A.  Yes, I do.

19   Q.  What is your middle name?

20   A.  Keith, K-e-i-t-h.

21             THE WITNESS:  Excuse me.  Let me drink a little water,

22   your Honor.

23             Okay, I am ready.

24   Q.  What is your full name?

25   A.  Full name is Brian Keith Hawks.

1    Q.  Have you ever gone by any other names besides Brian Keith

2    Hawks?

3    A.  Yes.  I use Gettys a few times.

4    Q.  Can you spell Gettys for us?

5    A.  Yes.  I can spell it for you.  G-e-t-t-y-s.

6    Q.  Now, why do you use the name Gettys, the last name Gettys?

7    A.  That was a given name.  My grandfather's name was Gettys

8    and I always used his name.

9    Q.  Why?

10   A.  He was there for me when I was a kid.  I didn't have a

11   father.  My real father's last name was Hawks.  I didn't like

12   that name for some reason.

13   Q.  Why didn't you like the last name Hawks?

14   A.  Because my father was never there or he was missing in

15   action when my moms had me.

16   Q.  What kind of relationship did you have with your

17   grandfather?

18   A.  A very good relationship.  It was very special.  He took

19   care of me when I was a kid getting me everything I wanted.

20   Q.  Mr. Hawks, how old are you?

21   A.  I am 50 years old.

22   Q.  Where were you born?

23   A.  I was born in Buffalo, New York.

24   Q.  Did you grow up in Buffalo?

25   A.  Yes, sir.

1    Q.  Do you have family in Buffalo?

2    A.  Yes, I do.

3    Q.  Who do you have in Buffalo?

4    A.  One sister, two brothers.

5    Q.  What are their names?

6    A.  First oldest brother is Donald Gettys.  The way I spelled

7    my grandfather's name, G-e-t-t-y-s.

8    Q.  Who else is in Buffalo your family?

9    A.  Donald Gettys already.  Leroy is the second eldest, my

10   other brother.

11   Q.  Where do you currently reside, Mr. Hawks?

12   A.  Right now?

13   Q.  Yes.

14   A.  At Comstock Great Meadows Correctional Facility.

15   Q.  Back in November of 2007 where did you reside?

16   A.  Green Haven Correctional Facility.

17   Q.  Can you please describe to the jury what life was like at

18   Green Haven?

19   A.  Well, being that you mention it, my life was like hell at

20   Green Haven.

21   Q.  Why?

22   A.  That's a good question.  I was always standing up for

23   myself and standing up for other prisoners or inmates or

24   whatever you want to call it and it seems like the prison

25   guards don't like a guy standing up for what is right.  They

1    don't look like that.  They don't see it that often.  I was

2    there and I was there at least for other guys who didn't speak

3    for themselves or afraid to speak up for themselves.

4    Q.  Have you ever been assaulted because you stood up for your

5    rights or for the rights of your fellow inmates?

6    A.  Absolutely.

7    Q.  How many times?  Who assaulted you?

8    A.  You want me to give you some names and different

9    facilities?  There will be a lot.

10   Q.  Who are the people who assaulted you in prison?

11   A.  In this case right here?

12   Q.  Was it the guards who assaulted you?

13   A.  Yes.  In this case right here, yes.

14   Q.  How many times have you been assaulted by the guards?

15   A.  This is the second time I was assaulted by prison guards in

16   Green Haven.

17   Q.  Have you been assaulted by guards at other facilities?

18   A.  Yes.

19   Q.  And have you sustained injuries as a result of those

20   assaults?

21   A.  Yes.

22   Q.  Have charges been brought against you in connection with

23   those assaults?

24   A.  No charges was brought against me because it wasn't no

25   charge -- it wasn't no charge that I brought up on anybody so I

1    guess they just left it like that.  It was a stalemate.

2    Q.  Have the guards ever brought charges against you?

3    A.  Yes, they try.

4    Q.  What kinds of charges do the guards bring against?

5    A.  Assault a staff.

6    Q.  Did you assault a staff?

7    A.  No.

8    Q.  What, if anything, would you do when the guards assaulted

9    you?

10   A.  Defend myself.

11   Q.  When you appeared before these disciplinary hearings, did

12   you have a lawyer?

13   A.  No.  I did not have a lawyer at the time.

14   Q.  Did anyone help you defend against these charges brought by

15   the guards?

16   A.  Oh, absolutely.  Inmate prisoners.

17   Q.  Anyone else besides your fellow prisoners?

18   A.  No.

19   Q.  What happened as a result of those charges brought against

20   you?  What punishment did you receive?

21   A.  I received -- I received 60 months in the SHU, which they

22   call it the box, Special Housing Unit.  That is where they

23   housed so-called violent inmates or whatever you want to call

24   them, criminals.  They keep you there for a substantial amount

25   of time.

D7m6haw4                    Hawks - direct

1    Q.  Aside assault, have the guards ever brought any other types

2    of charges against you?

3    A.  Yes.

4    Q.  What?

5    A.  A couple of charges, false --

6              THE COURT:  Sorry.

7    A.  False reports.  It's like if you got to have a pass to go

8    around the facility, with that pass you have to have your ID

9    card.  If you don't have your ID card, the officer has the

10   right to pull you over and ask you why you don't have your ID

11   card.

12   Q.  Did you provide the officer with false information?

13   A.  No, sir.

14   Q.  What happened?

15   A.  To my recollection I didn't have an ID card this day.  I

16   was walking through the hallway going to one of our call-outs

17   and officer pulled me over and said, Where is your ID card?  I

18   said, I left it behind, but I did have a call-out piece, number

19   and name and the direction where I was headed.  So the officer

20   said, That is not good enough.  You have to have your ID card.

21   Take it back.  I did.  So it was no further incident, but he

22   did write investigative report saying that I had caused false

23   allegations, that I lied to him and the officer said I gave

24   false allegations because he felt that I was lying about not

25   having my ID card.

D7m6haw4                    Hawks - direct

1    Q.  What other charges, if any, have the guards brought against

2    you besides assault, providing false informing?

3    A.  I had other incidents where he stopped me, pulled me over,

4    put me on the wall for different things, forgery, different

5    charges like that.  Again, not having the things that I

6    supposed to have so they say -- ID cards or different things or

7    credential cards, stuff that we're supposed to carry.

8    Q.  Now, I want to direct your attention to the date of

9    August 25th, 2007.

10         Where did you reside on that day?

11   A.  I resided in SI Green Haven.

12   Q.  Please tell the jury what happened to you on August 25th,

13   2007.

14   A.  I was assaulted by staff on August 25th, 2007.

15   Q.  Can you --

16   A.  Describe?

17   Q.  Yes, please do so.

18   A.  I am trying to put it together for you.  Just give me a

19   minute.  I was called to come out of my cell.  I was locked out

20   of my cell that day for a call-out.  Again, what happens is the

21   procedure in Green Haven, all inmates are put on call-outs

22   their names come out on a chart.  It is like a bulletin chart

23   with everybody's name and who has a call-out.  On that bulletin

24   board the guys when they come out their cell, they look at the

25   bulletin board and see if their name is on there and make sure

1    they are on the call-out.  My name is on that call-out and I

2    looked and I seen my name.

3            At this time I went to approach the officer desk where

4    he was sitting at where he can write my call-out.  The officer

5    has to sign the call-out so I can come out the gate.  So the

6    officer told me that they had already let the guys out, that he

7    told me that I was a little -- a couple minutes late, take it

8    back to your cell.  I will be honest with you, I didn't agree

9    with that.  I asked the man, the officer, I want to see a

10   sergeant.  I don't understand why you don't want to let me out.

11   I am only a couple minutes or couple minutes late.  I don't see

12   no problem letting me out the door.  He caught an attitude and

13   he said told me to I tried to abuse his authority.  So I did

14   what he asked me to do, went upstairs, but I didn't lock back

15   in.  He came upstairs and check to see the gate shut and he

16   seen me standing there and he said, What did I tell you?  He

17   called me up my name and walked up on me and hit me.  He swung

18   at me.  I, like I said, defended myself.  That is how we got

19   into an altercation, in a physical conflict.  The outcome of

20   that, I suffered a fractured left wrist.

21   Q.  Did you sustain any other injuries besides the fracture of

22   the left wrist?

23   A.  Laceration, cuts on my face and my head from the slamming

24   me around against the wall and the gates where the area where

25   they was taking me to the hospital and they had got me --

1    finally got me out of the prison system to put me in the

2    ambulance and start asking me questions.  There was a young

3    lady that was taking my pulse asking me what happened, can you

4    give me any name, can you talk to me, can you say anything.  I

5    told her that I was dizzy and I felt like my neck was broke.

6    Q.  You were hospitalized?

7    A.  Yes.  I was a little out -- out of it.  Like, dizzy blanked

8    out a little bit.

9              MR. NOVICH:  Your Honor, permission to approach the

10   witness to direct him to an exhibit.

11             THE COURT:  Sure.

12   Q.  Mr. Hawks, I want to direct your attention to Plaintiff's

13   Exhibit 7.

14             Do those records reflect the injuries that you

15   sustained that day at the hands of the officers on August 25th,

16   2007?

17   A.  Yes.  I am looking at it right now.

18             THE COURT:  Are you showing it to the jury on the

19   screen?

