D7n6haw1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

BRIAN HAWKS,

                    Plaintiff,          New York, N.Y.

          v.                            09 Civ. 9923 (RMB)

C. GUNSETT, D. MAZELLA, E.
CRUZ, C. GRAVELINE,

                    Defendants.

-------------------------------x

                                        July 23, 2013
                                        9:15 a.m.

Before:

                    HON. RICHARD M. BERMAN,

                                        District Judge

                         APPEARANCES

LITTLER MENDELSON
     Attorneys for Plaintiff
BY:  IVAN R. NOVICH
     LAUREN J. MARCUS

ERIC T. SCHNEIDERMAN
     Attorney General of the State of New York
BY:  MARY KIM
     JASON CLARK
     Assistant Attorneys General

          (In open court; jury not present)

          THE COURT:  I have a few administrative things

particularly relating to the exhibits.  First is that I have

asked counsel for both sides to prepare exhibit books not only

for me but for the jurors as well.  I don't know if that

D7n6haw1

happened, but I am just thinking back to yesterday and I don't

think anybody gave any of the jurors any of these exhibits.  I

don't know if that has happened.  I haven't seen any jurors

with exhibit books.

Now, point two, that might be a good thing because the

exhibit books contain exhibits that I had specifically excluded

based on motions in limine so I don't understand exactly why

they are in the exhibit books in the first place.  As plaintiff

exhibits there are the -- well, I didn't know whose they are.

The report and recommendation is in there and the so-called

misbehavior reports and I have, as I said specifically ruled,

that that was not coming in as evidence.  I am totally confused

as to what you are all trying to accomplish here.

MR. NOVICH:  Sorry, Judge.  I prepared the jury book.

I got limited resources here of what I can and cannot do.

What I would propose is that I will get together with Ms. Kim

and Mr. Clark at the end of the trial and we'll pare down that

exhibit book to the exact exhibits that your Honor said were

admissible and were actually moved into exhibits and we can

provide that.  I have all sorts of extra copies.  If we want to

get it to the jury at that time, we can give it to them at the

end.

THE COURT:  We usually give it to them during the

trial so it helps them.  I am amenable to either way, but I

wanted the books to be accurate, number one.

D7n6haw1

1          MR. NOVICH:  Sure.

2          THE COURT:  If you can get together since we don't

3    have all the jurors right now and we can get that straightened

4    out.

5          Second, I had made a comment yesterday during the

6    plaintiff's introduction of some of the photos, which is found

7    in the book at I think Plaintiff's Exhibit 6, and I didn't want

8    to say it in front of the jury, but the exhibit itself, that is

9    to say Plaintiff's Exhibit 6, once again which is prepared by

10   the plaintiff, has more photos than you showed to the jury.  I

11   am a little concerned that that is misleading because the

12   photos that you didn't show one could conclude that

13   Mr. Hawks -- well, they round out the picture of what Mr. Hawks

14   looked like on the day that these photos were taken.  So by

15   cherry-picking somewhat is Plaintiff's Exhibit 6, I am not sure

16   that that is fair and gives the jury a balanced picture so to

17   speak and so I don't know.

18         Are you, Ms. Kim, planning to introduce the other

19   photos as part of your cross-examination?

20         MS. KIM:  I could do that, your Honor.

21         THE COURT:  I don't want to tell you how to run your

22   trial.  I am just saying there are other photos that round out

23   the picture.  So if plaintiff is in fact producing its

24   Plaintiff's Exhibit 6, it seems to be it should be the whole

25   exhibit.  Again, I am not telling the lawyers how to run their

D7n6haw1

1    trial.  You have to figure that out for yourselves.

2            MS. KIM:  Your Honor, the reason we haven't made

3    binders for the --

4            THE COURT:  What about this issue?

5            MS. KIM:  I can certainly introduce them.

6            THE COURT:  Well, I am not telling you to do it.  I am

7    just pointing out something.  Do you want to introduce them

8    yourselves, Mr. Novich?

9            MR. NOVICH:  Well, I have no problem, your Honor, if

10   your Honor is more comfortable seeing all the photos.

11           THE COURT:  Well, it is an agreed to exhibit, both by

12   the defense and the plaintiff, and it consists of however many

13   photos.  You moved some of them in again.  I think that doesn't

14   tell the jury the full picture of the photos.

15           MR. NOVICH:  I have no problem with that, your Honor.

16   If your Honor wants all P 6 to go back to the jury, that's

17   fine.  It is a nonissue.

18           THE COURT:  There you go.

19           In part of your exam you feel you want to refer to

20   them or introduce them, you can do that too, Ms. Kim.

21           MS. KIM:  Yes, your Honor.

22           Anything else?

23           THE COURT:  We're still waiting for all the jurors to

24   show up.  Thank you.

25           MR. NOVICH:  My understanding, Judge, is we're going

D7n6haw1

1    to finish with Mr. Hawks and then we're going to proceed taking

2    out of turn nurse Davis.

3              THE COURT:  That's fine.  Did you want to take a break

4    in between Mr. Hawks and the next witness?

5              MR. NOVICH:  I don't need to.

6              THE COURT:  In the sense of you want the jury removed

7    at that point?

8              MR. NOVICH:  The only reason I did that, your Honor,

9    is because --

10             THE COURT:  I am asking.  These are not trick

11   questions.

12             MR. NOVICH:  I will defer to whatever the marshals

13   protocol is.  If they say that the they have to escort him

14   off --

15             THE COURT:  It's understood and he said himself and we

16   all know that Mr. Hawks is incarcerated.  This is standard

17   procedure.

18             MR. NOVICH:  I'm fine with that, Judge.

19             THE COURT:  Is that okay with you, Mr. Hawks?

20             MR. HAWKS:  That's fine, your Honor.

21             THE COURT:  We're going to call the jury in now.

22             (In open court; jury present)

23             THE COURT:  Please be seated, everybody.  We'll

24   continue with the cross-examination of Mr. Hawks.

25             THE DEPUTY CLERK:  Sir, before we begin I would like

1    to remind you that you are still under oath.

2                    THE WITNESS:  Yes.

3                    THE DEPUTY CLERK:  Thank you.

4                    MS. KIM:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MS. KIM:

7    Q.  Good morning, Mr. Hawks.

8    A.  Good morning.

9                    THE COURT:  Will you pull that microphone down a

10   little bit, Ms. Kim.

11   Q.  When we broke yesterday there was an open question and the

12   question was:  Before this November 1st, 2007 incident started,

13   when you claim that Officer Gunsett suddenly punched you,

14   Officer Gunsett didn't say anything to you other than, Put your

15   hands back in your pockets; correct?

16   A.  I -- I can't remember.  It's been a while since we had that

17   incident.  He did mention something about my hands.  I can't

18   remember exactly everything verbatim.  It's been six years.

19   So, you know, I need a little refreshing.

20   Q.  Other than Officer Gunsett saying something about your

21   hands before as you claim he suddenly punched you, he didn't

22   say anything else?

23                    THE COURT:  He said he couldn't remember.

24   A.  Yeah.  Thank you.  I don't recall.  It's been a while.  I

25   have been through a lot since then.

1   Q.  Maybe I can refresh your recollection with your deposition

2   testimony; all right?

3   A.  Yes, you can do that.

4   Q.  Page 43, starting at line 24:

5   "Q.  Did he say anything to you before he swung at you, meaning

6   Officer Gunsett?

7   "A.  No.  He didn't have nothing to say.  If he did, what was

8   it for him to say?  What did you have to say?  If a person is

9   ready to fight, he is not going to do any talking.  He is going

10  to do what he got to do."

11         Do you recall giving that answer, Mr. Hawks?

12  A.  Yes.  I recollect saying something like that.

13  Q.  So he didn't say anything threatening to you; isn't that

14  right?

15  A.  I didn't tell you that is a threat.

16  Q.  Now, by the time of this November 1st, 2007 incident, you

17  had a cast on your left wrist for about two months and a week;

18  right?

19  A.  I don't -- I don't know.  Can't recall.  I don't know when

20  the cast was on.  It was on for a while.  I don't know if it

21  was two months or three months.  It was on there for a while.

22  Q.  Well, you got the cast on when you fractured your wrist on

23  August 25th, 2007; correct?

24  A.  I don't recall exactly how long the cast was on.

25  Q.  Isn't it true that your cast was completely removed that

d7n6haw1                    Hawks - cross

1   day before this incident happened on November 1st, 2007?

2   A.  I have no recollection.

3   Q.  Now, Mr. Hawks, is it true that all inmates must follow a

4   set of rules called the Standards of Inmate Behavior?

5   A.  They do give us an All Inmates Rules Book.  It does have

6   standards and rules inside the rule book.

7   Q.  Isn't it true when an inmate breaks any of those rules, he

8   is issued what is called a misbehavior report that lists the

9   infractions against the inmate?

10  A.  It's true that they have the -- stipulates a lot of rules.

11  There are so many rules inside that book.  Does all inmates

12  follow all those rule?  I always have to say no.  But do I

13  follow all the rules?  I think I would have to say yes because

14  I am very, very careful.  I have been in the system for a long

15  time so I know that if certain rules you don't follow, they can

16  end up into a result, the results can be bad or it can be good.

17  I always have to say I follow all rules.

18  Q.  Mr. Hawks, how long have you been in prison?

19  A.  Since '04.

20  Q.  You always follow the rules since '04?

21  A.  The tough ones, I do.

22          THE COURT:  The what?

23          THE WITNESS:  The tough ones.

24  A.  The ones that specifies no bodily harm to others or staff

25  members, that will be the number one that I keep in the back of

1   my mind.  Miscellaneous rules and different things, as far as

2   out of place, stuff like that, I get caught up now and then not

3   having any ID.  Sometimes I rush and put my ID in the wrong

4   place.  I might misplace it on the bed or I might have it

5   someplace laying down on the floor.  It depends on my day.  It

6   depends on how my day is going.

7   Q.  What other rules have you violated while you were in

8   prison?

9   A.  Like I said out of place.  I get out of place tickets,

10  rules, violations.

11          THE COURT:  What does that mean, out of place?

12          THE WITNESS:  Out of place, it is like being somewhere

13  where you are not supposed to be inside the facility, inside

14  the correction area.

15  Q.  Any other rules?

16  A.  That's the only ones that I always get accused of and I

17  always get altercation with staff.  We don't see eye to eye all

18  the time.  Sometimes I find myself debating, arguing with the

19  officers.  Sometimes it can lead to something and sometimes,

20  you know, it can just be a result right then and there.  It

21  depends on both of the parties.

22  Q.  Mr. Hawks, have you ever received a ticket for an

23  unhygienic act?

24  A.  Well, unhygienic act.

25  Q.  Yes.

1                MR. NOVICH:  Overruled.

2      A.  Yes, I have, and I can tell you what does it consist of and

3      what happened in that unhygienic act.  This was in

4      October 27th, 2008.  I was in Southport Correctional Facility.

5      It is a lockdown facility.  It is a disciplinary jail.  I do

6      recall being in my cell waiting for medical -- a medical run.

7      The nurse came by and was supposed to have gave me some

8      assistance about my meds because a guy has to sign up for that.

9      I had some kind of problem with not getting my meds so I had

10     wanted to get my meds that day asked one of the porters to tell

11     the officer to go and inform the officer about that I needed my

12     meds.  It's a porter that comes out that helps run the floor.

13     He assists people with certain things that they need.  So I

14     told the guy could he address the aid officer and mention to

15     him that I didn't get my medication.  He went to go do that but

16     I never got a response.

17              So I had -- I waited until a chaplain had walked -- a

18     female chaplain by the name of Chaplain Stanley.  She came --

19     she always come to talk to the prisoner, the guys, inmates.

20     And I stopped her when she got near my cell and I asked her

21     could she inform one of the sergeants or supervisors that I

22     need medication and I didn't get fed on that particular day.  I

23     had a problem with getting my meals for some reason and staff

24     ignored the request and I had threw up my vomit fluid in a cup.

25     I had two big cups I was throwing up.  I handed the two cups to

d7n6haw1                    Hawks - cross

 1    Chaplain Stanley, which is the chaplain.  That is when I was

 2    written up misbehavior or unhygienic act.

 3              It would be viewed as a violent act if you throw it on

 4    somebody or if you use it as a weapon.  I didn't use it as a

 5    weapon.  I used it to get help.  I passed it to the chaplain

 6    saying, Could you show this to the sergeant and that is what

 7    she did.  She had a cart.  She was wheeling the cart and she

 8    carries magazines, Christianity literature and stuff like that.

 9    She passes it out.  That is what she was on the company for, on

10    the unit.

11              THE COURT:  Okay.  Go ahead.

12    Q.  Mr. Hawks --

13    A.  That is what that unhygienic was about.

14    Q.  -- in fact you handed the chaplain a cup of your feces;

15    correct?

16    A.  Un-correct.  Vomit fluid.  It wasn't body fluid, feces.

17    That is what they put in the misbehavior report to make the

18    ticket stick, to make me look like I did something wrong.

19    Q.  Now, have you ever been charged with anything in any

20    misbehavior report where you actually did something wrong?

21    A.  Only thing I can think of is that I didn't have any ID

22    card.  If you want to say that is wrong, you know, that's a

23    person's opinion.  Anything defined me putting my hand on

24    anybody, no.  I am not that kind of person.  You know, real

25    humble when I am around people.  I treat people with respect

d7n6haw1                    Hawks - cross

1    and I want it in return.

2    Q.  Mr. Hawks, in August of 2006 you had an incident for which

3    you received a misbehavior report for counterfeit; right?

4    A.  I believe we went over this yesterday if I am not mistaken.

5    Could you describe what counterfeit is?

6    Q.  Isn't it true that if an officer found you out of place and

7    you gave him a false call-out, a paper that is called a

8    call-out?

9    A.  Okay.  I know where you are going with this.  I had the

10   wrong call-out in my pocket.  I grabbed -- I always hold on to

11   my call-outs.  I don't destroy them.  Some inmates destroy

12   their call-outs.  I am one guy that holds onto all my

13   call-outs.  What happened that day is I left the original

14   call-out, the one that had the right date on it, and I grabbed

15   the call-out that that had the wrong date on it.

16   Q.  Mr. Hawks, is it true that thus far you have had at least

17   12 instances where you received a misbehavior report for either

18   a Tier 2 or Tier 3 infraction?

19   A.  I received a lot of tickets, yes.  Was it by choice, I

20   don't have any control over that what the officers want to

21   write a ticket or not.  Some officers just write tickets just

22   to pass time.  You know, I think that is wrong.  That is

23   abusing their authority.  It happens in hostile environments

24   where I am doing my time out.  I am in a maximum security.  So

25   we got a lot of things that go on in maximum security all the

d7n6haw1                    Hawks - cross

1    time.  It is not just me.  A lot of people get tickets.  I am

2    not the only guy to get tickets.

3    Q.  You never did anything to deserve any tickets?

4    A.  I am not going to say -- no.  I am going to be honest.  I

5    don't feel I deserve to get a ticket and pay $5 out of my

6    pocket.  No, I don't deserve that.

7    Q.  Let me explain something to the jury, Mr. Hawks, you are

8    familiar with the prison disciplinary system?

9    A.  Am I familiar with it?

10   Q.  Yes.

11   A.  In what content?

12   Q.  When you get a ticket there, they are hearings deemed Tier

13   1, Tier 2 or Tier 3?

14   A.  Yes.  Tier 3 is the highest ticket you can receive.

15   Q.  Tier 3 is the most serious, tier 1 is not so serious, and

16   Tier 2 is something in the middle?

17   A.  It is a give and take because Tier 3 don't necessarily have

18   to be a bad ticket.  It is just because they put a Tier 3 on

19   it.  It depends how the officer writes it up.  The officer can

20   add on his own version what he want to put in the ticket.  So

21   it is up to the discretion of the hearing officer who it goes

22   in front of which would be a lieutenant.  The lieutenant gets

23   the last decision and the final result whether or not he is

24   going to determine that ticket.

25   Q.  Let's move on, Mr. Hawks.

1    Now, isn't it true that you received a misbehavior

2  report for an incident that occurred on January 2, 2005, at

3  Attica Correctional Facility charging you with assaulting

4  staff, engaging in violent conduct, and disobeying a direct

5  order?

6  A.  I can -- I can give you some feedback on that.

7  Q.  It is a yes or no question.  Did you receive a ticket on

8  January 2nd, 2005 at Attica Correctional Facility charging you

9  with assaulting staff engaging in violent conduct and

10  disobeying a direct order, yes or no?

11  A.  My answer is no.  If you want an explanation behind it, I

12  can give you an explanation.

13  Q.  I am not asking you if you assaulted staff.  I am asking

14  you did you receive a misbehavior report for assaulting staff?

15  A.  Yes.  I was charged with a ticket pertaining to an assault.

16  Yes, ma'am, if that is what you want to hear.

17  Q.  Isn't it true that on that day, January 2, 2005 at Attica

18  Correctional Facility, you were moving from one cellblock to

19  another and Officer Mariani escorting you during the move?

20  A.  Absolutely not.  Nobody escorted me anywhere.  What

21  happened was they --

22  Q.  It is a yes or no.  Were you being moved from --

23          MR. NOVICH:  Objection, your Honor.

24          THE COURT:  Overruled.

25  A.  I am going to answer the best way I know how.  I can't

d7n6haw1                    Hawks - cross

1    answer the way you want me to answer.  I can only answer it the

2    way it happened.

3            THE COURT:  For now she is just asking you if you were

4    being moved from one place to another at that time.

5    A.  I -- I was -- I wasn't being moved by officer.  She stated

6    that did Mariani move me if that is what she asked me, your

7    Honor.

8            THE COURT:  Were you moving though?

9            THE WITNESS:  I was told to be moved, yes.

10           THE COURT:  Got it.

11           THE WITNESS:  That's a yes answer.

12           THE COURT:  Okay.

13   BY MS. KIM:

14   Q.  So when you and Officer Mariani -- is that is a female

15   officer?

16   A.  No.  He is a male officer.

17   Q.  So when you an Officer Mariani were in the lobby of the

18   housing block from which you were moving, you tried to leave

19   that officer and go back upstairs to the second floor without

20   permission; correct?

21   A.  Incorrect.

22   Q.  Well, then Officer Mariani told you to stop.  He gave you a

23   direct order to stop and you turned around and punched Officer

24   Mariani in the jaw; is that true?

25   A.  That is not true.

d7n6haw1                    Hawks - cross

1    Q.  Now, Mr. Hawks, after you received a misbehavior report,

2    you get what is called a tier hearing, right?

3    A.  Yes.  Tier hearing.

4    Q.  That's a hearing that occurs in the prison and it is

5    conducted by a hearing officer; right?

6    A.  Yes, ma'am.

7    Q.  You don't leave the prison to have this hearing; right?

8    A.  I don't leave the what?

9    Q.  You don't leave --

10           THE COURT:  She is asking you if the hearing happens

11   right there in the prison.

12   A.  Oh, yes.  It happens in the facility.  Yes, ma'am.  Excuse

13   me.  I didn't understand the question.

14   Q.  Sure.  Any time you don't understand a question, just let

15   me know.

16           Now, when you have what is called a Tier 3 hearing,

17   you have given the right to call witnesses in your defense;

18   right?

19   A.  Yeah.  That's true.

20   Q.  You get to testify during that hearing; correct?

21   A.  That's correct.

22   Q.  And you get assistance from another inmate or other inmates

23   to help you gather your defense; right?

24   A.  Not all the time.

25   Q.  Well --

1  A.  Sometimes.

2  Q.  -- you have a right to assistance; right?

3  A.  You have a right to assistance, yes.

4  Q.  And you also get assistance from the Corrections staff

5  members to help you gather your defense; right?

6  A.  That's if you want assistance.

7  Q.  You have the right to that; right?

8  A.  Yeah.

9  Q.  You are allowed to present documents at that hearing to

10  defend yourself; right?

11  A.  Yes.

12  Q.  You can call eyewitness; right?

13  A.  You can if you choose.

14  Q.  You can ask the witnesses questions although you have to

15  ask through a hearing officer; right?

16  A.  Yes.  You have to -- you have to go through the hearing

17  officer before you go through the witness.

18  Q.  Is it fair to say that the reason they do that is they

19  don't want arguments between the inmate having a disciplinary

20  hearing and the witnesses sitting in the room testifying?

21          MR. NOVICH:  Objection.

22          THE COURT:  Sustained.

23  A.  Well --

24          THE COURT:  If I say "sustained," you don't answer.

25          THE WITNESS:  Okay.  I didn't know that.  I won't

d7n6haw1                    Hawks - cross

1   answer that.

2   Q.  Now, during the incident of January 2005 with Officer

3   Mariani, did other officers try to subdue you?

4   A.  It was other officers, yes, that tried to subdue me.

5   Q.  In fact, Officer Volantino and an Officer Galloway had to

6   respond to subdue you; right?

7   A.  I don't know the names.  I just know it was a couple

8   officers that was trying to subdue me if that is what your

9   question was.

10  Q.  For that particular misbehavior report charging you with

11  punching Officer Mariani in the jaw, four days later on

12  January 6, 2005 you had a Tier 3 hearing with a hearing officer

13  at Attica Correctional Facility; correct?

14          MR. NOVICH:  Objection, your Honor.

15          THE COURT:  Overruled.

16          MR. NOVICH:  That's compound.

17          THE COURT:  Overruled.

18  A.  Ask the question again, please.

19  Q.  So whether you admit it or not you received a misbehavior

20  report for punching Officer Mariani in the jaw; right?

21  A.  That's the way that the ticket was written, yes, but did I

22  punch him in the face, no.

23  Q.  For that ticket you had a hearing on January 6, 2005 at

24  Attica; correct?

25  A.  Yes, I had a hearing.

d7n6haw1                    Hawks - cross

1    Q.  Now, at that hearing you testified; correct?

2    A.  Yes, on my behalf.  Yes, I did.

3    Q.  You were given the opportunity to present any witnesses and

4    documents; right?

5    A.  And I did.

6    Q.  At the end of that hearing you were found guilty of violent

7    conduct, assaulting Officer Mariani and refusing his direct

8    order; correct?

9    A.  I was found guilty, yes.  I already knew that was going to

10   happen.  It was an officer.

11   Q.  Let's get to the incident that occurred on August 25th,

12   2007, which you spoke about when you were examined by your

13   attorney; all right?

14   A.  Yes.  I hear you.

15   Q.  Now, isn't it true that for that incident on August 25th,

16   2007 that happened at Green Haven Correctional Facility you

17   received a misbehavior report charging you with disobeying a

18   direct order, assaulting staff, violent conduct and other

19   charges; correct?

20   A.  Yes.  I was charged with violent conduct, assaulting staff,

21   and disobeying a direct order, yeah.

22   Q.  Isn't it true that on that day you began arguing with

23   Officer Sabino, a female officer, and Officer Sabino gave you

24   direct orders to lock back into your cell?

25   A.  I don't -- I don't recall she giving me direct orders to

1    lock back in my cell.  I do recall the lady female telling me

2    that we are going to get you a sergeant.  Please don't give us

3    a problem and lock in.

4    Q.  And you didn't lock in, did you?

5    A.  I didn't lock in because I was being jumped.

6    Q.  When Officer Sabino told you to lock back in your cell, you

7    refused and you didn't lock in, did you?

8    A.  Ma'am, I was being jumped.  I couldn't lock in.  It was no

9    way for me to be locked in if somebody is -- somebody is

10   preventing you or stopping you from locking in.

11   Q.  Isn't it true that Officer Sabino had to pull her emergency

12   pin that day?

13   A.  I -- I don't -- I wasn't paying attention to her pulling

14   the pin.  I was paying attention to getting these officers off

15   my back.

16   Q.  At some point other officers responded?

17   A.  Like I said, I was focusing on my trying to protect myself.

18   Q.  Did other officers appear or not?

19   A.  I -- I wasn't paying attention to that, ma'am.

20   Q.  You say you were jumped --

21   A.  Like I said, I wasn't paying attention.  You can be jumped

22   and not be in your right state of mind.

23   Q.  Isn't it true that two other officers, Officer Mallius and

24   Calazzo stepped in between you and the female officer, Officer

25   Sabino, and escorted you back to your cell?

d7n6haw1                    Hawks - cross

1   A.  I don't recall that.  Matter of fact, I never made it back

2   to my cell.  They took me straight to the box.  They threw me

3   in the box.

4   Q.  Let's discuss why you never made it to your cell.  During

5   this escort back to your cell and this Officers Mallius and

6   Calazzo escorting you, you turned and punched Officer Mallius

7   several times; right?

8           MR. NOVICH:  Objection, your Honor.

9           THE COURT:  Overruled.

10  A.  That is a no answer, ma'am.  I didn't punch the officer in

11  the face.

12  Q.  Did you punch him anywhere else?

13  A.  I didn't punch him anywhere.

14  Q.  Officer Calazzo tried to help Officer Mallius and then you

15  punched him, too; correct?

16  A.  Not -- no, not at all, ma'am.  I didn't punch anybody.

17  Q.  Well, then three other officers had to respond; right?

18  A.  There's quite a few officers responded, yes.

19  Q.  Do the names Officers Dryer, Thompson and Regimen ring a

20  bell?

21  A.  Yes.  I am familiar with Dryer.  His name was on my ticket.

22  And the guy that you just mentioned, I can't pronounce his

23  name, yes, they -- they arrived.

24  Q.  It took all those officers, five officers, to restrain you;

25  isn't that right?

d7n6haw1                    Hawks - cross

1    A.  What do you mean "restrain" me?

2    Q.  At some point you had to be restrained; right?

3    A.  I don't understand the restrain part.  I am trying to find

4    out what you mean by restrain.

5    Q.  Restraining means they had to get your hands behind your

6    back anyway they can to handcuff you?

7    A.  They did that.

8    Q.  It took five officers to do that; right?

9    A.  I don't know about five.  I do know that they got -- they

10   got the restraints on me.  That's all I can remember.

11   Q.  During that incident, Mr. Hawks, you broke officer

12   Calazzo's nose, didn't you?

13   A.  Absolutely not.

14   Q.  During that incident Officer Mallius broke his arm, didn't

15   he?

16   A.  I don't know anything about no officer being hurt.  I don't

17   recall any officer being hurt in my incident.

18   Q.  Isn't it true that Officer Mallius never returned to work

19   after that because of his injuries?

20   A.  I don't know his -- his personal belief.  I don't know

21   anything about that, his returning for duty.  I have no

22   knowledge of that.

23   Q.  Did you have a Tier 3 hearing for that incident

24   August 25th, 2007?

25   A.  Yes.  I received a lot of tickets that day also.

d7n6haw1                    Hawks - cross

1   Q.  Do you recall that you had a Tier 3 hearing for this

2   August 25th, 2007 incident on September 4th, 2007?

3   A.  I recall having an incident.  I am not too sure what date

4   it was.  I do recall the 25th of August.

5   Q.  You had a hearing with a hearing officer and like the other

6   Tier 3 hearings you were able to produce witnesses, present

7   documents and have assistance in your defense; right?

