D7o6haw1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BRIAN HAWKS,

                    Plaintiff,          New York, N.Y.

            v.                          09 Civ. 9923 (RMB)

C. GUNSETT, D. MAZELLA, E.
CRUZ, C. GRAVELINE,

                    Defendants.

------------------------------x

                                        July 24, 2013
                                        10:00 a.m.

Before:

                    HON. RICHARD M. BERMAN,

                                        District Judge

                        APPEARANCES

LITTLER MENDELSON
     Attorneys for Plaintiff
BY:  IVAN R. NOVICH
     LAUREN J. MARCUS

ERIC T. SCHNEIDERMAN
     Attorney General of the State of New York
BY:  MARY KIM
     JASON CLARK
     Assistant Attorneys General

D7o6haw1

1              (In open court; jury not present)

2              THE COURT:  The record should reflect that for over an

3     hour I have been meeting with counsel to go over the jury

4     instructions and the verdict sheet and to see if they had any

5     comments and/or objections to the verdict sheet or the jury

6     instructions.  I indicated to them that before we finalized the

7     charges, they would have the opportunity, which is now, to

8     comment and/or object to any instruction or any aspect of the

9     verdict sheet if they wanted to.

10              So I would turn first to the plaintiff and ask if you

11    have any comments or objections to the charges as we have been

12    discussing them in the robing room or the verdict sheet?

13              MR. NOVICH:  No, your Honor.

14              THE COURT:  How about, Ms. Kim?

15              MS. KIM:  Your Honor, the only objection we have is

16    the exclusion of the instruction on qualified immunity.

17              THE COURT:  What that means is I had indicated in the

18    charge conference that I thought we should not include a charge

19    of qualified immunity because the issues of qualified immunity

20    are really incorporated in a sense into the jury instruction as

21    to excessive use of force.  So it would be at best confusing to

22    the jury and I don't think applicable as a legal matter in this

23    case, but Ms. Kim certainly has the right to object.

24              Did you want it in or out.  Go ahead, Ms. Kim.

25              MS. KIM:  In.  Thank you.

D7o6haw1

1          THE COURT:  Did you want that charge in or out, Mr.
2   Novich?

3          MR. NOVICH:  Out, judge.

4          THE COURT:  So you're content with the way we
5   concluded the charge conference, which I indicated I was taking
6   it out.?

7          MR. NOVICH:  Yes, your Honor.  I agree with your
8   Honor's position.

9          THE COURT:  So then we'll wait a couple minutes and
10  see how many jurors have present and we'll go off the record.
11  If you want to take a break or review your notes or prepare for
12  your summations that is fine.

13          David here will be in charge for the near term.

14          (Recess)

15

16

17

18

19

20

21

22

23

24

25

D7o6haw1

1          (In open court; jury present)

2          THE COURT:  Please be seated everybody.  Where we are

3     is, which I suggested we would be yesterday, at summations.  In

4     civil cases such as this one the defense usually goes first in

5     summation and the plaintiff goes second.  The defense is

6     entitled if they want to have a brief rebuttal thereafter.  So

7     we'll start with Ms. Kim for the defense.

8          MS. KIM:  Thank you, your Honor.

9          Good morning, ladies and gentlemen.  You have been

10    here for three long days.  It is almost over.  I will try to

11    keep it short or as brief as I can.  First on behalf of my

12    colleague Jason Clark and our clients Officers Mazzella,

13    Gunsett, Graveline and Cruz, I want to thank you for your time

14    here and for listening.

15         Now, on the first day of trial you heard the opening

16    statement from the plaintiff's counsel, Mr. Novich.  He made a

17    dramatic opening and went on about how this case is about a man

18    who has been wronged by the justice system, about a man who is

19    a victim of circumstances, a victim of Corrections officers who

20    pick on him and assault him for no reason.  Now that you have

21    heard all the evidence, you know none of that is true.

22         By the way don't get me wrong, I am not personally

23    attacking Mr. Novich.  He is just doing his job.  I am not

24    picking on him, but I am going to pick on the words that he

25    used during his opening because the evidence does not support

D7o6haw1

1    what he said.  He did not prove what he promised you that he

2    would prove on behalf of Mr. Hawk's case.

3           Now, you may recall Mr. Novich stated this is a case

4    about an abuse of power and a misuse of authority.  Ladies and

5    gentlemen, this is not a case about abuse of power or misuse of

6    authority.  This is a case about aggression against authority,

7    Mr. Hawks' aggression against authority.  You saw Mr. Hawks on

8    the stand.  You heard him testify.  He said some things that

9    proved that he has an aggression toward Corrections officers.

10   He acknowledged that as an inmate he is obligated to follow the

11   direct orders of Corrections officers and he picks and chooses

12   when he feels like following their orders.  He admits that he

13   has argued with officers depending if they agree with his

14   direct order or not or whatever his mood is that day.

15          Now, you heard from Officer Mazzella that at Green

16   Haven, a maximum security prison, there are approximately 2,000

17   inmates to approximately 100 officers on any given shift.

18   There are rules in place for a reason.  You heard the officers

19   testify that they are there to keep the peace and specifically

20   to keep the inmates themselves safe as well as their fellow

21   officers.  With approximately 2,000 inmates to approximately

22   100 officers on any given shift, imagine if every inmate

23   behaved the way Mr. Hawks behaves -- arguing with officers, not

24   listening to their direct order, lashing out at officers

25   whenever he feels like.

D7o6haw1

 1          Now, Mr. Novich is going to stand here before you

 2     after me and he is going to make a passionate speech about how

 3     Mr. Hawks is a victim.  He is going to try and make this case

 4     about the justice system and the prisons, about how on five

 5     occasions Mr. Hawks was found guilty of assaulting officers

 6     without a lawyer or a jury or about how badly he was injured

 7     during the August 25th, 2007 incident or how awful confinement

 8     in the Special Housing Unit is.  This case is not about any of

 9     those things.  This case is about one day, November 1st, 2007,

10     and what happened that day.

11          This case is not about the justice system or our

12     society as a whole, the Department of Corrections, Green Haven

13     Correctional Facility, Fishkill Correctional Facility or any

14     other officer other than the four officers who sit before you

15     today.  These four men have been wrongly a used of violating

16     Mr. Hawks' constitutional rights.

17          Now, let's talk about motive.  Mr. Hawks claims that

18     Officer Mazzella threatened him on August 25th, 2007 saying, "I

19     will get you," or something to that effect.  Mr. Hawks claims

20     that Officer Mazzella paid him a special visit at the hospital

21     and said this to him.  Come on.  This is not a movie.  It is

22     not a TV show.  You know that didn't happen.  It turns out that

23     Mr. Mazzella escorted Mr. Hawks to the hospital that day

24     because it was his job and he along with a sergeant and two

25     other officers took Mr. Hawks to the hospital.  And what

D7o6haw1

1    happened on that trip to the hospital?  Nothing.  Mr. Hawks

2    wasn't touched.  There wasn't another use of force.  Nothing

3    happened.

4         Then Mr. Hawks claims that after the November 1st,

5    2007 incident was over, Officer Mazzella said to him, "I told

6    you I would get you," or something to that effect.  When did

7    Officer Mazzella say this to him, with the entire Fishkill

8    response team and a Fishkill sergeant in the room?  We know

9    that didn't happen.  Mr. Hawks does have the evidence to back

10   up his outlandish allegations so he resorts to lies and Mr.

11   Novich resorts to innuendos and he tries to play on your

12   sympathies in his opening statement and his questioning.  Mr.

13   Novich even used the word "profile" in his opening statement.

14   He said Officer Gunsett profiled Mr. Hawks.  What does that

15   mean?  We know it is a code word for something, but it just

16   makes no sense in this context.

17        Officer Gunsett escorted Mr. Hawks to Fishkill.  That

18   is just part of his job.  Mr. Hawks had a medical appointment

19   at Fishkill.  He escorted him along with Officer Mazzella and

20   Officer Cruz.  Officer Gunsett didn't randomly pick Mr. Hawks

21   out to have a use of force incident with him.  Why is he saying

22   things like that in his opening?  It is because he wants to

23   prejudice you against these officers, not with evidence that he

24   could prove but with code words and innuendos calling these

25   officers prison guards rather than by their official title,

D7o6haw1

1    Corrections officers.  Don't fall for it, ladies and gentlemen.

2          Again, it may sound hard.  I am the not picking on Mr.

3    Novich personally.  He is just doing his job.

4          Getting back to motive.  Mr. Novich will stand before

5    you and argue to you that Officer Mazzella had a motive for

6    assaulting Mr. Hawks and Officer Mazzella knew that Mr. Hawks

7    assaulted another officer, an officer named Officer Mallius who

8    he was friendly with because they were coworkers and that

9    Officer Mazzella assaulted Mr. Hawks to retaliate for what

10   happened to Officer Mallius.  What evidence did they present

11   you of this other than Mr. Hawks' incredible and self-serving

12   testimony that Officer Mazzella supposedly said, I" am going to

13   get you" and "I told you I would get you"?  You know that is

14   all just made up.

15         Mr. Novich might even tell you that Officer Mazzella

16   was lying in wait for the opportunity to hurt Mr. Hawks.  Now,

17   we know that Officer Mazzella took Mr. Hawks on trips to

18   Fishkill twice between the August 25th, 2007 incident and the

19   November 1st, 2007 incident.  What happened during those trips?

20   Nothing.  In fact, during those trips Mr. Hawks was the only

21   inmate being escorted by three or four officers including

22   Officer Mazzella.  If Officer Mazzella was indeed lying in wait

23   to hurt Mr. Hawks, wouldn't those other times have been better?

24   Why wait until Officer Mazzella had five other inmates to worry

25   about?  When you listen to Mr. Novich's statements after me,

D7o6haw1

 1    listen for what evidence, solid evidence, he has to prove this

 2    alleged motive on the part of Officer Mazzella.  I guarantee

 3    you that you will not hear any solid evidence.  All you will

 4    hear is Mr. Hawks' lies and Mr. Novich's innuendos.

 5         Let's talk about where this incident took place.  It

 6    took place at Fishkill, not at Green Haven where Officer

 7    Mazzella and Gunsett work where they would be more comfortable

 8    and they knew other officers.  They don't know the other

 9    officers at Fishkill.  Why would they decide to hurt Mr. Hawks

10    there?  What about this room where the incident occurred?  Mr.

11    Novich made a big deal how Mr. Hawks was taken into this room

12    alone so that the officers could isolate him.  You heard the

13    testimony about the layout of this RMU basement where this is

14    located.  There is an officer in the bubble right outside the

15    room.  There is a bullpen full of inmates right next door.

16    There is a dialysis engineer next door with officers, inmates

17    and medical personnel.  There was no hiding going on.

18         In fact, it didn't take too long before a code was

19    called and an entire response team responded and a superior

20    officer, female sergeant, Sergeant Kennedy also responded.

21    This was not done in hiding where these officers could get away

22    with it.  In fact, Officer Graveline was walking by to lunch

23    when he heard a commotion and came to assist.  Officer Cruz who

24    was in the bullpen with the other inmates also heard commotion

25    and came to assist.  The door to that small room wasn't closed.

D7o6haw1

1    Nobody was hiding.

2            Mr. Novich might also say Officers Mazzella and

3    Gunsett picked Mr. Hawks out to be the first one in that room

4    alone, but in fact the evidence shows that is not the case.

5    The officers were just doing their job.  They were just

6    following usual protocol.  They took one inmate out at a time

7    into the room to shackle them.  You heard Officer Gunsett

8    saying they don't want to deal with one more inmate when they

9    are trying to shackle.  It makes perfect sense.  One officer

10   handing the shackling equipment to another officer who is

11   putting the shackling on an inmate.  Why would they want to

12   deal with six inmates in one room when they are shackling hands

13   and feet?

14        You also heard Officer Gunsett explain if it wasn't

15   Mr. Hawks in that room, it could have been any other inmate

16   taken one by one alone.  It was an orderly process.  There are

17   a number of inmates in the bullpen taken one at a time, put

18   them in a side room.  Officer Cruz and the other officer were

19   there watching the inmates in the bullpen and Officers Gunsett

20   and Mazzella are shackling up the inmates in the room.  Their

21   theory on the motive on the part of the Officer Mazzella and

22   Officer Gunsett has no basis in any evidence that you can rely

23   on and it also makes no sense.

24            Now, you heard Mr. Novich in cross-examining Officer

25   Mazzella and Officer Gunsett try to point out discrepancies in

D7o6haw1

their testimony or what he wants to characterize as

discrepancies and in the memos that they wrote this incident.

You didn't hear anything.  Were they caught in any lie?  Is

that all they have got?  It is all a bunch of red herrings.

Now, this whole business of two closed fists.  The

officers wrote that the Hawks was punching at them with two

closed fists.  Mr. Novich is going to come up here and say

these officers lied, that Mr. Hawks couldn't have been punching

with two closed fists.  The medical reports said he could have

made a fist with his left hand.  Well, Mr. Hawks was examined

after this incident happened.  That medical record was written

after this incident happened and Mr. Hawks himself claims he

reinjured that wrist.  There is no evidence he could have made

a fist with his left hand before the incident.  In any case,

what difference does it make?  The officers saw Mr. Hawks

swinging at him with two fists.  Was one hand in a fist?  Were

both hands in a fist?  What difference does it make?

In cross-examining Officer Mazzella, Mr. Novich tried

to point out in the deposition testimony where he testified

that when asked, Did you see Mr. Hawks take his hands out of

his pocket, and officer Mazzella said, No.  But Officer

Mazzella knew Mr. Hawks had taken his hands out of his pockets.