20             MR. NOVICH:  Yes.  Permission to publish to the jury?

21   This is a stipulated document.

22             THE COURT:  Sure.

23   Q.  I am showing you what has been marked as P-7526.

24             Is this the medical record for that day, sir,

25   August 25th, 2007?

1   A.   That's what it looks like to me.

2   Q.   You indicated that you sustained lacerations or scars?

3   A.   That's correct.

4   Q.   And in addition the records indicate that you had

5   lacerations on your eyelids and below your eyebrows?

6   A.   My eyebrows.  Yes, I am looking at it right there.

7   Q.   Did you have facial bruises as well?

8   A.   Yes.  Also on there also.

9   Q.   Was that true?  Did you have facial bruises that day?

10  A.   Yes.  I had bruises.

11  Q.   And did you have bruises on your ribs and your body?

12  A.   Yes.  I had bruises all the over my chest area.  My legs

13  was kind of bruised also.

14  Q.   Did you have any injuries to your left wrist?

15  A.   It was fractured according to the medical when I went

16  outside and was checked out.  They took X rays and said my

17  wrist was fractured and they put a cast on it.

18  Q.   It indicates that you sustained multiple injuries and

19  trauma.

20  A.   Yes.  I was suffering from a little bit of trauma.  My neck

21  was -- neck muscles was stretched on the back of my neck and

22  they told me to relax, they was going to put a neck brace on my

23  neck for a couple minutes, which they did, put ice on the back

24  of my neck.  They did all that and took me through a machine.

25  I believe it was a CAT scan if I am not mistaken.

D7m6haw4                    Hawks - direct

1    Q.  It also indicates that you were taken to the emergency

2    department via ambulance, is that correct?

3    A.  That's correct.  I described that to the jury I believe

4    earlier when I said I was in the ambulance when the paramedic

5    lady was asking me could I tell her what happened.

6    Q.  Turning to Exhibit P 7, page 5549, which is the next page.

7    Showing you the admission summary.  Again, it indicates that

8    you sustained traumatic injuries, is that correct?

9    A.  That's correct.

10   Q.  And you stated before that you sustained a fractured left

11   wrist.  Does the document reflect that?

12   A.  Yes.  It does to my knowledge.

13   Q.  Scalp laceration is also indicated.  Did you sustain that

14   as well?

15   A.  Yes.  I sustained.

16   Q.  Showing you the next page, which is part of the Exhibit 7

17   which is --

18              MS. KIM:  Objection, your Honor.

19              THE COURT:  Overruled.

20   Q.  Page 582.  This is a record from Putnam Hospital Care

21   Emergency Department.  Do you see that?

22   A.  Where it says wrist fracture right at the top in black

23   letters.

24   Q.  It indicates patient name Brian Hawks?

25   A.  Yes.  That's my name.

D7m6haw4                    Hawks – direct

1    Q.  Did you go to Putnam Hospital Center for a wrist fracture?

2    A.  Yes, sir.

3            MR. NOVICH:  Your Honor at this time I would like to

4    move into evidence Exhibit P 7.

5            THE COURT:  I will allow it.

6            (Plaintiff's Exhibit 7 received in evidence)

7    BY MR. NOVICH:

8    Q.  Now, were you placed in any type of cast that day for your

9    fractured wrist?

10   A.  Yes.

11   Q.  Can you please describe for the jury what the cast looked

12   like?

13   A.  Well, it came all the way up to my elbow.  It started from

14   my wrist all the way up to the elbow.  It was like a –– like

15   one of those slingshots –– slings that you put your arm in.

16   That is how far it goes, all the way back to the elbow.

17   Q.  Did you have any mobility limitations with your left hand?

18   A.  No.  Due to the swelling, I didn't have any kind of

19   mobility inside the wrist or to ball my fist.  I couldn't ball

20   my fist.

21   Q.  Who transported you to the hospital that day?

22   A.  Officer Cruz.

23           (Continued on next page)

24

25

D7MHHAW5                          Hawks - direct

1              THE COURT:  Are you talking about August now?

2              MR. NOVICH:  Yes, your Honor.

3              THE WITNESS:  It was August 25th.

4    BY MR. NOVICH:

5    Q.  On August 25th, who transported you to the hospital that

6    day?

7    A.  Officer Cruz.

8    Q.  Where is officer Cruz a guard?

9    A.  I believe he is a transportation officer.  He works with

10   inside the facility at Green Haven.

11   Q.  Did any other guards come to see you for any reason at the

12   hospital that day?

13   A.  Yes.

14   Q.  Who?

15   A.  David Mazzella, if I am pronouncing his name.  I think that

16   is an Italian name.  Mazzella, David.

17   Q.  What did Mr. Mazzella say to you at the hospital?

18   A.  He said some crazy stuff about, I told you if you say

19   anything, we're gonna get you.  And I'm asking him, what are

20   you talking about?  I don't know what you're talking about.  I

21   told the nurse to get this guy away from me, I don't want to

22   hear what he got to say.  I'm seriously hurt and I'm afraid

23   that this man might try to do something else to me.  Please get

24   him away from me.

25   Q.  Now regarding the August 25, 2007 assault, were any

1    disciplinary charges pressed against you?

2    A.   Yes.  I had some police officers from the outside of Green

3    Haven, I believe it was Dutchess County officers, detectives, I

4    believe ECI, the bureau chief of the unit came in my room where

5    I was laying down and told me, you know you're being charged

6    for assaulting a staff.  I said, man, I don't wanna talk to

7    you.  My lawyer's not present.  Please leave my room.  I know

8    my rights.

9    Q.   When you appeared before that disciplinary hearing in

10   connection with the August 25, 2007 assault, did you have a

11   lawyer?

12   A.   No, sir.

13   Q.   Could you afford a lawyer?

14   A.   Absolutely not.

15   Q.   Now at that disciplinary hearing where there was a hearing

16   officer there, not a judge, a hearing officer, was there a jury

17   that decided that case, to your knowledge?

18   A.   Could you repeat that question again, please.

19   Q.   Yes.  We have a jury here today.  When you were at the

20   disciplinary hearing in connection with the August 25, 2007

21   assault, was there any type of jury who decided your case?

22   A.   No.

23   Q.   Now, did you have the right at that disciplinary hearing to

24   directly ask questions of the officers or did you have to get

25   permission from the hearing officer?

1   A.   I had to get permission from the officer.

2   Q.   Were you found guilty?

3   A.   I was found guilty of all charges against me.  Not the

4   officers, but against me.

5   Q.   What punishment, if any, did you receive?

6   A.   They gave me a total of 60 months, which is a total of five

7   years.

8   Q.   Five years where?

9   A.   The box, which is a special housing unit, where there is a

10  small cell where they put guys in.  They are supposed to be bad

11  guys or guys that could commit violent, violent offenses, or

12  whatever the case may be.

13  Q.   Please explain to the jury what life is like in the box.

14  A.   Well --

15          MS. KIM:  Objection.

16          THE COURT:  I'll allow it.  Go ahead.

17  A.   We only get one hour out for rec.  So a total of 24 hours,

18  I get one hour out of that.  25.  So I am in my cell for the

19  remaining 23.  Or should I say 24 hours.  Excuse me.

20  Q.   How big is the cell you are in for 23 hours of the day?

21  A.   About the size of where I'm at and I'll say this little

22  piece of half right over here, because you've got a toilet,

23  you've got a sink where you can wash up, and you've got a bed.

24  That is all near the side of the wall with a water faucet and a

25  toilet.

1    Q.  Now I want to direct your attention to the date of November

2    1, 2007, just a couple months after the August 25th assault.

3    OK.  Now we are going to November 1, 2007.  All right?

4    A.  Yes.

5    Q.  Where did you reside at that time?

6    A.  Green Haven Correctional Facility.

7    Q.  Were you transported anywhere that day?

8    A.  I was transported to the PT, which is Fishkill Correctional

9    Facility.

10   Q.  Why were you being transported to the Fishkill Correctional

11   Facility?

12   A.  I was being transported to the Fishkill Correctional

13   Facility to get my cast taken off so the doctor can look at my

14   wrist and see how good it was healing or how well I was doing.

15   Q.  Was your left arm, when you were being transported to

16   Fishkill, was your left arm still in a cast that day?

17   A.  Yes, sir.

18   Q.  And is that the same cast you described before to the jury,

19   from the wrist to the elbow?

20   A.  Yes, sir.

21   Q.  Could you make a fist on November 1, 2007?

22   A.  Absolutely not.

23   Q.  Now, prior to November 1, 2007, how many times had you been

24   transported to Fishkill to receive medical treatment?

25   A.  I'd say about approximately three times.

1          THE COURT:  Is that after August?

2          MR. NOVICH:  Yes, Judge.

3   Q.  So between August 25, 2007 and November 1, 2007, you're

4   saying approximately three times you had gone to Fishkill to

5   receive medical treatment, right?

6   A.  That's correct.

7          THE COURT:  Before November --

8          THE WITNESS:  Before November 1st.

9          THE COURT:  November 1st would have been around the

10  fourth time?

11         THE WITNESS:  Yeah, the fourth time.  Scratch the

12  three.  Put the four in.

13  Q.  On those prior transports, before November 1st, did you

14  ever have any problems or any conflicts or any issues with

15  anyone?

16  A.  No, with nobody.

17  Q.  At Fishkill, did you have any problems?

18  A.  No problems.

19  Q.  Now on the medical transports prior to November 1, 2007,

20  was defendant Gunsett the person who transported you?

21  A.  Prior or before?

22  Q.  Prior, before November 1st.  The three transports that you

23  described that you had before November 1, 2007.  That is what

24  I'm asking you.

25  A.  You asking me was Gunsett in that transcript?

1    Q.   Exactly.

2    A.   Transportation.  No.

3    Q.   Prior, before November 1, 2007, did you ever have any

4    contact with defendant Gunsett?