8   A.  Yes.  I had a right to do all of that.

9   Q.  Now, at the end of that hearing you were found guilty of

10  violent conduct, assaulting officers, refusing direct orders

11  and other charges; right?

12  A.  Yes.  I was found guilty.  I wasn't going to be found

13  acquitted.

14          THE COURT:  You were not?

15          THE WITNESS:  I was not going to be found acquitted.

16          THE COURT:  I see.

17  Q.  Now, october 22, 2008.  Is it true that on that date at

18  Southport Correctional Facility you received a misbehavior

19  report charging you with disobeying a direct order, assault of

20  staff, violent conduct and interference?

21  A.  I recall that ticket, yes.

22  Q.  So this is the third such misbehavior report you received,

23  right, so far?

24  A.  I am not really counting it.  If you are counting it, yes,

25  that's the count.

d7n6haw1                    Hawks - cross

1   Q.  This is at Attica Correctional Facility, then the Green

2   Haven Correctional Facility, then Southport Correctional

3   facility; right?

4   A.  I was -- I was in three of those, yes.  I received tickets

5   in those facilities.

6   Q.  By the way, during the August 25th, 2007 incident at Green

7   Haven were any of these officers involved at all?

8   A.  Ask the question again, please.

9   Q.  During the August 25th, 2007 incident at Green Haven were

10  any of these officers sitting here involved?

11  A.  My back was turned and I was handcuffed.  I was handcuffed

12  behind so I didn't really get a chance to identify anybody's

13  face.  So I can't sit up here on oath and say they was there or

14  wasn't there.  My back was facing the wall and my hands were

15  behind my back, ma'am.

16  Q.  Well, you never heard that any of these officers were

17  involved in that incident; correct?

18  A.  I -- I don't recall any of those officers being involved in

19  my -- in that incident.  It was a lot of officers that was

20  there.

21  Q.  So getting back to the October 22, 2008 incident at

22  Southport.  Isn't it true that on that date an Officer Lozido

23  was moving you from one cell to another when you turned and

24  headbutted Officer Lozido in the face?

25  A.  I don't even recall a Lozido.

d7n6haw1                    Hawks - cross

1   Q.  Do you recall headbutting an officer in the face that day?

2   A.  No.  I don't recall none of that.

3   Q.  Do you recall that on that day Officer Butler and Sergeant

4   Chapman tried to get you back into the cell and you struggled

5   with them?

6   A.  I struggled to try -- to try to get free from getting hurt.

7   They got the cuffs on me and that was the end of the incident.

8   They took me where they had to take me and it was nobody --

9   nobody didn't get hurt.

10  Q.  So these officers again had to restrain you; right?

11  A.  They use the restraints because they came inside the cell.

12  Q.  And you struggled with them?

13  A.  Yes.  Because they weren't supposed to come inside my cell.

14  They didn't follow protocol.  They cracked my cell and ran in

15  there.  They didn't get permission from the lieutenant or ask

16  the supervisor, Can we go in there and get this guy.

17  Q.  So do you follow direct orders from officers when you feel

18  like or that the officers are doing the right thing whatever

19  you feel like?

20  A.  It is not like whether or not I feel like following orders.

21  I follow orders whether it is wrong or right just to avoid the

22  problems.

23  Q.  Getting back to that incident on October 22, 2008 at

24  Southport.  An officer named Officer Frisbee appeared and tried

25  to get control of your legs; right?

d7n6haw1                    Hawks - cross

1    A.  I don't recall these names that you are mentioning on the

2    record.  It's been a while.

3    Q.  Some officer tried to get control of your legs and you

4    kicked him?

5    A.  I don't recall these officers names, Miss.

6    Q.  Did you kick an officer during that incident?

7    A.  I don't recall their names so it is a no answer.

8    Q.  Whether you can recall the name or not, did you kick an

9    officer that day?

10   A.  I don't recall.  Again, I don't recall.

11   Q.  You were struggling; right?

12   A.  I wasn't struggling at all.

13   Q.  So again like the other incidents after the October 22,

14   2008 incident, you had a hearing, Tier 3 hearing, on

15   October 31st, 2008; right?

16   A.  Yes.

17   Q.  Again, just like the other hearings, you had the

18   opportunity to get assistance from inmates, from Corrections

19   staff, present witnesses, documents and defend yourself; right?

20   A.  Yes.

21   Q.  Now, at the end of that hearing you were found guilty of

22   violent conduct, assaulting officers, refusing to follow direct

23   orders and interference; correct?

24   A.  That's what the ticket says.

25   Q.  By the way, while your attorney was questioning you, you

d7n6haw1                    Hawks - cross

1    brought up the fact that during these Tier 3 hearings you

2    weren't represented by an attorney; right?

3    A.  Rephrase that question again, please.

4    Q.  During your direct examination you spoke about the fact

5    that during these Tier 3 hearings you are not represented by an

6    attorney, right?

7    A.  No.

8    Q.  No inmate is represented by an attorney in these Tier 3

9    hearings; right?

10   A.  No inmates.  What do you mean?

11            MR. NOVICH:  I am going to object, your Honor.

12            THE COURT:  I will allow it.  If you know.

13            THE WITNESS:  Again, what do you mean "represent"?

14            THE COURT:  A lawyer is typically present at these

15   prison hearings on behalf of the inmates?

16            THE WITNESS:  Lawyers from the streets, you mean?

17            THE COURT:  Yes, or lawyers from anywhere.

18            THE WITNESS:  Did they come in and represent me?

19            THE COURT:  She asked a more general question if you

20   know if they are available, used in these hearings.

21            THE WITNESS:  Yes.  That is what she asked.

22   A.  No.  I didn't have any attorneys from anywhere coming in.

23   Q.  Have you ever heard of an inmate being represented by a

24   lawyer during these Tier 3 hearings?

25   A.  No.  I never recall anybody that I know of personally, no.

d7n6haw1                    Hawks - cross

1    Q.  These hearings are not done in a court of law like here;

2    right?

3    A.  I don't -- you know, I never had that experience.

4    Q.  Now we're going to go to the last incident.

5             Isn't it true on April 30th, 2011 at Southport

6    Correctional Facility you received a misbehavior report

7    charging you with attempted staff assault for violent conduct?

8    A.  What year was this?

9    Q.  April 30th, 2011.

10   A.  Where was this at?

11   Q.  Southport.

12   A.  Yeah.

13   Q.  So you received a ticket for those infractions; right?

14   A.  I received a lot of tickets, ma'am.

15   Q.  Is it true that on April 30th, 2011 at Southport you were

16   directed to back out of your cell when you turned your

17   shoulders violently in an attempt to strike Officer Thatcher

18   with your elbow?

19   A.  No.  I never turned violently to strike anybody.  I was

20   pushed in my cell when I was supposed allegedly have went to

21   the shower and officer pushed me in my cell and they jumped me.

22   That is what happened.

23   Q.  So you didn't try to elbow Officer Thatcher?

24   A.  I was handcuffed behind my back, ma'am.  Why would I pull

25   an act -- why would I pull an act like that?  That is a no-win

1    situation.  I wouldn't do nothing like that and jeopardize my

2    physical being.

3    Q.  Well, on May 12th, 2011 you had a hearing for that ticket;

4    right?

5    A.  Yes, of course, I had a hearing.  There had to be a

6    hearing.  Somebody got hurt.

7    Q.  Again, at that hearing you had the opportunity to get

8    assistance from inmates and Corrections staff, present

9    witnesses, present documents and testify in your own defense;

10   correct?

11   A.  And I did so.

12   Q.  At the hearing after the hearing you were found guilty of

13   violent conduct and assault on staff; correct?

14   A.  That was the outcome, yes.

15            THE COURT:  Are you finished questioning about these

16   other incidents?

17            MS. KIM:  Yes.

18            THE COURT:  Before you go further, I want to give the

19   jury an instruction about these other incidents and it is as

20   follows:  You have heard testimony this morning, and yesterday

21   for that matter, of other incidents of assaults involving

22   Mr. Hawks and law enforcement officials.  The testimony that

23   you have heard yesterday and today may only be used for certain

24   limited purposes in your considerations and they are these:

25            One -- we have heard from him yet, but we will hear

from Mr. Mazzella -- in determining Mr. Mazzella's motive and

intent in restraining the plaintiff with respect to the

incident that we're considering here at trial; two, in

determining whether plaintiff, Mr. Hawks, had the requisite

intent and motive to commit assault and battery on Officers

Gunsett and Mazzella -- that is what the state is claiming

rather than defendants are claiming; and three, in determining

whether plaintiff's injuries in this matter, if any, were

proximately caused by any of the defendants' actions; or four,

in determining the amount of compensatory damages, if any,

should be awarded to plaintiff.

        So testimony regarding other incidents, and by other

incidents I mean other than the one we're talking about here in

this case in which plaintiff may have been involved, may not be

considered for the purpose of proving plaintiff's propensity to

engage in the altercation described in this case or proving

that plaintiff was at fault in the altercation here.

Specifically, you may not find that simply because plaintiff

was involved in other assaults with other officers on other

occasions that plaintiff has a propensity for violence and thus

it is more likely than not that he provoked the altercation

and/or committed an assault and battery on defendant officers

in this case.

        Did you get that?  I am going to give you this

instruction again at the end when I give you the overall

1    instructions.  Thank you.

2            MS. KIM:  Thank you, your Honor.

3    BY MS. KIM:

4    Q.  Mr. Hawks, on direct when your attorney Mr. Novich was

5    questioning you, you said that the officers tend to pick on you

6    because you stick up for the rights of other inmates; right?

7    A.  Yes.  I recall saying that.

8    Q.  In these instances that we discussed, you weren't sticking

9    up for the rights of other inmates, were you?

10   A.  No.  I was the only one that was involved.  So that

11   excludes everybody else if it is just me.

12   Q.  You weren't being a hero during any of those instances;

13   right?

14   A.  What do you mean by "a hero"?

15   Q.  Withdrawn.  Thank you.

16           MS. KIM:  I have nothing further.

17           THE COURT:  Any redirect?

18           MR. NOVICH:  Yes, your Honor.

19           THE COURT:  Let's go.

20   REDIRECT EXAMINATION

21   BY MR. NOVICH:

22   Q.  Mr. Hawks, you were asked questions by Ms. Kim regarding

23   these other incidents that happened at the different facilities

24   you've been at -- Green Haven, Southport and Attica.  In those

25   instances, did the officers attack you?

1    A.   Yes.

2    Q.   And after the officers attacked you, did you defend

3    yourself?

4    A.   Yes.

5    Q.   Did you fight back?

6    A.   As far as throwing punches?

7    Q.   In defending yourself at times what would you do to defend

8    yourself?

9    A.   Throw my hands up.

10   Q.   And when you defended yourself after the officers attacked

11   you, do the officers, prison guards, do they like that?

12   A.   No.

13            MS. KIM:   Objection.

14   A.   No.   They didn't like that.

15   Q.   Do the other guards to your knowledge, do they know that

16   you defend yourself when you are attacked by the guards?

17   A.   Yes, sir.

18   Q.   Do they like that?

19   A.   They don't like that.

20   Q.   Do they seem to retaliate against you as well?

21   A.   All the time.

22            MS. KIM:   Objection.

23            THE COURT:   Sustained.   The question to the objection

24   is sustained.

25   Q.   Let's talk about the August 25th, 2007 incident.   You

1    already talked about it on direct examination your version of

2    what happened that day.  This is the incident that happened

3    prior to the November 1st, 2007 assault.

4              Now, during your testimony on cross-examination

5    Ms. Kim asked you some questions.  You don't recall any of

6    these prison guards -- any of these defendants being involved

7    in the incident.  Do you remember that testimony?

8    A.  Yes.

9    Q.  But you were hospitalized that day, weren't you?

10   A.  Oh, yes, I was.  I went out.

11   Q.  The jury has already seen the injuries.  Did Defendant

12   Mazzella, talk to you at the hospital?

13             MS. KIM:  Objection, your Honor.

14   A.  Yes, he did.

15   Q.  And what did Defendant Mazzella say to you in connection

16   about the August 25th, 2007 incident?

17   A.  He -- he was really adamant about intimidating me, if I

18   said anything against staff that I was going to get what I

19   deserve.

20   Q.  Did you know if Defendant Mazzella or any of the other

21   defendants were friends with their fellow officers at Green

22   Haven who assaulted you on August 25th, 2007?

23   A.  I didn't know if they was friends or not.  I don't have no

24   knowledge of that.

25   Q.  You were asked some questions by Ms. Kim regarding the

1    disciplinary hearings.  You made it clear in Ms. Kim's question

2    to you they don't occur in a court of law and your answer was,

3    correct, they don't?

4    A.  Right.

5    Q.  You were represented not by counsel but my inmates; right?

6              MS. KIM:  Objection.

7              THE COURT:  Overruled.

8    Q.  The inmates are not lawyers, are they?

9    A.  Absolutely not.  They wouldn't be where they are at.

10   Q.  You have to get approval from the hearing officer not a

11   judge, a hearing officer who is in charge of that proceeding

12   before you can ask any questions of the officers involved;

13   right?

14   A.  That's correct.

15   Q.  Now, Ms. Kim made a point of saying you could also ask the

16   guards for help when you are charged with assault; right?

17   A.  She did mention that.

18   Q.  Is there a reason why you don't ask the guards for help

19   when you are being charged with assault?

20   A.  Yes.

21   Q.  Why?

22   A.  I don't trust them and they are against me any way.  Why

23   would I call an officer to speak in my behalf?

24   Q.  So no lawyer, you are an inmate and the only other people

25   who are going to offer you help are the same people who

1   assaulted you; is that right?

2   A.   That's correct.

3   Q.   And it is not in a court of law?

4   A.   Absolutely not.

5   Q.   And the punishment when you are found guilty is SHU, the

6   box; right?

7   A.   That's right.

8           THE COURT:  For the August 25 incident; is that right?

9           MR. NOVICH:  I believe it is for any.

10          THE COURT:  Well, what is your question?

11          MR. NOVICH:  Yes, your Honor.

12  Q.   For the August 25th incident you went to the box, didn't

13  you?

14  A.   Yes.

15  Q.   How long?

16  A.   They gave me a total of 60 months.

17  Q.   60 months for the August 25th incident?

18  A.   Right.

19  Q.   Now, I want to go forward now two months later to

20  November 1st, 2007.  November 1st, 2007 when you go to Fishkill

21  Reginal Medical Unit to receive for physical therapy or

22  treatment, did they cut down the cast that day?

23  A.   Yes, they did.

24  Q.   Did you still have a cast after they cut it down?

25  A.   I had half a cast.  Well, I would say a good third of it.

d7n6haw1                    Hawks - redirect

1   Q.  Can you show the jury after they cut it down where the cast

2   was on your arm and how wide it was?

3   A.  It was down to the -- to the wrist area just above the

4   wrist bone and it just shows a little bit of a cast, a little

5   piece of a cast.

6   Q.  Could you make a fist?

7   A.  No, I couldn't make a fist.  I couldn't ball my fist.  It

8   was swollen.

9   Q.  On November 1st, 2007 after you received physical therapy

10  and they cut down the cast before the assault, could you make a

11  fist?

12  A.  No.

13  Q.  Now, Ms. Kim asked you some questions yesterday about your

14  deposition.  Do you remember that?

15  A.  I recall.

16          MR. NOVICH:  Your Honor, permission to approach the

17  witness?

18          THE COURT:  Sure.

19  Q.  I am going to put in front of you, Mr. Hawks, your

20  deposition transcript.  Ms. Kim didn't show you that yesterday,

21  did she?

22  A.  No, I don't recall seeing it.

23  Q.  Do you see the date on the deposition transcript is

24  November 19th, 2010?

25  A.  Yes.

1   Q.  So that is, what, almost two and a half, almost three years

2   ago; right?

3   A.  Yes.  Like three years ago.

4   Q.  If you go to the very last page of the deposition

5   transcript, the last page of the index, do you see it is 137

6   pages; right?

7   A.  Yes.

8   Q.  So Ms. Kim didn't put a deposition transcript in front of

9   you and she was asking you about a conversation that happened

10  two and a half to three years ago that was 137 pages long;

11  right?

12  A.  Yes.  That's pretty steep, all the pages.

13  Q.  She was asking you about this conversation what you recall

14  of 137 pages long that happened two and a half, three years

15  ago; right?

16  A.  Yes.

17  Q.  And she didn't give you the benefit of looking at --

18          MS. KIM:  Objection.

19          THE COURT:  We got it.

20  Q.  Now, she asked you some questions about your filing the

21  complaints back in 2009; right?

22  A.  That's correct.

23  Q.  And I actually want you to turn to what you actually said

24  in your deposition transcript.  Turn to page 56.

25          THE COURT:  Do you have another copy?

1          MR. NOVICH:  Do you need one, your Honor?  I provided

2     a set for your Honor and your clerk.

3          THE COURT:  So this is dated November 19th, 2010, is

4     that what you are referring to?

5          MR. NOVICH:  Correct, your Honor.

6          THE COURT:  What page?

7          MR. NOVICH:  Page 56.

8          THE COURT:  Okay.

9          MR. NOVICH:  Starting at line 14.

10    BY MR. NOVICH:

11    Q.  Are you with me, Mr. Hawks?

12    A.  Yes.  I am on page 56.

13    Q.  The lawyer that was there was that Ms. Kim who was asking

14    you questions?

15    A.  No.

16    Q.  So Ms. Kim wasn't even present during this deposition?

17    A.  Absolutely not.  It was another female.

18    Q.  Now, on page 56 starting at line 14, the other attorney

19    asked you who typed it for you, referring to the complaint, and

20    your answer was:  And how I wanted it to be documented.  The

21    law library, the clerk, the law library, clerk.  We got a clerk

22    that works in the facility.  He does the clean up job.  Like

23    say if the guy writes something or misspelled a word, he might

24    put it incorrectly or he might spell it the way he spelled it

25    if it is.

1    "Q.  You said you got some assistance.  Who assisted you with

2    it?

3    "A.  Inmate clerk.  It was an inmate clerk assisted me.

4    "Q.  What is the name of the clerk?

5    "A.  Raheem.  He was a Muslim clerk at Green Haven.  He might

6    still be there if he hasn't gotten transferred.  He should

7    still be there.  He is doing a lot of time.  His name is

8    Raheem.

9              THE COURT:  What is your question?

10             MR. NOVICH:  Yes.  Is if this what it says, Judge.

11             THE COURT:  Well, you are reading the whole --

12             MR. NOVICH:  I am almost done.

13   Q.

14   "Q.  Your complaint is dated November 6, 2009 and you signed it

15   at Southport Correctional; right?

16   "A.  Yeah.  I was in Southport when I signed it.  Yes.

17   "Q.  So did somebody help you with it at Southport or Green

18   Haven?

19   "A.  Green Haven clerk did the work and it followed me when I

20   got to Southport and I had a follow-up inside the Southport

21   Facility to make sure that everything was done right so I sent

22   to the clerk and asked the clerk to assist me on anything that

23   I had written in my complaint and to find any errors that were

24   made and that is what the clerk did.  He assisted me from the

25   guy that originally did it in Green Haven."

1          Is that what you testified to at your deposition?

2          THE COURT:  Did you want to ask if those questions

3    were asked and did you give those answers?

4    Q.  Did you?

5    A.  Yes.  That was me who responded to those answers.

6    Q.  Mr. Hawks, you testified that you dropped out of school at

7    ninth great?

8    A.  Yes.  He said that he is -- I testified.

9    Q.  What is your reading level of education?

10   A.  I got a fifth grade reading level.  That was back -- back

11   then.  It has improved since then.

12         MR. NOVICH:  Nothing further, your Honor.

13         THE COURT:  Do you want it take a two-minute break?

14         We'll come right back.

15         (Jury excused)

16         (Recess)

17

18

19

20

21

22

23

24

25

d7n6haw1                        Hawks – redirect

1              (In open court; jury not present)

2              THE COURT:  What is happening with those photos that

3    we discussed before?

4              MS. KIM:  Your Honor, I can bring them out with this

5    witness.

6              THE COURT:  Okay.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:   Thank you very much.   Please be seated.

3              Counsel, can I see you for a second.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (At the side bar)

2                THE COURT:  Do you have more case to put on?

3                MR. NOVICH:  No.

4                THE COURT:  It is not really out of turn.

5                MS. KIM:  Right.

6                THE COURT:  This is their first witness.  You didn't

7    indicate whether you rested.  Can I do that?

8                MR. NOVICH:  Yes, Judge.

9                THE COURT:  I will ask you first so they are clear as

10   to what is happening and then I don't know if you still have

11   any other documents that you want to add.  I will allow that

12   later.

13               MR. NOVICH:  Do it later.

14               THE COURT:  I will ask you if you rested and advise

15   the jury this is the first witness.

16               MR. NOVICH:  Yes, your Honor.  Thank you.

17               (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  I have just discussed with counsel whether

3    the plaintiff has rested, that is to say concluded their part

4    of the case.  Mr. Novich has indicated that they have.

5              Is that right, Mr. Novich?

6              MR. NOVICH:  Yes, your Honor.

7              THE COURT:  So we now have the first witness for the

8    defense.

9              THE DEPUTY CLERK:  Sir, raise your right hand.

10    TERRY DAVIS,

11        called as a witness by the Defendants,

12        having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MS. KIM:

15    Q.  Good morning, Mr. Davis.

16    A.  Good morning.

17    Q.  Introduce yourself to the jury.

18    A.  My name is Terry Davis.  I am a registered nurse for the

19    Department of Corrections.

20    Q.  Do you work at a particular facility currently?

21    A.  Fishkill Correctional Facility.

22    Q.  Back in November of 2007 where were you working?

23    A.  Fishkill Correctional Facility.

24    Q.  How long have you been a registered nurse?

25    A.  15 years.

d7n6haw1                    Davis - direct

1   Q.  How long have you worked at Fishkill as a registered nurse?

2   A.  A little over seven years.

3   Q.  How long have you been employed by documents?

4   A.  A little over seven years.

5   Q.  As of November 2007 how long had you been working at

6   Fishkill Correctional Facility?

7   A.  Approximately a year and a half.

8   Q.  Mr. Davis, do you have an independent recollection of

9   examining an inmate named Brian Hawks sitting here today?

10  A.  Vividly.

11  Q.  So that was almost six years ago; right?

12  A.  That's correct.

13          THE COURT:  Did you say vividly?

14          THE WITNESS:  Yes.

15  Q.  Is there a reason why you remember this examination

16  vividly?

17  A.  From my of years of employment with the Department of

18  Corrections, it was probably the most angry individual I had to

19  deal with in a use of force and I probably have seen well over

20  a hundred easy use of forces.  Probably hundreds.  We do

21  them -- it is a daily occurrence.  Because his anger level was

22  so high, it vividly sticks out in my mind how angry he was when

23  I had to assess him.  I would add also in my seven years plus

24  service to the Department of Corrections it was the only time I

25  felt uneasy taking care of a patient.

d7n6haw1                    Davis - direct

1   Q.  Can you describe Mr. Hawks' demeanor that day?

2   A.  Well, he was on the wall.  They had to -- I would say at

3   least six or eight officers had to hold him against the wall

4   when I came down there and I remember his nose was flaring.

5          THE COURT:  I didn't hear.

6   A.  His nose was flaring.  A clear indicator to me that -- I am

7   an instructor.  I teach a lot of paramedics classes, EMT

8   classes.  I was concerned for my own well being.  I actually

9   turned to the watch commander.  I said, I do feel uneasy about

10  this.  He says, Well, I promise --

11         MR. NOVICH:  Objection, your Honor.

12         THE COURT:  Sustained.

13  Q.  Mr. Davis, you cannot talk --

14         THE COURT:  Just tell us what you recall.

15  A.  Okay.  What I recall is that I was concerned for my safety.

16  Q.  Now, where was Mr. Hawks when you first laid eyes on him on

17  November 1st, 2007?

18  A.  He was in the bullpen.  It is a receiving bullpen for

19  our-sourcing.

20  Q.  Is that in the RMU basement?

21  A.  In the basement.

22  Q.  At Fishkill?

23  A.  Yes.

24  Q.  At that point where exactly was Mr. Hawks?  Was he

25  standing?  Sitting?  Something else?

d7n6haw1                    Davis - direct

1    A.  He was in the back corner of the bullpen itself when I

2    walked into it.

3    Q.  Who else was in the bullpen at that point?

4    A.  10 plus officers probably.  The -- there was a lieutenant

5    in there and a watch commander.

6    Q.  Do you recall seeing any of the four officer sitting here

7    today?

8    A.  One of them, yeah.

9    Q.  Which one?

10   A.  Officer Graveline.

11           THE COURT:  Which would be which officer?

12           THE WITNESS:  The end one there closest to counsel.

13           THE COURT:  Is that Officer Graveline?

14           THE WITNESS:  Yes.

15           THE COURT:  The record will reflect that he witness

16   identified Officer Graveline.

17   BY MS. KIM:

18   Q.  How do you know Officer Graveline?

19   A.  He worked in the facility.

20   Q.  So he worked at Fishkill?

21   A.  That's correct.

22   Q.  When is the last time you saw Officer Graveline other than

23   today, this morning?

24   A.  Probably three plus years maybe.

25   Q.  So you know any of the other officers sitting here today --

d7n6haw1                    Davis - direct

1   Officers Mazzella, Gunsett and Cruz?

2   A.  No, not really.  I may have crossed paths, but no.

3   Q.  Now, so you had this concern for your safety?

4   A.  Yes.

5           THE COURT:  Wait a minute.  How did you get there in

6   the first place?  Why were you there?

7           THE WITNESS:  I was notified by my administrator --

8   we're one floor above -- to go downstairs to the basement that

9   there was a use of force going on that needed assessment of an

10  inmate so I went downstairs.

11  Q.  Do you recall if any type of code was called?

12  A.  I believe a Code 10 was call.  We were very busy in our

13  unit at the time.  So I didn't hear anything after that so I

14  didn't think it was an issues.  So when a Code 10 is called,

15  medicals doesn't always go to Code 10s.  So I heard it and

16  didn't hear anything later on so I assumed everything was okay.

17  So shortly after a time frame I was told by my administrator to

18  go assess an inmate who was part of a use of force.

19  Q.  What is a Code 10?

20  A.  Code 10 is a fight.

21  Q.  Could you just remind the jury again how you came to assess

22  Mr. Hawks?

23  A.  I was notified by my administration that security was

24  requesting medical assistance downstairs in the basement.  So I

25  went downstairs.

d7n6haw1                    Davis - direct

1   Q.  So by your administration, what do you mean?

2   A.  My nurse administrator.

3   Q.  Is that your direct supervisor?

4   A.  That's correct.  My direct supervisor.

5   Q.  Do you report to any security staff?

6   A.  No.

7   Q.  Who do you report to?

8   A.  Nurse administrator.

9          THE COURT:  So after you got that instruction, you

10  went downstairs to this room?

11         THE WITNESS:  That's correct.

12         THE COURT:  For the purpose of examining Mr. Hawks?

13         THE WITNESS:  Yes.  Medical need or assistance and I

14  rendered treatment to the patient.