Maybe he didn't see it at that moment.  He knew because he

heard Officer Gunsett standing right next to him staying to

Mr. Hawks, What are you doing?  I didn't tell you to take your

D7o6haw1

1    hands out of your pockets.  Is that a lie?  Was Officer

2    Mazzella caught in a lie?

3           Now, Mr. Novich tried to point out the officers' memos

4    and tried to discredit them with those memos.  When you go back

5    into the jury room, you will have the entire set of memos that

6    everyone filled out in connection with this incident.  You are

7    free to read them.  In fact, I invite you to read them.  You

8    will see that they all described the incident as the officers

9    described to you on the stand.  You will find the truth in

10   those documents.  In particular, please read the memo of the

11   superior officer, Sergeant Kennedy.

12          I will briefly show it to you so you know what to look

13   for.  It is going to be in Defendant's Exhibit 1.  In any case,

14   it will be Defendant's Exhibit 1 and the page on the bottom

15   will say 63.  That memo describes what that sergeant, the

16   superior officer, saw when she respond to the incident.  I will

17   not waste your time reading that to you.

18          Then there was this whole business that Mr. Hawks had

19   his cast cut short and part of his wrist was still in a cast

20   when this happened.  Let's look at the photo of Mr. Hawks' left

21   arm taken after the incident.  There is no cast.  There was no

22   testimony that after the incident he had this alleged shortened

23   cast off.

24          Now, why are they making a big deal about this cast?

25   It is not a big deal and you shouldn't get lost in that

D7o6haw1

 1    minutia.  He was thinking of an excuse as to why Mr. Hawks was

 2    not complying with the orders to keep his hands in his pockets.

 3    My cast was there so I couldn't get my hand in my pocket.

 4    Mr. Hawks did testify that he did put his hands in his pockets

 5    at certain times during that day.  Mr. Hawks also admits that

 6    Officer Gunsett did tell him to keep his hands in his pocket

 7    before this incident broke out.

 8              (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MS. KIM:  Now if officers Gunsett and Mazzella took

2     Mr. Hawks into this little room to beat him up, what is with

3     all the keep your hands in the pockets?

4           What is clear is that this would have been just

5     another day like any other day when an inmate is transferred

6     from Green Haven to Fishkill.  It would have been like the

7     other two times when officer Mazzella took Mr. Hawks to

8     Fishkill.  Nothing would have happened.  There would have been

9     an orderly process and everybody would have been taken back to

10    Green Haven safely.  In fact, Mr. Hawks admits that the

11    officers were just doing their job that day.  Whether it was in

12    a moment of clarity or he sliped and actually told the truth,

13    he said at his deposition, and I'll read it to you:

14    "Q.  Did they give you an order not to resist?

15    "A.  Yeah.  They kept telling me to be still, don't move, stop

16    resisting, stop resisting.  Of course they're going to tell me

17    that because that's what they're trained to do and I guess

18    that's what -- I guess I'm trained to do what I've got to do to

19    try to prevent myself from getting hurt.  I'm not trained the

20    way they're trained, but just like they don't know how trained

21    I am to defend myself.  It was just one of those things where

22    they had to do what they had to do to get the job done the best

23    they knew how and secure everybody and make their job safe and

24    try to apprehend me."

25          Now, why would the officers be telling Mr. Hawks to

1   stop resisting and don't move if they are just out to assault

2   him.

3           Now let's talk about Mr. Hawks' motive.  What about

4   his motive for assaulting and battering officers Mazzella and

5   Gunsett.  What do we know about Mr. Hawks?  He doesn't like

6   being in prison.  Who would.  He doesn't like being told what

7   to do.  He doesn't like taking direct orders, although as an

8   inmate he is required to comply with an officer's direct

9   orders.  And when he's had enough of taking orders, he lashes

10  out violently against officers and assaults and batters them.

11          Now you heard about four other occasions where

12  Mr. Hawks was found guilty of assaulting officers after failing

13  to follow their orders.  He claims that he didn't have a

14  lawyer; there was no jury; the officers are the ones who

15  assaulted him, and he was just defending himself.  He was the

16  victim in all those instances.

17          Now he denies everything he was charged with in those

18  misbehavior reports we discussed and on which he was found

19  guilty after the Tier III hearings, where he was allowed to

20  present evidence and witnesses and had assistance from other

21  inmates and also even correction officials.

22          Really?  In all of those instances, in three separate

23  prisons -- Attica, Green Haven, and Southport -- he just

24  happened to get into all of these violent situations as the

25  victim and then was found guilty on each occasion because he

D7OHHAW2                        Summation - Ms. Kim

didn't have a lawyer to represent him?  We know that's not

true.

        Let's go through those incidents.  There are four

others aside from the one we are here for today.  The first

one, January 25, 2005, at Attica Correctional Facility,

Mr. Hawks received a misbehavior report for and was found

guilty of assaulting staff, engaging in violent conduct and

disobeying a direct order.  In that incident, officer Mariani

was escorting Mr. Hawks from one cellblock to another when

Mr. Hawks tried to run away from officer Mariani.  When the

officer gave Mr. Hawks a direct order to stop, what did

Mr. Hawks do?  He turned around and punched officer Mariani in

the jaw.

        Number two, August 25, 2007 at Green Haven

Correctional Facility.  Mr. Hawks received a misbehavior report

for and was found guilty of disobeying a direct order,

assaulting staff and engaging in violent conduct.  On that day

Mr. Hawks began arguing with officer Sabino, a female officer,

who then gave Mr. Hawks several direct orders to walk back in

his cell.  Mr. Hawks refused, causing officers Mallius and

Calazzo to step in between Mr. Hawks and this female officer

and then they tried to escort Mr. Hawks back to his cell.

        And then what happens?  Mr. Hawks turns and punches

officer Mallius several times, and then officer Calazzo tries

to help officer Mallius and then Mr. Hawks punches officer

D7OHHAW2                    Summation - Ms. Kim

1    Calazzo too.

2           Number three, October 22, 2008 at Southport

3    Correctional Facility.  Mr. Hawks received a misbehavior report

4    for and was found guilty of disobeying a direct order,

5    assaulting staff and engaging in violent conduct.  In that

6    incident officer Lozido was moving Mr. Hawks from one cell to

7    another when Mr. Hawks turned and headbutted officer Lozido in

8    the face.  Then officer Butler and sergeant Chapman appeared

9    and tried to get Mr. Hawks back into his cell and he struggled

10   with them too.  Then officer Frisbee tried to get control of

11   Mr. Hawks' legs and he kicked officer Frisbee.

12          Number four, the final one, April 30, 2011 at

13   Southport Correctional Facility.  Mr. Hawks received a

14   misbehavior report for and was found guilty of attempted staff

15   assault and violent conduct.  In that incident Mr. Hawks was

16   directed to back out of his cell, when he turned his shoulders

17   violently and attempted to strike officer Thacher with his

18   elbow.

19          Now focusing on the August 25, 2007 incident, during

20   Mr. Hawks' direct examination by Mr. Novich, they went on and

21   on about the injuries that Mr. Hawks sustained during this

22   violent melee.  There is no denying Mr. Hawks sustained

23   injuries.  He even broke his left wrist.  But what happened to

24   the officers involved?  Officer Calazzo's nose was broken and

25   officer Mallius was so badly hurt he never returned to work.

1          Imagine the violent struggle that occurred during that

2     incident.  It took five officers to restrain Mr. Hawks.  Of

3     course Mr. Hawks was hurt.  But he wasn't the only one hurt,

4     was he?  If Mr. Hawks was simply the victim just defending

5     himself and putting his arms up to cover his face, as he claims

6     he always does in all of these incidents, how did officer

7     Calazzo's nose break, how did officer Mallius get so badly

8     injured that he can never work.  You can't believe Mr. Hawks'

9     denials and claims of simply being a victim.

10         Now what do all these four other incidents have in

11    common with the November 1, 2007 incident?  Mr. Hawks was given

12    a direct order to do something by an officer.  He didn't feel

13    like complying with that direct order and in a rage he

14    physically attacked the officers.  Just like here, officer

15    Gunsett gave him a direct order to keep his hands in his

16    pockets.  He didn't feel like complying with that direct order

17    and in a rage, he punched officer Gunsett and then he bit

18    officer Mazzella.

19         Imagine the anger, rage and aggression inside a person

20    that makes him bite another human being.  He wasn't biting

21    officer Mazzella just to defend himself.  He wasn't a victim.

22    He punched officer Gunsett and he bit officer Mazzella out of

23    pure anger, because on that day, at that particular moment,

24    Mr. Hawks decided that he had had enough of these officers

25    telling him what to do.  He had an attitude all day with

D7OHHAW2                        Summation - Ms. Kim

1     officer Gunsett.  He was huffing and puffing at every direction

2     that officer Gunsett gave him that day.  And at that moment

3     Mr. Hawks just had enough.

4             And you heard the testimony of nurse Davis.  He is not

5     a party to this case.  He has no dog in this fight.  He doesn't

6     even know officers Mazzella, Gunsett, and Cruz.  He knows

7     officer Graveline from having worked with him at Fishkill.  But

8     he hasn't even seen officer Graveline in years.

9             What did nurse Davis say?  Nurse Davis said he

10    responded to the incident and he saw how angry Mr. Hawks was.

11    In fact, this was almost six years ago but he has a clear

12    memory of that because of how angry Mr. Hawks was and how nurse

13    Davis himself feared for his own safety.  In fact, he called on

14    a high security official and said, look, I'm concerned about

15    examining this inmate.  His nostrils are flaring.  There is

16    just pure anger coming from him.  And nurse Davis said that

17    incident really stuck out in his mind.  He has examined

18    hundreds of inmates.  That one, Mr. Hawks, really stuck out in

19    his mind.

20            Nurse Davis did not see a victim when he arrived on

21    the scene.  Nurse Davis didn't describe an inmate who was

22    scared, who was cowering because officers suddenly assaulted

23    him and he was just defending himself.

24            Now, what Mr. Hawks claims is that these four officers

25    used excessive force on him and violated his constitutional

D7OHHAW2                    Summation - Ms. Kim

1  rights and that these officers repeatedly punched and kicked

2  him.  You saw the photographs of Mr. Hawks, and you will also

3  have them in the jury room, and you heard the testimony of

4  nurse Davis.  Nurse Davis described Mr. Hawks' injuries as

5  superficial abrasions, bruising and swelling.  There were no

6  broken bones.  There were no serious injuries.

7       Those injuries are not consistent with plaintiff,

8  Mr. Hawks' claim that he was repeatedly punched and kicked by

9  four officers.  As you can see, they are not exactly petite

10 men.  Those injuries are consistent with a reasonable force

11 that had to be used to get control of this violent, angry,

12 punching, biting, kicking and thrashing inmate.

13      This was not excessive force.  This was, in fact, a

14 measured response on the part of these officers.  And because

15 of their measured response, despite the violence of Mr. Hawks,

16 there was minimal injury caused to Mr. Hawks and the officers

17 themselves.

18      Now, we don't dispute that officer Gunsett punched

19 Mr. Hawks.  What was he supposed to do?  He is faced off with

20 an inmate who just punched him in the face.  His natural

21 response was to punch him back, get him on the floor.  We don't

22 dispute that officer Gunsett kneed Mr. Hawks in the forehead to

23 release the bite that he had on officer Mazzella's arm.  We

24 also don't dispute that there was a violent struggle with four

25 officers having to lay their hands on Mr. Hawks to get him

 1    turned over onto his stomach so that they could get his hands

 2    behind his back and cuff him.

 3          This also happened in a small room in front of a

 4    bench, and Mr. Hawks went over that bench and fell onto the

 5    floor and then he tried to get up and officer Gunsett pushed

 6    him with both hands on his chest to get him back on the floor.

 7          Now, when you go back into the jury room maybe one of

 8    you might say did officer Gunsett really have to punch

 9    Mr. Hawks?  Did he have to knee Mr. Hawks in the forehead?  I

10    am going to read something to you.  As Judge Berman explained

11    at the beginning of the trial, he is the determiner of the law,

12    you are the determiner of the facts.  But I am going to read a

13    part of the charges that the judge will read to you after we

14    are done, and this goes to the claim of excessive force, what

15    Mr. Hawks has to prove.

16          In order to establish his claim for a violation of the

17    Eighth Amendment, plaintiff must prove that defendants used

18    force against him maliciously, for the purpose of causing harm,

19    rather than a good faith effort to maintain and restore

20    discipline.  It is not enough to show that in hindsight the

21    amount of force seems unreasonable.  The plaintiff must show

22    that the defendants used force maliciously, with a purpose of

23    causing harm.

24          Hindsight is 20/20, right?

25          Now you heard Mr. Novich question the officers about

1    how many specific strikes landed on Mr. Hawks' face and body,

2    and he might put up the photos and the medical record of

3    Mr. Hawks' injuries and point out all of the areas where these

4    specific strikes don't match up to the injuries.  Now is that

5    fair?  This is a violent struggle with four grown men tussling

6    with an inmate who is violently fighting them in that small

7    room with the bench and the wall directly behind that bench.

8    In fact, I will show you the photos.

9            This is the bench that Mr. Hawks went over.  There is

10   a wall there.  He went over that bench.  He tried to get up.

11   Officer Gunsett had to push him down again on the floor.

12           Here is another perspective.  You will have these

13   photos in the jury room.

14           There are going to be scrapes, bruises and swelling on

15   Mr. Hawks' head and body that the officers can specifically say

16   I hit Mr. Hawks here, here and here or Mr. Hawks went back, hit

17   his head on the wall or the scrapes on his neck.  Some of those

18   things the officers are not going to be, won't be able to

19   specifically account for because this was a violent melee.

20   Four grown men and an inmate struggling.

21           Now let's talk about what is real.  What is the truth?

22   Mr. Hawks comes into this court and lies up and down.  I

23   couldn't keep track of how many different stories he told and

24   all the excuses he had for why he said one thing one time and

25   another thing another time all under oath.  He did bite officer

D7OHHAW2                       Summation - Ms. Kim

Mazzella, he didn't bite officer Mazzella.  And when confronted

with false testimony that he gave under oath at his deposition,

Mr. Hawks claimed that he was angry or he was scared or it was

the stenographer that mistranscribed his answers.  There was no

misunderstanding of that question.