5    A.   Absolutely not.

6    Q.   Now I am talking to you about the day, November 1, 2007,

7    that day.  What time did you arrive at Fishkill?

8    A.   I'd say about approximately 10-ish, somewhere around there.

9    10:00, somewhere.  We was running kind of early because we

10   started off early.  So we got there around that time.  Then

11   again they know the time sometimes because they get paid for

12   it, for the hours.

13            MS. KIM:  Objection.

14            THE COURT:  Overruled.

15   Q.   Now we are going to take the jury step through step what

16   happened that day.

17            What happened when you arrived at Fishkill?  What is

18   the first thing that happened?

19   A.   I entered the RMU area.

20   Q.   What is the RMU?

21   A.   I believe it's called regional medical unit.

22   Q.   Is that where you were receiving treatment?

23   A.   That was the building, that was the area where they had to

24   bring us to take the cuffs off or chains and stuff like that.

25   They had to prepare us to see.  You know, we have to wait in

1  that room until they get the jewelry off you, whatever you want

2  to call it.  The chains, the shackles.

3  Q.  You said we have to wait in that room.  Who is the "we"

4  that you're talking about?

5  A.  Me and three other inmates.

6  Q.  When they unshackled you, when defendant Gunsett unshackled

7  you, you were with the other inmates?

8  A.  I was with the other inmates, correct.

9  Q.  And who specifically unshackled you that day?

10  A.  The man over here by the name of Gunsett, with the sky blue

11  tie on and the black suit.

12  Q.  What orders or commands did defendant Gunsett give you?

13  A.  He didn't give me any directions or any orders besides put

14  my hands in my pocket.

15  Q.  So after he unshackled you, he told you to put your hands

16  in your pockets?

17  A.  Yes.

18  Q.  Did you comply?

19  A.  Yes.

20  Q.  Did you have any difficulty complying with that?

21  A.  The only difficulty I had complying with that was my cast

22  was too big to fit in my pocket.

23  Q.  Did you experience any type of discomfort or pain at all

24  when you were putting your hands in your pocket in connection

25  with your fractured wrist?

1    A.  Yes.  I would say yes, because my pockets was kind of

2    tight.  You know how guys wear ticket pockets.  My pants was

3    real tight and the cast was, outweighed my pocket.

4    Q.  Did you have any visible facial expressions or anything

5    indicating that you were in some discomfort as a result?

6    A.  Yes.  I was in some discomfort.  I did what the officer

7    asked me to do anyway, I went and I did it.

8    Q.  Now, did the defendant Gunsett at that point ask you,

9    Mr. Hawks, what's wrong, are you OK?  Did he ask you anything

10   like that?

11   A.  Absolutely not.

12   Q.  Now after you were unshackled, after you put your hands in

13   your pockets, tell the jury what happened next?  Where did you

14   go?

15   A.  I went to the bench.

16   Q.  At some point in time did you receive some type of physical

17   therapy?

18   A.  Yes.  I was waiting to see the physical therapy guy, which

19   I did.

20   Q.  Where did you receive the physical therapy?

21   A.  Inside a room, a closed area where they walked me, and we

22   found it reaches the room where the doctor was at waiting on

23   me.

24   Q.  I believe your testimony was when you arrived at Fishkill

25   you arrived at the RMU, which is in the basement.  Is the

1    doctor's office where you go upstairs at Fishkill?  Do you have

2    to go up some stairs?

3    A.  I believe there's an elevator.  I don't know about the

4    stairs.  I think we took the elevator.

5    Q.  And were you seen by the medical providers, the doctors?

6    A.  I was just seen by that one doctor.  Like I said, the guy

7    would check my cast and check my wrist.

8              THE COURT:  Had you been seen by that same fellow

9    before on the other three occasions?

10             THE WITNESS:  Yes, he was the same guy.

11             THE COURT:  Each time.

12             THE WITNESS:  Each time.

13   Q.  What if anything did the doctor do to your cast?

14   A.  He cut it short.  He made it short.  The long part, he chop

15   it down to the wrist.

16   Q.  Show the jury where it was chopped down to.  Raise your

17   left arm and show them where it was cut down to.

18   A.  From my elbow all the way down to about right there, a

19   couple of inches above my wrist.

20   Q.  Could you make a fist?

21   A.  No, sir.

22   Q.  Was your wrist still swollen?

23   A.  Yes.

24   Q.  The doctor didn't remove the cast entirely, did he?

25   A.  No.  He left a little piece there.

1       THE COURT:  So he removed from the elbow to the wrist

2  and he left a piece around your wrist?

3       THE WITNESS:  Yes.

4  Q.  Now approximately how long did your physical therapy last

5  on November 1, 2007?

6  A.  Could you ask that question again?

7  Q.  Yes.

8       How long were you with the doctor, the whole

9  experience with the doctor?

10 A.  As far as time?

11 Q.  Yes.

12 A.  I'd say a good three minutes.

13      THE COURT:  How many?

14      THE WITNESS:  Three minutes.

15 Q.  When you came out of the physical therapy with the doctor,

16 what room were you taken to next?

17 A.  They moved me to a room where they had a bunch of bench

18 that looked like bleachers where basketball players would be

19 sitting, and they had me and the three other inmates in the

20 same room.

21 Q.  Is this the room -- is this room called the bullpen?

22 A.  Yeah, they call it the bullpen.  They also call it, they

23 call it a cell bullpen.

24 Q.  You said you were moved to that room, the bullpen.

25 A.  Yes.  I was moved away from the rest of the guys, for

1   whatever reason I don't know.

2   Q.  Before you moved from the rest of the guys, you are with

3   the other inmates, right?

4   A.  That's correct.

5   Q.  And then when you were with the other inmates, what if

6   anything were you expecting to happen at that time?  Were you

7   expecting to be shackled again with the other inmates?

8   A.  Yes.  That's procedure.  I mean that's what I assumed.

9   That is what I anticipated.  But it didn't happen.  It didn't

10  happen that way.

11  Q.  Is that what happened on the three prior occasions when you

12  went to the Fishkill RMU, you were brought into the bullpen

13  with the other inmates and then shackled together?

14  A.  That's correct.

15  Q.  Before November 1, 2007, had you ever been isolated and

16  separated from the other inmates before you did the transport

17  back to Green Haven?

18  A.  Absolutely not.

19  Q.  Who separated you from the other inmates?

20  A.  David Mazzella told me to get up.  He called me by my name

21  and said, you coming in this room.  The rest of you guys stay

22  here.

23  Q.  This other room that you went into, can you describe it for

24  the jury, what it looked like.

25  A.  It looked like an average little room with benches.

1         MR. NOVICH:  Your Honor, permission to approach the

2    witness to direct him to the next exhibit.

3         THE COURT:  Sure.

4    Q.  Mr. Hawks, I'm showing you what's been previously marked

5    for identification as Defendants' D3-3.

6         Do you see that?

7    A.  Yes.  I'm looking at it right now.

8    Q.  Is that the room that you were brought to, ordered to go to

9    by defendant Mazzella?

10   A.  That's correct.

11        MR. NOVICH:  Your Honor, permission to publish Exhibit

12   D3-3 to the jury.

13        THE COURT:  Sure.

14   Q.  Explain to the jury where you were sitting in that room

15   after defendant Mazzella ordered you to go there?

16   A.  I was sitting right on the middle part of the bench.

17   Q.  So in this area here?

18   A.  Yeah.  Where your finger's at, yeah.  That's about right.

19   Q.  Who was in that room with you?

20   A.  Nobody but myself.

21   Q.  Were there any guards, prison guards in that room with you?

22   A.  When I got to the room, I was there by myself and about 30

23   seconds after I sit down it was like two or three officers

24   walking in.

25   Q.  Did anyone give you any orders after -- strike that.

D7MHHAW5                         Hawks - direct

1              When you were sitting on that bench, where were your

2      arms?

3      A.   In my pockets.

4      Q.   Did anyone give you -- strike that.

5              What happened next?  You said you are sitting on the

6      bench --

7      A.   With my hands --

8      Q.   -- with your hands in your pockets?

9      A.   With my hands in my pockets, yeah.

10     Q.   Please describe for the jury what happened next.

11     A.   Officer Gunsett came in the room.  I'm waiting for him to

12     put the handcuffs on me.  He attacked me.  He swung at me and I

13     fell over the bench.  He threw a couple of punches.  I

14     registered the punches, you know, because I kind of felt that

15     something was wrong, and it's a good thing I was paying

16     attention.  I am very observant when I seen him raise his hand

17     and I seen his hand come towards my face and next thing you

18     know his weight went across me, his whole body went across me

19     and I fell backwards.  That's when the rest of the officers

20     ganged up on me.  They came out of nowhere flying on top of me.

21     Q.   How many times did defendant Gunsett hit you before you

22     fell on the ground?

23     A.   He got two shots off that I could recollect.

24     Q.   And when you fell on the ground, what part of your body was

25     on the ground?  Were you on your stomach?  Were you on your

D7MHHAW5                    Hawks - direct

1    back?

2    A.  I was on my back at that time.

3    Q.  Did the defendant Gunsett, did he jump on top of you at

4    that point?