15  Q.  Did you examine Mr. Hawks?

16  A.  Yes, I did.  I did a head-to-toe examination.

17         THE COURT:  Head-to-toe examination?

18         THE WITNESS:  Yes

19  Q.  Can you describe from your recollection your examination of

20  Mr. Hawks?

21  A.  I think if you put up my notes on there:  Abrasions,

22  superficial injuries.  There was no deformities that I read in

23  my notes that stuck out in my mind and nothing at that point

24  that needed to be examined by a doctor at that point.  It was

25  just what I perceived to be a use of force with some

d7n6haw1                    Davis - direct

1   resistance.

2   Q.  You referred to your notes.  Did you fill out any documents

3   regarding your examination of Mr. Hawks?

4   A.  Yes, we have to.  It is an AHR, ambulatory health record.

5   Q.  Did you fill it out?

6   A.  Yes, I did.

7   Q.  Did you fill out what is called a use of force report?

8   A.  That's correct.

9   Q.  There is a binder in front of you, Mr. Davis.  If you look

10  in the back there are defendants exhibits.

11              THE COURT:  Just so everybody is clear, you didn't see

12  an altercation.  You came after it; right?

13              THE WITNESS:  That's correct.

14              THE COURT:  When you came just describe who was where?

15  Where was Mr. Hawks?  Where were the officers?  What was going

16  on?

17              THE WITNESS:  We walked down the basement.  It is

18  bullpen, a receivable bullpen from other facilities.  To the

19  rear of the bullpen, to the left corner of the bullpen the

20  officers had the inmate against the wall when I came down.

21  Again, everything was done other than he was very angry.

22              THE COURT:  He was angry?

23              THE WITNESS:  Very, very angry.  That's when I said --

24  should I continue to tell you?

25              THE COURT:  Yes.

1          THE WITNESS:  So I went up to the inmate.  I explained

2     that I was with medical and I was there to help him out.  I am

3     not security.  I am here to help him out.  I am going to assess

4     him and take care of his medical needs.  So at that point the

5     officer was there.  I wasn't -- didn't know all the security

6     staff there so one of the lieutenants had to talk to the

7     inmate, explain what I was there to help calm, ease him.

8     Because he was, as I told you, he was very, very angry, to

9     relax.  At that point the officers began to let off on him and

10    we sat him down on the bench.  There are benches in the

11    bullpen.  He allowed me to examine him.

12          THE COURT:  He did.  He allowed?

13          THE WITNESS:  Head-to-toe examination.  He had

14    abrasions on his scalp, some red areas.  Somebody who was

15    involved in a use of course.  That is what I saw.

16    BY MS. KIM:

17    Q.  Mr. Davis, in the back of that binder, there is a

18    Defendant's Exhibit 1.  Would you please turn to it.

19    A.  Okay.

20    Q.  Are you looking at what is called a use of force report?

21    A.  Yes.

22    Q.  This is the first page of that exhibit.  Mr. Davis, is that

23    the use of force report that you filled out?

24    A.  Yes, I did.

25    Q.  In connection with your examination of Mr. Hawks?

1    A.  Yes.

2    Q.  Would you read for the jury what you wrote in that use of

3    force report?

4    A.  Inmate Terry Davis, RN 2, 1-11007, 12:30 p.m.  Inmate strip

5    to shorts, abrasion to top of head.  Abrasions to right side of

6    face, ear and nose.  Small abrasions to right elbow.  All

7    abrasions cleaned and --

8             THE COURT:  What is after that?

9             THE WITNESS:  Cleaned non-saline.

10             THE COURT:  NS.

11    A.  Yes.  All bleeding stopped.  Red abrasions noted to the

12    head, chest, upper back, also bilateral arm, swelling noted to

13    left inter aspect of knee and right side of face including

14    right orbit.  Patient stated pain 8 of 10 to back of neck, left

15    knee and left wrist.  Inmate unable to make -- unable -- unable

16    to move all fingers.  Inmate unable to make -- can move all

17    fingers.  Ecchymotic areas to left wrist.  Inmate assessment

18    complete and off to Green Haven.  No loss of consciousness at

19    any time.

20    Q.  Did you sign and date it?

21    A.  That's correct.

22             MS. KIM:  Your Honor, I apologize.  I should have

23    moved it into evidence.

24             THE COURT:  I will allow it.

25             (Defendants' Exhibit 1 received in evidence)

d7n6haw1                    Davis - direct

1          THE COURT:  These exhibits are going to be given to

2     the jury during your deliberations.  You will have copies.

3     BY MS. KIM:

4     Q.  Mr. Davis, it looks like there may have been a word missing

5     after inmate unable to make.  Do you recall what you meant to

6     say?

7     A.  You know, working for the state we do a lot of forms, I

8     guess, like this right here.  I believe if you follow my AHR,

9     it may be make a fist.  That sheet was not there.  I omitted

10    it.  I am sure it is fist.

11    Q.  Thank you.

12          You mentioned an AHR.  Did you also fill out an AHR?

13    A.  That's correct.

14    Q.  Would you look at Defendants' Exhibit 10 in the binder.

15    AHR is short for what?

16    A.  Ambulatory health record.

17    Q.  Is that the AHR that you filled out in connection with your

18    physical examination of Mr. Hawks?

19    A.  That's correct.

20          THE COURT:  Excuse me.  Before we get to that when you

21    are doing the head-to-toe examination are you also

22    administering saline or whatever?

23          THE WITNESS:  I brought the stuff down and I just --

24    his wounds were very superficial so I brought some 4x4's.

25          THE COURT:  Some what?

d7n6haw1                    Davis - direct

1        THE WITNESS:  4x4's to wipe the areas down.  There

2   wasn't really much treatment needed.  Most of it was just an

3   assessment.  Usually treat them and go fill my notes out.

4        THE COURT:  Do what?

5        THE WITNESS:  Fill my notes out.

6        MS. KIM:  Your Honor, defendants move into evidence,

7   Exhibit 10.

8        THE COURT:  I will allow it.

9        (Defendants' Exhibit 10 received in evidence)

10        MS. KIM:  May I publish it to the jury?

11        THE COURT:  Yes.

12   BY MS. KIM:

13   Q.  Mr. Davis, would you read that note that you wrote

14   concerning your examination of Mr. Hawks?

15   A.  A 44-year-old inmate, alert times three was in altercation

16   with an officer and use of force used to control inmate.  Per

17   staff no loss of consciousness.  Pupils reactive.  Abrasions to

18   top of head, right side of face, near ear.  Swelling to

19   bilateral orbits, left inter aspect of knee.  Swelling to left

20   hand, wrist, and thumb.  Ecchymotic areas to right orbit, right

21   earlobe and right side of face.

22   Q.  What is ecchymotic?

23   A.  It is more than red.  It is really black and blue.  It was

24   more red.  I would constitute ecchymotic.

25   Q.  Please continue.

1   A.  Patient complained of pain of back of neck.  Left knee and

2   left wrist.  Full range of motion noted to all above mentioned

3   areas.  Inmate stripped down, turned 360, additional

4   observations.

5           THE COURT:  Did you say turned 360?

6           THE WITNESS:  Yes.

7           THE COURT:  Does that mean turned him around.

8           THE WITNESS:  Yes, so we can observe him.

9   A.  Skin upper chest, back red.  Intact.  Small abrasions to

10  right elbow.  Patient able to make fist.  Ecchymotic areas to

11  left wrist areas.  Patient able to bend left knee, patient

12  stated he had no loss of consciousness.  Patient has no other

13  complaints and deny any past medical history.

14          THE COURT:  And what?

15          THE WITNESS:  Denies no past medical history.

16  Q.  It says problems?

17  A.  No past medical history problems.  Sorry.

18  Q.  Mr. Davis, would you turn back to Defendants Exhibit 1 and

19  it's the page that has been stamped from the bottom 59.

20          THE COURT:  You will see, ladies and gentlemen, when

21  you look at the exhibits there are more than one page.

22          THE WITNESS:  What is stamped on it?

23          THE COURT:  I think 59; is that right?  On some copies

24  it may be hard to make out.  I think it is the one that has a

25  human body.  Would you confirm with the witness that is 59?

d7n6haw1                    Davis - direct

1          MS. KIM:  Yes.  May I approach?

2          THE COURT:  Yes.

3   Q.  Mr. Davis, is that another portion of the use of force

4   report that you filled out?

5   A.  Yes.

6   Q.  Part B.

7          MS. KIM:  May I publish to the jury?

8          THE COURT:  Yes.

9   Q.  This is part of Exhibit 1.  I apologize you cannot get the

10  entire document.

11         THE COURT:  Don't worry about it.

12  Q.  Would you read for the jury what you wrote there.

13  A.  Inmate stripped to boxers.  Abrasions to top of head, right

14  side of face, ear to nose.  Small abrasions to right elbow.

15  All abrasions cleaned by 4x4's normal saline.  With all

16  bleeding stoped.  Red areas noted to upper chest areas and

17  upper back and bilateral arms.  Swelling noted to left hand and

18  wrist.  Also slight swelling noted to left inter aspect of knee

19  and right side of face including right orbit.  Patient stated

20  pain to back of neck, left knee and left wrist.  Inmate unable

21  to make fist.  Ecchymotic areas noted to wrist and left also.

22  Q.  Mr. Davis, when you wrote that the inmate was unable to

23  make a fist, were you referring to one or the other hand?

24  A.  I think probably the left wrist.

25  Q.  Did you note anywhere that he was unable to make a fist

1  with his right hand?

2  A.  No.

3  Q.  Would you turn to the diagrams on top.  You circled certain

4  areas of this diagram.  What does that indicate to you?

5  A.  Those circled areas should coincide with your notes.

6  Q.  So are those circles areas where you indicate whatever

7  injuries you noted?

8  A.  Yes.  Observable injuries.

9  Q.  Mr. Davis, I am going to show you photographs that are

10  marked as Defendants' Exhibit 4-A through 4-H.  They are in

11  that binder.

12  A.  Defendants' Exhibit 4.

13            THE COURT:  It is in the binder.

14            MS. KIM:  May I approach, your Honor?

15            THE COURT:  It is midway.  I think you got it.

16            MS. KIM:  Your Honor, defendants move into evidence

17  photographs 4-A through 4-H.

18            THE COURT:  I am sorry.

19            MS. KIM:  Defendants move into evidence photographs

20  4-A through 4-H.

21            THE COURT:  Sure.

22            (Defendants Exhibits 4-A to 4-H received in evidence)

23            MS. KIM:  May I publish these to the jury?

24            THE COURT:  Yes.

25  BY MS. KIM:

d7n6haw1                    Davis - direct

1    Q.  Mr. Davis, would you look at the photograph marked

2    Defendant's Exhibit 4-A.  Does that photograph appear to depict

3    what Mr. Hawks looked like on that day after you examined him?

4    A.  Yes.

5    Q.  Photograph 4-B.

6    A.  Yes.

7    Q.  The red markings that you see here on Mr. Hawks face, you

8    noted them in your AHR and also the use of force report; right?

9    A.  That's correct.

10   Q.  What about photograph 4-C, does that depict Mr. Hawks the

11   way he appeared when you examined him?

12   A.  Yes.

13   Q.  You see some abrasion on his neck.  Is that also noted in

14   your AHR and use of force report?

15   A.  Yes.

16   Q.  What about photograph 4-D, does that show Mr. Hawks as he

17   appeared on that day?

18   A.  Yes.

19   Q.  4-E?

20   A.  Yes.

21   Q.  How about photograph 4-F?

22   A.  Yes.

23   Q.  Do you know if that is the left arm or the right arm?

24   A.  Left arm.

25   Q.  Left arm.  There is no cast on Mr. Hawks' left arm;

d7n6haw1                    Davis - direct

1    correct?

2    A.   That's correct.

3    Q.   When you saw him, did you have a cast on his left arm?

4    A.   No cast.

5    Q.   Did you have a piece of cast that remained on his left

6    wrist?

7    A.   No.

8    Q.   Would you have noted that in your AHR and the use of force

9    reports?

10   A.   Absolutely.

11   Q.   Photograph 4-G, is that also Mr. Hawks as he appeared that

12   day?

13   A.   That's correct.

14   Q.   The last is photograph 4-H, is that the back of Mr. Hawks

15   as far as you know?

16   A.   Yes.

17          THE COURT:  I am going to mention to the jury when you

18   give these exhibits to them in the jury room, the photos that

19   plaintiff has introduced and the photos that the defendant has

20   introduced for the most part are the same not entirely.  So if

21   you see any difference, there is none.

22   Q.   Mr. Davis, Mr. Hawks in this case claims that he was

23   repeatedly punched and kicked by these four officers during the

24   use of force incident.  Now, is that consistent with your

25   examination of Mr. Hawks?

d7n6haw1                    Davis - direct

1          MR. NOVICH:  Objection, your Honor.

2          THE COURT:  Can you rephrase the question?

3          MS. KIM:  I will rephrase it.

4   Q.  Mr. Davis, Mr. Hawks in this case claims that he was

5   repeatedly punched and kicked by these four officers during

6   this November 1st, 2007 use of force incident.  Based on your

7   experience as a nurse having done over 100 use of force

8   examinations, the injuries that you noted in your records, is

9   that consistent with four officers repeatedly punching and

10  kicking an individual?

11         MR. NOVICH:  Objection.

12         THE COURT:  I will allow that.  If you know.

13  A.  No.

14  Q.  What would you say the injuries that you recorded are more

15  consistent with?

16         MR. NOVICH:  Objection, your Honor.

17         THE COURT:  Sustained.

18         MS. KIM:  Thank you.

19  Q.  You testified that you have done over 100 use of force

20  examinations; is that correct?

21  A.  That's correct.

22  Q.  Does that also exclude inmate on inmate assaults or were

23  there other examinations for inmate on inmate assaults?

24  A.  We have done both, but in particular the use of force is

25  usually a break up with the security and security I have done.

d7n6haw1                    Davis - direct

1    I really mean well hundreds I have seen.  I worked at many

2    prisons, too.  Not just mine.  Inmate on inmate I see a lot of

3    those fights also.  Yes, I do.

4    Q.  How would you characterize the injuries that you found on

5    Mr. Hawks on November 1st, 2007?

6    A.  Consistent with the report given it was resistance and use

7    of force.

8    Q.  Did these injuries require any medical attention?

9    A.  Other than assessment and some abrasions, no.

10   Q.  How would you characterize the abrasions that you found on

11   Mr. Hawks?

12   A.  Superficial.

13   Q.  And did you clean the wounds?

14   A.  Yes.

15   Q.  In one of your reports you noted that bleeding was stopped?

16   A.  Yes.

17   Q.  Was Mr. Hawks bleeding?

18   A.  There were abrasions.  So you treat them with 4x4's.  They

19   basically stopped.  There was no blood on the floor.  There was

20   very superficial bleeding involved.

21   Q.  What are 4x4's?

22   A.  The treatment things we use.  Normal saline.  What we use

23   to treat things like use of force injuries.

24          MS. KIM:  Thank you.  I have no further questions.

25          THE COURT:  Counsel.

1          MR. NOVICH:  Yes, your Honor.

2   CROSS-EXAMINATION

3   BY MR. NOVICH:

4   Q.  Good morning, Mr. Davis.

5   A.  Good morning.

6   Q.  Mr. Davis, I want to make some things clear.  This is the

7   picture of Mr. Hawks after the assault on November 1st, 2007;

8   right?

9   A.  That's correct.

10         MS. KIM:  Objection.

11         THE COURT:  Overruled.  If you know.

12  Q.  This area here, this is bruising and swelling; right?

13  A.  I noted that, yes.

14  Q.  I am sorry?

15  A.  It is noted, yes.  Swelling to the right side of the face.

16  Q.  And bruising?

17  A.  Yes.

18  Q.  And it also looks like he as some type of scar or bruising

19  under his eye.  Is that the orbit area?

20  A.  That's correct.

21  Q.  I want to make something clear.  Is it your opinion that

22  that is a very superficial injury?

23  A.  We're talking about the abrasions.  Abrasions are

24  superficial.

25  Q.  So are these injuries here very superficial, is that your

d7n6haw1                    Davis - cross

1    opinion?

2    A.  I didn't say that.

3    Q.  I wanted to make sure that was clear to the jury.  I didn't

4    understand.

5         Now, if I understood your testimony right, and correct

6    me if I did not, you said you made a distinction between use of

7    force incidents with Corrections officers, with guards and

8    inmate on inmate violence; right?

9    A.  Well, I was trying to categorize what she was asking me.

10   She asked me inmates, which are separate type of incidents and

11   there are use of forces between an inmate and officer.  I tried

12   to give you a rough amount how many I dealt with.  I cannot

13   give you an exact number.  Hundreds probably.

14   Q.  Hundreds of use of force incidents?

15   A.  Yes.

16   Q.  That you have been involved in?

17   A.  Assessments, yes.

18   Q.  Again, just from using the nomenclature, the right cad

19   word, when you say use of force incidents, you are talking

20   about guards and inmates; right?

21   A.  That's correct.

22   Q.  You've been involved in hundreds of use of force incidents;

23   right?

24   A.  Yes.

25   Q.  Hundreds of situations where there has been violent

d7n6haw1                    Davis - cross

1    encounters --

2              MS. KIM:  Objection.

3    Q.   -- between guards and inmates?

4              THE COURT:  I will sustain that.

5    Q.   You have seen hundreds of situations where inmates have

6    received beatings by guards --

7              MS. KIM:  Objection.

8    Q.   -- correct?

9              THE COURT:  Overruled.

10   A.   Restate that, please.

11   Q.   You have seen hundreds of situations where guards have

12   beaten inmates; correct?

13   A.   No.

14   Q.   Well, didn't you say you were involved in hundreds of use

15   of force incidents?

16   A.   Yes.

17   Q.   In those incidents that is when guards and inmates are

18   involved in some type of violent encounter; is that correct?

19   A.   That's correct.

20   Q.   In those situations inmates receive injuries at times,

21   don't they?

22   A.   Not often.  Sometimes they have injuries.

23   Q.   Now, when you examined Mr. Hawks that day on November 1st,

24   2007 prior to you examining him, do you know if anyone else at

25   the medical staff at RMU at Fishkill had looked at him?

1    A.  I don't believe so.

2    Q.  Do you know?

3    A.  I don't know.

4    Q.  I am sorry.  I didn't hear you?

5    A.  I don't know that, no.

6    Q.  Do you know if anyone had removed Mr. Hawks's cast that day

7    before you examined him?

8    A.  No, I don't.

9         MR. NOVICH:  Your Honor, may I have permission to

10   approach?

11        THE COURT:  Yes, sure.

12   Q.  I am showing you what counsel previously showed you, which

13   was Exhibit 4-F.  This is picture 4-F what you testified before

14   of Mr. Hawks' left arm that day after the incident; right?

15   A.  Yes.  Uh-huh.

16   Q.  Now, do you see where I am pointing to?  There are two

17   marks that are right there.  Do you see that?

18   A.  That's correct.

19   Q.  They are outlines, arn't they?

20   A.  I guess.

21        THE COURT:  Do you have one for the jury?

22        MR. NOVICH:  Sure, Judge.  It may be harder to see on

23   the overhead.

24   Q.  These are the outlines I was pointing to before, correct,

25   where you said "I guess"?

1    A.  Yes.  Indentations.

2    Q.  Indentations, right, on the left wrist; is that correct?

3    A.  Yes.

4    Q.  You have to speak out loud.

5    A.  Yes.

6              (Continued on next page)

D7NHHAW2                    Davis - cross

BY MR. NOVICH:

Q.  Now, if I understood your testimony on direct, you said you

gave Mr. Hawks a head-to-toe examination?

A.  That's correct.

Q.  When you do a head-to-toe examination, do you have to move

the inmate around, do you have to look at different parts of

his body?

A.  Yes.

Q.  Do you have to tell him to do certain things so you can

see, examine parts of his body?

A.  Yeah.  We usually tell him -- it depends on what situation

it is.  They usually stand up and turn 360, but I was able

to -- I don't know exactly how I did it -- but I was able to

see 360 of his body, check for injuries.

Q.  Tell us typically -- I know you -- tell us typically how

you do a 360 or a head-to-toe examination in terms of giving

the inmate directions, different things to do?

A.  Normally use of force, when we are involved, they are

normally in a cell.  They strip down to their boxers.  They

turn 360 for us so we can observe the entire body, head-to-toe

examination, working from the head down to the toe examination.

Q.  You tell the inmate take off your clothes, strip down to

your boxers, correct?

A.  That's correct.

Q.  You tell the inmate to turn around?

1   A.  That's correct.

2   Q.  If you need to examine a different part of his body, you

3   tell him to do that?

4   A.  That's correct.

5   Q.  Mr. Hawks did all that, didn't he?

6   A.  Yes, he did.

7   Q.  Did he comply with your instructions?

8   A.  Yes.

9   Q.  Did he give you a hard time?

10  A.  After initially, what I wanted, as I explained to you,

11  initially, until the lieutenant got involved and explained to

12  him to comply with us, comply with our department, he wasn't

13  forthcoming into helping, at least allowing me to examine him.

14  Because initially, I felt very uneasy about an exam.  Like I

15  told your Honor earlier, vivid, because I was concerned -- I

16  don't get concerned very often -- because his demeanor, how

17  upset, how angry he was.

18          So at that point, as I told you, when we are able to

19  ease him down, then he was able to be cooperative.  But

20  initially, no.  Initially I was even debating examining him.

21  Because sometimes we have cases where they are so aggressive,

22  the medical staff has to begin -- you know, our safety is most

23  important at that point.  So after he calmed down, the

24  lieutenant talked him down, I was able then to examine him.

25  Q.  Understood.  Initially when you saw Mr. Hawks, which was

D7NHHAW2                    Davis - cross

1    shortly after the assault, right?

2    A.  I don't know how long after it but probably shortly after.

3    Within half an hour I imagine.

4    Q.  He was angry and upset, right?  He had just been in an

5    assault, correct?

6            MS. KIM:  Objection.

7            THE COURT:  Sustained.

8    Q.  He had just been assaulted?

9            MS. KIM:  Objection.

10           THE COURT:  Sustained.

11   Q.  He had just come from an altercation with guards, correct?

12   A.  That's correct.

13   Q.  And he was angry and upset?

14   A.  That's correct.

15   Q.  He had just come from an altercation with --

16           THE COURT:  We have been over this now, the second

17   round.

18   Q.  And after he calmed down, he complied with all of your

19   requests, right?

20   A.  That's correct.

21   Q.  Did he threaten you in any way?

22   A.  Did not.

23   Q.  Did he strike you in any way?

24   A.  Did not.

25   Q.  Did he attempt to strike you?

1    A.   Did not.

2    Q.   Did the guards, did any of the defendants tell you what had

3    happened?

4    A.   No.

5    Q.   Did defendant Gunsett tell you that he punched Mr. Hawks in

6    the face?

7    A.   The only -- can I just --

8    Q.   Just answer that question.

9    A.   No.

10   Q.   Did defendant Gunsett tell you that he kneed Mr. Hawks in

11   the head?

12   A.   No.

13   Q.   Did the defendant Gunsett tell you that he pushed Mr. Hawks

14   on the ground, that Mr. Hawks fell on the ground?

15   A.   No.

16   Q.   Now, you have seen the pictures.

17   A.   Yes.

18   Q.   Mr. Hawks had injuries to his head, right?

19   A.   That's correct.  Yes.

20   Q.   He had injuries to his face, correct?

21   A.   That's his head.

22   Q.   He had injuries to the top of his head, right?

23   A.   Abrasions, yes.

24   Q.   He had injuries to his orbit, which is underneath the eye,

25   if I understand.

1    A.  That's correct.  Yes.

2    Q.  He sustained some head trauma, didn't he?

3    A.  Yes.

4    Q.  Did you order an MRI?

5    A.  No.

6    Q.  Did you order an x-ray?

7    A.  No.

8    Q.  Did you order a CAT scan?

9    A.  No.

10   Q.  Did you give him any cognitive tests?

11           THE COURT:  Any what?

12           MR. NOVICH:  Cognitive tests.

13   A.  No.

14   Q.  Did you ask him, for instance, what day is it, who is the

15   President, ask him to --

16   A.  Yeah.  It is indicated in my report.

17   Q.  Did you --

18   A.  Alert times three.  Yes.

19   Q.  So you asked him those questions?

20   A.  Yes.

21   Q.  Did you give him any type of neurological testing?

22   A.  No.

23   Q.  Did you take his blood pressure?

24   A.  No.

25   Q.  Did you give him any type of respiratory testing, check his

1   breathing or his pulse?

2   A.  No.

3   Q.  And in medicine you don't know what you don't know, right?

4   A.  That's correct.

5           THE COURT:  In everything.

6   Q.  And these tests that you did not perform, that were not

7   performed on Mr. Hawks, these tests would reveal whether or not

8   there is some type of injury to the brain, correct?

9   A.  That's correct.

10  Q.  They would --

11          MS. KIM:  Objection, your Honor.

12          THE COURT:  Overruled.

13          MS. KIM:  Side bar, please.

14          THE COURT:  Overruled.

15  Q.  They would reveal whether there was some type of injury to

16  the skull, correct?

17  A.  Possible.

18  Q.  And they weren't performed on Mr. Hawks, were they?

19  A.  Other than the level of consciousness, I told you.  We do,

20  we ask questions.  I asked questions of him, time, date, place,

21  where is he at, his name.  My first sentence in that thing, it

22  says alert times three.  The questions we ask give us a level

23  of consciousness of the individual, of the patient.

24  Q.  Are you saying whenever you do that in all situations

25  that's sufficient, you never have to do an MRI or CAT scan or

1    any of the other tests I mentioned?

2    A.  Well, at this point it was -- he was headed back to his

3    facility.  He is not our inmate.

4    Q.  I wasn't asking about that.  I was just asking you about

5    generally.  When someone sustains head trauma, you should never

6    perform any of these other tests that I mentioned that were

7    performed?

8    A.  There are a lot of variables in that.

9            MS. KIM:  Objection, your Honor.

10           THE COURT:  Overruled.

11           MR. NOVICH:  Nothing further, your Honor.

12           THE COURT:  Anything else?  We will excuse the

13   witness.

14           MS. KIM:  Just a few, your Honor.  I'm sorry.

15   REDIRECT EXAMINATION

16   BY MS. KIM:

17   Q.  I will be quick, Mr. Davis.

18           Now you testified that you have been involved in over

19   100 use of force exams, correct?

20   A.  That's correct.

21   Q.  I think you said on cross-examination that sometimes you

22   don't find an injury?

23   A.  Yes.

24   Q.  If an inmate is in a use of force and doesn't have any

25   injuries, why are you examining him?

1    A.  All use of forces have to be examined by medical staff.

2    Q.  So is any time an officer lays hands on an inmate

3    considered use of force as far as you know?

4    A.  Pretty much so, yeah.

5    Q.  So it doesn't mean --

6    A.  The problem with -- a use of force is pretty much a

7    takedown and they comply.  It is when the resistance happens,

8    that is when your injuries happen.

9    Q.  Again, even if there are no injuries to the inmate, you are

10   required to examine him, right?