        At his deposition Mr. Hawks testified as follows:

"Q.  Did you bite him?"  Meaning officer Mazzella.

"A.  No, not at all.  Not at all."

        Then he comes in here and admits that he bit officer

Mazzella because he knows the evidence would prove that he did,

and then he says he lied at his deposition because he was

angry, scared, the stenographer mistranscribed his answers.

That is just one example of how Mr. Hawks has lied.  I won't

waste your time with all the other instances.  We will be here

all day.

        Ladies and gentlemen, you can't believe a thing that

Mr. Hawks says.  He admits that he lies depending on his mood,

whether he is angry or not.  Well, if the truth is on your

side, why are you ever lying?  You file a lawsuit and if you

have the truth to back it up, why not just tell the truth every

single time.  The nerve of him.  He assaults and batters

officers causing them to react and use force on him, to gain

control of him, and then he drags them into court like this and

asks you to award him money because he is the victim.  Don't

fall for it, ladies and gentlemen.

1          Now when you get back to the jury room one of you
2     might say, you know, Mr. Hawks has a left wrist that just
3     healed and he was injured in August, just a couple of months
4     before this incident.  Why would he start another fight with
5     officers.  That would be a logical question if you were dealing
6     with a logical person.
7          There is no need for you to determine exactly why
8     Mr. Hawks behaves the way he does.  That is not something you
9     need to figure out to decide this case.  All you need to
10     determine is has Mr. Hawks proved by a preponderance of the
11     evidence that these officers used excessive force against him
12     in violation of the constitution.
13          Mr. Novich might get up and, as he did in his opening,
14     he might say 51 percent, that is all we have to prove to you,
15     51 percent.  Did he even get there?  I think we know what the
16     truth is 100 percent.
17          So he assaults officers and sues them and what does he
18     have to lose?  Anyone can file a lawsuit.  That brings us to
19     the question of officers Mazzella and Gunsett's counterclaims
20     for assault and battery.
21          You may go back in that jury room and you might be
22     thinking, why are these officers suing Mr. Hawks.  They had
23     such minor injuries.  Do they really expect to get money from
24     Mr. Hawks.  We are not claiming that the officers were
25     seriously injured, and it is not about money.  It is about

D7OHHAW2                    Summation - Ms. Kim

1   sending Mr. Hawks a message.  You will no longer get away with

2   assaulting officers and then filing a bogus lawsuit claiming

3   that they used excessive force on you.  You will have to answer

4   for your conduct.  You will no longer think you have nothing to

5   lose when you assault officers and then sue them and then come

6   into court and lie.

7          I think we all know what the truth is here.  The

8   evidence clearly proves it.  On four other occasions, separate

9   and apart from this November 1, 2007 incident, Mr. Hawks

10  assaulted officers, and he assaulted officers because on that

11  particular day, for whatever reason, he had enough of listening

12  to their orders.  And that's what happened here on November 1,

13  2007.

14          THE COURT:  Ms. Kim, are you about to wrap up?

15          MS. KIM:  Yes.

16          Mr. Hawks had enough of officer Gunsett telling him

17  what to do and he again acted out his aggression, and the

18  officers in response used reasonable force, not excessive

19  force, a measured response on the part of these officers

20  quickly getting a violent situation under control with minimal

21  injury to the inmate and themselves.  These officers shouldn't

22  be found liable.  They should be commended for it.

23          Thank you.

24          THE COURT:  Before Mr. Novich, ladies and gentlemen,

25  you remember that during the trial when there was evidence

1    regarding other incidents involving Mr. Hawks and when there

2    was that testimony I gave you an instruction as to how to

3    consider that evidence.  The same is true for oral argument or

4    summations.  It has come up again, these other incidents.  I am

5    going to include that same instruction when I get to the jury

6    charges in a moment, but just to remind you, as I have said now

7    on a couple of occasions, part of that instruction is this.

8            I said, testimony regarding other incidents in which

9    plaintiff may have been involved may not be considered for the

10   purpose of proving plaintiff's propensity to engage in the

11   altercation described in this case or proving that plaintiff

12   was at fault in the altercation here.  Specifically, you may

13   not find that simply because plaintiff was involved in other

14   assaults with other officers on other occasions plaintiff has a

15   propensity for violence and thus, it is more likely than not

16   that he provoked the altercation and/or committed an assault

17   and battery on defendant officers in this case.

18           There was a little more to it earlier and I will give

19   you the full instruction as part of today's instructions.

20           Mr. Novich.

21           MR. NOVICH:  Thank you, your Honor.

22           Good morning, everyone.  In the home stretch.  So this

23   is a case, as I told you at the beginning, about prison guards,

24   the defendants, who abused their power, who abused their

25   authority, who took things too far because they felt they

D7OHHAW2                        Summation - Mr. Novich

1    could, and who engaged in excessive force because they beat

2    Brian Hawks.

3           Now, let's just talk a little bit about what is going

4    to happen.  When I am done, Ms. Kim may have some final words,

5    she may not, and the judge is then going to instruct you.  That

6    will probably last about an hour.  Then you are going to go

7    back to the deliberation room.  You are going to pick a

8    foreperson and then you are going to go around the table and

9    talk about the case, share your views.  Now these are some

10   things I want you to keep in mind, I am asking you to keep in

11   mind, talk about when you have that discussion.

12          First of all, the judge is going to instruct you on

13   the burden of proof.  You are going to see that.  I am not

14   coming up with this 51 percent.  That's the law.  The burden of

15   proof in a civil case is preponderance of the evidence.  It is

16   not a criminal case.  It is really important that you

17   understand that distinction.  Criminal case is beyond a

18   reasonable doubt.  That is way up here.  Burden of proof in a

19   civil case is preponderance of the evidence, more likely than

20   not.

21          The classic example is the scales of justice.  I don't

22   know if you any of you came in on the Pearl Street entrance.

23   There is that Lady Liberty with the scales.  The scales are

24   even at the beginning of the trial.  As the evidence comes in

25   on either side, if those scales just tip a little bit, that's

preponderance.  You put a feather, you put a pebble here, they

tip.  That's preponderance.  That is 51 percent.  That is more

likely than not.  That's your job.  Your job is not to say was

there clear and convincing evidence that this all happened.

No.  Your job, to do your job, is just to find who's got the 51

percent.  Do we have it, do they have it.  That is what you

have to do.

        All right.  Now the other thing the judge is going to

instruct you -- and this is really important.  You guys are the

fact finders.  What you have to keep in mind, and the judge is

going to instruct you on this, you have to use your common

sense.  Common sense is key.  You have got to use your

experience.  What do they tell you based on the testimony,

based on the evidence you see.

        Now, I have limited time.  You have already seen the

evidence.  I am going to try not to belabor it and get you out

of here, but let's talk about some of that evidence.

        The photos.  I told you I was going to prove this case

two ways -- based on the photographic evidence and based on the

medical evidence.  You saw the photos.  You are going to have

them back there of Mr. Hawks.  You going to have them back

there of the four defendants.  Who looks like they were beaten?

Mr. Hawks, right?  He's got the injuries to his face, to his

head.  That's a nonissue.  That's a given.  He was beaten.  He

was hit.

1        Now you are going to look at the photos -- again, we

2   are just talking about the photos now.  We are going to talk

3   about the other evidence.  You are going to look at the photos

4   of the defendants.  Do they look like they have been attacked?

5   Do they look like they have been assaulted?  What did officer

6   Gunsett, defendant Gunsett tell you?  He said, yeah, I was

7   sucker punched.  Right?  He said he got coldcocked.  Where is

8   that?  You don't see any of that.

9        Defendant Mazzella, you see him.  Does he look like he

10   was attacked?  The other two defendants who came later on the

11   scene.  There is no scaring on anybody's face.  The only one

12   who has the scaring and the bruises and the abrasions is

13   Mr. Hawks.  That's consistent, right, whether you believe him

14   or not, that is consistent with somebody who has been beaten,

15   those photographs.

16        The medical evidence, let's talk about that.  Again, I

17   am not going to put it up there on the screen.  You already

18   know what I'm referring to.  Nurse Davis' report.  Right.  That

19   cataloged for you all the different numbered injuries Mr. Hawks

20   had.

21        When you go back there, and it is D1, page 54, that's

22   the diagram with the body parts and all the different circles

23   all over Mr. Hawks' body and then cataloging that out.  Add

24   those up.  When I add it up, I count somewhere between ten and

25   13 injuries.  Ten and 13.  Do the math.

1          What did defendant Gunsett tell you?  Two strikes.  I

2    made that point really clear with him.  Two strikes.  Two

3    strikes does not equal ten to 13 injuries.  That math just does

4    not add up.

5          Ms. Kim is talking about Mr. Hawks being scraped

6    against a wall.  Who did you hear that from?  No one.  No one

7    told you will he was scraped against the wall.

8          What did defendant Mazzella tell you?  He was on his

9    back like a turtle, right, flailing around.  That was the image

10   he used.  A turtle?  A turtle is a defenseless creature on his

11   back.  OK.

12         Now let's talk about the medical evidence regarding

13   the defendants.  I showed you the employee accident report and

14   I put it on cross-examination up for defendant Gunsett.  The

15   box.  He went to work that day.  No medical attention required

16   was not checked.  No first aid, not checked.  They even

17   described their injuries as not significant.  And again, that

18   is important.  You are saying you are sucker punched, you are

19   saying he attacked you, the evidence should corroborate it, and

20   it doesn't.

21         Mr. Mazzella's bite.  What did he tell you?  He had no

22   bandage.  He didn't even get a band aid.  No band aid?  No

23   puncture, no bleeding.

24         Now we are moving on.  Now I told you at the beginning

25   of this case you are going to hear of course from them, they

1   are going to come into this court, he was resisting, he started

2   the fight.  I also told you only two of them were actually

3   there.  Right?  I told you that it was defendant Gunsett and

4   defendant Mazzella who were actually there.  So defendant Cruz

5   and defendant Graveline, they didn't come into the scene until

6   afterwards, and I specifically asked them on cross-examination,

7   did you see who threw the first punch?  No, no.  They don't

8   know how many strikes happened before they got there.

9          So when you are considering the evidence and the

10  testimony, you have got to focus on Mazzella and Gunsett.

11         Now let's look at their versions of the events.

12         What did I tell you at the beginning of the case.

13  Their versions contained all sorts of inconsistencies, all

14  sorts of things where their stories are not credible.  Their

15  stories don't make sense.  These are law enforcement officers.

16  They represent the state.  You have got to be comfortable with

17  these people telling the truth and making sure that what they

18  are saying happened actually happened.  Consider that.

19         Let's talk about it.  Let's talk about Mazzella's and

20  Gunsett's alleged version about how this assault happened.

21  What did they both write on that day of that incident, of the

22  assault on November 1st before they knew there was going to be

23  a lawsuit.  He was swinging, Mr. Hawks, closed fists, plural,

24  closed fists.  The nurse's report shows you that he couldn't

25  make a closed fist.  That is what nurse Davis said.  That is

1    what the report said.  You are going to have that.

2           This is where it gets really interesting.  Think about

3    this.  Stay with me here.  Ms. Kim got up here and I think she

4    said or at least suggested, oh, well, what did the officers

5    say.  He was swinging his fist and that is how he reinjured it.

6    Whoa, stop right there.  What did officer Gunsett say?  What

7    did the other officer say?  There was one strike by Mr. Hawks,

8    right, to the head.  OK.

9           No one said they struck him in that wrist.  No one

10   said they punched him in the wrist.  So how does that wrist get

11   reinjured unless they are beating him up.  Think about that.

12   That doesn't make any sense, their version, that he reinjured

13   it somehow during the struggle unless, one, it is not true or,

14   two, they punched him there, they struck him there.  You can't

15   have it both ways, right.  The testimony from them and the

16   reports say one strike by Mr. Hawks.  Their math does not add

17   up.

18          Now, Mr. Hawks came in.  He told you he went in for

19   physical therapy that day, November 1st, and they cut the cast

20   down.  Nurse Davis got up here and he said I don't know if

21   anybody else saw it before I did.  And then I put the

22   photograph of his arm.  You have that in evidence.  I know

23   Ms. Kim put it up there real quick and she pulled it down real

24   quick.  You are going to have it.

25          And what did nurse Davis do?  I said, Do you see those

1    outlines right there?  Remember that testimony.  Do you see

2    those outlines right there?  What did nurse Davis say?  I

3    didn't ask him that question.  He said, You mean the indents?

4    Yeah, that's right, the indents.  That's consistent with a

5    small cast that had been on his arm.  So when you go back

6    there, take a look at the photo.  You are going to see the

7    indents as well.

8            Now, I think once you get to their report on November

9    1st about the closed fists, case over.  Their story doesn't

10   make any sense.  They are the law enforcement officials.  They

11   are giving you inconsistencies.  That's a real problem there.

12   I think it is case over, 51 percent, verdict against the

13   defendants and make them pay for what they did.  But there is

14   more inconsistencies, disturbing inconsistencies, that do not

15   make any sense.  When you go back there you need to talk about

16   them.

17           Think about this one.  Think about this.  Mazzella,

18   when he was on the stand, he claimed that he saw Hawks punch

19   Gunsett.  Right?  Do you remember he said that?  And then he

20   said -- but he admitted on cross-examination that he didn't see

21   Gunsett punch Hawks but somehow, right, Mr. Hawks fell over the

22   bench.  Whoa.  Let me give it to you again.  He claimed,

23   Mr. Mazzella, that he saw Hawks punch Gunsett but admitted on

24   cross that he didn't see Gunsett then punch Mr. Hawks but

25   somehow he saw Mr. Hawks fall over the bench.  Think about

 1   that, because they didn't.  Think about it.  How is that

 2   possible?