5    A.  Yes, he did get on top of me.

6    Q.  Did anyone else jump on top of you?

7    A.  Yes.  The three officers that sit there, right down the

8    line, right down the aisle.  If you want me to name the names,

9    officer Cruz, officer Mazzella and officer Corey Graveline, or

10   whatever how you pronounce his name.

11   Q.  Just so we are clear, to recap, you go into this room.  You

12   are by yourself.  No other inmates.  You are sitting on the

13   bench with your hands in your pockets.  And then defendant

14   Gunsett hits you a couple of times and you fall over the bench.

15   Right?

16   A.  That's correct.

17   Q.  And then he jumps on top of you and the other officers jump

18   on top of you?

19   A.  That's correct also.

20   Q.  Now, you described for the jury defendant Gunsett punching

21   you, striking you.  Did anyone else, any of the other

22   defendants strike you?

23   A.  Officer Cruz, he had got some punches in and I believe he

24   kicked me a couple of times when I was on the ground.

25   Q.  Did the defendant Mazzella strike you?

1    A.   Yeah.  He had a couple of punches.

2    Q.   Did defendant Graveline strike you?

3    A.   He had a couple of, got a couple of little punches in also.

4    Q.   And, Mr. Hawks, please describe for the jury where you were

5    being hit.

6    A.   I was being hit from the head to the body.  Mostly all the

7    punches was mostly head shots.  But I was covering myself

8    pretty good so they had to go down to my body because that's

9    the only thing I left open.

10   Q.   Now at this point in time you are on the ground, right?

11   A.   That's correct.

12   Q.   Describe for the jury where the defendants are in relation

13   to your body, to your person?

14   A.   I'm not really sure about the question.  Could you relate

15   that question again.

16   Q.   Are they standing?  Are they on the ground?  Where are they

17   in relation to you, the defendants?

18   A.   They were standing up over me.

19   Q.   Was there any point in time where they were on top of you?

20   A.   Yes.

21   Q.   Describe that for the jury.

22   A.   When they got on top of me, they had to come down to the

23   floor where I was at.  That is how they got on top of me.  But

24   they were standing up over me after they got tired of punching

25   me.  I guess they wanted to take a little break and they stood

1    up over me.

2    Q.  How did you feel when the defendants were attacking you?

3    A.  I felt like I was a little scared, a little nervous.  I got

4    kind of like a little tense, you know, because I didn't know

5    whether I was going to make it through that day after all that

6    had happened.

7    Q.  Did you fear for your life?

8    A.  Yeah, you can say I sort of like had a little fear.

9    Q.  Were you trying to defend yourself in any way?

10   A.  That's the type of fear I had.

11   Q.  Now after the defendants assaulted you, did they place you

12   in handcuffs?

13   A.  Yeah.  They got me up, they stood me up off the ground,

14   finally they got me up off the ground, and they put the

15   handcuffs on me.

16   Q.  When they stood you up off the ground and got the handcuffs

17   on you, where did they push you?

18   A.  They slammed me up against the wall.  It was a brick wall.

19   It was a white paint, white paint on the wall, and they slammed

20   me up against the wall.  My face went straight to the wall.  I

21   couldn't put my hands out because I had my cuffs behind me so I

22   couldn't block, I couldn't protect my face.  So it had to hit

23   the wall.

24   Q.  Were you bleeding?

25   A.  Yes, I was bleeding.

D7MHHAW5                     Hawks - direct

1   Q.  Where were you bleeding from?

2   A.  From my eyebrow, my left eye, and on top of my head.

3   Q.  After they slammed you up against the wall and had you

4   handcuffed, what if anything did you do?

5   A.  I kept turning around.

6   Q.  Why?

7   A.  I thought they was going to keep on hitting me, and I was

8   scared.  I kept looking back hoping that the female sergeant

9   would tell these guys to stop hitting me, that's enough.  The

10  guy is handcuffed, you got the guy.

11              MS. KIM:  Objection.

12              THE COURT:  Sustained.

13  Q.  Now, what if anything did the defendant Mazzella say to you

14  at that point in time?

15  A.  He said what he said the prior time.  I told you I was

16  gonna get you.

17  Q.  You had your deposition taken in this case, correct?

18  A.  Yes.  I got it somewhere on the table over there in my

19  folders.

20  Q.  Didn't you say at your deposition, sir, that it was

21  officer --

22              MS. KIM:  Objection.

23              THE COURT:  Sustained.

24  Q.  Did you ever believe that anyone else had said that

25  statement to you, the statement being, I told you we were gonna

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   get you?

2   A.  Read into it all you want.  The rest of the guys don't even

3   know me.  This guy, I think he has something personal against

4   me.

5   Q.  Did you ever attribute that statement or say that it came

6   from anyone else besides defendant Mazzella?

7   A.  Could you repeat that again.

8   Q.  Yes.

9           Did you ever mistakenly say that somebody else besides

10  defendant Mazzella --

11          MS. KIM:  Objection.

12          THE COURT:  Sustained.

13  A.  Yes.  I made a mistake.

14          THE COURT:  No.

15          THE WITNESS:  I made a mistake.

16          THE COURT:  Excuse me.  If I sustain the objection --

17          THE WITNESS:  That means it's over.

18          THE COURT:  -- you don't have to answer.

19          THE WITNESS:  OK.

20  Q.  Now, after the assault on you on November 1, 2007, were you

21  seen by any medical personnel at the prison?

22  A.  Yes.  They took me to the hospital inside the facility.

23  Q.  Mr. Hawks, before we get there, I want to direct your

24  attention to Defendants' Exhibit 3A in that book.

25          Can you tell me who that photograph is in Defendants'

1    3A?

2              THE COURT:  Are you going to put that on the screen?

3              MR. NOVICH:  Yes, your Honor.

4    Q.  Who is that?

5    A.  That's defendant Mazzella.

6    Q.  Does Defendants' Exhibit 3A fairly and accurately depict

7    how defendant Mazzella looked immediately after you were

8    assaulted by him and the other officers?

9    A.  Yes, that's how he looked.

10   Q.  I show you another photo.  Again, that's another photo of

11   defendant Mazzella on November 1, 2007 after the assault,

12   correct?

13   A.  Yes.

14   Q.  I am going to show you what's been previously marked for

15   identification as Exhibit 3R.

16             Who is that a picture of?

17   A.  That's officer Clifford Gunsett.

18   Q.  Does that picture accurately and fairly depict how

19   defendant Gunsett looked that day, November 1, 2007, after he

20   assaulted you?

21   A.  Yes.  He looked the same as he looked in that picture.

22   Q.  I'm showing you a profile.  Is this a profile of officer

23   Gunsett on November 1, 2007, after he assaulted you?

24   A.  Yes.  That's a picture of him facing sideways.

25             MR. NOVICH:  For the record, that is Defendants'

1   Exhibit 3S.

2   Q.  Now I am going to show you Defendants' Exhibit 3T.  Is that

3   the other profile of defendant Gunsett on November 1, 2007

4   after he assaulted you?

5   A.  Yes.  The only thing different is he is facing towards his

6   left.

7   Q.  So the jury can see the front of his face and both sides,

8   right?

9   A.  Yes.  You showed me the right side of his face and that's

10  the left side we're looking at right now.

11  Q.  I'm showing you what's been previously marked, it is

12  Defendants' Exhibit 3Z.

13         Who is that a picture of?

14  A.  That's the Spanish officer.  His last name is Cruz.

15  Q.  Does Defendants' Exhibit 3Z fairly and accurately depict

16  how defendant Cruz looked on November 1, 2007 after you were

17  assaulted by the officers?  Mr. Hawks.

18  A.  Pardon me.  I got caught up in looking at the picture.

19  Q.  My question to you was, does Defendants' Exhibit 3Z fairly

20  and accurately depict --

21  A.  Yes.

22  Q.  -- how defendant Cruz looked that day after you had been

23  assaulted?

24  A.  Yes, that's the way he looked.

25         MR. NOVICH:  Your Honor, at this time I would like to

1    move into evidence Defendants' Exhibits 3A, 3R, 3S, 3T and 3Z.

2              THE COURT:  I'll allow it.

3              (Defendant's Exhibits 3A, 3R, 3S, 3T and 3Z received

4    in evidence)

5    Q.  Now, after you were assaulted, you described you were taken

6    to be seen by the medical personnel, correct, at the prison?

7    A.  Yes.

8    Q.  And they cleaned the blood up off you, right?

9    A.  Yes.  They couldn't leave the evidence.  So I guess they

10   cleaned up the blood up so they can't leave no evidence.

11   Q.  Were pictures taken of you that day after you were

12   assaulted?

13   A.  Yes.  They had a female staff.  She did the pictures.  I

14   don't know her name.  I can't recall her name, but I know it

15   was a female.

16   Q.  I am going to show you what's been previously marked and

17   stipulated to as Plaintiff's P6.  My question to you is, does

18   Exhibit P6 fairly and accurately depict how you looked on

19   November 1, 2007 after you had been attacked by the defendants?

20   A.  You asking me how did I look?

21   Q.  Does that picture that is up on the screen, does that

22   picture fairly and accurately depict how you looked that day

23   after you had been attacked?

24   A.  Yeah.  It looks like I was attacked.

25   Q.  I'm showing you a side profile.  That is also part of

D7MHHAW5                    Hawks - direct

1    Exhibit P6.

2              Is that how the right side of your face looked, is

3    that a fair and accurate depiction of how the right side of

4    your face looked on November 1, 2007 after you were attacked by

5    the defendants?

6    A.   Yeah.  My face looked kind of bruised up there a little

7    bit.