11   A.  Have to, yes.

12   Q.  Do nurses order MRIs or CAT scans or anything like that?

13   A.  No.

14   Q.  Who orders such tests?

15   A.  The MDs do.

16   Q.  The doctors?  Yes?

17   A.  That's correct.

18   Q.  Now, during the cross-examination your answer was cut off.

19          Why wasn't Mr. Hawks provided further medical care at

20   Fishkill?

21   A.  Because he is an inmate of Green Haven corrections and he

22   was an inmate coming to us, receiving services.  We have

23   different doctors come -- they all come to our facility --

24   cardiologist, whatever service they need.  So whatever service

25   he is there to see, that is why he was there.  And he's not, he

1   is not a Fishkill correction facility inmate; he is a Green

2   Haven inmate.

3   Q.   Is there a medical clinic at Green Haven?

4   A.   Yes, there is, and everything was forwarded to them.

5   Q.   So is it fair to say that if he required further medical

6   attention he was going to get it at Green Haven?

7   A.   That's correct.

8            MS. KIM:  Thank you.  No more questions.

9            THE COURT:  OK.  Thanks very much.

10           Next witness.

11           THE DEPUTY CLERK:  Sir, you can step down.  Thank you.

12           THE COURT:  Ms. Kim, next witness.

13           (Witness excused)

14           MS. KIM:  The defense calls David Mazzella.

15           I'm sorry.  Your Honor, can we have a short break?

16           THE COURT:  No, let's keep going.

17           MS. KIM:  Your Honor, side bar.

18           THE COURT:  OK.

19           MS. KIM:  Sorry.

20           (Continued on next page)

21

22

23

24

25

D7NHHAW2                    Davis - redirect

1              (At the side bar)

2              MS. KIM:  I'm sorry.  The witness needs to use the

3    restroom.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  We will take a one-minute break.

3              (Jury excused)

4              (Recess)

5              (Jury present)

6              THE COURT:  We will have the next defense witness.

7     DAVID MAZZELLA,

8          called as a witness by the Defendants,

9          having been duly sworn, testified as follows:

10    DIRECT EXAMINATION

11    BY MS. KIM:

12    Q.  Good morning, Mr. Mazzella.

13    A.  Good morning.

14    Q.  Are you currently employed?

15    A.  Yes, I am.

16    Q.  Who is your employer?

17    A.  The New York State Department of Corrections.

18    Q.  Is it known as DOCS?

19    A.  Yes.

20    Q.  We will call it DOCS.

21              Where do you work presently?

22    A.  Green Haven Correctional Facility.

23    Q.  And how long have you worked at Green Haven?

24    A.  A little over 16 years.

25    Q.  How long have you been employed by DOCS?

1    A.  17.

2    Q.  What is your current position at Green Haven?

3    A.  I am a New York state correction officer.

4    Q.  In general, what are your duties as a correction officer?

5    A.  Our duties are the care, custody and control of inmates.

6    Q.  Where were you born?

7    A.  Marlboro.

8    Q.  Where did you go to high school?

9    A.  Marlboro.

10   Q.  Where is Marlboro?

11   A.  About an hour and a half or so upstate from here.

12   Q.  Do you have a family?

13   A.  Yes, I do.

14   Q.  Who are your family members?

15   A.  I have a wife and two stepsons and just recently had a

16   grandchild, granddaughter.

17   Q.  Congratulations.

18   A.  Thank you.

19   Q.  Now, did you receive any training at the time that you

20   became a correction officer?

21   A.  Yes, I did.  We actually have to go to Albany for a

22   seven-week training course.  At the completion of that

23   training, we become correction officers.

24   Q.  Is that called the training academy?

25   A.  Yes.

1   Q.  During these seven weeks, do you actually live there?

2   A.  Yes, we do.  We live there during the week.  On the

3   weekends we are allowed to go home.

4   Q.  What type of training did you receive at the academy?

5   A.  We receive from firearms, all the directives pertaining to

6   the care, custody and control of inmates, transportation of

7   inmates, penal law, laws that also deal with uses of force or

8   anything in the nature to do our duties and supervising inmates

9   in the facilities.

10  Q.  Now as a correction officer, one of your duties is to keep

11  the inmates safe, correct?

12  A.  Correct.

13  Q.  Do your duties include keeping anyone else safe?

14  A.  Yes.  It is our duty to make sure everybody in our facility

15  or even out of it while we are supervising inmates is that the

16  inmates are safe, the officers are safe, and even the civilians

17  that might even work in those jails.

18  Q.  What kind of civilian employees work at the prisons?

19  A.  There are multiple.  You have clerks, operators, civilian

20  cooks, who actually help out the inmates with the food, to

21  counselors, parole officers, medical staff.  There's a lot.

22  Q.  Now at the academy you received training on how and when to

23  use force on an inmate?

24  A.  Yes, we do.

25          THE COURT:  Ms. Kim, you may want to bend that

1   microphone toward yourself a little bit.

2   Q.  What is the use of force?

3   A.  The use of force is the use of force to gain compliance

4   with a lawful order.

5   Q.  So if an inmate is being violent or combative, is it

6   appropriate to use force?

7   A.  Yes.  Depends on the degree of the situation.  Uses of

8   force can actually be from verbal to where we are giving them

9   orders, to get to an area, get to a wall, to where we actually

10  have to use our hands, batons, depending on the situation and

11  the escalation of the force.

12  Q.  Now while you are inside, working inside a prison, are you

13  given any weapons to use?

14  A.  You are allowed to carry a baton while inside the facility.

15  Q.  Are you required to carry a baton?

16  A.  No, you are not.

17  Q.  What was your training as to the amount of force that you

18  can properly use against an inmate?

19  A.  You would use enough force to gain the compliance.  You

20  don't go over.  As soon as that inmate complies, it is called

21  deemed necessary or reasonable.

22  Q.  Is it fair to say you can use such force as reasonably

23  necessary to get control of the situation?

24  A.  Correct.

25  Q.  Where is Green Haven located?

1    A.  It is about, I would say about an hour and a half north of

2    here.

3    Q.  What kind of correctional facility is Green Haven?

4    A.  Green Haven is a maximum security prison.

5    Q.  About how many inmates are housed at Green Haven?

6    A.  We are roughly around 2,000.

7    Q.  On any given shift, approximately how many correction

8    officers are working at Green Haven?

9    A.  Approximately 100 officers.  It might be a little less, it

10   might be a little more, depending on what is going on.

11   Q.  So that is about 100 officers to maintain control of

12   approximately 2,000 inmates?

13   A.  Yes.

14   Q.  How would you characterize your job?

15   A.  The job I have right now?

16   Q.  Yes.

17   A.  I am now, right now I work in the kitchen.  I am a mess

18   hall officer.  So on any given day there are four of us in the

19   mess hall with on the average of 80 inmates that we have to

20   supervise.

21   Q.  Now back in November of 2007 did you have a different job?

22   A.  Yes.  I was a transportation officer for Green Haven.

23   Q.  What does it mean to be a transportation officer?

24   A.  A transportation officer would be assigned to taking

25   inmates, could be transferred to another jail, could be clinic

1    call outs at other jails.  We also take them to court, to

2    different hospitals, funeral trips.  We will actually take the

3    inmate down so they can see their family on funeral trips.  And

4    pretty much that's it.

5    Q.  Now you described -- actually, you testified that Green

6    Haven is a maximum security prison, right?

7    A.  Yes, it is.

8    Q.  What are the different levels that are assigned to the

9    different correctional facilities around the state?

10   A.  We have three.  Well, actually -- three.  Minimum, medium

11   and maximum.

12   Q.  Now Green Haven being a maximum security facility, what

13   type of inmates are housed there?

14   A.  Generally we are dealing with the ones that are doing

15   long-term bids, prison sentences.

16   Q.  Is there any danger involved in performance of your job?

17   A.  Every day.

18   Q.  Can you describe to the jury what type of dangers a

19   correction officer faces?

20   A.  At any given moment, depending on -- you don't know what

21   might happen.  An inmate might be having a bad day and just

22   turn around and attack you.  He can make what they call a shank

23   or a weapon and stab you with it.  Excuse me.  They also can

24   throw feces at you, urine.  And at any given time you just

25   always have to be on alert, that at any chance that -- you

1    don't know today is this going to be the day that someone is

2    going to be so upset that they try to attack you.

3    Q.   Now I would like to direct your attention to November 1,

4    2007 when the incident with Mr. Hawks happened.  OK?

5    A.   OK.

6    Q.   Were you working at Green Haven that day?

7    A.   Yes, I was.

8    Q.   What was your shift?

9    A.   That day I was probably 7 to 3.  7 in the morning until 3

10   p.m.

11   Q.   You were a transportation officer on that day?

12   A.   Yes, I was.

13   Q.   When did you start working as a transportation officer?

14   A.   I believe I started around 2001.

15   Q.   So on November 1, 2007, you were working your regular

16   assignment that you had been working since 2001?

17   A.   Correct.

18   Q.   What was your particular assignment as the transportation

19   officer on November 1, 2007?

20   A.   We were taking inmates to a clinic call out over at

21   Fishkill Correctional Facility's RMU, the regional medical

22   center.

23   Q.   Now why are inmates taken from Green Haven to Fishkill to

24   the RMU for medical care?

25   A.   What happens is the jails in that area they call a hub.  In

1   that hub a specialty doctor -- could be a cardiologist, could

2   be a hand doctor -- certain people will go to Fishkill to see

3   all the inmates in that hub, all the jails in that area.  So

4   when they have these call outs, we will take them from Green

5   Haven over to Fishkill to see these specialty doctors.

6   Q.  Now would you please describe to the jury the standard

7   procedures that were used back in November 2007 when

8   transporting inmates from Green Haven to the Fishkill RMU.

9            THE COURT:  First of all, do you remember how many

10  people you were taking from Green Haven to Fishkill?

11           THE WITNESS:  I believe there were around six inmates

12  that day that we were taking over there.

13           THE COURT:  Do they go by bus or car?

14           THE WITNESS:  We have vans.  We have eight-passenger

15  vans, is what they call them.

16  Q.  As I recall there were six inmates being transported from

17  Green Haven to Fishkill that day?

18  A.  Yes.

19  Q.  How many officers were accompanying the inmates that day,

20  including yourself?

21  A.  There was a total of four.

22  Q.  Who were the other officers?

23  A.  It was officer Gunsett, officer Cruz, and I do not recall

24  the fourth officer's name.

25  Q.  How many vans did you take to go to Fishkill?

1   A.  We took two vans that day.  We had to take the wheelchair

2   van because we had one wheelchair inmate.

3   Q.  How many officers were in each van?

4   A.  Two officers for each van.  It is mandatory, two officers

5   have to be in each van.

6   Q.  Would you describe to the jury the standard procedures that

7   were used back then when transporting inmates from Green Haven

8   to Fishkill.

9   A.  On a day like this, I would go in, I would get my

10  paperwork, which would give me my permission to take those

11  inmates out of Green Haven to Fishkill.  I can't just grab

12  anybody.  I actually have to have, it is what is called an

13  order to let those inmates leave that jail, be given photo ID

14  cards of their faces.  I have to make sure they match.  Then I

15  also get their cell locations.  We put this all on what is

16  called an itinerary.  That itinerary tells me what time I need

17  to leave the jail, what time I need to make it to Fishkill, and

18  I also have to write the times down when I leave the jail and

19  when I get to Fishkill on that so my jail knows that I made it

20  there safe and on time.

21          At this time because I had two vans I do not remember

22  who I used.  Me and another officer would go get the equipment

23  that we need for that day.  The equipment would be all the

24  chains that we use to shackle up the inmates.  This would be

25  leg irons, waist chains, black boxes, and handcuffs.

1        At that time me and whoever that other officer was, we

2   would get our keys to get the van.  We would go up front.  We

3   would get our weapons that we have to use.  The other officers

4   that would have been with me, I would assign them to go get the

5   inmates.  What that means is I would call each block, let them

6   know -- ask them is this inmate in this cell.  They would give

7   me a yes or no.  Tell them what is going on.  I will be down

8   there to pick them up to go on a trip.

9        While they are doing that to get the inmates, we are

10   going around to what is called the rear gate of Green Haven.

11   We bring the vans inside the walls, drive them over to where

12   the clinic is, and then we would get out and go assist the

13   other officers in getting these inmates.

14        We have what is called a transportation shack in Green

15   Haven.  That is where we would bring all the inmates.  And in

16   that room, that is where we strip frisk them and we handcuff

17   them.  Basically what I am talking about is, strip frisk is a

18   head-to-toe examination to make sure they have no contraband on

19   them whatsoever.

20        After those strip frisks are done, we will handcuff

21   them, put the waist chains on and the black box, put leg irons

22   on them and then we will transport them over to where the vans

23   are, put them in the vans, go back to the rear gate where we

24   came in through before, and at that time a sergeant will

25   actually ID the inmates to make sure that is the person I have

1  and that is where I am going.  Then we go over to Fishkill

2  correctional.

3  Q.  What is a black box?

4  A.  A black box is this little box.  It is square.  It

5  literally covers over the holes on the handcuffs so that they

6  can't get to the holes and try to break free out of their

7  cuffs.

8  Q.  Can we call the entire apparatus the shackles?

9  A.  Yes.

10  Q.  Is that what you call them?

11  A.  Yes.

12  Q.  Now when inmates are in their home facilities, they are not

13  in shackles, right?

14  A.  No, they are not.

15  Q.  They don't have any restraints, right?

16  A.  Except for SHU.

17  Q.  If an inmate is in what is called special housing unit,

18  they are restrained?

19  A.  Yes.  When an inmate is in special housing unit, when they

20  come out of their cells they have to be in full restraints, is

21  what we call it.

22  Q.  When the SHU inmate is inside his cell he doesn't have any

23  restraints?

24  A.  When he is inside his cell he doesn't.  When he comes out

25  of his cell, he has to be in full restraints.

D7NHHAW2                           Mazzella - direct

1    Q.  So the inmates are shackled at Green Haven before they are

2    taken into the van, right?

3    A.  Correct.

4    Q.  Can you go step by step, because I am sure the jury doesn't

5    have a clear idea, how do you put shackles on an inmate?

6    A.  The procedure I always follow is the inmate will stand in

7    front of me.  I will make sure he has his hands in his pockets.

8    I will take the handcuffs first.  Depending on what hand I tell

9    him to take out first, I will tell him to take out one of his

10   hands.  Say for the sake his left hand.  I will place the one

11   cuff on it.  Then I will tell the inmate to take the other hand

12   out of his pocket and I will place the other cuff on him.  At

13   this time I what is called a double lock.  There is a little

14   switch on the cuffs to where it makes it harder for them to try

15   to pick open the lock, is what it is called.  I make sure that

16   they are securely on and not moving.

17          At that time I take what is called a black box, what

18   we were talking about before.  It literally covers over the

19   handcuffs to make sure that they can't get to the keyholes.  At

20   that time I take what is called a waist chain.  This waist

21   chain, with two locks, like normal master locks, we use one to

22   wrap around his waist, lock it to his waist, making sure he has

23   enough room to where he can breathe and it is not super

24   uncomfortable.  One end of that chain has this little box on it

25   almost and actually slides through the middle of the black box.

1   That is to make sure everything is secure to the chain and to

2   the cuffs.  The other end of that chain we actually slide

3   through the hole that is in the other side of the chain, loop

4   it back through and then we lock it back onto his waist.

5           We give the inmate enough space to where he can

6   actually reach his mouth and his lower area in case he does

7   have to go to the bathroom.  We don't have to take the cuffs

8   off again because he is able to move, sneeze, cough.  He can

9   cover his mouth and his face with his hands.

10          At that time, depending on where we are, and most

11  times we try to have the inmate sit, we put the leg irons on

12  him.  It is pretty much just like handcuffs but the chain

13  between them is a lot longer and they are a lot bigger.  Make

14  sure to double lock them too so they don't crush onto his

15  Achilles and it gives him enough freedom and movement to walk

16  but not run away from us.  That's pretty much it.

17  Q.  Thank you.

18          Now you described how you have an inmate keep his

19  hands in his pockets and take them out one at a time.  Why is

20  it done that way?

21  A.  I do it that way to make sure that I'm safe and that the

22  inmate's safe and that he is following my directions for that

23  time.

24  Q.  All right.  Would you take us through what happened on

25  November 1, 2007 from the time that you left Green Haven to the

1    time when the incident with Mr. Hawks happened.  You don't have

2    to go over the standard procedures again.

3    A.   OK.  We arrived at Fishkill correctional.  We went to their

4    RMU, their regional medical unit.  They have a lower level of

5    this unit where we bring our cars into.  We take the inmates

6    out.  We get escorted into what is called like a little bullpen

7    room, also a waiting room.  In there we will take everything

8    off the inmates, the shackles, the waist chains, and

9    everything.

10         At this time we would take the inmates from that room

11   into what is called a bullpen.  The inmates would go over to

12   the bullpen.  When they are in that bullpen there is actually

13   an officer who watches that whole entire area from what is

14   called a bubble.  He controls all the gates down there and all

15   the doors.  When those inmates get into that bullpen, he will

16   actually close it shut because he has to open up that bubble

17   that he is in so I could put my cuffs and my chains and

18   everything in there so the inmates can't get in there and try

19   to take over an area.

20         As soon as all of my stuff is done, I will take my

21   paperwork and when the Fishkill upstairs is ready for us, we

22   get escorted upstairs through an elevator to another bullpen

23   where we put the inmates.

24         In that bullpen they wait until the doctors or the

25   nurses are ready to see each individual inmate.  On that day,

1    like I said, I had about six inmates.  So we were all over the

2    place, to different doctors, different clinics, different call

3    outs.

4          At the end of the day when everything is done and I

5    receive all the paperwork back, we head back downstairs.  We

6    literally almost do it in reverse.  We put them all back into

7    that bullpen, close it up.  I will go get my shackles, which I

8    did that day.  I got my shackles, went into that other waiting

9    room where we uncuffed them and started setting up all my

10   chains and cuffs to individually lock them up.

11         Me and officer Gunsett were in the room at that time.

12   Officer Cruz and the other officer were watching the inmates

13   that were in the other bullpen.  I don't know who I said it to,

14   but I said, OK, we are ready, send the first one in.  The first

15   one in was inmate Hawks.

16         Inmate Hawks came into the room.  Officer Gunsett had

17   the cuffs, was going to get ready to cuff him.  I had the waist

18   chain ready with the locks and the black box, getting ready to

19   hand them over to officer Gunsett after he got the cuffs off --

20   on.

21         THE COURT:  This would have been after his medical

22   appointment?

23         THE WITNESS:  Yes.  Everything was done for the day,

24   your Honor, and we were on our way back to Green Haven.

25   A.  Gunsett told Hawks to step up towards him.  As Hawks

1    stepped up toward him, he pulled his hands out of his pockets.

2    Officer Gunsett looked at him and he said, What did I tell you.

3    I told you to keep your hands in your pockets until I order you

4    to not.  It looked like Hawks was about to put his hands back

5    in when all of the sudden Hawks punched officer Gunsett with

6    his right hand to officer Gunsett's right side of his face.

7           At that moment officer Gunsett started defending

8    himself, swung back at inmate Hawks and there was a little

9    bench right there.  While Gunsett was trying to defend himself,

10   I started charging towards him, towards inmate Hawks also.

11   Hawks fell over the bench, fell back onto his back, but as he

12   was on his back he kept swinging at us and trying to get back

13   up using his feet.  It was like you saw a turtle on his back

14   just swinging his arms and legs trying to get back up.

15          At that time all we were trying to do is gain control

16   of his arms, get him on his stomach and put his arms behind his

17   back so I can cuff him again, or someone.

18          At that time I tried to grab ahold of his right arm

19   and was trying to turn him over onto his stomach when I didn't

20   realize it, my left arm got near his face when he was turning

21   and that's when he bit me on the left side of my arm.  As he

22   started to bite me -- Gunsett saw it and he drove his knee into

23   his head to try to release that bite.

24          We finally got him onto his stomach.  I got ahold of

25   his right arm to get behind his back and I believe Gunsett got

1    hold of his other arm, got it behind his back and we finally

2    got the cuffs on him.

3    Q.  Did any other officers appear to help you restrain

4    Mr. Hawks?

5    A.  Yes.  At that time my priority is on that inmate.  I know

6    officers were in there, but what they were doing and what was

7    going on, I have no idea.

8    Q.  Now, you testified about how as you are shackling the

9    inmates to take them back to Green Haven all the inmates are in

10   the bullpen.

11   A.  Correct.

12   Q.  And one by one the inmate is taken to this other small room

13   to be reshackled, right?

14   A.  Correct.

15   Q.  They are not all taken together into that small room to be

16   shackled at the same time, right?

17   A.  No.  It just keeps it easier so that we have one at a time

18   and nothing gets confused or lost.

19   Q.  So there was nothing unusual about Mr. Hawks being taken

20   into that small room by himself to be shackled?

21   A.  No.

22   Q.  Let's try to give the jury some perspective about the area

23   where this incident happened.

24        Would you turn to, in that binder, Defendants' Exhibit

25   3.  There are photographs in there.  They are marked

1    Defendants' Exhibit 3-1 through 3-13.

2              Were you able to find the photographs?  Let me come up

3    and help you.

4              MS. KIM:  May I approach, your Honor?

5              THE COURT:  Yes.  Sure.

6              So it is like midway through the stack of photos,

7    right?

8              MS. KIM:  Yes.

9              THE COURT:  Is that what you are looking at?

10             THE WITNESS:  There it is.  OK.

11   Q.  Do any of those photographs depict that small room where

12   this incident happened?

13   A.  Yes.  The first one, 3-1.  That is the waiting room.

14   Q.  And that door, where does that door lead to?

15   A.  That leads to the outside where our vans would be.

16             THE COURT:  So is this where the incident occurred?

17             THE WITNESS:  Yes, it is, your Honor.

18             THE COURT:  In this room?

19             THE WITNESS:  Yes.

20             THE COURT:  Is that the bench to the left that you

21   were talking about?

22             THE WITNESS:  Yes, it is, your Honor.

23   Q.  Are there any other photos that show that room?

24   A.  Yes.  3-2.

25   Q.  Any other photos?

1    A.   A better one is 3-3.

2    Q.   Is this where the use of force incident happened?

3    A.   Yes, it is.

4    Q.   Can you --

5            THE COURT:  Before you do, could you just look at 3-4.

6    Is that the bubble you were talking about?

7            THE WITNESS:  Yes, it is, your Honor.

8            THE COURT:  Do you want to show that?

9    Q.   So that is what you call the bubble?

10   A.   Yes.

11   Q.   There is an officer in there?

12   A.   Yes, there is an officer posted in that room.

13   Q.   And that officer is watching all the inmates in the

14   bullpen, right?

15   A.   Watching all the inmates in the bullpen and controlling all

16   the gates that are down in that area.

17   Q.   Are there also officers inside the bullpen watching the

18   inmates?

19   A.   Not inside the bullpen.  They are waiting on the outside of

20   it.

21   Q.   But the officer in that bullpen controls all the gates and

22   so forth, right?

23   A.   Correct.

24   Q.   So if an incident happened, what would that officer in the

25   bubble do?

1   A.  He would probably be the one to call for a response.

2   Q.  Let's go back to this photo.  Can you describe to the jury

3   where Mr. Hawks was when this use of force incident happened?

4   A.  Inmate Hawks was nearer to the bench.  He was sitting down

5   towards the middle.  Then when he stood up, he was nearer to

6   the bench.  Me and officer Gunsett were in between those

7   partitions.

8   Q.  So would it be fair to say Mr. Hawks is right here?

9   A.  Yeah, about there.

10  Q.  And you and officer Gunsett are in this area?

11  A.  Correct.

12  Q.  Who is doing the actual shackling?

13  A.  I had officer Gunsett doing the cuffing while I was holding

14  onto the rest to hand over to him one at a time when he got the

15  cuffs on.

16  Q.  So you are handing the shackling equipment to officer

17  Hawks?

18  A.  No, Gunsett.

19  Q.  Sorry.  Officer Gunsett.  And officer Gunsett is putting

20  the shackles on Mr. Hawks?

21  A.  Correct, but we did not get that far.

22  Q.  OK.  Do any of those photographs show the bullpen where all

23  the inmates are sitting and waiting?

24  A.  Looking from the outside, 3-8.

25  Q.  So that's the bullpen where the inmates wait and across

1    from there is that officer in the bubble?

2    A.  Yes.

3    Q.  So in relation to that bullpen, where is the little room

4    where the use of force incident happened?

5    A.  It is literally right on the left-hand side of that inmate

6    waiting sign.

7    Q.  Would you look at photograph 3-5.  Is that photo taken from

8    inside that small room where the use of force incident

9    happened?

10   A.  Correct.

11   Q.  Where does that door lead to?

12   A.  The one straight ahead that is closed?

13   Q.  The one that is opened to the room.

14   A.  That leads to the hallway where the bubble is and to the

15   left, literally right to the left is the bullpen.

16   Q.  What else is in that immediate area in the RMU basement?

17   A.  I'm not quite sure.  I do believe they have some type of

18   medical unit down there to the right-hand side, but I'm not

19   sure what it is.

20   Q.  Do you recall if, on this photograph, that door was open

21   when this use of force incident happened?

22   A.  Yes, that door was open.

23   Q.  Photograph 3-12.  Does that show the rest of the RMU

24   basement?

25   A.  Yes, pretty much.

1    Q.  Photograph 3-13, what is depicted in this?

2    A.  Those are the elevators where we would take the inmates up

3    to the next floor where they can be seen for their clinic call

4    outs.

5    Q.  That is still the RMU basement, right?

6    A.  Correct, that is still the RMU basement.

7          MS. KIM:  Your Honor, we are not going to use all the

8    photographs but the jury will get all the photographs.

9          THE COURT:  OK.

10   Q.  Now, when the use of force incident happened, did Mr. Hawks

11   have anything on his left arm or wrist?

12   A.  When the use of force happened, no, he had no cast on his

13   hand.

14   Q.  What is your understanding as to why Mr. Hawks was taken to

15   Fishkill that day?

16   A.  To be seen by the hand doctor.

17   Q.  Did he have a cast on when you were taking him to Fishkill?

18   A.  Yes, he did.

19   Q.  And by the time you and officer Gunsett are shackling him

20   back to be taken back to Green Haven, did he have anything on

21   his left arm?

22   A.  No, he did not.

23   Q.  Is it your understanding that the cast was taken off that

24   day?

25   A.  Yes, it was.

1   Q.  Now, other than what you already described, did you use any

2   other type of force on Mr. Hawks?

3   A.  No, I did not.

4   Q.  Did you punch Mr. Hawks?

5   A.  No, I did not.

6   Q.  Did you kick Mr. Hawks?

7   A.  No, I did not.

8   Q.  How would you describe the amount of force that you used on

9   Mr. Hawks that day?

10  A.  I used the amount of force to make sure that me and my

11  partners and even Mr. Hawks were safe.

12  Q.  Now, other than the punch that you described from officer

13  Gunsett to Mr. Hawks after officer Gunsett himself was punched,

14  did you see anyone else punching Mr. Hawks?