 3        So what he is saying is I saw the first punch come in

 4   from Hawks and then I looked away.  Come on.  He looked away

 5   after the first punch.  He didn't see Gunsett punch him back.

 6   Didn't happen.  That doesn't make any sense.  He sees the guy

 7   fall over but he didn't see how.  You have to ask those

 8   questions.  You have to talk about that stuff when you go back

 9   there.  Please.

10        Now let's talk about more inconsistencies.  Mazzella

11   admitted on cross that he did not see Hawks remove his hands

12   from his pockets.  Do you remember that?  I asked him that

13   question on cross and he admitted it.  Their whole case turns

14   on this.  Their whole case is Mr. Hawks took his hands out of

15   his pockets.  He was ordered to put them back in and then

16   allegedly he hauls off and punches Gunsett.  Mazzella didn't

17   even see him remove his hands from his pockets.  He admitted

18   that on cross-examination.  Another inconsistency, discrepancy

19   that's got to raise questions for you.

20        Also, officer Gunsett, defendant Gunsett gave

21   different versions of what happened.  First he said, well, you

22   know, I punched Hawks and then he fell to the ground.  Remember

23   that.  I punched Hawks and then he fell to the ground.  But on

24   the day in question I showed him the accident report before the

25   lawsuit came in.  What did he say?  I took him to the ground.

1    That's very different.  You punch someone and they fall to the

2    ground versus I take him to the ground.  Take him to the ground

3    is you are tackling somebody to the ground.  Different versions

4    here.

5            Meanwhile, as I indicated before, officer Mazzella

6    says Hawks tripped over a bench.  These guys are all over the

7    place.

8            Now what did Gunsett also admit that he said in his

9    deposition.  He said that he believed that's when Mr. Hawks

10   punched him, after he told him to put his hands back in his

11   pockets.  Believe?  Believe?  If somebody punches you, you

12   know.  You don't believe it.  You know it.

13           Now let's talk about motivations.  I don't have to

14   prove it.  It is not any of the elements the judge is going to

15   give you but it is something to think about.  Again, using

16   common sense, does it make sense this is the way it happened.

17   It is not a mandatory element, but it is something to think

18   about.

19           Motivations.  OK.  We know about the August 25, 2007

20   incident.  We know that Mr. Hawks was in an altercation with

21   officer Mazzella also at Green Haven where these same

22   defendants work and that officer Mazzella was friendly with

23   officer Mallius, the officer who was badly injured, and that he

24   blamed Mr. Hawks for that.  What do we also know?  We also know

25   that officer Mazzella transported Mr. Hawks to the hospital

1    that same day.  If you remember, I asked him on cross, do you

2    recall what you said to him and he said, no, I don't.

3          Now, again, I don't have to prove it but does it make

4    sense that that was the motivation?  Remember Spock from Star

5    Trek controlled his emotions.  When this situation unfolded on

6    November 1, 2007, officer Mazzella was Spock and he wasn't

7    thinking about that this is the guy who took my friend out.

8    Really?  Does that make sense?  Does your experience tell you

9    that, your every day experience and common sense.

10         Let's talk about officer Gunsett's motivations.  What

11   did he say?  Well, I didn't know on November 1st, I didn't see

12   that cast.  How could you miss it.  It's taking up his whole

13   arm, from the wrist to the forearm.  So he says, I didn't see

14   it.  But what does he tell you.  This guy, I'm shackling him

15   and telling him to put his hands in his pockets and he is

16   giving me a hard time.  He's huffing and puffing.  He's

17   disrespecting me.  He's battling me.  Remember all that.  And I

18   said to him, did you ask the guy what was wrong?  Did you ask

19   him if he was having a problem?  No.  So he doesn't ask the guy

20   what's wrong, he doesn't ask Mr. Hawks what's wrong, he doesn't

21   ask him what his problem is and he doesn't see the cast.  You

22   don't have to be a rocket scientist to figure out maybe it is

23   the cast, the fracture that is giving him a problem.  That's

24   not disrespecting.

25         I used the word profiling.  I use it for a reason.

 1    The reason is, you profile somebody when you don't know who

 2    they are -- officer Gunsett said he didn't know Mr. Hawks prior

 3    to November 1, 2007 -- and you make assumptions about that

 4    person that are incorrect.  And the assumption, the profiling

 5    that officer Gunsett did that day, because he didn't know

 6    Mr. Hawks, was that he was disrespecting him and he was giving

 7    him a hard time.  That wasn't the case at all.

 8          Now we have to talk about this, Mr. Hawks and these

 9    alleged other, these altercations, these other things.  We have

10    a term for this.  This is called poisoning the well.  This is

11    called making you so scared of this guy -- this is the

12    tactic -- make you so scared of this guy, get you so upset with

13    him about stuff that didn't happen here and all this other

14    stuff, even though -- did she present any witnesses to you that

15    he did all these things?  Did she present any documents?  No,

16    you didn't see any of that.

17          When you go back there, flip through that book.  Are

18    you going to see any evidence that that is what happened?  That

19    is a distraction.  That is a sideshow.  That's hoping you get

20    so riled up either with anger or with fear that you ignore what

21    your job is to do.  The judge gave you the limiting

22    instruction.  Your job is to evaluate this case.  That's it.

23    You are to evaluate this case and what happened.

24          You know, this is an Eighth Amendment case, and I am

25    going to talk a little bit more about the Eighth Amendment when

1    I talk about the elements for a Section 1983 claim, which is

2    the claim for excessive force that Mr. Hawks is bringing so you

3    will understand that.  But when our founders were writing the

4    Constitution, they didn't say, Eighth Amendment, no cruel and

5    unusual punishment for people except if you are a really bad

6    guy.  Then they can beat the crap out of you.  No.  That's not

7    the way it works.

8         I don't know how many of you came in -- again, I

9    mentioned this before -- on the Pearl Street entrance during

10   the trial, but you have Lady Liberty there, and what is she

11   wearing?  A blindfold, because justice is supposed to be blind.

12   You are not supposed to look at people's pasts and judge them

13   based on the past.  Everybody gets treated the same under the

14   law.  Everybody is the same, is entitled to the same

15   protections.

16        In this country, nobody is supposed to be -- the ideal

17   is -- is supposed to be above the law and nobody is supposed to

18   be below the law.  Everybody is treated the same.  So when they

19   start talking, when someone starts talking about but what about

20   all that prior stuff, remember that.  Remember that.  And

21   remember the limiting instruction the judge gave you as well.

22        And also, consider this.  This is important too.  All

23   this stuff about Mr. Hawks being a bad guy, right, really

24   angry.  You have been with him for now two and a half, almost

25   three days.  How is his demeanor in this case?  You got to see

1    him firsthand.  He was asked some pretty tough questions by

2    Ms. Kim and, if I remember, that went on for a couple of days.

3    It stretched over.  Did he ever get violent.  Did he ever raise

4    his voice to her.  Did he ever used any profanities.  Did he

5    ever threaten her.  Did he give anybody in this courtroom a

6    hard time.  Did he sit there well behaved.  So consider that as

7    well.  You actually got to observe his demeanor.

8         All right.  The Section 1983 claim, that is the

9    excessive force one.  I am going to briefly talk to you about

10   the elements.  The judge is going to instruct you on this.

11        The first element is were the defendants acting under

12   color of state law.  That is a given.  They were all acting as

13   prison guards at the time at Green Haven.  It is undisputed.

14   It is even going to be in the judge's instructions.  You can

15   just check that one off.

16        Was there a constitutional violation?  I mentioned

17   this before.  Eighth Amendment protects against cruel and

18   unusual punishment.  You are going to see that in the

19   instructions when you get them.  In the context of inmates,

20   that applies to excessive force case.  You can't brutalize

21   inmates.  I think everybody knows that you can't do that.  The

22   Eighth Amendment is a safeguard there.

23        So if you find for Mr. Hawks, if you believe that the

24   evidence shows that what they did was engaging in excessive

25   force, it is a given that it is a violation of the Eighth

1    Amendment and that a constitutional right was violated.

2              Some of the other elements you need to consider.  Was

3    it an intentional act, was it done malicious and sadistically.

4    I asked, if you remember, defendant Mazzella, you would agree

5    with me that if an inmate is just sitting on a bench waiting

6    for instructions and the guard hauls off and punches him, that

7    would be an inappropriate use of force, that would be excessive

8    force.  He admitted it would be.  That is what we have here.

9    That is a given.  When you punch somebody in the face, I submit

10   to you that is an intentional, malicious and sadistic act by

11   itself, by its very nature.

12             The judge is also going to instruct you --

13   constitutional violation sounds pretty hefty, but what the

14   judge is going to instruct you in the instructions is you

15   actually don't need to have any significant injury at all.  If

16   it has violated your right to be free from excessive force, to

17   be free from unusual punishment, you don't need significant

18   injury.  Here I would submit to you we got it.  The medical

19   evidence and the photographs support it.  But you don't need

20   it.

21             Proximate cause.  The judge is going to instruct you

22   on that.  All that means is were the defendants' acts a

23   significant or substantial factor -- substantial factor -- in

24   bringing about the harms.  There is no question that there

25   were.  He has the bruises, he has the abrasions, he has all the

 1    injuries to support that.

 2           Now let's briefly talk about Gunsett and Mazzella's

 3    counterclaims for assault and battery, because that may come up

 4    during the discussion.

 5           If you find that Mr. Hawks was acting in self-defense

 6    when he just had his one right arm and the only other thing he

 7    could use is his teeth to get these officers off him, then

 8    their assault and battery claim is done, it is over.  If he was

 9    acting in self-defense, that is a defense to assault and

10    battery.

11           They also concede -- they have to admit -- that they

12    have no significant injuries.  So you should just reject the

13    assault and battery claim as is.

14           Let's talk about Mr. Hawks' damages.  The judge is

15    going to instruct you that if you find the defendants liable,

16    one of the things you have the power to do is to award

17    compensatory damages.  That is bodily injuries, that is

18    emotional distress and mental anguish.  You have that power to

19    do that.

20           You saw, again, the photographs.  You saw the medical

21    evidence.  You know the injuries that he sustained.  You also

22    heard that -- to add insult to injury -- he was not only beaten

23    up but then he was charged and then he was found guilty in a

24    system that -- and I don't care if this is the way the system

25    works, if nobody gets this.  It is not right.  No jury, no jury

1    trial.  That is not right.  No lawyer.  You just have inmates,

2    who aren't even lawyers, who knows what their legal education

3    is.  And what, Ms. Kim suggested you are supposed to go to the

4    guards.  Really?  Ask yourself, would you go to the guards for

5    help.

6         What did you hear from officer Mazzella?  This guy got

7    60 months, five years in SHU, in the box, which he described

8    for you.  That is 23 hours a day in a confined cell.  Based on

9    what?  Officer Mazzella appearing by telephone?  By telephone

10   at the disciplinary hearing?

11        We have a broken system of justice, a system that

12   doesn't work, and you need to fix it.  The way we fix this is

13   you make them pay.  If you don't make them pay, it ain't

14   getting fixed.  The only way it gets fixed is if you make them

15   pay because that is the only time they are going to pay

16   attention.

17        Now, I briefly want to go over with you the verdict

18   form.  The judge is going to give you that.  This is the

19   verdict form you are going to get from the judge.  You are

20   going to take it back there when you deliberate.

21        So question No. 1, plaintiff's excessive force claim.

22   You are going to have this back there too.  Question No. 1:  Do

23   you find that plaintiff Brian Hawks has proven by a

24   preponderance of the evidence that any of the defendants

25   (Clifford Gunsett, David Mazzella, Eladio Cruz, Corey

 1   Graveline) used excessive force on plaintiff in violation of

 2   his federal constitutional rights.  Then it gives you Clifford

 3   Gunsett, David Mazzella, Eladio Cruz and Corey Graveline.  Yes

 4   or no.

 5          Mazzella and Gunsett, those are yeses.  Those are

 6   yeses.  Officer Cruz and Graveline, I leave that to your

 7   discretion.

 8          Now let's talk about -- you should answer those

 9   questions as to Gunsett and Mazzella yes.  Once you answer yes,

10   then you go to question No. 2.

11          Question No. 2:  What amount of compensatory damages,

12   if any -- again, the quality is poor.  I apologize.  But you

13   are going to get this back there.  What amount of compensatory

14   damages, if any, has plaintiff Brian Hawks proven were

15   proximately caused by defendants use of excessive force?  If

16   none, indicate none.

17          Again, remember what I said, you heard about the

18   injuries, you heard about the 60 months in the box.  If you

19   want this justice system fixed, if you are unhappy with what

20   you heard and how it works, you have to make them pay.  If you

21   don't make them pay, it's not getting fixed.  You put the

22   number down there.

23          Now there is a question 3, that if you don't award

24   compensatory damages, you can award nominal damages and you can

25   indicate the amount.  Again, I would say just answer question

 1    No. 2, put in the right amount.  Nominal damages are minimal

 2    damages.  I would say this question -- it is up to you -- this

 3    question, move on.

 4           Answer question No. 1 yes as to the defendants;

 5    question No. 2, put an amount that is going to make them fix

 6    it; and then question No. 3 skip over.

 7           THE COURT:  I am going to instruct you further about

 8    the verdict sheet and how you go about reaching any

 9    determinations that are called for on the verdict sheet.

10           MR. NOVICH:  Thank you, your Honor.

11           Then question No. 4:  Do you find that plaintiff Brian

12    Hawks should be awarded punitive damages against one or more of

13    the defendants if you found that defendant liable.  Gunsett and

14    Mazzella, yes.  If you want the system fixed, they have to pay.

15    You have got to put yes.  As to the other defendants, again,

16    you saw the evidence.  I leave it to your discretion what you

17    think is right and appropriate.