8    Q.   You can see there is some bruising here, is that right?

9    A.   By the cheekbone, yeah.

10   Q.   Was there some swelling there too?

11   A.   Yeah, there was swelling.

12   Q.   Was there some bruising under your eye?

13   A.   Yeah.

14   Q.   And were there injuries to the top of your head?

15   A.   Yeah.

16   Q.   Did you also sustain the injuries to the back of your neck?

17   A.   Yes.  I believe I mentioned that during the opening of the

18   jury that my neck was stretched.  They said my neck muscles

19   were stretched when I got to the outside hospital in Putnam.

20   The nurses were telling me that --

21             MS. KIM:  Objection.

22             THE COURT:  Sustained.

23             Counsel, there are other pictures that are part of P6.

24   Are you introducing them as well?

25             MR. NOVICH:  No, your Honor.

D7MHHAW5                          Hawks - direct

1   Q.  I'm showing you the other side profile, Mr. Hawks.  Does

2   this picture fairly and accurately represent the other profile

3   after you were attacked on November 1, 2007?

4   A.  Yes.  That's a pretty accurate profile picture.

5   Q.  That is the other side of your face, right?

6   A.  That's the other side of my face, correct.

7   Q.  Was there redness in this area that I'm pointing to here?

8   A.  Yeah.  That's right there by my neck.

9   Q.  As well as behind your head?

10  A.  Yeah.  A lot of swelling.

11          MR. NOVICH:  Your Honor, at this time I would like to

12  move those specific photos that I showed the jury that are part

13  of P6.

14          THE COURT:  I am not understanding the exhibit system.

15  P6 in my book has about six or seven or eight photos.  It is

16  your exhibit.

17          MR. NOVICH:  Right, your Honor.

18          THE COURT:  But you are not introducing all of your

19  exhibits.

20          MR. NOVICH:  Just those photos, your Honor.

21          THE COURT:  OK.

22  Q.  Now, in connection with the November 1, 2007 assault on

23  you, were charges pressed against you?

24  A.  Yes.

25  Q.  Were you represented by counsel in that proceeding?

1   A.  No, I wasn't.

2   Q.  Was there a jury of your peers who decided the case?

3   A.  Absolutely no.

4   Q.  Were you allowed to directly question the defendants?

5   A.  They brought nobody inside the room with me.

6   Q.  Were you found guilty?

7   A.  I was found guilty.  As I said earlier to the jury, 60

8   months, which was a total of five years.

9   Q.  60 months and what?

10  A.  Box time, special housing unit, whatever they want to call

11  it.

12  Q.  Mr. Hawks, the complaint that was filed in this matter, you

13  filed the complaint, right?

14  A.  Yes.  It was a grievance complaint that I filed.

15  Q.  No, I'm talking about the complaint in this federal

16  lawsuit, this case here.

17  A.  Yes.

18  Q.  Did you file that complaint?

19  A.  I had help.

20  Q.  Did you have a lawyer representing you at that time?

21  A.  No lawyer.

22  Q.  And that was back in 2009, right?

23  A.  That's correct.

24  Q.  Now, I'm just representing you in connection with this

25  trial, right?

1    A.  That's correct.

2    Q.  I wasn't representing you back in 2009?

3    A.  I didn't even know you.

4    Q.  Did anyone help you draft the complaint that you filed in

5    this federal lawsuit?

6    A.  Yes, sir.

7    Q.  Who helped you?

8    A.  A guy by the name of Raheem.  He is an older guy.  He stays

9    in the law library.  He does, researches different things of

10   violence, criminal cases, and etc.

11   Q.  Where was Raheem?

12   A.  Raheem was busy inside, working inside the law library.  It

13   is called the place where guys go do their research.

14   Q.  Was Raheem an inmate?

15   A.  Yes.

16   Q.  What prison was Raheem at?

17   A.  Raheem was in Green Haven Correctional Facility where I was

18   at.

19   Q.  Was Raheem a lawyer?

20   A.  Absolutely not.

21   Q.  Do you know if Raheem went to law school?

22   A.  I didn't get into all that.  I didn't ask him his personal

23   occupation.  But he knew what he was doing.

24   Q.  Did you tell Raheem what happened to you?

25   A.  Yes, I had to tell him what happened to me before he can

1  draw up a brief and draw up the complaint.

2  Q.  Did he draw up the complaint?

3  A.  Somewhat.  I did most of that, though, the work, but he did

4  the typing.

5  Q.  Did you have anyone else help you with the complaint?

6  A.  No.  He was the only one that I could recall.

7  Q.  Now after you were at Green Haven, was there another prison

8  that you went to?

9  A.  Southport.

10  Q.  Was there anyone at Southport who helped you with the

11  complaint?

12  A.  Yes.  An inmate by the name of Kareem Perry was his name.

13  Q.  So if I am understanding you right, you told Raheem at

14  Green Haven what happened.  He helped you with the complaint.

15  And then when you went to Southport --

16  A.  I had the other guy there.

17  Q.  He also worked on it?

18  A.  To follow up on some things, yeah.

19  Q.  Before the complaint was filed, did you speak to a lawyer?

20  Did you ask a lawyer to review it, to go over it with you?

21  A.  No, there wasn't no lawyer present.

22  Q.  Did you have access to a lawyer?

23  A.  Absolutely not.

24  Q.  Did you read the complaint before it was filed?

25  A.  I didn't understand it but I read it.

1   Q.  Did you have problems reading back in 2009?

2   A.  I had, I had a pretty low reading level.  I think it was a

3   fifth grade reading level, as you mentioned it earlier.  I did

4   bring that up.  Yes, I did.

5   Q.  What is the last grade of formal schooling that you

6   completed?

7   A.  Ninth grade.

8   Q.  Did you do any subsequent studying after that?

9   A.  I did some cell studying, you know, to try to sharpen up my

10  skills.  They got cell study teachers that comes around and

11  they give you books and stuff to read to try to better your

12  education.

13  Q.  Was there a point in time in your youth when you stopped

14  going to school?

15  A.  I dropped out in ninth grade, like I said.

16  Q.  Did you trust the inmates who prepared the complaint for

17  you, did you trust the inmates who wrote the complaint for you

18  to put your words down correctly?

19  A.  Yes, I did.

20  Q.  Now I want to talk to you about the injuries that you

21  sustained as a result of the November 1, 2007 incident.  OK.

22          Please tell the jury what, if any, injuries you

23  suffered as a result?

24  A.  In 2007 you're saying?

25  Q.  I'm sorry.  November 1, 2007.  This assault that we are

D7MHHAW5                           Hawks - direct

1    here for, this case.

2    A.   OK.  What's the question?

3    Q.   The question is, please describe for the jury what, if any,

4    injuries did you sustain?

5    A.   I sustained a broken wrist, with, you could say -- scratch

6    that, a fractured wrist, left wrist, and laceration, bruises

7    from my head and other body parts.  My leg, my left leg had

8    cuts and bruises, and I believe the neck muscles that I

9    described were stretched.

10   Q.   In connection with the assault in this case, did the prison

11   nurse examine you?

12   A.   I believe there was a prison nurse by the name of Terry

13   Davis just looked at me and they cleaned me up, but he didn't

14   stitch me up.

15   Q.   Mr. Hawks, I want to show you what's been previously marked

16   as Plaintiff's Exhibit 3.  It is page 43 of P3.  It is a

17   nurse's report that has been stipulated to by the parties.

18            Now, this nurse's report reflects a date of November

19   1, 2007, that you were seen by, examined by nurse Terry Davis

20   on that day.

21            Do you recall that?

22   A.   Yes.  I just mentioned his name.

23   Q.   And the time of the examination was 1 p.m. on that day,

24   right?

25   A.   That's correct.

1   Q.  And the time noted in nurse Davis' report about --

2   A.  12:20.

3   Q.  Was the time of the incident, the assault?

4   A.  Yes, that's correct.

5   Q.  Does that sound right to you?

6   A.  That sounds accurate to me.

7   Q.  Now nurse Davis circled different areas where you sustained

8   injuries.  Does that accurately reflect where you sustained

9   injuries on that day?

10  A.  Could you describe what is accurate and what is not.

11  Q.  There is an indication that you sustained injuries

12  underneath your right eye.  Did you?

13  A.  My left eye.  Not my right eye.

14  Q.  Well, this shows a circling under the right eye.  Do you

15  remember that you had the right bruising under the right eye?

16  A.  I had some bruises on the right eye, but I don't know about

17  the cut that they had.

18  Q.  Did you have any injuries -- this indicates that you had

19  some injuries to your upper chest.  Did you?

20  A.  Yes.  Where they got the circle around my chest, yes, I had

21  little bruises up there.

22  Q.  What about to the back of your arm, did you have injuries

23  there?

24  A.  Yes.  That was supposed to be my left arm.  My elbow was

25  kind of busted.  The skin was broken.

1    Q.  There is a circle mark on top of your head.  Did you have

2    any injuries there?

3    A.  Yeah.  I had a concussion, slight concussion.

4    Q.  Did you have any bleeding or lacerations at the top of your

5    head?

6    A.  Laceration, cuts.

7    Q.  This also indicates that you had some injuries to the right

8    side of your face.  Did you?

9    A.  Yes, I did.

10    Q.  And also injuries to your left wrist.  Is that right?

11    A.  That's correct.

12    Q.  If you look at the body of the report, it says:  Inmate

13    strip to boxers.  Were you striped to your boxers?