15  A.  No, I did not.

16  Q.  Did you see anyone else kick Mr. Hawks?

17  A.  No, I did not.

18  Q.  Did anyone else respond to the incident?

19  A.  I know there were people that responded to it.  But who and

20  how many, I'm not sure.

21  Q.  This wasn't your home facility, right?

22  A.  Correct, it is not my home facility.

23  Q.  You didn't know all the officers at Fishkill?

24  A.  No, I did not.

25  Q.  Did you know any sergeants or lieutenants or captains at

D7NHHAW2                    Mazzella – direct

1    Fishkill?

2    A.  No, I do not.

3    Q.  Do you know how the response team came, how they knew that

4    there was something going on?

5    A.  That I could not tell you.  My focus was on gaining control

6    over that inmate.

7    Q.  Now, what happened after Mr. Hawks was finally cuffed and

8    restrained?

9            THE COURT:  Could I ask a question before that.

10           THE WITNESS:  Yes.

11           THE COURT:  So how long did that altercation take,

12   would you estimate, from the time that there was physical

13   contact to the time that he was restrained again?

14           THE WITNESS:  It felt like forever, but probably maybe

15   a minute.

16           THE COURT:  And before there was any physical contact

17   between either you all and Mr. Hawks, was anything said?  Could

18   you tell us what was said by you or by him.  Was there any

19   conversation or exchange?

20           THE WITNESS:  The only exchange that happened before

21   that fight was Gunsett ordering him to put his hands back in

22   his pockets and waiting for him to tell him when to take them

23   out.

24   Q.  So once Mr. Hawks is finally restrained and cuffed, what

25   happened?

1    A.  We had to get him immediately off the ground because of

2    positional asphyxia.

3    Q.  What does that mean?

4    A.  Positional asphyxia is when an inmate is laying on his

5    chest and his hands are behind his back, they start losing the

6    feeling to breathe.  It is very big and we are trained on that

7    almost every year.  So the second we have him in control, we

8    have to get him off of his chest to make sure he can breathe.

9    That is what we did.  We immediately got him off the ground,

10   got him up to the wall, and at that time officers took over

11   control of that inmate.

12              THE COURT:  Other officers?

13              THE WITNESS:  Other officers, yes.

14   Q.  And at that point was Mr. Hawks still resisting?

15   A.  Yeah, he was struggling with us, even trying to get him up

16   towards to the wall.

17   Q.  And did there come a time when you went back to Green

18   Haven?

19   A.  Yes.  After I got seen by their medical department and

20   photos were taken, I eventually did get back to Green Haven

21   that day.

22   Q.  Did you take the other inmates back to Green Haven?

23   A.  No.  My day was done taking inmates back and forth right

24   after that fight.

25   Q.  And you had no other contact with Mr. Hawks that day,

1    correct?

2    A.   No.  I haven't had any contact.

3    Q.   After you got back to Green Haven, what did you do?

4    A.   Started filling out my use of force reports, my misbehavior

5    reports, and my to/froms.

6    Q.   Did you fill out something called an employee

7    accident/injury report?

8    A.   Yes, I did.

9    Q.   Would you look at, in the binder, Defendants' Exhibit 2.

10   It is the second page in that exhibit.

11   A.   Yes.

12   Q.   Is that the employee accident/injury report that you filled

13   out?

14   A.   Yes, it is.

15            MS. KIM:  Your Honor, defendants move into evidence

16   Defendants' Exhibit 2.

17            THE COURT:  I will allow it.

18            MS. KIM:  May I publish to the jury?

19            THE COURT:  Sure.

20            (Defendant's Exhibit 2 received in evidence)

21   Q.   Which portions of that document did you fill out?

22   A.   I filled out the whole entire top.  So from facility all

23   the way to my signature.

24            THE COURT:  So facility being what, top left corner?

25            THE WITNESS:  Correct, No. 1.

1        THE COURT:  And then down to where --

2        THE WITNESS:  No. 17, signature of employee.

3        THE COURT:  That's you?

4        THE WITNESS:  That's me.

5   Q.   That is your signature there?

6   A.   Yes, that is my signature.

7   Q.   Where it says statement of employee, what did you write?

8   A.   "While CO Gunsett was attempting to shackle inmate Hawks

9   turned and swung at him with his right fist.  I assisted

10  restraining inmate."

11  Q.   On the bottom it says, facility health services report.

12  No. 24, the findings, do you know who filled that out?

13  A.   I do not know.  It was probably the nurse that was on that

14  saw me over there.

15  Q.   You were examined by a nurse after the use of force

16  incident, right?

17  A.   Yes, I was.

18  Q.   Here it says, "redness noted both" -- I think that means

19  both -- "sides of neck."

20        Did you have redness to your neck?

21  A.   I think I did, yes.

22  Q.   And then "abrasions left knee."

23        Did you have abrasions to your left knee?

24  A.   Yes, I did.

25  Q.   I am going to skip these medical terms.  That says, "right

1  upper arm with approximate 3 inch appears to be a human bite

2  mark."

3          Did Mr. Hawks bite you in that area?

4  A.   Not my right upper arm but my left upper arm.  I don't know

5  why they wrote right, but it was my left upper arm.

6  Q.   Sometimes I'm sure they --

7  A.   Yeah.

8  Q.   Can you show the jury where Mr. Hawks bit you.

9  A.   Right about here on the inside of my elbow, between the --

10  almost right around the elbow area on the inside of my left

11  arm.

12  Q.   Your skin wasn't punctured, right?

13  A.   No, it was not.

14  Q.   But you had a bite mark on your arm?

15  A.   Yes.  It was visible.

16  Q.   How did you feel when Mr. Hawks was punching and kicking at

17  you and biting you?

18  A.   The adrenaline is going.  I'm just trying to make sure we

19  get him secured before it just gets any worse.

20  Q.   Did you have any concern for your own safety?

21  A.   Oh, absolutely.

22  Q.   At that time did you believe that Mr. Hawks intended to

23  cause you physical harm?

24  A.   Absolutely he did.

25  Q.   Had you ever had any interactions with Mr. Hawks before

1    November 1, 2007?

2    A.  Yes, I have.

3    Q.  What other interactions did you have with him?

4    A.  I took inmate Hawks actually, I believe, three other trips

5    prior to that trip.

6    Q.  Where did you take him?

7    A.  I took him to the emergency room for that August trip and I

8    also took him to Fishkill for two other trips to see the hand

9    doctor.

10   Q.  Are you referring to the August 25, 2007 incident when

11   Mr. Hawks fractured his left wrist?

12   A.  Correct.

13   Q.  So you took him to the emergency room of an outside

14   hospital?

15   A.  Yes.  We took him to Putnam emergency room.

16   Q.  You heard Mr. Hawks testify that officer Cruz took him to

17   the hospital and then you came later and visited him and

18   threatened him.

19   A.  That's absolutely ridiculous.  That does not happen.

20   Q.  Do officers visit inmates in hospitals?

21   A.  No, they do not visit inmates in hospitals.

22   Q.  Are you allowed to have outside contact with inmates?

23   A.  No, we are not allowed to have outside contact.

24   Q.  Now did anything -- withdrawn.

25          On that trip to the hospital on August 25, 2007, who

1    else accompanied you?

2    A.  It was me plus two other officers and a sergeant.

3    Q.  So there was a sergeant and three officers transporting

4    this one inmate to the hospital?

5    A.  Yes.

6    Q.  And then after that and before this November 1, 2007

7    incident, you took Mr. Hawks to Fishkill two other times?

8    A.  That's correct.

9    Q.  And that was between the hospital trip and the incident

10   when this happened, the November 1, 2007 incident?

11   A.  Yes, it was.  Yes.

12   Q.  Do you recall around what time -- when those two other

13   trips to Fishkill happened?

14   A.  I cannot recall.  I just know that I remember doing those

15   trips.  I think one actually was a couple weeks after the

16   August incident.

17   Q.  Now during that trip who accompanied you?

18   A.  On that trip it was me, another officer and a sergeant.

19   Q.  So it was two officers and one sergeant?

20   A.  Yes.

21   Q.  And how many inmates were you transporting to Fishkill?

22   A.  Just him.

23   Q.  So it was three correction staff members with this one

24   inmate?

25   A.  That is correct.

1   Q.  And then the second time after the August 2007 incident,

2   when you took Mr. Hawks to Fishkill, who accompanied you?

3   A.  On that one it was just three officers and just him.

4   Q.  So it was you and two other officers and just Mr. Hawks?

5   A.  Correct.

6   Q.  Is that unusual, that only one inmate is being accompanied

7   by more than two officers?

8   A.  It depends on the inmate and depends on what the dep of

9   security calls for, what he wants on that trip.

10  Q.  So that is the deputy superintendent of security?

11  A.  Correct.

12  Q.  At Green Haven?

13  A.  Yes, it is.

14  Q.  Now do you know why on those two other trips to Fishkill

15  Mr. Hawks was the only inmate being transported and there being

16  more than two officers present?

17  A.  That would be because of his assault on staff during that

18  August incident.

19  Q.  So would it be fair to say that there were extra

20  precautions taken with Mr. Hawks during those two other trips

21  to Fishkill?

22  A.  Yes.

23  Q.  So then November 1, 2007 incident happened.  That was the

24  third trip to Fishkill, right?

25  A.  Yes, it was.  For me it was with him.  Yes.

1   Q.  Do you know why on that trip Mr. Hawks wasn't the sole

2   inmate that was transported to Fishkill?

3   A.  It is not my decision to make.  They decided that -- people

4   above my level decided that he can go out with other inmates.

5   We don't make that decision.

6   Q.  Now during the hospital trip on August 2005 -- I'm sorry.

7   Long day.

8           During the hospital trip on August 25, 2007 with

9   Mr. Hawks, did any incidents happen?

10  A.  No, no incidents happened.

11  Q.  What about those other two occasions when you took

12  Mr. Hawks to Fishkill?

13  A.  We never had any problems with him during those times.

14  Q.  So nothing happened?

15  A.  Nothing happened.

16  Q.  There were no use of force incidents?

17  A.  Nothing.

18  Q.  Were you involved in the August 25, 2007 incident with

19  Mr. Hawks at all?

20  A.  No, I was not.

21  Q.  What do you know about the August 25, 2007 incident with

22  Mr. Hawks?

23  A.  On that day --

24          MR. NOVICH:  I am going to object, your Honor.

25          THE COURT:  Sustained.

1    Q.  On November 1, 2007, were you aware that Mr. Hawks had been

2    in an altercation with officers on August 25, 2007?

3    A.  Yes, I was.

4    Q.  What did you know about what happened on August 25, 2007?

5            MR. NOVICH:  Your Honor, it is the same objection.

6            THE COURT:  Overruled.

7    A.  From what I knew is that he assaulted two officers on the

8    August date.

9    Q.  Who were those officers?

10   A.  It was officer Collazzo and officer Melius.

11   Q.  What do you know about the injury that officer Melius

12   sustained during that incident?

13   A.  From what I know, officer Melius broke his arm and due to

14   complications from that break he eventually could never come

15   back to work.

16   Q.  So is he out on disability?

17   A.  Yes, he is.

18   Q.  He hasn't worked since August 25, 2007?

19   A.  He tried to come back for a little bit and ultimately they

20   told him no.  They ended up having to put him out on

21   disability.

22   Q.  Do you know what happened with officer Collazzo?

23   A.  He's working.

24   Q.  Do you know if he suffered a broken nose?

25   A.  I'm not sure.

D7NHHAW2                    Mazzella - direct

1    Q.  Is it fair to say that that August 25, 2007 incident with

2    Mr. Hawks, although it didn't involve you, that was a violent

3    incident?

4              MR. NOVICH:  Objection.  Leading.

5              THE COURT:  Sustained.

6    Q.  Now, having knowledge of that August 25, 2007 incident on

7    the date that this use of force happened with Mr. Hawks on

8    November 1, 2007, did that affect how you handled your use of

9    force of Mr. Hawks?

10   A.  No, it did not.

11   Q.  Have you ever testified at a Tier III hearing?

12   A.  Yes, I did.

13   Q.  Can you tell the jury just generally how Tier III hearings

14   are done.

15             MR. NOVICH:  Objection, your Honor.

16             THE COURT:  Sustained.

17             Did you have any involvement with Mr. Hawks?

18             THE WITNESS:  Yes, I have.

19             THE COURT:  At a Tier III hearing?

20             THE WITNESS:  Yes.

21             THE COURT:  You can ask about that if you want.

22   Q.  Did you testify at a Tier III hearing, at Mr. Hawks' Tier

23   III hearing for the November 1, 2007 incident?

24   A.  Yes, I did.

25   Q.  There was a hearing officer there?

1    A.  Actually, I had to do it by phone because at that time I

2    believe inmate Hawks was in Southport correctional and the

3    hearing officer called me at Green Haven and we had to do it

4    over the phone.

5              MS. KIM:  Nothing further.  Thank you.

6              THE COURT:  Counsel.

7              MR. NOVICH:  Start now, Judge, or take the lunch

8    break?

9              THE COURT:  No, let's keep going for a little while.

10   We will go until 12:45.

11             MR. NOVICH:  Just give me a moment, Judge.  I am just

12   trying to get set up here.

13   CROSS EXAMINATION

14   BY MR. NOVICH:

15   Q.  Good afternoon, officer Mazzella.

16   A.  Good afternoon.

17   Q.  Just picking up where you left off with Ms. Kim, you said

18   that at Mr. Hawks' disciplinary hearing you appeared by

19   telephone?

20   A.  Correct.

21   Q.  You weren't there in person?

22   A.  No, I was not.

23   Q.  That is the same hearing that Mr. Hawks received 60 months

24   in SHU?

25   A.  I don't know.  We don't ask.

1           THE COURT:  So you were the only one on the phone.

2     The others were at the same location?

3           THE WITNESS:  Generally what happens is there is a

4     hearing officer that is assigned to that job.  That is what his

5     job is across the state.  When situations like this happen, the

6     hearing officer that is doing the hearing on the inmate will go

7     to the jail itself --

8           THE COURT:  In this case Southport.

9           THE WITNESS:  Southport.

10          -- be in front of the inmate to ask the questions or

11    what inmate questions he wants asked.

12          THE COURT:  So this would be Mr. Hawks.

13          THE WITNESS:  Yes.

14          THE COURT:  So they are both at Southport.

15          THE WITNESS:  They are both at Southport.  And then I

16    would be on speaker phone and where the hearing officer would

17    ask me the questions or say yes or no to the questions that he

18    will allow inmate Hawks to ask.

19          THE COURT:  Got it.

20    Q.  I'm sorry.  The hearing officer is at Southport?

21    A.  Yes, he is.

22    Q.  And you were at Green Haven?

23    A.  Correct.

24    Q.  So the hearing officer didn't get to observe your demeanor,

25    directly observe how you present yourself like the jury is

1   doing here today, right?

2   A.  No.  Yeah.

3   Q.  I want to talk to you about August 25, 2007.  Your counsel,

4   Ms. Kim, asked you some questions about that.  I just want to

5   ask you some more.

6            You had talked about an incident involving officer

7   Melius?

8   A.  Melius.

9   Q.  Officer Melius is a coworker of yours or was a coworker of

10  yours at Green Haven, is that right?

11  A.  Yes, he was.

12  Q.  That was true in August of 2007?

13  A.  Yes.

14  Q.  In fact, you are friendly with officer Melius, correct?

15  A.  Yes, I am.

16  Q.  And on August 25, 2007, as you described on direct, officer

17  Melius was involved in an altercation with Mr. Hawks, right?

18  A.  Yeah.  I believe so, yes.

19  Q.  And officer Melius, he was injured as a result of his

20  altercation with Mr. Hawks, right?

21  A.  Yes.

22  Q.  As I understand your testimony, he was injured pretty

23  badly?

24  A.  Yes.

25  Q.  Mr. Hawks injured someone pretty badly that you were

D7NHHAW2                    Mazzella - cross

1   friendly with on August 25, 2007, correct?

2   A.   Yup.

3   Q.   And you transported Mr. Hawks to -- strike that.

4           Mr. Hawks was also injured as a result of that

5   altercation on August 25, 2007, correct?

6   A.   Yes.  I'm taking him to the hospital.  Medical deemed that

7   he needed to go out.

8   Q.   As you just testified you took him to, I believe it was

9   Putnam Hospital?

10  A.   Yes, it was.

11  Q.   And do you recall if you said anything to Mr. Hawks during

12  that transportation?

13  A.   No.

14  Q.   You don't recall?

15  A.   No, I don't -- there was nothing out of the ordinary.  What

16  the orders to do, what we needed him to do, stuff like that.

17  Q.   My question was, do you recall what if anything you said to

18  him?

19          THE COURT:  Specifically.

20  A.   No.  No.

21  Q.   Ms. Kim asked you some questions, general questions about

22  use of force based on your experience as a corrections officer.

23  Do you remember those questions?

24  A.   Yup.

25  Q.   And what is appropriate and what is inappropriate.  Right?

1    A.  Correct.

2    Q.  Can we agree that it is an inappropriate use of force to

3    punch an inmate who is sitting on a bench with his hands in his

4    pockets waiting for a correction officer to give him the next

5    set of instructions?

6    A.  Can we agree on that?

7    Q.  Yes.

8    A.  Yes.

9    Q.  Can we agree that if that --

10          THE COURT:  This is a hypothetical?

11          MR. NOVICH:  Yes, your Honor.

12   Q.  Can we agree if that situation occurred that the correction

13   officer would be engaged in excessive force?

14   A.  Yes.

15   Q.  Let's talk about November 1, 2007.  You were the officer in

16   charge that day, right?

17   A.  Yes, I was.

18   Q.  And when Mr. Hawks was transported from Green Haven to

19   Fishkill RMU, his hand was in a cast, right?

20   A.  Yes, it was.

21   Q.  Now let's discuss what happened after Mr. Hawks came back

22   from seeing the doctors at Fishkill RMU on November 1, 2007.

23          He had to be shackled for the return trip back to

24   Green Haven, correct?

25   A.  Correct.

1    Q.  And at some point in time he was separated from the other

2    inmates in order to be shackled, right?

3    A.  Yes.

4    Q.  Now you testified that you took Mr. Hawks on some of the

5    trips.  You said you took him on three trips to Fishkill RMU,

6    correct?

7    A.  Correct.

8    Q.  So there was at least -- if there was another trip, you

9    didn't take him on that one, right?

10   A.  Yeah.

11   Q.  And you don't know if in that other situation Mr. Hawks was

12   separated or not for the trip back, do you?

13   A.  Yeah, I wouldn't have known.

14   Q.  Now, you testified that you prepared some type of report

15   when you came back after the assault on November 1, 2007, after

16   you came back from Fishkill RMU.

17   A.  Yes.

18   Q.  When you came back to Green Haven, you prepared some type

19   of report, right?

20   A.  Correct.

21   Q.  That was to document what occurred, right?

22   A.  Yes.

23   Q.  You have got to make sure it is accurate and complete,

24   right?

25   A.  Correct.

1    Q.  That was that day, right?

2    A.  Yes.

3    Q.  And defendant Gunsett, he also prepared a similar report,

4    didn't he?

5    A.  Yes.

6    Q.  Now, you testified on direct examination that Mr. Hawks,

7    when he was in that room alone with you and defendant Gunsett,

8    you testified on direct examination here today that he removed

9    his hands from his pockets, correct?

10   A.  Correct.

11   Q.  You have previously testified in this case, right?

12   A.  In this case?

13   Q.  You were deposed?

14   A.  In my deposition, yes.

15   Q.  You previously testified in this case?

16   A.  Yes.

17   Q.  Ms. Marcus, my associate who was here yesterday, she took

18   your deposition?

19   A.  Yes.

20   Q.  There was a court reporter there?

21   A.  Yes, there was.

22   Q.  You were under oath like the oath you gave here today?

23   A.  Yes.

24   Q.  And your lawyer was there?

25   A.  Yup.

1          MR. NOVICH:  Your Honor, permission to approach the

2     witness.

3          THE COURT:  Sure.

4     Q.  Mr. Mazzella, there should be a deposition transcript, an

5     extra copy there for you.  I'm showing you your deposition

6     transcript.

7     A.  Uh-huh.

8     Q.  Could you please turn to page 30 of your deposition

9     transcript.

10         Are you there with me?

11    A.  Yup.

12    Q.  Ms. Marcus asked you the following question, under oath, in

13    front of a court reporter, with your lawyer present, starting

14    at line 21:

15         "Now, did you see inmate Hawks take his hand out of

16    his pocket?"

17         And your answer, under oath --

18         THE COURT:  Wait a minute.

19         MR. NOVICH:  Line 21, Judge, page 30.

20         THE COURT:  What you really mean to do is to read him

21    the question that was asked and to read him the answer and ask

22    if he recalls that.  Isn't that what you are --

23         MR. NOVICH:  Yes, your Honor.  I will do that.

24    Q.  Question, on page 30, line 21:  "Now, did you see inmate

25    Hawks take his hand out of his pocket?

1    "A.  I don't remember."

2            Did I read that correctly?

3    A.  Yes.

4            THE COURT:  Do you recall that question being asked

5    and that answer being given?

6            THE WITNESS:  Yes.

7    Q.  Now you also testified on direct examination today that

8    officer Gunsett punched Mr. Hawks.  After Mr. Hawks allegedly

9    punched him, officer Gunsett punched him back.  You testified

10   to that, didn't you?

11   A.  Yes.

12   Q.  Would you please turn to page 32.  I think it is on the

13   same -- we have the mini -- I believe it is on the same one.

14   Looking at line 4, the question was:

15   "Q.  OK.  Did you see officer Gunsett hit him at all?

16   "A.  I do not remember."

17           Did I read that correctly?

18   A.  Yes, you did.

19           THE COURT:  And do you recall being asked that

20   question and giving that answer?

21           THE WITNESS:  Yes, I do, your Honor.

22           THE COURT:  Counsel, do you want to break for lunch

23   now?

24           MR. NOVICH:  Sure, Judge.

25           THE COURT:  Before we do, let's excuse the witness.

1    We will ask you to come back after lunch.  I will tell you

2    when, but you can step down.

3              (Witness excused)

4              THE COURT:  I meant to do this a couple of minutes

5    ago, but I will do it now.  So we had testimony again with

6    respect to in this case the August 2007 incident.  So I want to

7    just read my instruction with respect to those other incidents

8    once again so you have it in your mind.

9              You heard testimony regarding other incidents of

10   assaults involving plaintiff and law enforcement officials.

11   The testimony may only be used for the limited purposes of,

12   one, determining officer Mazzella's motive and intent in

13   restraining plaintiff; two, in determining whether plaintiff

14   had the requisite intent and motive to commit assault and

15   battery on officers Gunsett and Mazzella; three, in determining

16   whether plaintiff's injuries, if any, were proximately caused

17   by any of the defendants' actions; or four, in determining the

18   amount of compensatory damages, if any, that should be awarded

19   to plaintiff.

20             Testimony regarding other incidents in which plaintiff

21   may have been involved may not be considered for the purpose of

22   proving plaintiff's propensity to engage in the altercation

23   described in this case or proving that plaintiff was at fault

24   in the altercation here.  Specifically, you may not find that

25   simply because plaintiff was involved in other assaults with

1    other officers on other occasions plaintiff has a propensity

2    for violence and, thus, it is more likely than not that he

3    provoked the altercation and/or committed an assault and

4    battery on defendant officers in this case.

5              So time for lunch.  Why don't you come back at a

6    quarter to 2.  Today if you wish -- do you want to use the

7    cafeteria in this building?  Is that easier for you?  It seems

8    like it might be.  It is on the eighth floor.  But then I am

9    going to ask the lawyers and the parties to not use this

10   cafeteria.  Use the one across the street, for example, at 40

11   Foley if you want to do that.

12             We are making good progress.  And if you leave

13   everything in place, we will safeguard it for you and we will

14   see you at a quarter to 2.

15             (Jury excused)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  I am going to do a conference in another

3     matter.  If you might just -- I think the plaintiffs are OK,

4     but if the defendants could make a little room on the end of

5     the table.

6          MS. KIM:  Your Honor, I do have an application.

7          THE COURT:  You will have to make it later.  I am

8     going to do another case first.

9          MR. NOVICH:  Judge, the same rule that was in place

10    with Mr. Hawks in terms of not talking during the breaks while

11    he is on the stand is also in place with defendant Mazzella and

12    the other defendants.

13         MS. KIM:  I have no intention of --

14         THE COURT:  Counsel are all professional and should

15    know that.

16         MR. NOVICH:  I wasn't suggesting otherwise.

17         THE COURT:  I get it.

18         MR. NOVICH:  I just want to make sure.

19         THE COURT:  Thanks.

20         So we are going to ask officer Mazzella be back at

21    quarter to 2.  Thanks a lot.

22         (Luncheon recess)

23         (Continued on next page)

24

25

1          A F T E R N O O N   S E S S I O N

2                         1:45 p.m.

3              THE COURT:  Did you have an application, Ms. Kim?

4              MS. KIM:  Yes, your Honor.  I apologize.  My intention

5     was to make it at the close of plaintiff's case, but we moved

6     right into the next witness and I didn't get a chance because

7     the jury was seated here.  The defendants at this time with

8     your permission pursuant to Rule 50 asks for a directed

9     verdict.

10             THE COURT:  So not to cut you off, you will reserve

11    your right.  We'll make the motion later.  Let's keep going.

12    The judge can either grant the motion or deny the motion or not

13    rule on the motion and go forward with the case and then you

14    can make it at the end of the case, a comparable motion.  That

15    is probably what I would do.  Nobody is going to be prejudiced.

16    Let's continue with the next witness.

17             MS. KIM:  Thank you, your Honor.

18             (Continued on next page)

19

20

21

22

23

24

25

1           (In open court; jury present)

2           THE COURT:  We'll continue with the cross-examination

3    of Officer Mazzella.

4           THE DEPUTY CLERK:  Sir, I would like to remind you

5    that you are still under oath.

6           THE WITNESS:  Yes.

7           THE DEPUTY CLERK:  Thank you.

8    BY MR. NOVICH:

9    Q.  Officer Mazzella, prior to the break I was asking you some

10   questions about your deposition testimony.  I want to make sure

11   we're clear.  Before you were deposed in this case, when

12   Ms. Marcus asked you questions under oath, you did review the

13   reports; correct?

14   A.  Yes, I did.

15   Q.  You reviewed your reports and the other reports in the

16   case; right?

17   A.  Yes.

18          MR. NOVICH:  Your Honor, permission to approach the

19   witness?

20          THE COURT:  Sure.

21   Q.  I want to direct your attention to Defendant Gunsett's

22   report in this case, which is Defendant's Exhibit 1.

23          I will make it easier for you.

24   A.  Sure.

25   Q.  Is that Defendant Gunsett's report in connection with the

1    use of force incident on November 1st, 2007 involving

2    Mr. Hawks?

3    A.  It looks like it, yes.

4          MR. NOVICH:  Your Honor, I would like to admit this

5    document, but at this time I would like to just publish it and

6    put it on the screen for the jury to see.

7          THE COURT:  Well, yes.  This is Defendant Gunsett's

8    report?