18           All right.  I apologize.  There are also questions

19    regarding Gunsett and Mazzella's counterclaims.

20           Do you find that defendant Clifford Gunsett and David

21    Mazzella have proven by a preponderance of the evidence that

22    plaintiff Brian Hawks assaulted them, basically.  The answer to

23    those questions are no, for the reasons I said.  Self-defense,

24    if you believe he was acting in self-defense.  The evidence

25    supports that, and no significant injuries.  No, no.

1           The next question:  Do you find the defendants

2      Clifford Gunsett and David Mazzella have proven by a

3      preponderance of the evidence that plaintiff Brian Hawks

4      committed battery against Clifford Gunsett and David Mazzella.

5      Same answers.  No, no.  That is question No. 2 on their assault

6      and battery claim.

7           Then questions 3 and 4.  If you have answered no and

8      no, you don't have to answer, you don't have to put a response

9      to those questions.

10          Same thing with question 5.  If you find no assault

11     and battery, you just put no to those questions as well.  Then

12     the foreperson will sign it and the judge will instruct you how

13     it will be handed up and so forth.

14          All right.  So I want to thank you for your service.

15     As I said at the beginning, it is not easy to sit on a jury.  I

16     appreciate your patience.  We have tried to keep this as short

17     as possible to get you back to your work and to your personal

18     commitments and so forth, and I hope I have accomplished that.

19          But what I asked you for in return is to do justice in

20     this case, and justice in this case is to make them pay for

21     what they did to Mr. Hawks for the excessive force and for

22     beating him.

23          Thank you.

24          THE COURT:  Ms. Kim, anything further?

25          MS. KIM:  No, your Honor.  Thank you.

D7OHHAW2                        Charge

1          THE COURT:  So, ladies and gentlemen, we are at the

2     point where I am going to read you the jury instructions.  This

3     will probably take an hour or so.  When I am finished, you will

4     go back in the jury room.  Your lunch will be there by then.

5     You can have lunch, talk, whatever you want to do starting at

6     that time.

7          I should tell you that it is my practice to give each

8     of the jurors a copy of these instructions.  I know a lot of

9     you are taking notes, and you are free to do that, but this is

10    pretty long.  You will each have your own copy of these exact,

11    same instructions when you go back there, and they are as

12    follows:

13          Members of the jury, you are about to enter your final

14    duty, which is to decide the fact issues in this civil case.

15    Please pay close attention to the instructions.  I will be as

16    clear as possible.

17          You have now heard all of the evidence in the case as

18    well as the final arguments of the lawyers for the parties and

19    my duty at this point is to instruct you as to the law.  It is

20    your duty to accept these instructions of law and apply them to

21    the facts as you determine them, just as it has been my duty to

22    preside over the trial and decide what testimony and evidence

23    is relevant under the law for your consideration.

24          On these legal matters, you must take the law as I

25    give it to you.  If any attorney has stated a legal principle

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7OHHAW2                         Charge

1    different from any that I state to you in my instructions, it

2    is my instructions that you must follow.

3        You should not single out any instruction as alone

4    stating the law, but you should consider my instructions as a

5    whole when you retire to deliberate in the jury room.  You will

6    receive a copy of these instructions, as I mentioned, to take

7    with you into the jury room.

8        You should not, any of you, be concerned about the

9    wisdom of any rule that I state.  Regardless of any opinion

10   that you may have as to what the law may be -- or ought to

11   be -- it would violate your sworn duty to base a verdict upon

12   any other view of the law than the one I give to you.

13       Your role, as I have said before, is to consider and

14   decide the fact issues in this case.  You, the members of the

15   jury, are the sole and exclusive judges of the facts.  You pass

16   upon the evidence; you determine the credibility or

17   believability of the witnesses; you resolve whatever conflicts

18   may exist in the testimony; and you draw whatever reasonable

19   inferences and conclusions you decide to draw from the facts as

20   you have determined them, and you determine also the weight of

21   the evidence.

22       In determining the facts, you must rely upon your own

23   recollection of the evidence.  What the lawyers have said in

24   their opening statements, in their closing arguments, in their

25   objections, or in their questions is not evidence.  Nor is

1    anything I may have said during the trial or may say during

2    these instructions about a fact issue to be taken instead of

3    your own independent recollection.  What I say is not evidence.

4    It is your own independent recollection of the evidence that

5    controls.  In this connection, remember that a question put to

6    a witness is never evidence.  Only the answer is evidence.  But

7    you may not consider any answer that I directed you to

8    disregard or that I directed struck from the record or that was

9    given after an objection was sustained.

10          If there is any difference or contradiction between

11   what any lawyer has said and what you decide the evidence

12   showed, or between anything I may have said and what you decide

13   the evidence showed, it is your view of the evidence -- not the

14   lawyers and not mine -- that controls.

15          And since you are the sole and exclusive judges of the

16   facts, I do not mean to indicate any opinion as to the facts or

17   what your verdict should be.  The rulings I have made during

18   the trial are not any indication of my views of what your

19   decision should be as to whether the plaintiff or the

20   defendants have presented the more convincing evidence.

21          I also ask you to draw no inference from the fact that

22   upon occasion I may have asked questions of certain witnesses.

23   These questions were intended only for clarification or to move

24   things along, and certainly were not intended to suggest any

25   opinions on my part as to the verdict you should render or

1    whether any of the witnesses may have been more credible than

2    any other of the witnesses.  It is important that you

3    understand that I wish to convey no opinion as to the verdict

4    you should render in this case, and that if I did convey such

5    an opinion, you would not be obliged in any way to follow it.

6          In determining the facts, you must weigh and consider

7    the evidence without regard to sympathy, prejudice or passion

8    for or against any party and without regard to what the

9    reaction of the parties or the public might be to your verdict.

10   I will later discuss with you how to pass upon the credibility

11   of witnesses.

12         As this is a civil case, the plaintiff, Brian Hawks,

13   has the burden of proving his claims and damages by a

14   preponderance of the evidence.  Similarly, because they have

15   asserted counterclaims, defendant officers Clifford Gunsett and

16   David Mazzella have the burden of proving their counterclaims

17   and damages by a preponderance of the evidence.  This means

18   that both the plaintiff, with respect to his claims, and

19   defendants Gunsett and Mazzella, with respect to their claims,

20   have the burden of proving by a preponderance of the evidence

21   each and every disputed element of their respective claims and

22   any damages resulting therefrom.

23         If you find that the plaintiff has failed to establish

24   his claims by a preponderance of the evidence, you must decide

25   against him on the issues you are considering.  If you find

D7OHHAW2                           Charge

1    that defendants Gunsett or Mazzella have failed to establish

2    their counterclaims by a preponderance of the evidence, you

3    must decide against them or either of them on the issues you

4    are considering.

5            To establish a fact by a preponderance of the evidence

6    means to prove that the fact is more likely true than not true.

7    A preponderance of the evidence means the greater weight of the

8    evidence.  It does not mean the greater number of witnesses or

9    the greater length of time taken by either side.  The phrase

10   refers to the quality of the evidence; that is, its convincing

11   quality, the weight and the effect that it has on your minds.

12           The law requires that in order for either the

13   plaintiff or defendants Gunsett and Mazzella to prevail on

14   their respective claims, the evidence that supports their

15   claims must appeal to you as more nearly representing what took

16   place than the evidence opposed to their respective claims.  If

17   it does not, or if it weighs so evenly that you are unable to

18   say that there is a preponderance on either side, then you must

19   decide the question in favor of the party against whom such

20   claims are brought.  It is only if the evidence favoring a

21   party's claims outweighs the evidence opposed to it that you

22   can find in favor of such party.

23           (Continued on next page)

24

25

D7O6HAW3                        Charge

1           THE COURT:  This concept of preponderance of the

2      evidence is often illustrated with the idea of scales, you put

3      on one side all the credible evidence favoring one party and on

4      the other all the credible evidence favoring the other party.

5      If the scales tip toward the party making a claim because such

6      pasty's evidence is weightier, then you must find in such

7      party's favor.  But if the scales are evenly balanced, or if

8      they tip in favor of the party opposing such claim, then you

9      must find for the party opposing such claim.  Remember, it is

10     the party making a particular claim that has the burden of

11     proof on that claim.  Some of you no doubt have heard of proof

12     beyond a reasonable doubt, which is the standard of proof is

13     that used in a criminal trial.  A plaintiff in civil case does

14     not have to satisfy that requirement, and you should put it out

15     of of your mind.

16           So let's talk a minute about what evidence is.  The

17     evidence from which you are to decide what the facts are

18     consists of the following:

19           1.  The sworn testimony of witnesses, on both direct

20     and cross-examination, regardless of who called the witness;

21     and

22           2.  The documents and exhibits which have been

23     received into evidence.

24           Nothing else is evidence; not what the lawyers say,

25     not what I say, not anything you may have heard outside the

1   courtroom.

2            Remember, when we started I said there were two kinds

3   of evidence:  One is direct and one is circumstantial.  Direct

4   evidence is direct proof of a facts, such as testimony by a

5   witness about what that witness personally experienced through

6   his or her own senses -- so something seen, something felt,

7   something touched, heard or tasted for example.  Direct

8   evidence may also be in the form of an exhibit.

9            Circumstantial evidence is evidence which tends to

10  prove a disputed fact by proof of other facts.  There is a

11  simple example of circumstantial evidence we use in the court

12  and it goes as follows:  Let's assume that when you came in the

13  courthouse this morning the sun was shining and it was a nice

14  day.  Let's assume further that the courtroom blinds, as they

15  pretty much are, were drawn and you could not look outside.  As

16  you were sitting here, let's say someone walked in the

17  courtroom through the back door with an umbrella that was

18  dripping wet and then a few minutes later another person

19  entered that door with a wet umbrella.  Now, on the facts that

20  I have given you, you cannot look out of the courtroom because

21  the blinds, as I say, are drawn and you cannot see for yourself

22  whether or not it is raining.  So you have no direct evidence

23  of that fact.  But on the combination of facts which I asked

24  you to assume, it would be reasonable and logical for you to

25  conclude that it had been raining.

1          That is all there is to circumstantial evidence.  You

2    infer on the basis of reason and experience and common sense

3    from one established fact the existence or nonexistence of some

4    other fact.

5          Circumstantial evidence is of no less value than

6    direct evidence; the law makes no distinction between direct

7    evidence and circumstantial evidence but simply requires that

8    your verdict must be based on a preponderance of the evidence

9    of all the evidence presented.

10          It is for you to decide whether a fact has been

11    proven.  In making that decision, you must consider all the

12    evidence related to that fact in light of reason, common sense,

13    and your experience.

14          During the trial you may have heard attorneys use the

15    term "inferences," and in their arguments they may have asked

16    you to infer on the basis of your reason, experience and common

17    sense, from one or more proven facts the existence of some

18    other facts.

19          An inference is not a suspicion or a guess.  It is a

20    logical conclusion that a disputed fact exists that we reach in

21    light of another fact which has been shown to exist.

22          There are times when different inferences may be drawn

23    from facts, whether proved by direct or circumstantial

24    evidence.  It is for you, and you alone, as the jurors to

25    decide what inferences you will draw.

1              The process of drawing inferences from facts in

2      evidence is not a matter of guesswork or speculation.  An

3      inferences is a deduction or conclusion which you, the jury,

4      are permitted to draw -- but are not required to draw -- from

5      the facts which have been established by either direct or

6      circumstantial evidence.  In drawing inferences, you should

7      exercise your common sense.

8              Keep in mind that the mere existence of an inference

9      against the defendants does not relief the plaintiff of the

10     burden of establishing his claims by a preponderance of the

11     evidence.  Nor does the existence of an inference relieve the

12     plaintiff relief the defendants Gunsett and Mazzella of the

13     burden of establishing their counterclaims by a preponderance

14     of the evidence.  In order for the plaintiff or defendants

15     Gunsett or Mazzella to obtain a verdict on their respective

16     claims, you must still plea of from the credible evidence that

17     the plaintiff or defendants Gunsett and Mazzella, respectively,

18     have sustained the burden cast upon them.  If the party making

19     a claim has failed, then your verdict must be for the party

20     opposing the claim.  If you should find that all of the

21     evidence is evenly balanced, then the party making the claim

22     has not sustained the burden of proof and your verdict should

23     be for the party opposing the claim.

24             If, and only if, you determine, after carefully

25     weighing all the evidence that the facts favor the party making

D7O6HAW3                    Charge

1   a claim by the standard I have articulated, then such party has

2   met its burden of proof.

3           Let's talk a bit about credibility of witnesses.  You

4   have had the opportunity to observe the witnesses on the

5   witness stand and now it is your job to decide how believable

6   each witness was in his testimony.  You are the sole judges of

7   the credibility of each witness and of the importance of the

8   witness testimony.

9           So how do you determine whether the truth lies?  Well,

10  you should use all the tests for truthfulness that you would

11  use in determining matters of importance to you in your every

12  day lives.  You should consider any bias or hostility that a

13  witness may have shown for or against any party as well as any

14  interest the witness has in the outcome of the case.  It is

15  your duty to consider whether the witness has permitted any

16  such bias or interest to color his or her testimony.

17          You should consider the opportunity to witnesses had

18  to see, hear and know the things a which they had testified,

19  the accuracy of their memory, their candor or lack of candor,

20  their intelligence, the reasonableness and probability of their

21  testimony and its consistency or lack of consistency and its

22  corroboration or lack of corroboration with other believable

23  testimony.  You watched the witness testify.  Everything a

24  witness said or did on the witness stand counts in your

25  determination.  How did the witness appear?  What was the

D7O6HAW3                         Charge

1   witness' demeanor while testifying?  Often it is not what

2   people say but how they say it that moves us.