14    A.  Yes.  They striped me all the way down to my underwears.

15    Q.  Nurse Davis wrote on that day, 40 minutes after the

16    assault, that you had abrasions to the top of head.  Right?

17    A.  Yes.

18    Q.  Right side of face ear to nose.  Did you have abrasions

19    there as well?

20    A.  Yes.

21    Q.  Small abrasion to right elbow.  Is that accurate?

22    A.  That's accurate.

23    Q.  All abrasions cleaned, and the bleeding was stopped.  Is

24    that right?

25    A.  Yes.

1    Q.  Now red area noted to upper chest.  Did you have redness to

2    your upper chest?

3    A.  Yes.

4    Q.  And upper back of arms.  Did you have some type of injury

5    there?

6    A.  Yes.

7    Q.  And swelling noted to the left hand and wrist.  Is that

8    right?

9    A.  Yes.

10   Q.  Also slight swelling noted to the left inner aspect of your

11   knee.

12   A.  Yes, my left knee.

13   Q.  And right side of the face included right orbit.

14   A.  Yes.  Yes.

15   Q.  Patient stated pain to back of neck.  Were you complaining

16   of pain to the back of your neck?

17   A.  Yes.  I complained a few times to the nurse and they just

18   gave me a pain pill and that was it.

19   Q.  And then there is left knee and left wrist.  Did you have

20   any injuries to those areas.

21   A.  Say the question again.

22   Q.  The nurse noted that you had noted left knee and left

23   wrist.  Did you have pain coming from those areas?

24   A.  Yes, I did.

25   Q.  And then it says, inmate unable to make fist.  Was that

1   true?

2   A.  Yes, that's very true.

3   Q.  Did you receive any medication for your injuries?

4   A.  Pain pills, 500 milligrams.

5   Q.  How long were you on that medication for?

6   A.  They gave me a big bag.  I would say it lasted for about a

7   month.

8           MR. NOVICH:  Your Honor, one moment, please.

9           Nothing further, your Honor.

10          THE COURT:  Nothing further.  Counsel,

11  cross-examination.

12          MS. KIM:  Thank you, your Honor.

13  CROSS EXAMINATION

14  BY MS. KIM:

15  Q.  Good afternoon, Mr. Hawks.

16  A.  Good afternoon, ma'am.  Miss Kim.

17  Q.  Now, Mr. Hawks, would you remind the jury one more time why

18  you were transported to Fishkill on November 1, 2007.

19          THE COURT:  Ms. Kim, if you could pull that microphone

20  down.  Yes.

21  A.  Yes.  I could remind the jury again.  I was transported to

22  the Fishkill hospital or, I should say, facility for a

23  fractured wrist.

24  Q.  So you already had a fractured wrist, correct?

25  A.  Yes, from the first incident.

D7MHHAW5                    Hawks - cross

1   Q.  And you didn't fracture your wrist in this November 1, 2007

2   incident, isn't that right?

3   A.  Yes.  No, it's not right.  They refractured it.  It was

4   already fractured and they refractured it again.  They injured

5   it again.

6   Q.  And that was your left wrist?

7           THE COURT:  Wait a minute.  Did they refracture your

8   wrist --

9           THE WITNESS:  Yeah.

10          THE COURT:  -- on November 1 or did they injure it

11  again?

12          THE WITNESS:  I am going to scratch that and say they

13  reinjured it again.

14  Q.  So your left wrist wasn't broken again, right?

15  A.  According to the medical, they determined that it was a

16  tear.  I don't know what that mean.  I don't know if that's

17  broke or if it's tore.  I'm not a doctor.  I don't know.

18  Q.  That was your left wrist, right?

19  A.  That was my left wrist, right.

20  Q.  There was nothing wrong with your right hand, was there?

21  A.  No.

22  Q.  There was nothing wrong with your right wrist, was there?

23  A.  No.

24  Q.  There was nothing wrong with your right arm, was there?

25  A.  No.

1    Q.  Now, turning to the November 1, 2007 incident, and I want

2    you to really try and keep them separate, what happened in

3    November and what happened in August.  All right, Mr. Hawks?

4    A.  Yes, I'm listening.

5    Q.  You claim these four officers used excessive force on you,

6    correct?

7    A.  I'm not claiming.  I'm saying that they assaulted me.

8    Q.  OK.  Did you physically fight any of these officers that

9    day?

10   A.  No, ma'am.

11   Q.  Did you physically resist these officers that day?

12   A.  Yes, ma'am.

13   Q.  You physically resisted them, right?

14   A.  Resisting as far as putting my hands up and covering my

15   face.

16   Q.  Isn't it true that on that day you punched officer Gunsett

17   in the face?

18   A.  Absolutely not.  Not true.

19   Q.  You used your right hand and punched officer Gunsett in the

20   face.  Isn't that right?

21   A.  That's not right.

22   Q.  Isn't it true that you grabbed at officer Gunsett's legs to

23   try and trip him?

24   A.  I never grabbed the officer and tried to trip him, no,

25   ma'am.

D7MHHAW5                    Hawks - cross

1  Q.  Isn't it true that on November 1, 2007 you bit officer

2  Mazzella in his arm?

3  A.  Now that's true.  I had to bite the guy to get him up off

4  me.

5          THE COURT:  Who did you bite?

6          THE WITNESS:  Mazzella.

7  Q.  Now isn't it true that what officer Mazzella was trying to

8  do at the time when you bit him was turn you over on your

9  stomach?

10 A.  That's not true.

11 Q.  Do you recall if you ever, under oath, denied biting

12 officer Mazzella?

13 A.  I was under pressure at the time and I was being a little

14 pressured and that's why I just made that statement, out of

15 fear.

16         THE COURT:  You made which statement?

17         THE WITNESS:  That the officer, I didn't bite the

18 officer.

19 Q.  So at some point under oath you lied and you said you did

20 not bite officer Mazzella, isn't that correct?

21 A.  I wouldn't say it's a lie.  I would say that I was scared.

22 Q.  When you said that you didn't bite officer Mazzella, you

23 weren't telling the truth, were you?

24 A.  Well, I'm telling the truth now.

25         THE COURT:  No, but she's asking you about some prior

1    time.

2              Was it a deposition that you are talking about?

3              MS. KIM:  Yes, your Honor.

4              THE WITNESS:  Yes, I mentioned that in a deposition.

5    Maybe I did tell the truth and maybe I didn't because sometimes

6    when the stenographer, like the one that is doing this now,

7    doing everything, sometimes they miss the keys and

8    misinterpreted what was being said.  Maybe that could have been

9    the case.  It could have been a mistake on both parties, not

10   just my part but on other side also.

11   Q.  Mr. Hawks, at your deposition when you were sworn to tell

12   the truth, you either said you did bite officer Mazzella or you

13   didn't bite officer Mazzella.  And what did you say?

14   A.  I said that I didn't bite officer Mazzella.

15   Q.  It was the stenographer who was incorrect, is that right?

16   A.  I believe so.  If she had down something different than

17   what I said.

18             THE COURT:  Wait a minute.  At the deposition what did

19   you say about the bite?

20             THE WITNESS:  I said that I didn't bite officer --

21             THE COURT:  Did not or did?

22             THE WITNESS:  I did not.

23             THE COURT:  And that's what you meant to say, or no?

24             THE WITNESS:  That is what I didn't meant to say.

25             MS. KIM:  Just one minute, your Honor.

1   Q.  Do you remember testifying at a deposition on November 19,

2   2010?

3   A.  Yes.

4   Q.  You swore to tell the truth at that deposition, right?

5   A.  Yes.

6   Q.  You were under oath just like you are under oath today,

7   correct?

8   A.  Yes.

9   Q.  Do you remember being asked these questions and giving

10  these answers:

11  "Q.  Did you bite him?"  Meaning officer Mazzella.

12          Your answer was:  "No, not at all.  Not at all.  Just

13  before he hit me, I didn't get a chance to do, even do

14  anything."

15          Mr. Hawks, do you remember giving that answer at your

16  deposition?

17  A.  I remember I was angry when I gave that deposition.

18  Q.  So the stenographer wasn't mistaken, was she?

19          MR. NOVICH:  Object, your Honor.

20          THE COURT:  Overruled.

21  A.  Ask the question again, please.

22          THE COURT:  She is asking you if that question was

23  asked and you gave that answer at that deposition.  That is

24  what she is asking.

25          THE WITNESS:  I would have to say yes, I gave that

1   answer.  The answer is yes.

2   Q.  Now, Mr. Hawks, you filed a document called a complaint in

3   this court, correct?

4   A.  Yes.

5   Q.  And that's the document that you filed in this court to

6   start this lawsuit, right?

7   A.  That's correct.

8   Q.  And when you filed that document with this court, you were

9   swearing to the truth of what was stated in that document,

10  correct?

11  A.  Yes.

12  Q.  You wrote that complaint yourself, didn't you?

13  A.  I had help.

14  Q.  Well, isn't it true that you had help but only with the

15  spelling of the words in that document?

16  A.  No, that's not true.

17  Q.  That complaint contained your words and how you wanted it

18  to be worded, isn't that right?

19  A.  It's somewhat.  I had help.

20  Q.  You only had help with spelling, right, not what was said

21  in the document?  Isn't that right?

22  A.  What was said in the document, like I said, that I was kind

23  of emotional and I didn't really, really focus on what I was,

24  exactly how I wanted to put it, write the complaint.