9          MR. NOVICH:  Gunsett's report.

10          THE COURT:  Sure.

11   Q.  This is the report that you testified about before when you

12   and Defendant Gunsett after the incident with Mr. Hawks after

13   you came from Green Haven from Fishkill RMU, you both prepared

14   reports as in the normal course?

15   A.  That's correct.

16   Q.  You prepared it that day?

17   A.  Yes.

18   Q.  In this report like Defendant Gunsett, like your report

19   describes the altercation and what exactly happened that day

20   with Mr. Hawks; right?

21   A.  Yes.

22   Q.  The inmate that is referred in both Defendant Gunsett's

23   report and your report, that inmate is Mr. Hawks; right?

24   A.  Correct.

25   Q.  Now, in Defendant Gunsett's report that he wrote that day,

1   one of the things that he wrote --

2          THE COURT:  That he wrote?

3          MR. NOVICH:  That Defendant Gunsett wrote.

4          THE COURT:  Right.

5   Q.  -- was I responded --

6          THE COURT:  If you have a question to ask him, ask it

7   to him.  I don't think you have to read another defendant's

8   report to do that.

9          MR. NOVICH:  Based on the question I do want to ask

10  him, Judge.

11         THE COURT:  No.  If you want to elicit some

12  information from him, just do that.

13         MR. NOVICH:  Sure.

14  Q.  Defendant Gunsett wrote in his report that Mr. Hawks fell

15  to the ground after he punched him; correct?

16  A.  According to the report, yes.

17  Q.  But your claim is that Mr. Hawks actually fell to the

18  ground because he tripped over a bench; right?

19  A.  Yes.

20  Q.  Now, in Defendant Gunsett's report he wrote that Mr. Hawks

21  was on his back and he was -- the inmate had to swing both

22  closed fists violently; correct?

23  A.  According to his report, yes.

24  Q.  And if you turn to the next report, the next one is your

25  report; right?

1  A.  Yes.

2  Q.  That is the report you prepared that day; correct?

3  A.  Correct.

4          MR. NOVICH:  Your Honor, permission to publish?

5          THE COURT:  Sure.

6  Q.  I have a report from you dated November 1st, 2007; right?

7  A.  Yes.

8  Q.  One of the things that you wrote was, The inmate, meaning

9  Mr. Hawks, was trying to get back up.  He was swinging towards

10  me and C.O. Gunsett with closed fists; correct?

11  A.  Correct.

12  Q.  You said closed fists?

13  A.  Correct.

14  Q.  You were here when nurse Davis testified that based on his

15  examination --

16          THE COURT:  Wait a minute.  You can ask the nurse what

17  the nurse thinks and you can ask this witness what he thinks.

18          MR. NOVICH:  Sure, Judge.

19          THE COURT:  The jury can determine.

20  Q.  Now, other than Mr. Hawks, has any other inmate ever

21  alleged that you have engaged in excessive force?

22          MS. KIM:  Objection.

23          THE COURT:  Sustained.

24  Q.  At your deposition do you recall denying under oath that

25  there was a finding --

1           MS. KIM:  Objection.

2           THE COURT:  Sustained.

3           MR. NOVICH:  Your Honor, side bar?

4           THE COURT:  Nope.  Sustained.

5   Q.  Were you ever investigated by the Inspector General's

6   Office?

7   A.  Yes, I have.

8           MS. KIM:  Objection.

9           THE COURT:  Sustained.

10  Q.  Did you ever slam another inmate's head --

11          MS. KIM:  Objection.

12          THE COURT:  Counsel, we already discussed this

13  pretrial.  You know what the rulings have been.  So let's not

14  keep doing down a path that is not appropriate to go down.

15          MR. NOVICH:  I did request a side bar, your Honor, to

16  discuss the issue.

17          THE COURT:  Well, you didn't get an okay for that.

18  BY MR. NOVICH:

19  Q.  Now, Officer Gunsett, let's talk about your alleged

20  injuries after the altercation.  Your left arm?

21  A.  I am Officer Mazzella.

22  Q.  I am sorry.

23          Officer Mazzella, let's talk about your injuries after

24  the alleged altercation with Mr. Hawks.

25  A.  Okay.

1    Q.  Your left arm was not bandaged; correct?

2    A.  Correct.

3    Q.  You weren't bleeding?

4    A.  No, I was not.

5    Q.  The skin on your left arm was not broken?

6    A.  No, it was not.

7    Q.  And you continued to work that day, November 1st, 2007;

8    correct?

9    A.  Correct.

10   Q.  You have been at Green Haven for 16 years?

11   A.  Close to it.

12   Q.  Have you ever heard anyone refer to it as gladiator school?

13   A.  No.

14          MR. NOVICH:  No further questions, your Honor.

15          THE COURT:  Anything further?

16          MS. KIM:  Just a few.

17   REDIRECT EXAMINATION

18   BY MS. KIM:

19   Q.  Officer Mazzella, you heard Mr. Hawks testify that at some

20   point you threatened him.  You said, "I am going to get you,"

21   and then after this incident you said, "I told you I would get

22   you."  Did you ever say anything like that to Mr. Hawks?

23   A.  No, I did not.

24          THE COURT:  Either before or after?

25          THE WITNESS:  Either before or after, your Honor.

1   Q.  Did you do anything to Mr. Hawks in retaliation for

2   whatever happened on August 25th, 2007?

3   A.  No, I did not.

4          MS. KIM:  I have no more questions.

5          THE COURT:  We'll excuse the witness and ask for the

6   next defense witness.

7          (Witness excused)

8          THE COURT:  Who is the next witness?

9          MS. KIM:  Defense calls Officer Gunsett.

10         THE DEPUTY CLERK:  Sir, if you could remain standing

11  for a moment and raise your right hand, please.

12   CLIFFORD K. GUNSETT,

13      called as a witness by the Defendants,

14      having been duly sworn, testified as follows:

15  DIRECT EXAMINATION

16  BY MS. KIM:

17  Q.  Good afternoon, Officer Gunsett.

18  A.  Good afternoon.

19  Q.  Are you currently employed?

20  A.  Yes.

21  Q.  What is your employer?

22  A.  New York State Department of Corrections.

23  Q.  Where do you work currently?

24  A.  Green Haven Correction Facility.

25  Q.  How long have you worked at Green Haven?

1    A.   Just over nine years.

2    Q.   When did you start working for DOCs?

3    A.   2004.

4    Q.   What is your current position at Green Haven?

5    A.   Correction officer for New York State.

6    Q.   And was Green Haven your first facility when you started

7    working for DOCs?

8    A.   Yes.

9    Q.   Do you have any other duties other than your general duties

10   as a Corrections officer at Green Haven?

11   A.   I am a member of the Green Haven CERT team.

12   Q.   What is the CERT team?

13   A.   Corrections Emergency Response Team.

14   Q.   What does the CERT team do?

15   A.   For lack of a better term, it is basically what is S.W.A.T.

16   is to police, but we're in a Corrections in a correctional

17   setting.

18   Q.   So what things do CERT officers do that regular officers

19   don't necessarily do?

20   A.   We get more specialized training in tactical scenarios,

21   cell extractions.  They kind of use us for a myriad of things.

22   They sent us down for a couple years ago for the hurricane and

23   we were protecting, I guess you would say, one of the clinics

24   that they set up for elderly people.  They use us for, like I

25   said, a myriad of different things.

1    Q.  Are you called when things happen in other facilities?

2    A.  We can be, yes.  If there was a serious situation in a

3    facility, they can call.  There are certain teams at certain

4    states.  So they can call us, yes.

5    Q.  Where were you born?

6    A.  Walkill, New York.

7    Q.  Where is that?

8    A.  It is about an hour and a half north of here.

9    Q.  Where did you go to high school?

10   A.  Walkill Senior High School.

11   Q.  Did you go to college?

12   A.  Yes.

13   Q.  Did you receive a degree?

14   A.  No.

15   Q.  How many semesters did you attend?

16   A.  I went for education.  I had one more semester of student

17   teaching when I left.

18   Q.  That is when you started working with DOCs?

19   A.  No.  No.  I left there and started doing some substitute

20   teaching along with working for a pool company installing

21   in-ground pools.

22   Q.  Do you have any children?

23   A.  Yes.

24   Q.  How old are they?

25   A.  My daughter is seven.  My son is nine.

1  Q.  So November 2007 you had your daughter, right, and she was

2  a newborn?

3  A.  She was, yes.

4  Q.  What training, if any, did you receive to become a

5  Corrections officer?

6  A.  I attended the academy, training academy.

7  Q.  How long did you attend the academy?

8  A.  That was eight weeks.

9  Q.  Did you receive training at the academy as to how and when

10  to use force on an inmate?

11  A.  Yes.

12  Q.  Generally what were you taught?

13  A.  You use force to, you know -- as much force is necessary to

14  get the inmate to comply with lawful direction.

15  Q.  Would it be fair to say that an officer should use as much

16  reasonable force as necessary to subdue a combative inmate?

17  A.  Yes.

18  Q.  For what reasons are you allowed to use force on an inmate?

19  A.  To defend yourself, to defend a third person, property,

20  gross obstruction of property, escape.

21  Q.  I would like to direct your attention to the November 1st,

22  2007 use of force incident.

23  A.  Okay.

24  Q.  Were you working at Green Haven then?

25  A.  Yes.

1    Q.   What shift you were on?

2    A.   7:00 to 3:00.

3    Q.   7:00 a.m. to 3:00 p.m.?

4    A.   Yes.

5    Q.   What was your assignment for that day?

6    A.   To transport inmates to the Fishkill Regional Medical Unit.

7    Q.   Was that your regular job?

8    A.   No.

9    Q.   Had you worked as a transport officer prior to that day?

10   A.   I don't remember.  I don't recall if I had.

11   Q.   And how did you become assigned to be the transportation

12   officer on November 1st, 2007?

13   A.   You know what, I honestly don't know.  I had a number of

14   different bids.  There is a job bid and you can bid on a job.

15   I had, like, maybe seven or eight bids since I have been there.

16   I don't remember what my bid was.  I don't know if I had a bid

17   where I had a miscellaneous day.  I don't know if I was on

18   overtime.  I don't know if I was a resource officer where you

19   don't have a job and the sergeant assigns you to a job for that

20   day.  I don't recall back then if I had -- what my bid was if I

21   had a bid.

22   Q.   So if you were a resource officer, you would fill in for

23   any gaps in coverage where ever you are needed in the facility?

24   A.   Right.  I would get there that morning at 6:40.  I have to

25   report to the chart sergeant and wherever they need you, they

1    put you in a slot whether it be a cellblock, tower or trip or

2    wherever.

3    Q.  Now, when you say "bid," we would know it has a regular

4    assignment?

5    A.  Right.  Right.  Something that like you do every single day

6    and that is your job.  So every day you report to the jail you

7    know exactly what you do.  You do the same job every day of the

8    week.  That is what a job bid would be.

9    Q.  What are the different bid jobs that you held at Green

10   Haven?

11   A.  I've worked -- there are corridors in the job where I

12   worked the corridors.  I have worked SHU.  I have worked A

13   Block, B Block, J Block.  Offhand that is all I can think of.

14   Q.  Now, before November 1st, 2007, had you had any

15   interactions with Mr. Hawks?

16   A.  No.  Not that I can remember anyway.

17   Q.  Did you know who Mr. Hawks was before that day?

18   A.  Not that I can remember, no.

19   Q.  How many inmates are at Green Haven?

20   A.  I think it is roughly over 2,000.

21   Q.  Was that the case back in November 2007?

22   A.  Yes.

23   Q.  Is it fair to say that back in November 2007 you came into

24   contact with many inmates?

25   A.  Yes.  Absolutely.

1   Q.   Hundreds of inmates?

2   A.   Yeah.  I mean, yes.

3   Q.   Thousands of inmates?

4   A.   Yes.  Yes.  Thousands in the course of your duties.

5   Q.   Would you take us through what happened on November 1st,

6   2007 from the time that you left Green Haven to the time that

7   the incident with Mr. Hawks happened as best as you can

8   remember?

9   A.   Yeah.  Yeah.  We arrived at Fishkill and pulled the vans up

10  and go in through that door into that little room where you

11  remove the shackles.  Once we get into that room, they shut the

12  door and then all the inmates are in that room.  I somewhat

13  remember asking Mr. Hawks to step aside so that the other

14  inmates could be unshackled due to the fact that he was SHU

15  inmate and my logic on that is usually an inmate is in SHU for

16  a problem.  It doesn't have to be a violence problem, drugs, it

17  could be he might be notorious weapons type guy.  It could be

18  he assaulted other inmates, staff members.  It could be

19  anything.  My theory is if there is an inmate that is a

20  disciplinary type problem, I will leave him shackled last while

21  I unshackle all the other inmates so there is the least amount

22  of an issue.

23        When I asked him to step aside, he was visibly

24  aggravated.  He was huffing and puffing and talking under his

25  breath and whatever he said he said.  Anyway I got the shackles

1      off the inmates and told him to put his hands in his pockets.

2      Every time I gave him a direction, it was huff and puff.  He

3      seemed to be generally upset.

4            So once we got all the shackles off, we went into the

5      other bullpen that we talked about.  Once they were ready for

6      us to come upstairs, we went upstairs.  Then they go into the

7      larger bullpen up there and wait for their medical procedure,

8      see their doctor, or what have you.  Once they are all done

9      with that, we get them all back together, bring them back down

10     into the bullpen and then we shackle them and we take them back

11     out to the van and leave to head back.  So we brought Inmate

12     Hawks in.  I believe I was in the room with Officer Mazzella

13     when he came into the room to be shackled.  The shackle setup

14     is all connected with padlocks.  So in order to take that setup

15     apart to apply it to the inmate, you have to unlock the

16     padlocks and take the whole thing apart.  So you have all the

17     separate pieces, block box, chain, padlocks.

18           Officer Mazzella was doing that and Mr. Hawks was

19     seated on the bench there, but he was pretty much done getting

20     everything undone I told Inmate Hawks to stand up and he took

21     his hands out of his pockets.  I told him for whatever amount

22     of time that was, I told him, Put your hands back in your

23     pockets.  I said something to that effect.  That is when I

24     think I had glanced over to grab a piece of the equipment from

25     Mazzella and that is when I get hit.  He punched me in the face

1    with as fist and then immediately I just responded and hit him

2    back.

3           Like you heard, there is a bench like right behind his

4    knees.  It was the effect of basically if you are standing and

5    somebody kneels down behind you, you push them and you fall

6    over.  When I hit him, he went over that bench and as soon as

7    he hit the ground, he started to come back swinging at which

8    point I pushed him back down because subduing an inmate on the

9    floor is lot easier than to stand up.  If you can get him down

10   to the ground and keep him in the area, it is safer.

11          So I had him down on the ground and we were trying to

12   give him directions to stop resisting, roll over on your

13   stomach.  He was throwing wild hands at us, throwing punches at

14   us.  At some point in trying to gain control of his arms as I

15   looked down, I realized that he had his mouth on Officer

16   Mazzella's arm biting him.  At that time as I had my hands tied

17   up with him, I was up.  My knee was and I drove my knee down

18   into his forehead to release the bite, which it did.  Once he

19   released the bite, we were able to get him over on his stomach,

20   get his hands up on his back, mechanical restraints were

21   applied and they ushered us off to see medical.

22   Q.  Now, other than what you already described, you struck

23   Inmate Hawks in the face after he punched you, he fell over,

24   then you saw him bite Officer Mazzella and you took a knee to

25   his forehead?

1    A.   Yep.

2    Q.   Other than that and trying to gain hold of his arms, turn

3    him over, did you use any other type of force on Mr. Hawks?

4    A.   No.

5    Q.   Other than that initial strike to Mr. Hawks' face, did you

6    punch Mr. Hawks again?

7    A.   Absolutely not.

8    Q.   Did you kick Mr. Hawks?

9    A.   Absolutely not.

10   Q.   How would you describe the amount of force that you used on

11   Mr. Hawks that day?

12   A.   I used the force that I needed to just get that situation

13   under control, get him rolled over on his stomach and get him

14   secured so he was no longer a threat.

15   Q.   Officer Mazzella was in the room; right?

16            THE COURT:   Sorry.

17   Q.   Officer Mazzella was in the room with you?

18   A.   Yes.

19   Q.   Did any other officers respond to the incident?

20   A.   Yes.   I believe Officer Cruz responded and then from

21   there -- honestly, when I was dealing with the inmate

22   physically, you don't really know exactly who is coming.   You

23   hear somebody -- there was obviously a response called because

24   in that type of situation, it's very distinct sound.   I mean

25   once that response is called, all the members from the response

1   team they arrive.  You imagine that these guys have keys on

2   their hips.  You hear keys jingling.  He hear feet hitting the

3   floor.  You hear people running from different areas.  That is

4   what I heard.  There were hands in there and people are trying

5   to get the guy handcuffed and stuff.  That is why I assumed the

6   whole response team that had been called.

7   Q.  Did you see anyone else punch Mr. Hawks?

8   A.  No, I did not.

9   Q.  Did you see anyone else kick Mr. Hawks?

10  A.  Absolutely not.

11  Q.  What happened once Mr. Hawks was finally restrained?

12  A.  I am sorry?

13  Q.  What happened once Mr. Hawks was finally restrained and

14  cuffed?

15  A.  We were leading by the responding officers.  The responding

16  officers take control of the inmate and they send us to BC by

17  medical right away for any injuries we may have.

18  Q.  Were you seen by a nurse?

19  A.  Yes.

20  Q.  Did you fill out an employee accident, slash, injury

21  report?

22  A.  Yes, I did.

23  Q.  In that binder would you look at Defendant's Exhibit 2.  It

24  is that first page.

25  A.  I have it.

1  Q.  Is that the employee accident, slash, injury report that

2  you filled out?

3  A.  Yes.

4          MS. KIM:  May I publish that, your Honor?

5          THE COURT:  Sure.

6          MS. KIM:  This is Defendant's Exhibit 2.

7  Q.  Officer Gunsett, which part of that document did you fill

8  out?

9  A.  I filled out the top section from the top left corner, No.

10  1 one, facility, down to No. 17, signature of employee.

11  Q.  Where it says "statement of employee," what did you write?

12  A.  Attempting to shackle inmate Hawks -- 04B24A1.  Inmate

13  Hawks turned and swung at me with his right fist striking me in

14  the face.  I took inmate to floor.

15  Q.  04B24A1 is what?

16  A.  It's PIN number, Department identification number.

17  Q.  Do you see the bottom half of that document?

18  A.  Yes.

19  Q.  Do you know who filled that part out?

20  A.  I am assuming that medical staff, the nurse.

21  Q.  So it is a little bit hard to read.  I am going to skip the

22  first report.  Areas noted, superior to left eye, no open area

23  but redness.  Redness areas.  Both forearms.  Old abrasions.

24  And something abrasions.

25          Then it says FROM with pain or complained at this

1    time.  It says, All areas cleansed with H2O and Benodine.

2              Do you recall having that type of medical treatment?

3    A.  Yeah.  Honestly it was a long time ago so I don't remember

4    exactly, you know, how I was treated but I remember, you know,

5    they treated me.  I don't remember exactly what they did.

6    Q.  You didn't have serious injuries; right?

7    A.  No.  No.

8    Q.  During this use of force event, did you believe that

9    Mr. Hawks intended causing you physical harm?

10   A.  Absolutely.

11   Q.  He punched you in the face; right?

12   A.  Yes.

13   Q.  Then he kept fighting with you and trying to hit you and

14   kick you?

15   A.  Yes.

16             MS. KIM:  Thank you.  No more questions.

17             THE COURT:  Counsel.

18             MR. NOVICH:  Yes, Judge.

19   CROSS-EXAMINATION

20   BY MR. NOVICH:

21   Q.  Good afternoon, Officer Gunsett.

22   A.  Good afternoon.

23   Q.  Let's discuss your knowledge of Mr. Hawks before

24   November 1st, 2007.  Before November 1st, 2007 you didn't know

25   who he was; right?

1   A.  No, I didn't.  I cannot say that I did.

2   Q.  Had you heard of him?

3   A.  I cannot say that I did.

4   Q.  To your knowledge did anyone working with you on

5   November 1st know Mr. Hawks?

6   A.  Not to my knowledge, no.

7   Q.  Now, on November 1st, 2007 you participated in the

8   transport of Mr. Hawks and other inmates from Green Haven to

9   the basement of the Regional Medical Unit at Fishkill; right?

10  A.  Yes.

11  Q.  Were you the transporting officer at the time?

12  A.  That day I was a transporting officer.  I don't know -- do

13  you mean regularly?

14  Q.  Yes.

15  A.  It wasn't my bid job, no.

16  Q.  Did you receive any annual training on transporting

17  inmates?

18  A.  No.  You don't receive any annual training on transporting

19  inmates.

20  Q.  And you don't remember receiving any training on

21  transporting inmates as part of your initial training when you

22  became a Corrections officers, do you?

23  A.  Yeah.  In the academy I believe they touch on shackles.

24  They go through a lot of stuff in the academy.  I don't

25  distinctly remember the transportation aspect, but I remember

1    learning about the shackles and how a shackle is set up and

2    things like that, which goes along with transportation.

3    Q.  Let me make sure to repeat the question again.

4    A.  Yes.

5    Q.  The question was:  You don't remember receiving any

6    training on transporting inmates as part of your initial

7    training when you became a Corrections officer, do you?

8    A.  Like I said, in the academy you go through a whole thing, a

9    whole regimen of two-month training.  That was back if 2004,

10   nine years ago.  So I don't remember every little bit of

11   training that we did at the academy.  I know that we learned

12   about the shackle set up and things.  As far as actual delving

13   in the transportation training, I cannot say that I remember

14   all the way back to the academy.

15   Q.  Now, on November 1st, 2007, when you were transporting

16   Mr. Hawks, was there a sergeant, was there any sergeant who was

17   in charge in overseeing the transport?

18   A.  No.

19   Q.  And this was the first and only time you had ever

20   transported an inmate to Fishkill RMU; correct?

21   A.  I believe so.

22   Q.  Let's talk about what happened when you arrived at Fishkill

23   RMU in 2007.  You got the inmates out of the van; right?

24   A.  Right.

25   Q.  You brought them into a little room?

1    A.  Yes.

2    Q.  The inmates were altogether; right?

3    A.  Yes.

4    Q.  You began unshackling the inmates in this little room;

5    correct?

6    A.  Right.

7    Q.  You told the inmates to put their hands in their pockets;

8    correct?

9    A.  Once they were unshackled?

10   Q.  Yes.

11   A.  Yes.

12   Q.  Did you know why Mr. Hawks was going to the medical unit

13   that day?

14   A.  Not that I can remember, no.

15   Q.  You did not know if Mr. Hawks had any visible injuries, do

16   you?

17   A.  I don't recall.

18   Q.  You didn't ask Mr. Hawks why he was receiving medical

19   treatment that day, did you?

20   A.  Not that I can remember, no.

21   Q.  And at some point after you arrived at Fishkill RMU on

22   November 1st, 2007, you unshackled Mr. Hawks; right?

23   A.  I don't recall who if it was me that unshackled him when we

24   first got there.  I don't remember.

25   Q.  At some point he was unshackled though after you arrived;

1    right?

2    A.  Yes.

3    Q.  And either you or some other Corrections officer told him

4    to put his hands in his pockets; right?

5    A.  Yes.

6    Q.  And it is your testimony that he didn't want to do that?

7    A.  Sorry.

8    Q.  He didn't want to do that, did he?

9    A.  I can't speculate what he wanted to do.  I know it was --

10   it seemed like he was angry.

11   Q.  He was upset?

12   A.  Yeah.

13   Q.  About putting his hands in his pocket?

14   A.  Yep.

15   Q.  He asked you why he had to put his hands in his pockets?

16   A.  Uh-huh.

17   Q.  Is that a yes?

18   A.  I believe so.

19   Q.  He was huffing and puffing that morning, that is how you

20   described it; right?

21   A.  Yep.  Yes.

22   Q.  You believed he was giving you a hard time; correct?

23   A.  Yeah.  I mean, I don't know giving me a hard time, but just

24   general, like I said before he seemed angry at every direction

25   he was given.

1    Q.  You assumed that he was battling with you; right?

2             THE COURT:  He was what?

3    Q.  Battling with you; correct?

4    A.  I wouldn't say he was battling.  It was a constant battle

5    with him to just -- you know, when I said stand over there, it

6    was huffing and puffing, and then put your hands in your

7    pockets.  It seemed like every direction I gave him was a

8    constant battle to get him to comply with directions.

9    Q.  Then after Mr. Hawks put his hands in his pockets, he went

10   upstairs to see the medical providers; correct?

11   A.  I believe they went to the other bullpen, larger bullpen

12   first and once they were ready for us upstairs then we went

13   upstairs.

14   Q.  He is brought to different areas before he actually saw the

15   medical providers?

16   A.  Right.  Once we unshackle the inmates into that area, they

17   go into the larger area.  We put our restraints away and then

18   we move on.  Once they are ready for us, then we'll move to the

19   next area.

20   Q.  He was unshackled; right?

21   A.  Yes.

22   Q.  To your knowledge were there any altercations between

23   Mr. Hawks and the medical staff that day?

24   A.  Not to my knowledge, no.

25   Q.  Now, after he was done with his physical therapy, the

1    inmates that was approximately 15 or 20 minutes or so?

2    A.  I couldn't tell you.

3    Q.  After the inmates came back down from seeing their medical

4    providers, they came back downstairs?

5    A.  I am sorry.  After they seen their medical providers?

6    Q.  Yes.

7    A.  Yes.  They came back downstairs.

8    Q.  Mr. Hawks was shackled first?

9    A.  Yes.  We attempted to shackle him first.

10   Q.  You brought him alone into a separate room to be shackled?

11   A.  Right.

12   Q.  You separated Mr. Hawks from the other inmates?

13   A.  I can't say that I separated him.  I don't remember if I

14   was -- I think I was in that room already.

15   Q.  Mr. Hawks was separated from the other inmates; correct?

16   A.  Yes.

17   Q.  In that room where Mr. Hawks was to be shackled, it was

18   just you, Mr. Hawks and Officer Mazzella; correct?

19   A.  I believe so.

20   Q.  Mr. Hawks was sitting on the bench waiting to be shackled;

21   correct?

22   A.  Yes.

23   Q.  Mr. Hawks was waiting for instructions from you; right?

24   A.  Yeah.  I would assume so, yeah.

25   Q.  Was he resisting when he was sitting on that bench waiting

1    for instructions from you?

2    A.   No.

3    Q.   You told him to stand up; right?

4    A.   Yes.

5    Q.   He stood up when you told him to stand up?

6    A.   Yes.

7    Q.   He complied with your command?

8    A.   Are you asking me?

9    Q.   Yes.

10   A.   Yes, he did.

11   Q.   You testified on direct examination I believe that you

12   ordered him to put his hands back in his pockets and that is

13   when he punched you; correct?

14   A.   Yes.

15   Q.   You gave a deposition in this case, didn't you?

16   A.   Yes.

17   Q.   And at your deposition you were less than certain when

18   Mr. Hawks actually --

19             THE COURT:  Did you want to ask a question from the

20   deposition?