3          In deciding whether to believe a witness, keep in mind

4   that people sometimes forget things.  You need to consider,

5   therefore, whether in such a situation the witness' testimony

6   reflects an innocent lapse of memory or an intentional

7   falsehood, and that may depend on whether it has to do with an

8   important fact or with only a small detail.

9          If you find that any witness has willfully testified

10  as to a material fact (that is, to say as to an important

11  matter), the law permits to you disregard completely the entire

12  testimony of that witness upon the principle that one who

13  testifies falsely about one material fact is likely to testify

14  falsely about everything.  You are not required, however, to

15  consider such a witness totally unworthy of belief.  You may

16  accept so such of the witness' testimony as you deem true and

17  disregard what you feel is false.  As the sole judges of the

18  facts, you the jurors must decide which of the witnesses you

19  will believe, what portion of their testimony you accept, and

20  what weight you will give to it.

21         In other words, what you must do in deciding

22  credibility is to size a witness up in light of his or her

23  demeanor, the explanations given and all of the other evidence

24  in the case.  Always remember you should use your common sense,

25  your good judgment, and your own life experience.

1          In evaluating the credibility of witnesses, you should

2     take into account any evidence that a witness may benefit in

3     some way from the outcome of this case. Such interest in the

4     outcome creates a motive to testify falsely and may sway a

5     witness to testify in a way that advances the witness' own

6     interest. Therefore, if you find that any witness whose

7     testimony you are considering may have an interest in the

8     outcome of this trial, then you should bear that factor in mind

9     when evaluating the credibility of his testimony, and accept it

10    with great care.

11         Keep in mind, though, that it does not automatically

12    follow that testimony given by an interested witness is to be

13    disbelieved. An interested witness is not necessarily less

14    credible than a disinterested witness. The fact that a witness

15    is interested in the outcome of the case does not mean that he

16    has not told the truth. It is for to you decide, based upon

17    your own perceptions and common sense, to what extent, if at

18    all, the witness's interest has affected his testimony.

19         You are to perform the duty of finding facts without

20    bias or prejudice as to any party. You are to perform your

21    final duty in an attitude of complete fairness and

22    impartiality.

23         The fact that the plaintiff is an inmate and that the

24    defendants are corrections officers entitles them to no greater

25    consideration than that afforded to any other party in the

1    litigation.  By the same token they are entitled to no less

2    consideration.  All parties stand as equals before the bar of

3    justice.

4            The defendants in this case are Clifford Gunsett,

5    David Mazzella, Eladio Cruz, and Cory Graveline.  The state of

6    New York is not on trial as a party in this action, and neither

7    is the New York State Department of Corrections and Community

8    Supervision.

9            Similar act evidence.  This is the instruction that I

10   mentioned several times during the trial, also during

11   summations in part and I will mention it again now.

12           You heard testimony regarding other incidents of

13   assaults involving plaintiff and law enforcement officials.  As

14   I instructed you when the evidence was introduced, the

15   testimony may only be used for the limited purposes of:

16           One, determining Officer Mazzella's motive and intent

17   in restraining plaintiff; two, in determining whether plaintiff

18   had the requisite intent and motive to commit assault and

19   battery on officers Gunsett and Mazzella; three, in determining

20   whether plaintiff's injuries, if any, were proximately caused

21   by any of the defendants' actions; or four, in determining the

22   amount of compensatory damages, if any, that should be awarded

23   in this case.

24           Testimony regarding other incidents in which plaintiff

25   may have been involved may not be considered for the purpose of

proving plaintiff's propensity to engage in the altercation

described in this case or proving that plaintiff was at fault

in the altercation here.  Specifically, you may not find that,

simply because plaintiff was involved in other assaults with

other officers on other occasions, plaintiff has a propensity

for violence and, thus, it is more likely than not that he

proved the altercation the altercation and/or committed the

assault and battery on defendant officers in this case.

        You have also heard evidence that at some earlier time

a wit has said or done something or failed to say or do

something that counsel has argued -- counsel for either side,

is inconsistent witness' trial testimony.

        Evidence of a prior inconsistent statement is not to

be considered as affirmative evidence in determining liability.

Evidence of a prior inconsistent statement was placed before

you for the more limited purpose of attacking the credibility

of the witness.  If you find that the witness has made an

earlier statement that conflicts with his trial testimony, you

may consider that fact in deciding how much of his trial

testimony, if any, to believe.

        In making this determination, you may consider whether

the witness purposely made a false statement or whether it was

an innocent mistake; whether the inconsistency concerns an

important fact, or whether it has to do with a small detail;

whether the witness had an explanation for the inconsistency;

D7O6HAW3                          Charge

1    and whether that explanation appealed to your common sense.

2             It is exclusively your duty as jurors, based upon all

3    the evidence and your own good judgment, to determine whether

4    the prior statement was inconsistent and, if so, how much, if

5    any, weight to give to the inconsistent statement in

6    determining whether to believe all or part of the witness'

7    testimony.

8             So now we come to what are called or referred to as

9    the substantive charges, that is to say the legal claims and

10   and the analysis of the legal claims.

11            So plaintiff's claims are under federal law, statute

12   is called 42, United States code, Section 1983.  Plaintiff

13   Brian Hawks has asserted claims against defendants Clifford

14   Gunsett, David Mazzella, Eladio Cruz, and Cory Graveline.

15   Under federal statute, as I say, called Title 42, United States

16   Code, Section 1983, you should consider each defendant

17   individually with respect to the claim against them when you

18   deliberate.  Plaintiff alleges that the defendants each used

19   excessive force against him in violation of his rights under

20   the Eighth Amendment of the United States Constitution.  This

21   claim of excessive force will be further explained in a minute.

22   For now I want to quote to you Section 1983 of this Title 42 of

23   the United States Code.

24            It read as follows:  Every person who, under color of

25   any statute, ordinance, regulation, custom or usage of any

1    state or territory or the District of Columbia, subjects or

2    causes to be subjected, any citizen of the United States or

3    other person within the jurisdiction thereof to the depravation

4    of any rights, privileges, or immunities secured by the

5    Constitution and laws, shall be liable to the party injured in

6    an action at law, suit in equity, or other proper proceeding

7    for redress.

8            To establish a claim under this Title 42, Section

9    1983, plaintiff must establish by a preponderance of the

10   evidence each of the following three elements:  First, that the

11   conduct complained of was committed by a person acting under

12   color of state law; second, that the conduct complained of

13   deprived the plaintiff of rights, privileges or immunities

14   secured by the Constitution or laws of the United States; and

15   third, that the defendants' acts were the proximate cause of

16   any injuries and damages sustained by the plaintiff.

17           I will now examine each of these elements in greater

18   detail.  So now we're talking about plaintiff's claim against

19   the defendants.  After we will talk about the two defendants

20   claim against the plaintiff.  42, U.S.C., Section 1983 for now.

21   So I am going to talk about these three elements which I say

22   compromise a claim under that statute be then I will explain

23   those three elements in more detail.

24           First element:  Color of state law.  The first

25   elements of plaintiff's claim is that defendants, Correction

1    Officers Clifford Gunsett, David Mazzella, Eladio Cruz, and

2    Cory Graveline acted under color of state law.  In this case,

3    it is not disputed that the defendants were acting in their

4    official capacity as corrections officers employed by the New

5    York State Department of Corrections and, therefore, that they

6    were acting under the color of state law.  The parties agree

7    that defendants were acting under color of state law.  So that

8    is the first element.

9         Your job, though, will be to determine whether

10   plaintiff has established by a preponderance of the evidence of

11   evidence, the remaining elements of Title 42, U.S.C., Section

12   1983.

13        The second remaining element is called deprivation of

14   a federal right.  The second element of plaintiff's claim is

15   that defendants intentionally deprived the plaintiff of a

16   federal right, privilege, or immunity, which in this case

17   refers to the right not to be subjected to excessive force

18   while in prison.  In order for the plaintiff to establish this

19   element as to each of the defendants, he must prove by a

20   preponderance of the evidence:  First, that the defendants

21   committed the acts alleged by the plaintiff; second that in

22   committing the acts alleged, the defendant acted intentionally;

23   and third, that the acts of defendants caused the plaintiff to

24   suffer the deprivation of a federal right.

25        I have used some terms here and now I will define

D7O6HAW3                          Charge

them.

Commission of the acts.  As already noted, plaintiff
must prove by a preponderance of the evidence that the
defendants committed the acts alleged by plaintiff.

I have also used the word "intentionally."  An act is
intentional if it is done knowingly; that is, if it is done
voluntarily and deliberately and not because of mistake,
accident, negligence or other innocent reason.  Use of
excessive force also involves malicious or sadistic behavior as
will be further explained in a minute or two by me.  In
determining whether the defendants acted with the requisite
state of mind, you should remember that while witnesses may see
and hear and so be able to give direct evidence of what another
person does or fails do, they have no way of looking into
another person's mind.  Therefore, you have to determine the
defendants' state of mind based on what occurred and what the
people involved said was in their minds and your belief or
disbelief with respect to those facts.

Deprivation of a federal right.  The plaintiff must
also prove by a preponderance of the evidence the deprivation
of a federal right.  The right at issue here is the right not
to be subjected to excessive force while in prison.  The Eighth
Amendment to the United States Constitution, which prohibits
cruel and unusual punishment, protects inmates from being
subjected to excessive force by prison officials.  In this

 1    case, the plaintiff claims that he was subjected to excessive

 2    force by each of the defendants.

 3         Now, let me talk about this excessive force claim

 4    against an inmate in a little bit more detail.  Some of this is

 5    repeat, some of things that I have said, but it is worth taking

 6    the time.

 7         The Eighth Amendment to the United States

 8    Constitution, which prohibits cruel and unusual punishment,

 9    protects inmates from being subjected to malicious or sadistic

10    uses of physical force by prison officials.

11         In this case, plaintiff claims that all defendants

12    used excessive force on him on November 1, 2007 at the Fishkill

13    Correctional Facility while plaintiff was awaiting transport

14    back to Green Haven Correctional Facility following a medical

15    appointment.

16         In order to establish his claim for a violation of the

17    Eighth Amendment, the plaintiff must prove that defendants used

18    force against him maliciously, for the purpose of causing harm,

19    rather than in good-faith effort to maintain or resist store

20    discipline.  It is not enough to show that, in hindsight, the

21    amount of force seems unreasonable; the plaintiff must show

22    that the defendants used force maliciously, for the purpose of

23    causing harm.  When I use the word "maliciously," I mean

24    intentionally injuring another person without just cause or

25    reason, and doing so with excessive cruelty or delight in the

cruelty.  Plaintiff must also prove that defendants' use of
force caused some physical injury to him.  In deciding whether
plaintiff has proven this claim, you should consider whether
the defendants used force against the plaintiff, whether there
was a need for the application of force, and the relationship
of that need for force, if any, and the amount of force
applied.  In considering whether there was a need for force,
you should consider all of the relevant facts and circumstances
that defendants reasonably believed to be true at the time of
the encounter.  Such circumstances can include whether
defendants reasonably perceived a threat to the safety of
staff, including themselves, or inmates, and if so, the extent
of that threat.  In addition, you should consider whether
defendants made any efforts to temper the severity of the force
they used.

         You should also consider whether plaintiff was
physically injured and the extent of plaintiff's injuries.  But
a use of force can violate the Eighth Amendment even if it does
not cause significant injury.  Although the extent of any
injuries to plaintiff may help you assess whether use of force
was legitimate, a malicious and sadistic use of force violates
the Eighth Amendment even if it produced no significant
physical injury.

         Remember, I said there were three elements to this
claim.  Here is the third, so-called proximate cause element.

1    The third element that the plaintiff must prove by a

2    preponderance of the evidence is that the defendants' wrongful

3    acts were a proximate cause of any injuries sustained by the

4    plaintiff.  Proximate cause means that there must be a

5    sufficient causal correction between the wrongful able or

6    omission of a defendant and any injury or damage sustained by

7    the plaintiff.  An act or omission is a proximate cause if it

8    was a substantial factor in bringing about or actually causing

9    injury; that is, if the injury or damage was a reasonably

10   foreseeable consequence of the defendant's acts or omission.

11   If an injury was a direct result or a reasonably probable

12   consequence of a defendant's wrongful act or omission, then it

13   was proximately caused by such act or omission.  In other

14   words, if a defendant's wrongful act or omission had such an

15   effect in producing the injury that reasonable persons would

16   regard it as being the cause of the injury, then the act or

17   omission is a proximate cause.

18        In order to recover damages for any injury, the

19   plaintiff must show by a preponderance of the evidence that

20   such injury would not have occurred without the conduct of the

21   defendant you are considering.  If you find that the defendants

22   have proved, by a preponderance of the evidence, that the

23   plaintiff in this case asserts an injury which would have

24   occurred even in the absence of defendants' conduct, you must

25   find that the defendants did not proximately cause plaintiff's

1    injury.

2             Although there are four defendants in this case, it

3    does not follow from that fact alone that if one or more

4    defendant is liable, any other defendant is liable.  Each

5    defendant is entitled to a fair consideration of the evidence

6    relating to the plaintiff's claims and that defendant's own

7    conduct and defenses, and each defendant is not to be

8    prejudiced by any finding you make for or against any other

9    defendant.

10            Let's explore that in a little more detail.  Again,

11   although there are four defendants in this trial are being

12   represented by the same attorney, you are not to treat them as

13   one person.  Each defendant is entitled to a fair, separate and

14   individual consideration of the case without regard to your

15   decision as to the other defendants.  In order to prove a claim

16   under Section 1983, the plaintiff must establish that the

17   defendants were personally involved in and caused the

18   deprivation of his rights.  Therefore, in order for a given

19   defendant to be liable, plaintiff must show that the individual

20   defendant caused a violation of plaintiff's rights.