25  Q.  Now your complaint was dated November 6, 2009, right?

1   A.  Yes.

2   Q.  This is two years after the incident happened?

3   A.  That's correct.

4   Q.  Let's go back to your deposition.

5   A.  OK.

6   Q.  Do you recall being asked these questions and giving these

7   answers --

8   A.  What questions?

9   Q.  I am about to tell you.

10          THE COURT:  She is about to read it to you.

11          MR. NOVICH:  I am going to ask if counsel is going to

12   refer to a deposition --

13          THE COURT:  Overruled.

14          Do you have a copy of it?

15          MR. NOVICH:  I do, but it is 120 pages long.

16          THE COURT:  Overruled.

17   Q.  This is page 55:

18   "Q.  Are you familiar with the complaint that you filed in this

19   action?

20   "A.  Yes, I'm very familiar with it.  I filed it.

21   "Q.  And --

22   "A.  What is it that you want to know?"

23          THE COURT:  What is it what?

24   Q.  "What is it that you want to know?"

25   "Q.  Did you type it up?

1    "A.  What is it that you want to know about the complaint?

2    "Q.  Did you type it up yourself?

3    "A.  Did I write it?

4    "Q.  Yes.

5    "A.  Did I write it myself?  I had a little bit of assistance

6    of spelling words, if that's what you're getting at, but it was

7    my complaint, my words, how I wanted it to be worded."

8              THE COURT:  OK.  Do you have a question for him?

9              MS. KIM:  Yes.

10   Q.  Do you recall being asked those questions and giving those

11   answers?

12   A.  I recall some of those questions.

13   Q.  Those were your answers at the deposition, correct?

14   A.  Some of them, not all of them.

15   Q.  You are denying that you answered this way to these

16   questions at your deposition?

17   A.  I'm not denying anything.  I said I'm aware of some of them

18   and not the others.  In other words, I remember some of them

19   and I don't remember the others.

20   Q.  Now --

21   A.  I don't recall.

22             MS. KIM:  Your Honor, may I approach?

23             THE COURT:  Sure.

24   Q.  Mr. Hawks, I'm going to show you what we marked as

25   Defendants' Exhibit 11.

1              MR. NOVICH:  Your Honor, objection.

2              THE COURT:  Sustained for the moment.

3              I only have 10.

4              MS. KIM:  This is impeachment.

5              THE COURT:  It is what?

6              MS. KIM:  It is an impeachment document, your Honor.

7              THE COURT:  Are you using it --

8              MS. KIM:  To impeach.

9              THE COURT:  You are not offering it in evidence?

10             MS. KIM:  I am going to move it into evidence.

11             THE COURT:  First let's see what you have to say.

12    Q.  Mr. Hawks, do you recognize this document?

13    A.  Excuse me?

14    Q.  Do you recognize this document?

15    A.  I've seen it before.

16             THE COURT:  Do you have a copy for me?

17             MS. KIM:  Yes, your Honor.

18    Q.  Mr. Hawks, is that the complaint that you filed in this

19    court to start this lawsuit?

20    A.  This is the complaint that Raheem filed.

21    Q.  Raheem didn't start this lawsuit, right?  You started this

22    lawsuit?

23    A.  I started it and he typed it.

24    Q.  You signed this complaint, right, Mr. Hawks, on the last

25    page?

1    A.   Yes.   That's my signature.

2              THE COURT:   On which page?

3              THE WITNESS:   On page 11.

4              THE COURT:   What about page --

5              THE WITNESS:   4.   No, it was 11.

6         (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7M6HAW6                    Hawks - cross

1              THE COURT:  What about page 7.

2              THE WITNESS:  Seven?

3              THE COURT:  Yes.

4              THE WITNESS:  Let me get to seven.  Injuries.  Where

5     it says injuries?

6              THE COURT:  No.  I don't know if I have the same

7     document as you do.

8              THE WITNESS:  Does it say that?

9              THE COURT:  This is what I have as page 7.  Do you see

10    that?

11             THE WITNESS:  Uh-huh.  Where it says, Declare under

12    penalty of perjury that this 2nd day of November 2000.

13             THE COURT:  No.  It says, That the foregoing.  Do you

14    see that?

15             THE WITNESS:  Point to it.

16             THE COURT:  Right there.

17             THE WITNESS:  Okay.  Okay, I got.

18    BY MS. KIM:

19    Q.  You signed that document --

20    A.  Yes.

21    Q.  -- in three different places, right, on page 7?

22    A.  Uh-huh.

23    Q.  You signed it after it says, I declare under penalty of

24    perjury that the foregoing is true and correct, right?

25    A.  Yes.

1    Q.   Then further down on that page you signed it again?

2    A.   That's correct.

3    Q.   Then the pages start again starting with one and then it

4    goes to page 4.  That is the last page of that document?

5    A.   Yes.  That's the last page.

6    Q.   You signed it on that page, too, correct?

7    A.   Yes.

8    Q.   In your complaint in paragraph two that would be the second

9    page 2.  Do you follow me?

10   A.   Okay.

11   Q.   In paragraph two you stated that you turned to fight the

12   officers, isn't that correct?

13   A.   I don't recall.

14   Q.   It is right in front of you.  You wrote that you turned to

15   fight the officers, didn't you?

16   A.   I didn't write that, though.  The stenographer or the

17   attorney, assistance attorney general wrote that on there.

18   Q.   I am sorry?

19   A.   I didn't write that on there.

20   Q.   This complaint wasn't prepared by you?

21   A.   Like I said, I didn't write that on there.

22          THE COURT:  Ms. Kim, where are you now?  On the second

23   document?

24          MS. KIM:  Second page 2.

25          THE COURT:  Page 2, right?

1          MS. KIM:  Second paragraph.

2          THE COURT:  Which begins Gunsett --

3          MS. KIM:  -- told Pops.

4    Q.  Now you are denying that you wrote this complaint,

5    Mr. Hawks?

6    A.  Where it says the Gunsett was talking for quite some time.

7    Q.  I am asking if you wrote in this paragraph that you turned

8    to fight the officers?

9    A.  I am reading right here what I just said, where it says I

10   was talking quite some time and --

11         THE COURT:  She is in paragraph two.

12   A.  Where it says Gunsett told Hawks to shut up?

13         THE COURT:  I think that is what she is referring to.

14   A.  That is what you are referring to?

15   Q.  Let me ask you a question, Mr. Hawks.  It says in paragraph

16   two, Hawks, referring to yourself, took his hand off the wall

17   and turned to fight when Mazzella punched Hawks in the stomach

18   causing Hawks to double over.

19         So you turned to fight the officers, right?

20   A.  I turned around to put my hands up to defend myself.  I

21   didn't turn to fight the officer.  I turned to defend myself.

22   I believe I stated that earlier in the opening to the jury.

23   Q.  Let's go to paragraph three.

24   A.  Okay.  Where it says that Gunsett rammed his knee.

25   Q.  No.  I have not asked a question, Mr. Hawks.

1          In paragraph three you admit that Officer Mazzella was

2     trying to roll you onto your stomach and you bit Officer

3     Mazzella, isn't that correct?

4     A.  Yes.  I state that I bit him.

5     Q.  At that point he was trying to turn you over onto your

6     stomach, right?

7     A.  No.  He was punching me.  He wasn't trying to turn me over

8     onto my stomach.

9          THE COURT:  Ms. Kim, are you referring to three or

10    four.

11         THE WITNESS:  Three.

12         MS. KIM:  Pardon me.  Paragraph four.  Four.

13         THE COURT:  She is in four.

14         THE WITNESS:  I was on three.

15    Q.  Isn't it true your complaint states in paragraph four

16    Mazzella tried to roll Hawks on his stomach and then Hawks bit

17    Mazzella, is that right?

18    A.  No.

19    Q.  In your complaint in paragraph three you admit that you

20    grabbed at Officer Gunsett's legs trying to trip him over,

21    isn't that right?

22    A.  No.

23    Q.  It doesn't say that in paragraph three?

24    A.  That is what it says, but that is not what happened.

25    Q.  Mr. Hawks, you can read, right?

1    A.   A little bit.

2    Q.   Well, you just read the some sentences.

3              THE COURT:   She is asking if that is what it says.

4    A.   Yes.   That is what it says, yeah.

5    Q.   Now, Mr. Hawks, is it true that on November 1st, 2007 these

6    officers were trying to hold you down and put restraints on you

7    when this incident happened?

8    A.   They did hold me down.   They wasn't trying to.   They

9    were --

10   Q.   They were holing you down to get restraints on you,

11   correct?

12   A.   They was holding me down, yes.

13   Q.   To get your hand behind your back and handcuffs on your

14   wrist, correct?

15   A.   After they did what they did, I can't say that they was

16   trying to put restraints on me because it seemed like it took

17   them a long time to get restrains on because I cannot say yes

18   to that.

19   Q.   Because you were fighting them, right?

20   A.   No, ma'am.   I wasn't fighting.

21   Q.   Isn't it true that it took four officers to hold you down

22   and get the restraints finally on you?

23   A.   I am saying no, I can't, ma'am.

24   Q.   Isn't it true that before this incident started where you

25   claim that you were assaulted by these officers, Officer

1   Gunsett told you to put your hands in your pockets?

2   A.  And I did so.

3   Q.  So he did tell you that, right?

4   A.  And I did.

5   Q.  He told you to keep your hand in your pockets right before

6   this incident broke out, right?

7   A.  And I did.

8   Q.  Did Officer Gunsett tell you that?

9   A.  No.  He didn't tell me that.

10  Q.  He didn't tell you that?

11  A.  He told me to put my hands in my pocket one time.  That's

12  all he said.  He did not tell me several times.  He told me one

13  time and I did what he said that one time.