21             MR. NOVICH:  Yes, I do, Judge.

22   Q.   Didn't you testify at your deposition that after you told

23   Mr. Hawks to put his hands in his pocket that is when you

24   believe he hit you?

25             MS. KIM:  Objection, your Honor.

1            THE COURT:  Sustained.  Read the question and read the

2    answer from the deposition and then ask a question about that.

3            MR. NOVICH:  Sure.

4            May I approach the witness?

5            THE COURT:  Sure.

6    Q.  If you could turn to page 20 of your deposition, you were

7    asked the question earlier about what happened and you were

8    giving your description on page 20.

9    A.  Okay.

10   Q.  On the middle of the page starting at line 11 did you say,

11   Do you recall saying:  I told him to stand up, he stood up, he

12   took his hands out of his pockets.  I told him to put his hands

13   back in his pockets and that is when I believe he struck me in

14   the face?

15   A.  Yes.

16   Q.  Now, on direct examination you testified that Mr. Hawks

17   punched you, you punched him back and he fell down to the

18   ground; right?

19   A.  Yes.

20   Q.  You testified that he fell to the ground; correct?

21   A.  Right.  Like I said, when I struck him, he -- what I

22   believe happened was that he toppled back over that bench that

23   was behind him about knee-high and fell to the ground.  Yep.

24   Q.  Didn't you previously state that you took him to the floor?

25   A.  Yeah.  That is a statement we use for all uses of force and

1  a lot of times we'll do that to kind of in our own -- you know,

2  like if I am working Green Haven, I will wright the report as I

3  took the inmate to the floor.  That is what we're trying to

4  accomplish, to take the inmate to the floor.  Instead of saying

5  word for word that the inmate struck me and write on paper, I

6  believe at that time he fell over a bench that was behind him.

7  We just say we took the inmate down to the floor and got

8  control.  At the time it wasn't, you know -- this wasn't -- to

9  me this was -- you know, it wasn't a major incident because

10 there was no major injuries and he struck me in the face, I

11 struck him, with got him to the floor, we cuffed him.  After

12 that time I never really gave it a thought until it was brought

13 up with this -- this case.

14 Q.  So today the testimony was you punched him and he fell to

15 the ground; right?

16 A.  Right.  I struck him and then I believe he tripped over --

17 went backwards over that bench.

18 Q.  And on November 1st you wrote, I took inmate to floor.

19 A.  Right.  That medical form, that is when they are asking for

20 the statement of employee.  It is a brief synopsis of what

21 happened.  In your to/from that I wrote, that is when you go

22 into detail as to what happened.  So with that medical they ask

23 you a brief description real quick as to what happened so they

24 have an idea of what happened.

25 Q.  After the altercation with Mr. Hawks, you prepared an

1    incident departmental communication report; right?

2    A.   Yes.

3    Q.   You prepared this report on November 1st, 2007; correct?

4    A.   Yes.  That's the same day of the incident?

5    Q.   Excuse me?

6    A.   That is the same day of the incident?

7    Q.   Yes.  This report is about your altercation with Mr. Hawks

8    on November 1st; right?

9    A.   Yes.

10   Q.   The inmate in the report that you referred to, that is

11   Mr. Hawks; correct?

12   A.   Yes.

13   Q.   In that report didn't you write that the inmate began to

14   swing --

15            MS. KIM:  Objection.

16            THE COURT:  Overruled.

17   Q.   Didn't you write that the inmate began to swing both closed

18   fists violently?

19   A.   Yes, I did.

20   Q.   You said both of Mr. Hawks' fists were closed, didn't you?

21   A.   Yes.

22   Q.   Now, after the altercation was over and Mr. Hawks was

23   handcuffed, he was examined by medical personnel in the

24   hospital; right?

25   A.   I have no idea.  Once the inmate was restrained, they

1   ushered us off to medical and we never saw each other again.

2   Once he was standing against the wall by resisting officers,

3   they took us to a separate area to be seen by medical.  I

4   didn't -- never saw him again after that.

5   Q.  You testified on direct that the only strikes on Mr. Hawks

6   that day were your punches to his face?

7   A.  Yes.

8   Q.  And your knee to his forehead; correct?

9   A.  Yes.

10  Q.  You testified on directed, too, that there was no other use

11  of force; right?

12  A.  Well, the only thing is a use of force.

13  Q.  My question to you, sir, was --

14            MS. KIM:  Objection.

15  Q.  -- you testified in response to your counsel's question

16  there was no other use of force to Mr. Hawks; correct?

17  A.  I didn't strike the inmate.

18  Q.  That is not what I asked you.

19  A.  I cannot answer that yes or no.

20  Q.  What I asked you was you testified today --

21            THE COURT:  Do you want to read back the testimony?

22            MR. NOVICH:  I would just like an answer to my

23  question, Judge.

24            THE COURT:  You have to be precise if you are talking

25  about prior testimony.  You have to have the prior testimony.

1   You can have a readback if you want.

2          MR. NOVICH:  My notes reflect that.

3          THE COURT:  My notes, who knows, notes.  If you want

4   to hear what was asked and answered, you need to talk to the

5   court reporter.

6          MR. NOVICH:  Sure.

7          THE COURT:  Let's do that.  Do we want to take a break

8   for the court reporter to find that?

9          MR. NOVICH:  Sure.

10         THE COURT:  We'll take five minutes.

11         (Jury excused)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2              THE DEPUTY CLERK:  You are still under oath.

3              THE WITNESS:  OK.

4      BY MR. NOVICH:

5      Q.  Officer Gunsett, you punched Mr. Hawks in the face and you

6      kneed -- on the right side of the face, right?

7      A.  I believe so.  I believe it was the right side of the face.

8      Q.  You punched him in the face on the right side and you kneed

9      him in the forehead, correct?

10     A.  Yes.

11     Q.  There were no other strikes by you?

12     A.  There were no other strikes, no.

13     Q.  There were no other strikes by any of the officers?

14     A.  No.

15     Q.  So no one punched or kneed or kicked Mr. Hawks on the top

16     of the head, correct?

17     A.  No.

18     Q.  Is that a yes?

19     A.  That's correct.  Nobody did.

20     Q.  Nobody punched or kicked Mr. Hawks on the back of his head,

21     correct?

22     A.  No.

23     Q.  His neck?

24     A.  No.

25     Q.  Nobody struck Mr. Hawks on his arms, correct?

1    A.   No.

2    Q.   That's yes?

3    A.   Nobody struck him on the arms.

4    Q.   Did anyone strike him on the inner part of his left knee?

5    A.   No.

6    Q.   Did anyone strike him on his upper chest?

7    A.   During my use of force, I pushed him back down to the

8    ground with both of my hands on his chest to keep him down to

9    the ground.

10   Q.   Did you strike him?

11   A.   I pushed him with both my hands to his chest down to the

12   ground.

13   Q.   You didn't punch him in the chest, did you?

14   A.   No.  I pushed him with both of my hands.

15   Q.   When you punched him in the face, did you punch him on the

16   right side of the face, from ear to nose, did you punch him on

17   this side of the face, or did you punch him under the eye?

18   A.   I can't recall exactly where the punch landed.

19   Q.   Did anyone else punch him under the eye?

20   A.   No.

21   Q.   Did anyone strike him in the elbow?

22   A.   No.

23   Q.   Did anyone strike him on his left arm?

24   A.   No.

25   Q.   Did anyone strike him on his left wrist?

1    A.  No.

2    Q.  Did anyone strike him on his left hand?

3    A.  No.

4    Q.  Now you claim that Mr. Hawks assaulted you, correct?

5    A.  Yes.

6    Q.  And before he allegedly assaulted you, before he attacked

7    you allegedly, he didn't say anything to you, did he?

8    A.  No.

9    Q.  And your testimony on direct was that you were actually

10   glancing over at officer Mazzella at the time that Mr. Hawks

11   struck you, right?

12   A.  Right.  I believe I was -- I believe I was grabbing one of

13   the, either the cuffs or one of the pieces of equipment from

14   him to apply to the inmate.

15   Q.  So you were busy doing something else when Mr. Hawks

16   allegedly struck you, correct?

17   A.  Not exactly.  No.

18   Q.  You weren't grabbing that piece of equipment?

19   A.  I wouldn't say I was busy doing something else.  I kind of

20   keep the inmate in my peripheral.  I am not going to take my

21   eyes completely off of the inmate.  As I keep him in my

22   peripheral, I am glancing for the, you know, piece of equipment

23   that I was getting.

24   Q.  Your testimony was you glanced over at Mr. Hawks while you

25   were getting a piece of equipment from officer Mazzella,

1    correct?

2    A.   I glanced over at officer Hawks?

3    Q.   I'm sorry.  You glanced over at Mr. Hawks while you were

4    grabbing a piece of equipment from officer Mazzella, correct?

5    A.   I don't recall if I said that I glanced at inmate Hawks.  I

6    don't know.  Normally, like I said, I try to keep the inmate in

7    my peripheral if I am grabbing something from another officer

8    just cause I'm not going to take my, completely turn my back to

9    the inmate.

10   Q.   Were you expecting him to punch you?

11   A.   No.  No, I can't say that I was.  It's always, in our

12   nature of work, it is always a possibility.

13   Q.   So he sucker punched you, right?  That is what you claim.

14   A.   That's what I would call it, right.

15   Q.   He coldcocked you, right?

16   A.   Right.

17   Q.   But you didn't require any medical attention, did you?

18   A.   If I remember right, I might have got like an icepack to

19   the eye maybe.  Like I said, it was a long time ago and I

20   didn't have like a broken eye or something like that or

21   anything like that.  But I think they put, you know, ice on my

22   eye and that might have been if it, if I recall.

23   Q.   Your counsel already showed you your employee accident

24   report which was marked as Exhibit D2.  You already testified

25   on direct that you signed this that day, correct?

1    A.   Yes.

2    Q.   Yes?

3    A.   Yes.

4    Q.   And do you see box 15, employee required medical attention?

5    A.   Yes.

6    Q.   The box that is checked is no?

7    A.   Right.

8    Q.   You signed that document on the same day?

9    A.   Yes.

10   Q.   After the attack, right?

11   A.   Yes.

12   Q.   You were not provided with first aid, were you?

13   A.   Just maybe an icepack on my eye.  Maybe that was it.

14   Q.   And even though you claim that Mr. Hawk sucker punched you,

15   that he coldcocked you, you were not provided with medical

16   attention, were you?

17   A.   Yes.  As soon as that incident was done, we went to go see

18   medical.

19   Q.   In fact, you didn't remember at your deposition, you didn't

20   remember sustaining any injuries, correct?

21   A.   Yeah.  Like I said, I got punched in the eye.  So whatever

22   injuries come from getting punched in the eye, maybe it was

23   swollen red, but it wasn't anything that's going to keep me out

24   of work or that I had to report to a hospital or anything for,

25   you know.  Like I told you before, to me this was just a

1   run-of-the-mill every day type of thing when you run in a

2   correctional facility.  I got hit, I responded, and that was

3   it.  I didn't really think much of it.

4   Q.  Can you turn to page 33 of your deposition.

5   A.  Yes.

6   Q.  Starting at line 4:  "Did you sustain injuries?"

7   "A.  You know what, I don't remember."

8           "OK."

9   A.  I think I'm losing you.

10  Q.  Page 33, line 4.

11          THE COURT:  33 is the box on the lower right.

12          THE WITNESS:  And line 4.

13          THE COURT:  Line 4.

14          THE WITNESS:  I see that it says he is trying to

15  restrain him.

16  Q.  Let me get you there.  You are looking at Mazzella's.

17  A.  I'm sorry.

18  Q.  You want to look at your deposition testimony.

19          Starting at line 4:  Did you sustain injuries, was the

20  question.

21  "A.  You know what, I don't remember.

22  "Q.  OK.

23  "A.  I don't really remember."

24          Did I read that correctly?

25  A.  Yes.

D7NHHAW4                    Gunsett - cross

1    Q.  Do you recall being asked those questions and giving those

2    answers?

3    A.  Yeah.

4    Q.  And after the assault -- strike that.

5          After the assault took place, you remained on duty

6    that day, right?

7    A.  I believe so.

8    Q.  Let's go back to your employee accident report.  Box 14,

9    employee remained on duty.

10   A.  Yes.

11   Q.  Yes?

12   A.  Yes.

13   Q.  And if you look at box 25, services provided.  First aid is

14   not checked, correct?

15   A.  No.

16   Q.  Medical treatment, not checked, right?

17   A.  No.

18   Q.  You claim that Mr. Hawks coldcocked you and sucker punched

19   you, right?

20   A.  He absolutely did.  Yes.

21   Q.  Officer Gunsett, have you ever been accused of using

22   excessive force before?

23          MS. KIM:  Objection.

24          THE COURT:  Sustained.

25   Q.  Have you ever been sued before for excessive force?

1            MS. KIM:  Objection.

2            THE COURT:  Sustained.

3   Q.  And just so we're clear, it's your testimony that there

4   were only two strikes on Mr. Hawks that day, your punch and

5   your knee and no other strikes, right?

6   A.  Yes.

7            MR. NOVICH:  No further questions, Judge.

8            THE COURT:  Counsel, any redirect?

9            MS. KIM:  Thank you, your Honor.

10  REDIRECT EXAMINATION

11  BY MS. KIM:

12  Q.  Officer Gunsett, you were asked about Mr. Hawks being

13  brought into this side room alone, right?

14  A.  Yes.

15  Q.  Can you explain to the jury why Mr. Hawks was brought into

16  that room, why he was the only inmate brought into that room at

17  that particular time?

18  A.  Well, whether -- I don't remember that day why he was the

19  first one.  It could have very well have been another inmate

20  that was --

21           THE COURT:  Just tell us what you do remember.

22           THE WITNESS:  Right.

23  A.  It could have easily been another inmate that was brought

24  in there first.  It could have been random.  Me personally,

25  like I said, when we brought him in, I would be more apt to

1    restrain the SHU inmate first because he could be -- he is in

2    SHU and he is obviously, it is a disciplinary type inmate or a

3    violent inmate or whatever the case may be.  So me personally,

4    common sense wise, I would rather get him restrained first so

5    that you avoid any problems.

6         And as far as being alone, if he wasn't the first one

7    and it was another inmate that was the first one, he would have

8    been alone because we are not going to have five or six

9    unshackled inmates standing all around us as we are shackling

10   an inmate.  You are going to shackle one all alone while the

11   other ones are in a secure bullpen.  And once we get him

12   shackled, we would bring the next guy in to shackle him.  That

13   is the reason for him being alone, for any inmate being alone

14   in that room being shackled.  Because I am not going to have

15   five unrestrained convicts standing around me as we attempt to

16   shackle them.

17   Q.  Thank you.  Now, Mr. Novich asked you about specific

18   strikes on Mr. Hawks.

19   A.  Yes.

20   Q.  Other than the specific strikes that you had with Mr. Hawks

21   to his either face or body, there were a lot of holds and

22   grabbing to try to get him onto his stomach, right?

23   A.  Yes.  It was a violent struggle to get his hands behind his

24   back to be handcuffed.

25   Q.  And it was a small room?

1    A.  Very small room, yes.

2    Q.  And then at some point he tripped over the bench and fell

3    onto his back, right?

4    A.  Yes.

5    Q.  And there was a wall right behind that bench?

6    A.  Yes.  There is a wall directly, pretty much directly behind

7    that bench, yeah.

8    Q.  There was a lot of tussling to try to get Mr. Hawks on his

9    stomach, right?

10           MR. NOVICH:  Objection.  Leading.

11           THE COURT:  Sustained.

12   Q.  Other than actual punching or kneeing of Mr. Hawks, the

13   officers involved had their hands on Mr. Hawks in other ways,

14   right?

15   A.  Yeah.  I mean the inmate was flailing all around, just, you

16   know, squirming, rolling, you know, thrashing about.  So at

17   that time we're just trying to get him controlled so that we

18   can turn him over and get the handcuffs on him while he's

19   swinging and thrashing and kicking and, you know, you know,

20   going crazy for the most part.

21           THE COURT:  Do you recall how many other officers were

22   there aside from you?

23           THE WITNESS:  Honestly I don't.  When they call a

24   response team -- I don't work at Fishkill.  Certain officers

25   are assigned to a response team.  So when they call a response,

1    anybody who is a responder responds.  So I mean there could

2    have been five, there could have been ten, there could have

3    been 15.  I have no ideas how many officers.

4              THE COURT:  Would you say there were at least three?

5              THE WITNESS:  Oh, absolutely.  Yeah, yeah, yeah.

6              MS. KIM:  Thank you.  I have nothing further.

7              THE COURT:  Thanks very much.

8              (Witness excused)

9              THE COURT:  Let's have the next witness.

10             MR. CLARK:  The defense calls officer Eladio Cruz.

11    ELADIO E. CRUZ,

12         called as a witness by the Defendants,

13         having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. CLARK:

16    Q.  Good afternoon, officer Cruz.

17    A.  Good afternoon.

18    Q.  So where are you presently employed?

19    A.  I'm employed at Green Haven Correctional Facility.

20    Q.  Could you speak up a little bit into the microphone.

21    A.  Yes.  Is that better?

22    Q.  Yes.

23              When were you born, officer Cruz?

24    A.  When was I born?

25    Q.  Yes.

1    A.  February 4, 1980.

2    Q.  Where do you live?

3    A.  I live in Highland, New York.

4    Q.  Are you married?

5    A.  I am married.

6    Q.  Do you have a family?

7    A.  Yes.

8    Q.  So when did you begin working at DOCS?

9    A.  I began working at DOCS in 2004.

10   Q.  Before working at DOCS -- strike that.

11           Did you have any training to become a corrections

12   officer?

13   A.  Yes, I did.  I went to the training academy in Albany.

14   Q.  Could you speak a little bit more into the microphone.

15   A.  I went to the training academy in Albany.

16   Q.  What type of training did you receive at the training

17   academy in Albany?

18   A.  A lot of different training, from penal law, firearms

19   training, how to deal with inmates in a correctional facility,

20   use of force training.  Like a lot of different training over

21   eight weeks.

22   Q.  Can you tell us a little bit more about the use of training

23   research?

24           THE COURT:  You mean use of force.

25           MR. CLARK:  I'm sorry.

D7NHHAW4                          Cruz - direct

1   Q.  The use of force training you received at the academy.

2   A.  Well, basically they teach you when to use force and how

3   much force to use, only when it is necessary, and to use a

4   reasonable amount of force to quell a situation.  And when

5   inmates stop resisting to stop using force.

6   Q.  And approximately when did you complete your training at

7   the academy?

8   A.  That was probably around August of 2004.

9   Q.  And could you please describe your career at DOCS since

10  that time until now.

11  A.  Sure.  After I completed the eight weeks, I was assigned to

12  work at Green Haven Correctional Facility as OJT.  That is

13  on-the-job training.  That is for, I believe it was two weeks

14  at the time.  And then after that you are essentially thrown to

15  the wolves, just go to work and learn as you go.

16          I stayed as a resource officer.  They put you in a

17  pool of officers that work in the facility, as if someone's not

18  at work or on vacation or they have someone out sick, you take

19  their place for that day.  I'm sorry.  I did that for about

20  four years.  Then I took a bid working in Green Haven's mess

21  hall, which I worked on day shift.  They make the meals for all

22  the inmates in the jail for breakfast and lunch.  And I

23  supervise those inmates and I hand them out the utensils that

24  they use and things like that.

25  Q.  As part of your responsibilities with the resource unit,

1    did you ever have to transport inmates?

2    A.  Yes, I did.

3    Q.  And how often did you have to, ballpark, how often did you

4    have to transport inmates?

5    A.  I did that a lot because I was like a local person that

6    lives close by the jail and I had done it a few times and the

7    other transport officers got to know me and sometimes they

8    would tell the chart sergeant that I was reliable.  So the

9    sergeant would often assign me to do transport.

10   Q.  Now let me direct your attention to the incident that

11   occurred on November 1, 2007.

12   A.  OK.

13   Q.  Were you working at Green Haven that day?

14   A.  Yes, I was.

15   Q.  And what shift were you on?

16   A.  The 7 to 3, 7 a.m. to 3 p.m. shift.

17   Q.  And what was your assignment that day?

18   A.  I was assigned to the trip that was going to Fishkill

19   Correctional Facility.

20   Q.  Now, when did you find out that you were going to be

21   transferring inmates to Fishkill?

22   A.  When you are a resource officer, typically you would find

23   out the day before.  They have like a bulletin board, like a

24   chalkboard, and they will write out the trips and the names of

25   the officers who are on it.  So I would check on that board

1    every day before I went home to see if I was on.

2         It also tells you what time you have to come in.  You

3    could come in early in the morning or later in the morning.  It

4    tells you what time to be there and where you are going and who

5    the other officers are.  So I would check it every day.  And

6    that day, the day before the trip, I knew I was going at 7:00

7    in the morning and I would report and I was going to Fishkill

8    Correctional Facility.

9    Q.  Would it be correct to say that you didn't know that you

10   would be going to Fishkill for transportation more than 24

11   hours beforehand?

12   A.  No, not more than 24 hours.

13   Q.  And that is standard procedure?

14   A.  Yes, that is standard procedure.

15   Q.  Now, you previously heard testimony from the plaintiff

16   stating that you had transported him on August 25, 2007.  Have

17   you ever seen Mr. Hawks before November 1, 2007?

18   A.  No.  Before the trip that I took to Fishkill Correctional

19   Facility on November 1st, I had never seen that inmate before.

20   Q.  Before the incident in question, can you describe or did

21   you know -- was there anything about Mr. Hawks' demeanor that

22   you remember?

23   A.  You mean before we left the facility?  Could you repeat the

24   question?

25   Q.  Before the actual use of force incident.

1          MR. NOVICH:  I am going to object.

2          THE COURT:  Sustained.

3          Are you asking if he knew or encountered Mr. Hawks

4     before that day?

5          MR. CLARK:  No, no.  Let me rephrase.

6          THE COURT:  Hold on a second.  The answer to that

7     question is what?  Before November 1st, did you ever know or

8     encounter Mr. Hawks?

9          THE WITNESS:  No, your Honor, before that day I did

10    not know him or I had not encountered inmate Hawks.

11    Q.  So were you transporting Mr. Hawks on November 1, 2007?

12    A.  Yes.

13    Q.  And how did you transport him to Fishkill Correctional

14    Facility?

15    A.  By van.

16    Q.  During that day did you see Mr. Hawks before the

17    altercation, the use of force incident?

18    A.  Yes, I definitely did see inmate Hawks before the

19    altercation.

20    Q.  Was there anything about his demeanor that you remember?

21         MR. NOVICH:  Objection, your Honor.  Foundation.

22         THE COURT:  Sustained.

23    Q.  Let's take our attention to the use of force incident,

24    specifically the time of the use of force incident on November

25    1st.

1    When the altercation occurred -- did you see when the

2  altercation began?

3  A.  No, I did not.

4  Q.  So how did you know that there was an altercation

5  occurring?

6  A.  Well, when they finished with -- we finished with all the

7  medical call outs the inmates had, we brought them all

8  downstairs to the bullpen.  Myself and the other officer that

9  were on the trip stayed with the larger group of inmates by the

10  bullpen area while the other two officers were applying the

11  shackles to them, to keep our eye on them, because when we are

12  on these trips outside the facility, we always have to keep an

13  eye on the inmates to make sure that they are not passing

14  contraband or anything of that kind of nature.  You never want

15  to lose sight of the inmates that we take.

16    So we were with them, keeping an eye on them while the

17  inmate Hawks was being shackled.  I heard some commotion going

18  on, like wrestling kind of noises coming from the left, the

19  area where the inmate was being shackled.  So I instructed the

20  other officer to wait and keeping his eye on the inmates that

21  were remaining while I went to see what was going on.

22    So I went over and I saw behind that bench, in between

23  the bench and the wall the inmate on his back and officers

24  Gunsett and Mazzella on either side of him and they seemed to

25  be struggling with him.  So I came over to assist them.  There

1   is not much room in between the bench and the wall.  So I did

2   what I could do, was I saw he was kicking his legs a lot and

3   trying to stand back up and stuff.  So I grabbed both of his

4   legs to try to stop him from swinging them and trying to stand

5   up so that it would make it easier to roll him over onto his

6   stomach so that he could be placed in mechanical restraints or

7   handcuffs.

8   Q.  During the altercation, did you ever see a cast on

9   Mr. Hawks' arm?

10  A.  No, I did not.

11  Q.  Did you ever see any piece of a cast on his wrist?

12  A.  No, I did not.

13  Q.  Also, would it be fair to say based on your testimony

14  that -- actually, strike that.

15          Again, when you arrived the incident was already

16  occurring, correct?

17  A.  Right.  When I came into that room, the altercation had

18  already begun and I came over to assist any way I could.

19  Q.  So when you arrived, did you see any officers punch

20  Mr. Hawks?

21  A.  I did not.

22  Q.  Did you see any officers kick Mr. Hawks?

23  A.  No, I did not.

24          THE COURT:  When you got there, there were two

25  officers already there?

1          THE WITNESS:  Correct, your Honor.

2          THE COURT:  That's it?

3          THE WITNESS:  Only two, your Honor.

4     Q.  Did anyone ever tell you to harm Mr. Hawks?

5     A.  No, never.

6     Q.  And after Mr. Hawks was subdued, what happened next?

7     A.  After inmate Hawks was subdued, he was taken off the floor.

8     Responding officers came into the room from Fishkill and they

9     took control of the inmate, and myself and the other officers

10    that were involved were seen by medical back upstairs, I

11    believe, in the Fishkill Correctional Facility.  They removed

12    us from the area and we were seen by the medical staff.

13    Q.  Now, officer Cruz, did you ever punch Mr. Hawks?

14    A.  No, I did not.

15    Q.  Did you ever kick Mr. Hawks?

16    A.  No, I did not.

17    Q.  One more question.  Before November 1, 2007, have you ever

18    met officer Corey Graveline?

19    A.  No.  That was the first time I met him.

20         MR. CLARK:  Thank you.  No further questions.

21         THE COURT:  Counsel.

22         MR. NOVICH:  Yes, Judge.

23    CROSS EXAMINATION

24    BY MR. NOVICH:

25    Q.  Good afternoon, officer Cruz.

1   A.  Good afternoon.

2   Q.  On November 1, 2007 you arrived to the scene of the assault

3   after the assault had already started, correct?

4   A.  Correct.

5   Q.  You did not see who threw the first punch, did you?

6   A.  I did not.

7   Q.  You didn't see how many times officer Gunsett punched

8   Mr. Hawks, did you?

9   A.  I did not.

10  Q.  You didn't see how many times officer Gunsett kneed or

11  kicked Mr. Hawks, did you?

12          MS. KIM:  Objection.

13          THE COURT:  Overruled.

14  A.  I did not see any punches or kicks thrown at all.

15  Q.  You don't know if defendant Mazzella hit, either punched or

16  kicked Mr. Hawks before you arrived, do you?

17  A.  I didn't see anyone punch or kick inmate Hawks, no.

18  Q.  That wasn't my question.  My question is, you don't know if

19  officer Mazzella punched or kicked Mr. Hawks before you

20  arrived, do you?