21            You must also be careful to impose any damages that

22   you may award on a claim solely upon the defendant or

23   defendants you find liable on that claim.  Again, although

24   there are four defendants in this case, it does not follow that

25   if one is held to be liable, all or any one of the other others

 1    are liable as well.  If you find that only one defendant is

 2    responsible, for example, for a particular injury, then you can

 3    only impose damages for that injury upon that defendant.

 4           You might find that more than one defendant is liable

 5    for a particular injury.  If two or forepersons unite in an

 6    intentional act that violates another person's right, then all

 7    of those persons are jointly liable for the acts of each of

 8    them; the law does not require the injured party to establish

 9    how much of the injury was done by each particular defendant

10    that you find liable.  If you decide that two or more of the

11    defendants are jointly liable on a particular claim, then you

12    may simply determine the overall amount of damages for which

13    they are liable, without breaking that figure down into

14    individual percentages.

15           So those are the instructions with respect to

16    plaintiff's claim against the four defendants.  Now we're

17    talking about the counterclaims, which are considered under

18    state law, New York State law.

19           So in addition to plaintiff's claims against

20    defendants under federal law, two of the defendants, Officers

21    Clifford Gunsett and David Mazzella, have alleged two state law

22    counterclaims against the plaintiff, which are:  One, assault,

23    and two, battery.  In order to prevail on any one or more of

24    these state claims, each element of each claim must be

25    established by Defendants Gunsett and Mazzella by a

 1   preponderance of the evidence.  If any claim is not established

 2   by a preponderance of the evidence, it must be resolved in

 3   favor of plaintiff.

 4           You must consider each claim separately, and you must

 5   return a separate verdict as to each claim and each defendant.

 6   Your verdict as to each claim and each defendant must be

 7   determined solely upon the evidence, or lack of evidence, as to

 8   that claim and that defendant.

 9           So let's talk first a little bit about assault and

10   then a little bit about battery and then we'll turn to how you

11   go about considering damages.

12           Assault.  One who has the real or apparent ability to

13   cause imminent harmful bodily contact and intentionally does a

14   menacing act which threatens such contact to another person

15   commits an assault upon that person if the act causes

16   apprehension of such contact in that person.  A party is liable

17   for assault when he intentionally causes another person to

18   become concerned that the party is about to cause a harmful or

19   offensive bodily contact.  In order to commit an assault, the

20   assailant must have the real or apparent ability to bring about

21   that harmful or offensive bodily contract.  There must be some

22   menacing act or gesture that causes the plaintiff to believe

23   that a harmful or offensive bodily contact is about to occur.

24   It is not necessary in fact that there be any contact.

25           Now the word "plaintiff" here is used as the person

1    making the claim, not the plaintiff in this case.

2              Defendant Gunsett claims that the plaintiff in this

3    overall case punched him and Defendant Mazzella claims that

4    plaintiff bit him on his arm.  If you find that the plaintiff

5    Mr. Hawks punched Defendant Gunsett and/or bit Defendant

6    Mazzella, and that plaintiff intended by doing so to cause

7    defendants Gunsett and/or Mazzella to become apprehensive that

8    a harmful or offensive bodily contact was about to occur, and

9    that plaintiff had the real or apparent ability for carry out

10   the threat, and that defendants Gunsett and/or Mazzella had

11   such apprehension, you will find that plaintiff committed an

12   assault.

13             If you find that plaintiff did not voluntarily punch

14   Defendant Gunsett or that he did not bite Defendant Mazzella,

15   or that plaintiff did not intend to cause either or both

16   defendants to become apprehensive that harmful or offensive

17   bodily contact was about to occur, or that the defendants

18   Gunsett and/or Mazzella did not become apprehensive, you will

19   find that plaintiff did not commit an assault.  That is the law

20   of assault.

21             Battery.  One who, in a hostile manner, touches the

22   person of another, without his concent and with the intention

23   of causing harmful bodily contact to such other person, commits

24   a battery.  As with assault, intent involves the state of mind

25   with which the act is done.  The intent required for battery is

1    intent to cause a bodily contact that a reasonable person would

2    find offensive.  An offensive bodily contact is one that is

3    done for the purpose of harming another or one that offends a

4    reasonable sense of personal dignity, or one that is otherwise

5    wrongful.

6         Defendants Gunsett and Mazzella claim that plaintiff

7    punched, Mr. Hawk, him and bit Defendant Mazzella on his arm.

8    If you find that plaintiff intentionally punched Defendant

9    Gunsett and/or that plaintiff intentioanlly punched and/or bit

10   Defendant Mazzella, and that said contact was offensive, you

11   will find that plaintiff committed a battery.  If you find that

12   plaintiff did not intentionally punch Defendant Gunsett and/or

13   that plaintiff did not intentionally punch or bite Defendant

14   Mazzella, or that, although plaintiff may have done so, the

15   contact was not offensive, you will find that plaintiff did not

16   commit battery.

17        Now, before we get to damages, let's talk about the

18   concept of self-defense.

19        Plaintiff claims that he was acting in self-defense

20   and therefore is not liable for any damages to defendants

21   Gunsett or Mazzella.  Plaintiff has the burden of establishing

22   self-defense by a preponderance of the evidence.  In order to

23   establish self-defense, plaintiff must establish that he

24   reasonably believed that defendants Gunsett and Mazzella were

25   attacking or about to attack him and that the force that

D7O6HAW3                    Charge

1   plaintiff used to prevent injury to himself was reasonable

2   under the circumstances.

3           If you find that plaintiff had a reasonable belief

4   that he was facing a physical attack from defendants Gunsett

5   and/or Mazzella, and that the force plaintiff used was

6   reasonable under the circumstances, you will find that

7   plaintiff was acting in self-defense and is not liable for

8   assault and/or battery.  If you find that plaintiff did not

9   have a reasonable belief of that he was facing a physical

10  attack from defendants Gunsett and/or Mazzella, or that even if

11  he did, the force that plaintiff used was not reasonable under

12  the circumstances, you will find that plaintiff was not acting

13  in self-defense and therefore is liable for assault and/or

14  battery.

15          Now damages.

16          Do you want it take a break or do you want me to keep

17  going?

18          If you find that the plaintiff has carried his burden

19  of proving, by a preponderance of the evidence, his claim

20  against any of the defendants, then you must consider the

21  amount of damages that will fairly and reasonably compensate

22  plaintiff for the injuries he has proven he sustained as a

23  result of the conduct of the defendants.  Likewise, if you find

24  that either defendants Gunsett or Mazzella have carried their

25  burden of proving, by a preponderance of the evidence, any of

1    their counterclaims against the plaintiff, then you must

2    consider the amount of damages that will fairly and reasonably

3    compensate them for the injuries they have proven they

4    sustained as a result of plaintiff's conduct.

5           The fact that I am charging you on the issue of

6    damages does not mean that plaintiff is entitled to prevail on

7    his claims or that defendants Gunsett or Mazzella are entitled

8    to prevail on their counterclaims.  That is for you to decide.

9    I instruct you on this subject only in the event you decide,

10   that plaintiff has sustained his burden of proof with respect

11   to liability and that damages are appropriate, or, that either

12   Defendant Gunsett or Mazzella has sustained his burden of proof

13   with respect to the liability for his counterclaim and that

14   damages are appropriate to him.

15          Let's talk first about the idea of compensatory

16   damages under federal law.  Remember, plaintiff's claim is

17   under federal statute.  Then we'll talk about damages under

18   state law.  Remember that defendants' counterclaims are under

19   state law.

20          So I will now give you instructions for awarding what

21   are called compensatory damages.  This is under federal law.

22   First, the fact again that I am instructing you on how to award

23   damages does not mean that I have any opinion on whether you

24   should decide for or against any of the parties and award

25   damages.  It is for you to decide on the evidence presented and

1    the rules of law, which I have given you, whether any party is

2    entitled to recover damages from the other.  If you find that

3    none of the parties have sustained their burden of proof with

4    respect to liability, then you need not consider damages at

5    all.

6            If you return a verdict for the plaintiff on his

7    excessive force claim, then you must award him such sum of

8    money as you believe will fairly and justly compensate him for

9    any injury you believe he actually sustained as a direct

10   consequence of the conduct of the defendants.

11           You should award compensatory damages only for those

12   injuries which you find that plaintiff has proven by a

13   preponderance of the evidence and which you find to have been

14   the direct result of conduct of the defendant whose conduct

15   violated the plaintiff's federal rights.  You may only award

16   compensatory damages for pain and suffering or the mental

17   anguish and distress which plaintiff has shown he has suffered

18   as the result of any injuries you find he experienced.  You

19   must award damages only for those injuries that are a direct

20   result of conduct by a defendant which violated plaintiff's

21   federal rights.

22           Any damages awarded must be solely based upon the

23   individual defendant's personal involvement.  If you find only

24   one party is liable for an injury, then damages for that injury

25   must only be imposed upon that party.

1          You might find that more than one defendant is liable

2     for a particular injury.  If two or more persons unite in an

3     intentional act that violated another person's right (here in

4     the use of excessive force that is alleged), then all of those

5     persons are jointly liable for the acts of each of them.  The

6     law does not require the injured party to establish how much of

7     the injury was done by each of the particular defendant that

8     you find is liable.  If you decide that more that one of the

9     defendants are jointly liable on a particular claim, then you

10    may simply determine the overall amount of compensatory damages

11    for which they are liable, without breaking that figure down

12    into individual percentages.

13         Compensatory damages must not be based on speculation

14    or sympathy.  They must be reasonable and based upon the

15    evidence presented at trial.

16         Now, there is also something called nominal damages.

17    If you return a verdict for the plaintiff under Section 1983

18    but find that plaintiff has failed to prove by a preponderance

19    of the evidence that he suffered actual damages, then you must

20    return an award of damages in some nominal or token amount not

21    to exceed the sum of one dollar.

22         Nominal damages must be awarded when a plaintiff has

23    been deprived by a defendant of a constitutional right but has

24    suffered no actual damage as a natural consequence of that

25    deprivation.  The mere fact that a constitutional deprivation

D7O6HAW3                    Charge

has occurred is an injury to the person entitled to enjoy that
right, even when no actual damages flow from the deprivation.
Therefore, if you find that plaintiff has suffered no actual
injury as a result of the defendants' conduct, apart from a
constitutional deprivation, you must award nominal damages not
to exceed one dollar.

And then there is the concept of punitive damages.  In
addition to compensatory or nominal damages, you may make a
separate and may make a separate and additional award of
exemplary or punitive damages for plaintiff's claims.  Punitive
damages are awarded to punish a defendant for extreme or
outrageous conduct, or to deter or prevent a defendant or
others like them from committing such conduct in the future.

You may award the plaintiff punitive damages against
any of the defendants whom you find liable, if you find the
that plaintiff has proven by a preponderance of the evidence
that the defendant acted maliciously or wantonly.  An act is
malicious if it is done in such a manner, and under such
circumstance, as to reflect utter disregard for the potential
consequences of the act on the rights of others.  An act is
wanton if it is done in reckless or callus disregard of, or
indifference to, to the rights of others.  Plaintiff has the
burden of proving, by a preponderance of the evidence, that a
defendant act maliciously or wantonly.  The purpose of punitive
damages is to punish for outrageous conduct and to set an

D7O6HAW3                        Charge

1    example to deter others from the commission of similar offenses

2    in the future.  An award of punitive damages is discretionary.

3    If you find that the legal requirements for punitive damages

4    are satisfied, then you may decide to award punitive damages,

5    or you decide not to award them.  You should always bear in

6    mind that such extraordinary damages may be aloud only if you

7    should first unanimously award the plaintiff a verdict for

8    compensatory or nominal damages.  In making this decision, you

9    should consider the underlying purpose of punitive damages.

10          Punitive damages are awarded in the jury's discretion

11   to punish a defendant for outrageous conduct or to deter him

12   and others like him from performing similar conduct in the

13   future.  Thus, in deciding whether to award punitive damages,

14   you should consider whether the defendants may be adequately

15   punished by an award of actual damages only, or whether the

16   conduct is so extreme and outrageous that actual damages are

17   inadequate to punish the wrongful conduct.  You should also

18   consider whether actual damages standing alone are likely to

19   deter or prevent the defendants from again performing any

20   wrongful acts that they may have performed, or whether punitive

21   damages are necessary to provide deterrence.  Finally, you

22   should consider whether punitive damages are likely to deter or

23   prevent other persons from performing wrongful acts similar to

24   those the defendants may have committed.

25          If you decide if you decide that punitive damages

D7O6HAW3                      Charge

1    should be awarded in this case, the sum of money to be awarded

2    as punitive damages will be determined in a separate phase of

3    this trial.  In other words, after you render a verdict that,

4    if you do, that plaintiff should receive punitive damages, if

5    you do so, the parties will present additional evidence about

6    the sum of money they think is appropriate.  When they have

7    finished, you will then again retire to the jury room to

8    deliberate and to decide the sum of money that should be

9    awarded to plaintiff as punitive damages.  That is another

10   step.  All you must do at this time, however, when you go back

11   to the jury room, is determine whether the requirements for

12   awarded with punitive damages have been met, and whether, in

13   your discretion, punitive damages should be awarded in this

14   case.

15          Now let's talk about damages under state law.  It is

16   similar to but not in every respect exactly the same as damages

17   under federal law.  If you decide that defendants Gunsett

18   and/or Mazzella have proven by a preponderance of the evidence

19   that plaintiff is liable with respect to one or more of their

20   state law claims -- now we're talking about assault or

21   battery -- then they entitled to recover a sum money which will

22   justly and fairly compensate them for any injury and conscious

23   pain and suffering to date they sustained as a direct

24   consequence of plaintiff's conduct.