14  Q.  This is right before the incident broke out.  He told you

15  to keep your hands in your pockets, correct?

16  A.  And I did.  Like I said one time.

17  Q.  I am not asking if you --

18          THE COURT:  He answered.  He said yes.

19          Right?

20          THE WITNESS:  Yes.  The answer was yes.

21  Q.  When an officer tells you to keep your hands in your

22  pockets, that is a direct order, right?

23  A.  Depends.  Depends on what kind of direct order he is giving

24  me.  If I can't put my hand in my pocket because I have a

25  cast --

1    Q.   Whether you can follow --

2    A.   -- wrapped around.

3    Q.   Whether you can follow the direct order or not when the

4    officer tells you to keep your hands in your pockets, that is a

5    direct order?

6    A.   In any situation it was not a direct order because I had a

7    cast wrapped around my wrist, ma'am.

8              THE COURT:  You said it was not a direct order?

9              THE WITNESS:  No, it wasn't.  I am saying it wasn't to

10   me.  It wasn't a direct order.  I am saying I put my hand in my

11   pocket.  He asked me if you ask me did he give me a direct

12   order, I didn't hear him call a direct order.  All he said was,

13   Put your hands in your pocket and I did.

14   Q.   When an officer gives an inmate a direct order, whether it

15   is to keep your hands in your pockets, put your hands on the

16   wall, whatever it may be, the inmate is supposed to follow the

17   order, right?

18   A.   Yes.

19   Q.   Isn't it true that during this use of force incident on

20   November 1st, 2007, the officers kept telling you to be still,

21   don't move and stop resisting?

22   A.   Do you want me to answer that?

23   Q.   Yes.

24   A.   I didn't move when they told me to be still.  I was still.

25   Q.   What I am asking you is what these officers were telling

D7M6HAW6                    Hawks - cross

1    you during this incident is be still, don't move and stop

2    resisting?

3    A.  No.  I don't recall them telling me to stop moving, stop

4    resisting.  I don't remember him saying that in his deposition

5    either.

6    Q.  Let's go back to the deposition because I have the

7    transcript right here.  Do you remember being asked this

8    question and giving this answer:

9    "Q.  Did they, meaning the officers, give you an order not to

10   resist?

11   "A.  Yeah, they kept telling me to be still, don't move, stop

12   resisting.  Stop resisting."

13            Mr. Hawks did you give that answer to that question?

14   A.  I don't -- I don't quite understand what resisting is.

15            THE COURT:  She is reading from a document and she is

16   asking you only if you recall being asked that question and

17   giving that answer.

18            THE WITNESS:  No, I don't recall.  I don't recall

19   giving that question.  Stop resisting or whatever you just

20   asked.  I don't recall that.

21            THE COURT:  Do you want to read it again and ask the

22   question again?

23   Q.  The question was:  Did they, meaning the officers, give you

24   an order not to resist?

25   A.  I don't recall, ma'am.  I just told you I don't recall.

1   Q.  Let me go over the question and answer one more time, okay?

2   A.  You can ask it as many times as you want.  I don't recall.

3   Q.  You don't recall giving that answer at the deposition?

4              THE COURT:  Wait.  You are confusing two things.  So

5   you have a question for now and then you have a question about

6   the deposition, right?  Why don't you reask them so everybody

7   is clear.

8   Q.  At your deposition you were sworn to tell the truth.  Do

9   you recall being asked this particular question and giving this

10  particular answer, and I am going to read the question and the

11  answer; all right?

12  A.  I guess.

13  Q.  The question was:  Did they give you an order not to

14  resist?

15             Your answer was:  Yeah.  They kept telling me to be

16  still, don't move, stop resisting.  Stop resisting.

17  Q.  Do you recall giving that answer in response to the

18  question that I just read?

19  A.  Yes.  I recall being questioned that same thing that you

20  just explained about stop resisting.  I did hear the assistant

21  attorney ask me that and I told her that I didn't resist.

22  Well, she -- they put down that I said that I stopped.  I

23  didn't stop resisting.

24  Q.  Mr. Hawks, isn't it true that these officers on that day

25  during that incident --

1          THE COURT:  On November.

2     Q.  -- November 1st, 2007, they were just doing their job to

3     protect themselves and to restrain you?

4     A.  I don't know about them just doing their job.  I know I

5     followed and complied with the order.  That is all I know.

6     Q.  Do you recall at your deposition testifying to this what I

7     am about to read, all right, it is the same question and the

8     answer continued?

9          THE COURT:  Are you going to read a question and

10    answer from the deposition?

11         MS. KIM:  Yes.

12         THE COURT:  Then you can ask him if he calls that

13    question and that answer.

14    Q.

15    "Q.  Did they give you an order not to resist?"

16    A.  I don't recall.

17    Q.  I haven't read the answer.

18    A.  Okay.  Sorry.

19    Q.  The answer was:  Yeah.  They kept telling me to be still,

20    don't move, stop resisting.  Stop resisting.  Of course they

21    are going to say that because that is what they are trained to

22    do and that is what I am trained to do, what I got to do to

23    prevent myself from getting hurt.  I am not trained the way

24    they are trained, but just like they don't know how I am

25    trained to defend myself.  So it is just one of those things

1    where they had to do what they had to do to get the job done

2    they best they knew how and secure everybody and make their job

3    safe and try to apprehend me.

4             Do you recall being asked that question and giving

5    that answer?

6    A.  I recall answering that question, but I don't recall giving

7    that answer.

8    Q.  Do you deny giving that answer?

9    A.  I am not denying.  I don't recall.  That means that I don't

10   recall saying that.

11   Q.  Now, before this incident started --

12            THE COURT:  The one on November 1st.

13   Q.  -- on November 1st, 2007, when you claim that Officer

14   Gunsett suddenly punched you, he didn't say anything to you

15   other than, Keep your hands in your pockets, correct?

16            THE COURT:  It is just about quarter to 5:00.  We

17   usually stop at quarter to 5:00.  I am going to stop now.  If

18   you would like, you can leave everything on your chair and

19   Christine will secure it for you overnight.  It will be there

20   when you come back, your notes, etc.  I do want to give you a

21   couple of instructions that we talked about earlier as I said I

22   would before you went home.

23            First, do not talk to each other about this case or

24   about anyone who has anything to do with it until the end of

25   the case when you go to the jury room to decide, deliberate on

1   your verdict.

2          Second, do not talk with anyone else about this case

3   or with anyone who has anything to do with it until the trial

4   has ended and you have been discharged as jurors.  Anyone else

5   is broad.  It includes members of your family and your friends.

6   You may tell them that you are a juror in a case, but please

7   don't tell them anything about the case until after you have

8   been discharged by me.  Also, by talking we refer these days to

9   all forms of communications.  That would be Internet, Tweeting,

10  texting, phone, person to person.  No communications about the

11  case.

12         Third, do not let anyone talk to you about the case or

13  about anyone who has anything to do with it.  If someone were

14  to try to talk to you about this case, please report that to me

15  immediately.

16         Fourth, do not read any news or Internet stories about

17  the case assuming there were any, or listen to any radio, TV

18  radio reports about the case assuming there were any, or about

19  anyone who has anything to do with it?

20         Fifth, do not do any research or any investigation

21  about the case on your own.

22         So I think that is it for today.  We made a lot of

23  good progress.  Leave everything there and if you come

24  tomorrow, we'll have tea and coffee in the jury room.  I would

25  like you to get here around 9:15 or so so we can get assembled

1    and start promptly at 9:30.

2              Thank you very much.

3              (Jury excused)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7M6HAW6                    Hawks - cross

1          THE COURT:  That's it for today.  We'll see all at

2    9:15 tomorrow morning.

3          MR. NOVICH:  Thank you, Judge.

4          MS. KIM:  May I address a housekeeping matter?

5          THE COURT:  Yes.

6          MS. KIM:  You may recall I said that we would bring

7    the nurse in on Tuesday morning.  He is on vacation.  He is

8    breaking up his vacation.

9          THE COURT:  Yes.

10          MS. KIM:  Perhaps we can finish with Mr. Hawks first

11    thing tomorrow morning and I will tell the nurse to come maybe

12    about 10:30.

13          THE COURT:  If you want to have the nurse and then

14    resume with Mr. Hawks that is okay, too.  I don't want to have

15    any break in the action so to speak.  You need to have the

16    nurse here ready to go whenever you are ready to go with that

17    person.

18          Do you know what I am saying?

19          MS. KIM:  Yes.

20          THE COURT:  There should not be any gap between the

21    end of cross-examination of Mr. Hawks and beginning of the

22    nurse.  Earlier is the better approach even if the nurse has to

23    sit around for a while.

24          MS. KIM:  Thank you, Judge.

25          THE COURT:  Thank you.  See you the first thing

1    tomorrow.

2              (Adjourned to July 23, 2013 at 9:30 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        INDEX OF EXAMINATION

Examination of:                              Page

BRIAN HAWKS

Direct By Mr. Novich . . . . . . . . . . . . .33

Cross By Ms. Kim . . . . . . . . . . . . . . .76

                        PLAINTIFF EXHIBITS

Exhibit No.                                  Received

  7  . . . . . . . . . . . . . . . . . . . . .44

                        DEFENDANT EXHIBITS

Exhibit No.                                  Received

 3A, 3R, 3S, 3T and 3Z  . . . . . . . . . . .65