21  A.  Right.  I answered no.  No.

22  Q.  Now Mr. Hawks, he didn't punch you, did he?

23  A.  No, he did not.

24  Q.  He didn't kick you, did he?

25  A.  I was by his feet.  So maybe not purposefully, but his foot

1    could have hit part of my body while I was grabbing them.  I

2    mean -- but I don't know if his intent was to kick me or not.

3    Q.  Could have been just trying to defend himself, right?

4    A.  I don't know.

5    Q.  You didn't complete an employee accident report for

6    yourself that day, did you?

7    A.  I don't remember.

8    Q.  You don't remember sustaining any injuries, do you?

9    A.  No.

10   Q.  And you remained on duty at work after the assault,

11   correct?

12   A.  Yes, I did.

13            MR. NOVICH:  No further questions, your Honor.

14            THE COURT:  Thanks a lot.

15            Anything else?

16            MR. CLARK:  No, your Honor.

17            THE COURT:  Thanks very much.

18            THE WITNESS:  Thank you.

19            (Witness excused)

20            THE COURT:  Do we have any more witnesses?

21            MR. CLARK:  Yes, your Honor.  One more.

22            Officer Corey Graveline.

23            THE COURT:  OK.

24

25

1    COREY GRAVELINE,

2         called as a witness by the Defendants,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. CLARK:

6    Q.   Good afternoon, officer Graveline.

7    A.   Good afternoon.

8    Q.   So where are you presently employed, officer Graveline?

9    A.   Willard Drug Treatment Campus.

10   Q.   What is that a part of?

11   A.   What is it a part of?

12   Q.   Yes.

13   A.   DOCS.

14   Q.   How did you decide to become an employee of DOCS?

15   A.   To be honest with you, I really had no intentions of

16   becoming an employee of DOCS.  One week my mother signed me up

17   and said you have a test to take and I went and took it.

18   Q.   So when did you begin working at DOCS?

19   A.   '06.  January '06.

20   Q.   Before you began working at DOCS, did you have any

21   training?

22   A.   Before I began working at DOCS, did I have what?

23   Q.   Any training.

24            THE COURT:  What did you do before DOCS?

25            THE WITNESS:  I did a number of things.  I mean, pizza

1  making, garage doors.

2  Q.  I'm sorry.  Once you started working with DOCS, did you

3  receive any training as a corrections officer?

4  A.  Yes, in the academy.

5  Q.  What type of training did you receive?

6  A.  Firearms, legals, inmate supervision, use of force.

7  Q.  We've heard this from some of the other defendants, but

8  could you please tell us what that use of force training

9  entailed.

10  A.  Basically when you are using force use necessary force to

11  get the inmate to comply, nothing more than that, to prevent

12  like assault on staff, destruction of state property.

13  Basically the same thing everybody else said.

14  Q.  When did you graduate from the academy?

15  A.  I think it was March '06.

16  Q.  Once you graduated, what was -- how has your DOCS career

17  progressed?  What things did you do since then?

18  A.  Repeat the question.

19  Q.  Once you finished at the academy, what units and what work

20  did you do at DOCS?

21  A.  When I was at Fishkill, I had a bid in the RMU.  I had a

22  relief bid there.  So different days I had different

23  assignments.  Some days I would be running the control booth on

24  the main floor, which opens the doors so people can enter that

25  building and also controls the bull people when inmates come in

1    for sick call.  I had a bid as the sick hall rover, which is

2    basically a rover in that building.  In the morning we bring

3    inmates for sick calls or calls for doctors on the first floor.

4    I had half the building.  I got them to their appointments, got

5    them back, sent them back.  And I had a bid in the infirmary,

6    which is on the third floor.

7    Q.  Where were you working on November 1, 2007?

8    A.  I was a sick hall rover.

9            THE COURT:  At Fishkill?

10           THE WITNESS:  At Fishkill.

11   Q.  Let me direct your attention to this specific incident on

12   November 1, 2007, the use of force incident.  Were you working

13   this day?

14   A.  Yes, I was.

15   Q.  And what shift were you working?

16   A.  I was 6:30 to 2:30.

17   Q.  6:30 to 2:30 a.m.?

18   A.  6:30 in the morning to 2:30 p.m.

19   Q.  Now, where were you when the use of force altercation

20   began?

21   A.  I was actually still upstairs.  It was around lunchtime.  I

22   was coming downstairs, where I normally eat lunch with the guy

23   that ran the bubble downstairs.  I went down the elevator.  I

24   got off the elevator and I was headed to the bubble when I

25   heard the commotion.  I ran over to where it was and I seen a

1    struggle on the floor behind that bench.  I couldn't tell you

2    the officers there, but there were a couple of them.  And

3    basically what I did is I just went over and assisted to see

4    what I could do, you know.  It was a tight area.

5              When I got over there, the inmate was struggling

6    still.  I mean we couldn't get him on his stomach.  So once we

7    got him rolled over on his stomach, I applied mechanical

8    restraints or handcuffs.  Once they were applied, we got the

9    inmate up and we got him in the corner and that's when the

10   other responding units and the sergeant came.

11             THE COURT:  That is when what?

12             THE WITNESS:  One of the other responding units and

13   the sergeant came.

14             THE COURT:  I see.

15             So when you got there, do you know how many officers

16   were already there?

17             THE WITNESS:  I do not.  I know there were a few of

18   them, but I couldn't tell you the number.  I was actually the

19   first Fishkill officer there.

20   Q.  Now during the incident, do you remember there being a cast

21   on Mr. Hawks' arm?

22   A.  No, I do not.

23   Q.  Do you remember there being any type of bandaging on his

24   arm?

25   A.  No, I do not.

1    Q.  So when there is an incident such as -- when there is a use

2    of force incident, is there a particular code that is called?

3    A.  Yes.  At Fishkill it is called code 10, and that's

4    basically just an emergency response code that comes over the

5    radios whenever there is any trouble in the building, a fight,

6    anything like that.  They would pull their pin on their radio

7    and there are some people who would announce that all the

8    responder units to report.

9    Q.  So to be clear, were you responding to a code 10?

10   A.  No, I was not, because it had not been called at that

11   point.  It was called after, after I had already gotten there.

12   Q.  So before November 1st, did you know any of the other

13   defendants in this case?

14   A.  No.  I had never seen them before.

15   Q.  So you didn't know officer Gunsett?

16   A.  No, I did not.

17   Q.  You didn't know officer Mazzella?

18   A.  No, I did not.

19   Q.  You didn't know officer Cruz?

20   A.  No, I did not.

21   Q.  Did you have any contact with them after this incident?

22   A.  I haven't spoken or seen them since the incident prior to,

23   I believe it was either Monday or Sunday, when we just came out

24   to New York.

25   Q.  Now, when you arrived on the scene, did you see anybody

1  punch Mr. Hawks?

2  A.  No, I did not.

3  Q.  Did you see anybody kick Mr. Hawks?

4  A.  No, I did not.

5  Q.  Prior to November 1, 2007, have you ever even met Mr. Hawks

6  himself?

7  A.  I've never seen him before the incident.

8          MR. CLARK:  Thank you.  No further questions.

9          MS. KIM:  Your Honor, may we have just one minute?

10          THE COURT:  Sure.

11          (Pause)

12  Q.  Officer Graveline, do you know which sergeant responded to

13  this incident?

14  A.  The first sergeant who responded to the incident was

15  sergeant Kennedy, who was actually the building sergeant there.

16  Q.  Do you know if she is a female sergeant that we heard about

17  earlier?

18  A.  She is the female sergeant, yes.  She was the bid sergeant

19  in that building.

20  Q.  I would like to add as Exhibit 1 -- I'm sorry.

21          I would actually like to ask you to look at the binder

22  at Defendants' Exhibit 1.

23          THE COURT:  Me or him?

24          MR. CLARK:  I'm sorry.  Officer Graveline.

25  A.  Which one is Exhibit 1?

1          THE COURT:  I think, counsel, you probably want to

2    show him.

3          MS. KIM:  May I, Judge, show him?

4          THE COURT:  Yes.

5    Q.  Do you have the page?

6    A.  Yes, I do.

7    Q.  To your knowledge, is this the to/from that sergeant

8    Kennedy wrote?

9    A.  Yes, it is.  It appears to be.

10         MR. CLARK:  No further questions.

11         THE COURT:  Are you offering this into evidence?

12         MS. KIM:  It is part of Defendants' Exhibit 1.

13         THE COURT:  So it is already in.

14         MS. KIM:  It is already in.

15         THE COURT:  Thanks.  Counsel.

16   CROSS EXAMINATION

17   BY MR. NOVICH:

18   Q.  Good afternoon, officer Graveline, is it?

19   A.  Yes.  Good afternoon.

20   Q.  Now, on November 1, 2007 you arrived at the scene, if I

21   understand the testimony correct, after the assault had already

22   occurred, right?

23   A.  Yes.

24   Q.  So you did not see who threw the first punch, did you?

25   A.  No, I did not.

1   Q.  And you didn't complete an accident report that day for

2   yourself, did you?

3   A.  No, not that I'm aware of, no.

4   Q.  You didn't sustain any injuries, correct?

5   A.  No.

6   Q.  Is that a yes?

7   A.  That is a yes, I did not sustain any.

8   Q.  And you remained on duty that day after the assault, right?

9   A.  Yes, I did.

10  Q.  Now, at the time you were a Fishkill corrections officer?

11  A.  Yes, I was.

12  Q.  And this incident happened at Fishkill, right?

13  A.  Yes, it did, in the RMU.

14  Q.  In the RMU, in this particular room.  Does this room have a

15  name?

16  A.  No, not that I'm aware of.

17  Q.  It's in the basement area, right?

18  A.  Yes, it is.

19  Q.  And in this area of the basement, this is where inmates are

20  transported and are dropped off to go seek medical attention,

21  right?

22  A.  Yes, it is.

23  Q.  And we've seen some pictures, all these different places

24  where inmates are held.  Right?

25  A.  Yes.

1    Q.  So this is an area where guards and inmates regularly come

2    in contact with each other, right?

3    A.  It would only be the guards from the transporting

4    facilities, and the only other guard down there would be the

5    guy running the bubble, which is a Fishkill officer, and the

6    guard that is at the dialysis unit there.

7    Q.  But there are guards and inmates in this area regularly on

8    a daily basis, is that right?

9    A.  Usually.  Normally Monday through Friday, yes.

10   Q.  Is it your testimony that there are no cameras in that area

11   at all?

12   A.  None that I'm aware of.

13   Q.  Do you know why that's the case?

14   A.  No, I don't.

15   Q.  If you know.

16        Now, looking at Defendants' Exhibit 2.  Sorry.  1.

17   Your report.  Let me help you.  Let me just direct you there.

18        THE COURT:  Where would this be in the book?

19        MR. NOVICH:  Judge, this is part of Defendants'

20   Exhibit 1.  It is officer Graveline's report.

21        THE COURT:  Is it toward the end?

22        MR. NOVICH:  Yes, Judge.  It is actually the last

23   page.

24        THE COURT:  I've got it.

25   Q.  So officer Graveline, this is your report that you prepared

1  that day, correct?

2  A.  Yes, it is.

3         MR. NOVICH:  Your Honor, permission to publish it to

4  the jury?

5         THE COURT:  Sure.

6  Q.  You prepared this report on November 1, 2007, right?

7  A.  Yes, I did.

8  Q.  You wrote that you responded to a code 10 in the RMU

9  basement, right?

10 A.  Yes, I did.

11 Q.  And you observed correctional officers Gunsett and Mazzella

12 had inmate Hawks, and then I guess that is his DIN number, is

13 that right?

14 A.  Yes.

15 Q.  Subdued on the floor when you arrived?

16 A.  Yes.

17 Q.  So when you arrive, they already had him on the floor

18 subdued?

19 A.  He was -- they were still struggling with him.

20 Q.  Didn't you say, use the word subdued?

21 A.  I did, but I mean I might have been wrong, but there was

22 definitely some struggling going on when I got there.

23 Q.  In your report did you write that he was still struggling

24 or did you say when you arrived you observed that Gunsett and

25 Mazzella had him subdued?

D7NHHAW4                    Graveline - cross

1    A.  I said subdued.

2    Q.  You testified that, I believe -- correct me if I'm wrong --

3    that sergeant Kennedy came to the scene eventually?

4    A.  Yes.  After we already had him on his feet.

5    Q.  And sergeant Kennedy, she is a Fishkill sergeant, right?

6    A.  Yes.  She was at the time.

7    Q.  She was at the time.

8    A.  Yes.

9    Q.  She wasn't a Green Haven corrections officer, right?

10   A.  Not that I'm aware of, no.

11   Q.  She wasn't a sergeant or a corrections officer in the

12   facility where Mr. Hawks was an inmate, right?

13   A.  No, not that I know.

14   Q.  Sergeant Kennedy, were you there when she told Mr. Hawks to

15   stand still on the wall?

16   A.  Yes, I was.

17   Q.  And he complied with sergeant Kennedy's command, didn't he?

18   A.  I believe it was her second order, but yes, he did.

19           MR. NOVICH:  No further questions, your Honor.

20           THE COURT:  Thank you.  Thanks very much.

21           MR. CLARK:  Your Honor, one last question.

22   REDIRECT EXAMINATION

23   BY MR. CLARK:

24   Q.  Officer Graveline, to your knowledge are there any video

25   surveillance cameras at Fishkill?

1  A.  Video surveillance, as in taped?

2  Q.  Yes.

3  A.  No.

4          MR. CLARK:  Thank you.

5          THE COURT:  Thanks very much.

6          Any further witnesses?

7          MS. KIM:  The defense rests.

8          THE COURT:  So we will excuse Mr. Graveline.

9          (Witness excused)

10          THE COURT:  Now the defense has rested, which means

11  that the case is over in terms of presenting evidence here in

12  court.  So it is a quarter to 4.  I think I am going to excuse

13  you for today and ask you to come back tomorrow at 10 a.m., at

14  which point we will have closing arguments and jury

15  instructions and then you will begin your deliberations.  But

16  before I let you go, I just want to go over my instructions for

17  how to conduct yourself between now and then.  These are

18  instructions I gave you yesterday as well.

19          So first, do not talk to each other about the case or

20  about anyone who has anything to do with it until the end of

21  the case when you go to the jury room to decide, deliberate on

22  your verdict.  That means not to have discussions until after

23  the charges and you are in the jury room altogether.

24          Second, do not talk with anyone else about the case or

25  about anyone who had anything to do with it until the trial has

1   ended and you have been discharged as jurors.  Anyone else

2   includes members of your family and your friends, and the

3   vehicle for talking is not just face to face but, you remember,

4   phone, no internet, no Facebook, no Twitter, no social media.

5   You may tell people that you are a juror in a case, but please

6   don't tell them anything about the case until after you have

7   been discharged by me.

8           Third, don't let anyone talk to you about the case or

9   about anyone who has anything to do with it.  If someone were

10  to try to talk to you about the case, please report that to

11  Christine or me immediately.

12          Fourth, do not read any news or internet stories or

13  articles about the case or listen to any radio or TV reports

14  about the case, assuming there were any, or about anyone who

15  has anything to do with it.

16          And fifth, please don't do any research or any

17  investigation about the case on your own.

18          You remember I closed yesterday by saying that the

19  parties are entitled to have you personally render a verdict in

20  this case based on your independent evaluation of the evidence

21  presented here in the courtroom.  So obviously speaking to

22  others about the case, including family members, before you

23  deliberate or exposing yourself to evidence outside the

24  courtroom could compromise your jury service and fairness to

25  the parties.

1          We have been making and have made great progress in

2   this case.  As I say, if you would be ready to be in the

3   courtroom at 10 -- so come a little bit before 10 tomorrow --

4   things should move along nicely.

5          If you leave everything on your chair, Christine will

6   take care of, safeguard it until tomorrow.

7          Thanks so much.

8          (Jury excused)

9        (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (Jury not present)

2              THE COURT:  We have a few housekeeping matters.  So

3    first, I am happy to hear if anyone wants to make a motion,

4    hear about that.  The principal housekeeping matter that I want

5    you to do in the next 15, 20 minutes or so is to agree with

6    each other as to what the exhibits are and make sure they are

7    properly numbered or ordered, and tomorrow which exhibits we

8    should send into the jury room.

9              Yes, sir.

10             MR. NOVICH:  One notebook, Judge, is that good?

11             THE COURT:  You have multiple notebooks, right?  I

12   think we have a bunch of them.  I just assume have a bunch.

13             MR. NOVICH:  I think I provided the court with three.

14   One for your Honor, one for your clerk, and one for the

15   witness.

16             THE COURT:  Two things.  We will see what we've got

17   here.  I would rather have a couple more.  Ideally we would

18   have one for everybody, but at least four I'd say.  One for two

19   people would be great.  We are happy to give you back that

20   book.  The one for the witnesses, for example.  And if I have

21   one, I am happy to give you mine as well.

22             Now be careful in putting the books together to make

23   sure that things that we are not including as evidence are not

24   included in the books and just to make sure that everything

25   that was supposed to be in evidence is in the books.

1          MS. KIM:  Your Honor, can we come up to side bar.

2     They are housekeeping matters.  I just don't want to say them

3     in open court if you don't mind.

4          THE COURT:  Is that all right with you?

5          MR. NOVICH:  Sure.

6        (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the side bar)

2        MS. KIM:  I'm sorry.  Officer Mazzella's wife was

3   rushed to the hospital this morning.  She is admitted.  She has

4   a terrible -- she is admitted.  It could be very serious.  If

5   your Honor allows perhaps he may not be here tomorrow.  Is that

6   OK?

7        MR. NOVICH:  No problem.

8        THE COURT:  It is not a problem.

9        MS. KIM:  We will explain it to the jury why he is not

10  here?

11       THE COURT:  I don't think we need to explain it.

12       MR. NOVICH:  I don't think we need to explain it,

13  Judge.

14       MS. KIM:  I don't want the jury to question why all of

15  the sudden he is not here.  He has better things to do than

16  this trial.

17       THE COURT:  No, no.

18       MR. NOVICH:  I have no problem if it is official

19  business or something like that.

20       THE COURT:  If you want me to say I excused officer

21  Mazzella for today's proceeding.  That is it.

22       MS. KIM:  Also, your Honor, I have a two and a half

23  year old and he gets very upset if I leave before he wakes up.

24  Can we start at 9?

25       THE COURT:  No, we can't.

1          MS. KIM:  Because I don't think it is going to be very

2     long.

3          THE COURT:  When we do the jury instructions, just so

4     you know why we can't, so if there are changes, and there

5     invariably are so changes, and we have to redo it and make

6     eight copies and look through each copy to make sure that we

7     haven't made any mistakes, etc.  I am not being difficult.

8          MS. KIM:  I will wake him up.

9          THE COURT:  Bring him.

10          MR. NOVICH:  You want us here 8:30?

11          THE COURT:  Yes.  8:30.

12          MR. NOVICH:  We are not going to actually start the

13     trial until 10.

14          THE COURT:  8:30 we will do the charge conference.

15     Here is what we will do.  We will go right through the charges

16     and we will flip pages until somebody has a comment and then we

17     will talk about them.  We will do the same thing for the

18     verdict sheet and then we will talk about them.  We will make

19     the changes and then you will probably want to prep a little

20     bit.  I promise you that will probably eat up an hour, more or

21     less.  So then it is 9:30 already.  I said 10 to them just to

22     give us a little window so that they wouldn't be sitting

23     around.

24          MR. NOVICH:  Judge, maybe I am getting ahead of

25     myself.  Closing.  Mary is going to go first.  Then I am going

1   to go.

2           THE COURT:  Let's figure.  How much time do you think

3   you will need for the closing?

4           MS. KIM:  Probably --

5           THE COURT:  Less is always more, right?

6           MS. KIM:  Probably half an hour, and I think I am

7   going to waive, I am most likely waiving any rebuttal.  So half

8   an hour.

9           THE COURT:  How much time do you think you need?

10          MR. NOVICH:  Tops, half an hour.

11          THE COURT:  Yes.  I am not going to cut you off, but

12  it is a simple case.  It is a question of who people believe,

13  right?  Credibility mostly, I would say.

14          If we start at 10, that takes us to 11.  Then I will

15  finish before -- it is about 30 pages or something.  That is an

16  hour.  12-ish.  We will order lunch for them and they will have

17  the case around 12, 12:30 would be my guess.

18          MR. NOVICH:  So Mr. Hawks should be brought up when?

19          THE COURT:  He is entitled to be here.

20          MR. NOVICH:  The whole thing.

21          THE COURT:  As much as he wants.  Does he want to be

22  in the charge conference?

23          MR. NOVICH:  I will ask him, but I don't think so.

24  But I will ask him.

25          THE COURT:  In that case 10.

1          MR. NOVICH:  OK.

2          THE COURT:  We certainly wouldn't do anything without

3    him.  9:30 if there is any discussion of anything.

4          MR. NOVICH:  Right.

5          THE COURT:  So 9:30.

6          MR. NOVICH:  Thanks, Judge.

7          THE COURT:  Do you want to make your motions?

8          MS. KIM:  Yes.

9          THE COURT:  OK.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          MS. KIM:  Your Honor, at this time the defense moves

3     pursuant to Rule 50 for a directed verdict.  Specifically,

4     Mr. Hawks has not proven his burden in this case of an

5     excessive force on the part of the defendants.  Also, based on

6     his own admissions it is clear that the defendants should be

7     granted qualified immunity in taking the actions that they did.

8     Mr. Hawks admits to being combative, of having at least bit

9     officer Mazzella.  He also states in his complaint that he took

10    other physical actions against the officers.

11         There is no clear-cut law that states that officers

12    cannot use any force against an inmate.  In fact, I would argue

13    that the law allows these officers to use reasonable force as

14    necessary to protect themselves, other inmates, and other

15    officers, and that is what they did here.  It was reasonable

16    force.  Mr. Hawks was combative, physically assaulting them,

17    and they used the minimal and reasonable force necessary to

18    subdue and restrain the inmate.

19         THE COURT:  Thanks.  Hold on for a second.

20         (Pause)

21         THE COURT:  Yes.

22         MR. NOVICH:  Judge, the standard under Rule 50 is

23    whether, giving plaintiff all the benefits of the doubt,

24    whether a reasonable jury could find in his favor, and I think

25    there is more than enough evidence in the record that a

1   reasonable jury could find in his favor in this case.

2          I believe if you draw all reasonable inferences in

3   favor of Mr. Hawks, all of the mandatory elements for an

4   excessive force claim under Section 1983 have been met.  Some

5   of them aren't even disputed.  The first being were the

6   defendants acting under color of state law.  Clearly they were.

7   They were acting as correction officers, prison guards at Green

8   Haven at the time of the altercation.  That element is

9   satisfied.  It is not even disputed.

10         Second element, whether there was a constitutional

11  violation.  The Eighth Amendment protects against cruel and

12  unusual punishment, protects against excessive force for

13  prisoners, and I believe the test is was it sadistic, was it

14  malicious.  I think there is more than enough evidence in the

15  record to support a reasonable jury concluding and inferring

16  that it was.

17         There was all sorts of testimony by Mr. Hawks that he

18  was noncombative, that he was complying with officer Gunsett's

19  commands, and that officer Gunsett hit him.  I also think a

20  reasonable jury could infer there was plenty of motivation

21  here.  We heard about the August 25th incident and what

22  happened.  I think a reasonable jury can conclude that the act

23  was intentional and was deliberate and that the defendants

24  were, at least some of them, were lying in wait for the right

25  opportunity to carry that out.

1    MR. NOVICH:  In terms of proximate cause and injuries

2    and damages, they are all there.  I don't think there is any

3    dispute that he suffered damages, that he has got injuries.

4    The case law is pretty clear.  I saw it in your Honor's

5    proposed jury instructions about under Section 1983 excessive

6    force claim, the injuries don't even have to be significant.

7    Here, I would argue that they are significant.  He has the

8    abrasions, bruising, swelling and all sorts of injuries all

9    over his body.

10    For all those reasons I think the Rule 50 motion

11    should be denied.  I think the jury should be given an

12    opportunity to decide this case.  I think it is classic "he

13    said, they said" controversy and the jury should sort this out.

14    THE COURT:  Hold on one second.

15    (Pause)

16    THE COURT:  I think I said this earlier when we had an

17    abbreviated discussion on the close of the plaintiff's case

18    that my options are threefold:  One is to grant the motion, one

19    is to deny it, and another is to reserve judgment and let the

20    case go to the jury.  That is exactly what I am going to do,

21    without ruling on the motion, I am going to reserve decision

22    and place the case in the hands of the jury, which we'll do

23    tomorrow.  Thank you very much.

24    MS. KIM:  Thank you, your Honor.

25    THE COURT:  Let's get the exhibit thing straightened

1    out.

2         Incidentally what I was obliquely referring to during

3    the trial, I don't know if this is intentional or unintentional

4    or inadvertant, but the photos are not the same with respect to

5    plaintiff and defendant.  So I saw one anyway that appeared in

6    plaintiff's exhibits but didn't appear in defendants'.  I don't

7    know if that was an oversight.

8         MR. NOVICH:  There were some last minute photo

9    swapping.

10        THE COURT:  That is why I want you to make sure both

11   sides get it all straightened out.

12        MR. NOVICH:  I am going to take the witness's notebook

13   and I need Jackie's notebook or your Honor's notebook.

14        (Adjourned to July 24, 2013 at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                              Page

3    BRIAN HAWKS

4    Cross By Ms. Kim . . . . . . . . . . . . . . 108

5    Redirect By Mr. Novich . . . . . . . . . . . 133

6    TERRY DAVIS

7    Direct By Ms. Kim . . . . . . . . . . . . . 146

8    Cross By Mr. Novich . . . . . . . . . . . . 164

9    Redirect By Ms. Kim . . . . . . . . . . . . 175

10   DAVID MAZZELLA

11   Direct By Ms. Kim . . . . . . . . . . . . . 179

12   Cross By Mr. Novich . . . . . . . . . . . . 213

13   Redirect By Ms. Kim . . . . . . . . . . . . 231

14   CLIFFORD K. GUNSETT

15   Direct By Ms. Kim . . . . . . . . . . . . . 232

16   Cross By Mr. Novich . . . . . . . . . . . . 244

17   Redirect By Ms. Kim . . . . . . . . . . . . 264

18   ELADIO E. CRUZ

19   Direct By Mr. Clark . . . . . . . . . . . . 267

20   Cross By Mr. Novich . . . . . . . . . . . . 275

21   COREY GRAVELINE

22   Direct By Mr. Clark . . . . . . . . . . . . 278

23   Cross By Mr. Novich . . . . . . . . . . . . 284

24

25

Redirect By Mr. Clark  . . . . . . . . . . . 288

DEFENDANT EXHIBITS

Exhibit No.                                    Received

1  . . . . . . . . . . . . . . . . . . . 154

10   . . . . . . . . . . . . . . . . . . 156

4-A to 4-H   . . . . . . . . . . . . . . 159

2  . . . . . . . . . . . . . . . . . . . 204