25          If you find defendants Gunsett and Mazzella are

1    entitled to a verdict in their favor on either of their

2    counterclaims in accordance with these instructions but do not

3    find that they have sustained substantial or actual damages,

4    then you may return a verdict for defendants' Gunsett and

5    Mazzella in some nominal amount such as one dollar.

6          Punitive damages, again, under state law.  If you find

7    from a preponderance of the evidence in the case that

8    defendants Gunsett or Mazzella are entitled to a verdict for

9    compensatory or nominal damages, and you further find that the

10   act of plaintiff, which proximately caused actual injury or

11   damage to the defendant, was done maliciously or wantonly, then

12   you may, but are not required to, decide to award punitive

13   damages in addition to the compensatory or nominal damages

14   already awarded.  As in considering whether plaintiff should be

15   awarded punitive damages on his claim, in making this decision,

16   you should consider the underlying purpose of punitive damages

17   to, which is to punish a person for outrageous conduct or to

18   deter him and others like him from performing similar conduct

19   in the future.

20         If you decide that punitive damages should be awarded

21   with respect to Defendant Gunsett and/or Defendant Mazzella,

22   the sum of money to be awarded as punitive damages will again

23   will be determined in a separate phase of this trial, after

24   which the parties will present evidence about the amount of

25   punitive damage that should be awarded and after which you will

1   deliberate and decide the amount of money to award.  Second

2   stage for punitive damages as we discussed before.  All you

3   must decide at this time or must determine at this time is

4   whether the requirements for awarding punitive damages have

5   been met, and whether, in your discretion, punitive damages

6   should be awarded in this case.

7              Now, ladies and gentlemen, you are about to go into

8   the jury room and begin your deliberations.  Before you do go,

9   I will just talk to the lawyers for 30 seconds and then I will

10  come back and we'll let you go.  All of the exhibits will be

11  given to you at the start of deliberations.  I think in your

12  case the lawyers have done at least two binders, each of which

13  is the a duplicate of the other and has all the others of both

14  sides.  If you want any of the testimony read, you may also

15  request that, but please remember that we do not have

16  necessarily daily written transcripts available.  So if you do

17  ask for testimony, the court reporter must search through his

18  or her notes and the lawyers must agree on what portions of the

19  testimony may be called for.  If they disagree, I need to

20  resolve those disagreements.  So that can be a time-consuming

21  process and so please try and be as specific as you possibly

22  can in requesting the portions of the testimony if, in fact,

23  you do so.

24             Your request for testimony and in fact any

25  communication with me with the Court once you start your

1   deliberations, should be made in writing in a note.  You will

2   have a pad back there -- signed by the foreperson -- and given

3   to one of the marshals who will be outside the door of the jury

4   room.  We'll talk about foreperson in a minute.  In any event,

5   do not tell me or anyone else at that time how the jury stands

6   on any issue until after a verdict is reached.

7          We're going to get to foreperson in a moment.  Let me

8   talk about the verdict first.  The most important part of this

9   case, members of the jury, is the part that you as jurors are

10  now about to play as you deliberate on the issues of fact.  It

11  is for you, and you alone, to decide whether the plaintiff or

12  defendants Gunsett and Mazzella have sustained their burden of

13  proof as I have explained it to you with respect to each

14  element of their respective claims.  If you find that plaintiff

15  has succeeded in proving his excessive force claim, you should

16  return a verdict in his favor.  If you find that the plaintiff

17  has failed to sustain his burden on any element of his

18  excessive force claim, you should return a verdict in favor of

19  defendants.

20         If you find if a defendants Gunsett and Mazzella have

21  sustained their burden of proof with respect to any of their

22  counterclaims, you should return a verdict in their favor on

23  that counterclaim.  If you should find that the defendant

24  Gunsett and Mazzella failed to sustain their burden on any

25  element of any counterclaim, you should return a verdict in

1    favor of plaintiff on that counterclaim.

2            I know you will try the issues that have been

3    presented to you according to the oath that you have taken as

4    jurors and that oath you promise that you would well and truly

5    try the issues in this case and a true verdict render.  It is

6    your duty as jurors to consult with on another and deliberate

7    with a view to reaching an agreement.  Each of you must decide

8    the case for yourself, but you should do so only after a

9    consideration of the case with your fellow jurors and you

10   should not hesitate to change an opinion when convinced that is

11   it erroneous.  Every juror should be heard.  No one juror

12   should hold the center stage in the jury room and no one juror

13   should control or monopolize the deliberations.

14           Your verdict must be unanimous, but you are not bound

15   to surrender your honest convictions concerning the affect or

16   weight of the evidence for the here purpose of returning a

17   verdict or solely because of the opinion of others jurors.

18   Discuss and weigh your respective opinions dispassionately

19   without regard to sympathy, without regard to prejudice or

20   favor for either party, either side, and adopt that conclusion

21   which in your good conscience appears to be in accordance with

22   the truth.

23           We talked about foreperson a minute ago.  Your

24    foreperson will preside over the deliberations and speak for

25   you the jury in open court.

D7OHHAW4                              Charge

 1          THE COURT:  The foreperson, though, has no greater

 2     voice or authority than any other juror.  The foreperson will

 3     send out notes and when the jury has reached a verdict, he or

 4     she will notify the marshal via a jury note that a verdict has

 5     been reached.

 6          I am going to ask you as the first order of business

 7     when you go back into the jury room is to select your

 8     foreperson.  The first juror, the last juror or any juror in

 9     between.  It is entirely up to you.  But as soon as you have

10     done that, please send me a note, signed by the foreperson,

11     whoever that turns out to be, that so-and-so has been selected

12     the jury foreperson.  Do that first, if you would.

13          I am also going to give you a verdict sheet or form to

14     be filled in by the jury.  We have heard some discussion about

15     that.  That form, the purpose of that form and the questions on

16     the form is to help us -- that is to say, me, the court, and

17     the counsel for the plaintiff and the defendants -- to

18     understand what your findings are.  I am going to hand this

19     form, which contains a set of questions, to Christine and she

20     will give it to you so that you may record the decision of the

21     jury with respect to each question.

22          No inference is to be drawn from the way the questions

23     are worded as to what the answer should be.  The questions are

24     not to be taken as any indication that I have any opinion as to

25     how you should answer them.  I have no such opinion and, as I

1    said before, even if I did, it would not be binding on you.

2            Before the jury attempts to answer any question, it is

3    my strong recommendation that you read the entire set of

4    questions and make sure that everybody understands each

5    question.  So we have claims by plaintiff against defendants.

6    We also have claims by two defendants against plaintiff.  So

7    there are questions related to each of those claims and there

8    are questions related to damages pertaining, if any, to each of

9    those claims.  So I think you should, as I say, read the whole

10   form, understand it, before you start to fill it out or fill it

11   in.

12            You will find at the end there is a place for

13   everybody's signature as jurors and for the date.

14            Before you answer the questions, you should deliberate

15   in the jury room and discuss the evidence that relates to the

16   questions that you have to answer.  When you have considered

17   the questions thoroughly, and the evidence that relates to

18   those questions, then record the answers to the questions on

19   the form that I give you.  Remember, all answers must be

20   unanimous.  And the verdict sheet has to be signed by all the

21   jurors.

22            So finally -- my closing comment -- I say this not

23   because I think it is necessary but because it is the custom in

24   this court.  Treat each other with courtesy and respect during

25   your deliberations, as I know you will do.  After you have

1    reached a verdict, your foreperson will fill in the verdict

2    sheet that will be given to you, sign it and date it and advise

3    the marshal outside your door that you are ready to return to

4    the courtroom with a verdict.

5             I stress that you should be in agreement with the

6    verdict which is announced in court.  Once a verdict is

7    announced by the foreperson in open court and officially

8    recorded, it cannot ordinarily be revoked.

9             All litigants stand equal in this courtroom.  All

10   litigants stand equal before the bar of justice.  All litigants

11   stand equal before you.  Your duty is to decide between these

12   parties fairly, between and among these parties fairly and

13   impartially, to see that justice is done, all in accordance

14   with your oath as jurors.

15            I thank you for your time and attentiveness up until

16   now.  We have moved along pretty nicely, I think.  If you just

17   remain seated for one more minute while I talk to the lawyers

18   outside just for a minute or less and then we will ask you to

19   follow the marshal.  We will swear in the marshal and then ask

20   him to lead you to the jury room.

21            (Jury not present)

22            THE COURT:  We always ask after the instructions are

23   read if anybody has any objection to the way they were read as

24   opposed to the substantive instructions which were the

25   discussion of our charge conference.

D7OHHAW4                          Charge

1              MS. KIM:  No.

2              MR. NOVICH:  No, your Honor.

3              THE COURT:  So we are going to give the case to the

4    jury, swear in the marshal, and if you are going to go to lunch

5    or whatever -- they have their lunch probably sitting on the

6    table back there.  As long as you tell Christine how we can

7    reach you in case we get a note or cell phone or whatever.

8              MR. NOVICH:  My cell phone is checked in downstairs.

9    So what I was going to do is go to the cafeteria.

10             THE COURT:  Eighth floor.

11             MR. NOVICH:  I could just come right back if that is

12   easier.

13             THE COURT:  If you don't mind.  That's fine.

14             I don't think we have another case, do we?

15             THE DEPUTY CLERK:  We don't.

16             MS. KIM:  I will leave you my cell phone number.

17             (Jury present)

18             THE COURT:  We will ask the court officer to please

19   come forward and Christine will swear you in.

20             (Marshal sworn)

21             THE COURT:  Just one more comment.  I mentioned it

22   before.  You are certainly welcome to take your notes back

23   there.  But remember, the notes are not evidence.  They are

24   just your notes maybe to refresh an individual's recollection,

25   but they are not evidence in the case.

D7OHHAW4                           Charge

1              Great job so far.  I think your lunch will be there

2        when you get there.

3                   (At 1:07 p.m., the jury retired to deliberate)

4                   THE COURT:  OK.  Whatever you want to do, we will get

5        ahold of if we hear something from the jury.

6                   MR. NOVICH:  Thank you, your Honor.

7                   MS. KIM:  Thank you, your Honor.

8                   THE COURT:  Thanks very much.

9                   (Luncheon recess)

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                A F T E R N O O N   S E S S I O N

 2         THE COURT:  Two things.  First is I want to put on the

 3   record what is called juror note No. 1, which indicates -- yes,

 4   it is juror note No. 1, but it also indicates that juror No. 1

 5   is the foreperson.  That would be Mr. Holodak.  I mentioned it

 6   to counsel earlier but I wanted to make sure the record

 7   reflected it, and I will make their note a court exhibit.

 8         The other thing is that I would like to send the jury

 9   a note, which you all have in front of you, saying that we

10   usually end deliberations at 4:45, and it is now 4:25, and then

11   pick up the next day promptly at 9:30 a.m.  I included a

12   sentence in there:  Is that agreeable with you?

13         MR. NOVICH:  Just a small little thing, Judge.  Where

14   you say is that agreeable to you?

15         THE COURT:  Did I not?

16         MR. NOVICH:  I think it says is the agreeable to you.

17         THE COURT:  I will make it that.  Good catch.

18         Is that OK, though, to send that note with that

19   correction?

20         MS. KIM:  Yes.

21         THE COURT:  Is that all right with you, Mr. Novich?

22         MR. NOVICH:  Yes, Judge.

23         THE COURT:  We also filled up two pitchers of water

24   for the jury through the marshal.

25         MR. NOVICH:  Judge, can we impose on Christine maybe

1  to get us some more too, or somebody.

2          THE COURT:  Water?

3          MR. NOVICH:  Yes.  Because I think we are all out.

4          THE COURT:  When Jackie comes back with those, we will

5  ask her to help you out.

6          MR. NOVICH:  Thank you very much.

7          (Pause)

8          THE COURT:  So the jury responded saying that:  We

9  have made good progress on our deliberations and feel that we

10  are ready to break for the day.  We will return tomorrow to

11  continue deliberations at 9:30.

12          I am going to call them in anyway and give them my

13  usual instructions about conduct between now and then.  So

14  let's do that.

15          (Jury present; time noted 4:38 p.m.)

16          THE COURT:  So I have got your note back in response

17  to mine which indicated that you are ready to break for today

18  and that you would be back in the jury room by 9:30 tomorrow to

19  resume deliberations, and that works just fine.  We will have

20  coffee and tea for you in the morning.  But I just wanted to

21  call you out to remind you of the instructions that I normally

22  give when we break for the day.

23          The first is, please don't deliberate between now and

24  tomorrow at 9:30.  Jurors deliberate when everybody is in the

25  room together at the same time.  That would mean all eight of

D7OHHAW4                          Charge

1   you.

2            Second, please don't speak with anyone else about the

3   case or anyone who has anything to do with the case, and

4   speaking in the broadest possible sense, internet, social

5   media, phone, and of course person to person.

6            Third, don't stay in the presence of others who might

7   talk to you about the case unless you are all in the jury room

8   deliberating.  And if someone should try and talk to you about

9   the case, please advise Christine or myself.

10           Fourth, please don't read any stories or TV or radio

11  stories or listen to or view them about the case, assuming

12  there were any.  And last, please don't do any research about

13  the case on your own.

14           I would appreciate if you could leave your notes

15  behind in the jury room with whatever materials.  We will

16  safeguard the jury room and we will have it unlocked for you

17  first thing in the morning when you get back.  So great job.

18  Thanks very much and we will see you tomorrow.

19           (Jury excused; time noted 4:40 p.m.)

20           THE COURT:  So if you all could be here tomorrow at

21  9:15.  The plan would be that they will show up and once they

22  are all together, there is no need for me to call them out.

23  Presumably that would be around 9:30 and they would just

24  continue their deliberations.

25           I don't know what to anticipate first thing tomorrow

D7OHHAW4                          Charge

1    morning, but that is the schedule.

2              Thanks, everybody.  We will see you all tomorrow.

3              (Trial adjourned to July 25, 2013 at 9:30 a.m.)